UNITED STATES DISTRICT COURT
OF THE DISTRICT OF COLUMBIA

CIVIL DIVISION

Pat Cason-Merendo and
Jeffrey A. Suhre,                                    :
                                                     :
            Plaintiffs,                              :
                                                     :
    vs.                                              :
                                                     :  Case Pending in the U.S. District Court
Detroit Medical Center,                              :  for the Eastern District of Michigan,
Henry Ford Health System,                            :  Southern Division
Mount Clemens General Hospital, Inc.,                :  Case No.:  2:06 cv 15601
St. John Health, Oakwood Healthcare, Inc.,           :  Hon. Gerald E. Rosen
Bon Secours Cottage Health Services, William         :  Magistrate: Honorable Donald A. Scheer
Beaumont Hospital and Trinity Health Corp,           :
                                                     :  Miscellaneous No. _____
            Defendants.                              :
                                                     :
                                                     :
                                                     :

## DEFENDANT OAKWOOD HEALTHCARE, INC.'S MOTION FOR ORDER COMPELLING PRODUCTION OF DOCUMENTS IN COMPLIANCE WITH RULE 45 SUBPOENA

Pursuant to Rule 45(c)(2)(B)(i) of the Federal Rules of Civil Procedure, Defendant

Oakwood Healthcare, Inc. ("Oakwood"), a Southeastern Michigan hospital system and a

defendant along with seven other Southeastern Michigan hospital systems in *Pat Cason-*

*Merendo and Jeffrey A. Suhre v. Detroit Medical Center et al.*, No. 2:06 cv 15601 (E.D. Mich.),

an antitrust class action alleging a conspiracy to fix and suppress the wages of registered nurses,

through its counsel, moves for an order compelling the Service Employees International Union

("SEIU"), a non-party, to produce documents in compliance with a subpoena served on

September 14, 2007 (the "Subpoena").

The grounds for relief are set forth in the accompanying Memorandum In Support Of Motion To Compel Production Of Documents In Compliance With Rule 45(c) of the Federal Rules of Civil Procedure.

Pursuant to LCvR 7(m), counsel for Oakwood and the SEIU conferred by telephone on October 25, 2007, in an attempt to narrow the areas of disagreement. On October 29, 2007 Oakwood submitted a proposal to the SEIU to limit the search for hard copy documents and electronic files responsive to certain of the Subpoena's requests. Nonetheless, the SEIU has not agreed to comply with the Subpoena as modified by Oakwood's October 29, 2007 proposal. Accordingly, it is necessary to file this Motion.

WHEREFORE Defendant Oakwood respectfully requests that this Court enter an order requiring the SEIU to produce the documents requested in the Subpoena.

Respectfully submitted,

Dated: November 7, 2007          DYKEMA GOSSETT PLLC

By: _Howard E. O'Leary_

Howard E. O'Leary, Jr.
DC Bar No. 15664
Howard Iwrey
1300 I Street, NW, Suite 300
Washington, DC 20005
hiwrey@dykema.com
holeary@dykema.com
(202) 906-8601
*Attorneys For Defendant,*
**Oakwood Healthcare Inc.**

DC01\126969.1
ID\HEO

UNITED STATES DISTRICT COURT
OF THE DISTRICT OF COLUMBIA

CIVIL DIVISION

Pat Cason-Merendo and                         :
Jeffrey A. Suhre,                             :
                                              :
            Plaintiffs,                        :
                                              :
      vs.                                     :
                                              :   Case Pending in the U.S. District Court
Detroit Medical Center,                       :   for the Eastern District of Michigan,
Henry Ford Health System,                     :   Southern Division
Mount Clemens General Hospital, Inc.,         :   Case No.:  2:06 cv 15601 (E.D. Mich.)
St. John Health, Oakwood Healthcare, Inc.,    :   Hon. Gerald E. Rosen
Bon Secours Cottage Health Services, William  :   Magistrate: Honorable Donald A. Scheer
Beaumont Hospital and Trinity Health Corp,    :
                                              :   Miscellaneous No._____
            Defendants.                        :
                                              :
                                              :
                                              :
                                              :

**MEMORANDUM IN SUPPORT OF *MOTION TO COMPEL*
PRODUCTION OF DOCUMENTS IN COMPLIANCE
<u>WITH RULE 45(c) OF THE FEDERAL RULES OF CIVIL PROCEDURE</u>**

## TABLE OF CONTENTS

**PAGE**

Table of Authorities ................................................................................................ ii

I.      INTRODUCTION ..........................................................................................1

II.     STATEMENT OF FACTS ...............................................................................2

        A.      Introduction.........................................................................................2

        B.      The SEIU's Subsidization Of The Five Pending
                Nurse Wage Antitrust Class Actions ........................................................3

                1.      The SEIU's Pre-Litigation Support
                        Of The Nurse Wage Antitrust Class Actions..................................3

                2.      The SEIU's Continuing Subsidization Of
                        The Five Pending Nurse Antitrust Class Actions .........................6

        C.      Documents Requested By the Subpoena ...................................................7

III.    LEGAL ARGUMENT....................................................................................8

        A.      The Documents and Information Sought Are Relevant
                To One of the Prerequisites For Class Certification,
                Namely, Adequacy Of Representation ....................................................8

        B.      The Subpoena Is Not Overly Broad Or Unduly Burdensome ...............10

        C.      Under The Protective Order In This Action, Documents Designated
                As Confidential Or Highly Confidential May Only Be Used For
                Purposes Of Conducting This Litigation ...............................................12

IV.     CONCLUSION...........................................................................................13

<u>**TABLE OF AUTHORITIES**</u>

**PAGE(S)**

**CASES**

*General Tel. Co. v. Falcon,*
    457 U.S. 147 (1982) ....................................................................................................8

*In re American Med. Sys., Inc.,*
    75 F.3d 1069 (6th Cir. 1996) .......................................................................................8

*In re Radio Corp. of America,*
    13 F.R.D. 167 (S.D.N.Y. 1952).................................................................................11

*Kamean v. Local 363,*
    109 F.R.D. 391 (S.D.N.Y. 1986),
    *appeal dismissed,* 833 F.2d 1002 (2d Cir. 1986),
    *cert. denied,* 481 U.S. 1024 (1987) ...........................................................................9

*Linder v. Dep't of Defense,*
    133 F.3d 17 (D.C. Cir. 1998) .....................................................................................10

*Martinez v. Barasch,*
    No. 01-2289, 2004 WL 1367445 (S.D.N.Y. June 16, 2004)........................................9

*Smith v. Babcock,*
    19 F.3d 257 (6th Cir. 1994).........................................................................................9

*United States v. Int'l Business Machine Corp.,*
    83 F.R.D. 97 (S.D.N.Y. 1979)..............................................................................10, 11

*Wiwa v. Royal Dutch Petroleum Co.,*
    392 F.3d 812 (5th Cir. 2004) ......................................................................................10

**OTHER AUTHORITIES**

Fed. R. Civ. P. 45(c) ............................................................................................................1

Fed. R. Civ. P. 23(a) ............................................................................................................8

## I. INTRODUCTION

Oakwood Healthcare, Inc. ("Oakwood"), a Southeastern Michigan hospital system and a defendant along with seven other Southeastern Michigan hospital systems in *Pat Cason-Merendo and Jeffrey A. Suhre v. Detroit Medical Center et al.*, an antitrust class action alleging a conspiracy to fix and suppress the wages of registered nurses, moves for an order compelling the Service Employees International Union ("SEIU"), a non-party, to produce documents in compliance with a Rule 45(c) subpoena (the "Subpoena").[1] The narrowly-crafted subpoena seeks documents relating to class actions, like this case, which the SEIU has subsidized since January 1, 2000.

The SEIU is attempting to protect the disclosure of documents under the purported objection that the Subpoena is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence in this action, and that compliance would require disclosure of some form of trade secret information pertaining to the goals, plans and strategies for organizing employees of defendants in class actions in which the SEIU has had a funding relationship with the named plaintiffs' counsel.[2]

In compliance with LCvR 7(m), Counsel for Oakwood and the SEIU conferred by telephone on October 25, 2007, in an attempt to narrow the areas of disagreement. On October 29, 2007, Oakwood submitted a proposal to the SEIU to limit the search for hard copy documents and electronic files responsive to Requests Nos. 3 and 4 of the Subpoena.[3] Unfortunately, the SEIU has refused to comply with the Subpoena as modified by Oakwood's

---

[1] Attached as Exhibit 1 is a copy of the Subpoena.

[2] A copy of the letter from Robert M. Weinberg and Matthew Clash-Drexler to Howard E. O'Leary (Oct. 16, 2007), setting forth the SEIU's objections, is attached as Exhibit 2.

[3] A copy of the letter from Howard E. O'Leary to Matthew Clash-Drexler (Oct. 29, 2007), setting forth Oakwood's proposal, is attached as Exhibit 3.

proposal. For the reasons set forth below, Oakwood is entitled to the discovery sought in the

Subpoena, as modified by Exhibit 3, its October 29, 2007 proposal.

## II. STATEMENT OF FACTS

### A. Introduction

This action, *Pat Cason-Merendo and Jeffrey A. Suhre v. Detroit Medical Center, et al.*, is

one of five similar nurse wage antitrust class actions filed in Albany, New York, Chicago,

Illinois, Detroit, Michigan, Memphis, Tennessee and San Antonio, Texas brought by the same

counsel and subsidized by the SEIU.[4]

Oakwood seeks to discover evidence relevant to class certification, and specifically has a

right bearing upon the adequacy of counsel (including their various alliances) as well as whether

a conflict exists between the interest of Plaintiffs and absent class members. Notably, none of

the registered nurses at any of the Defendant hospital systems in any of the five pending nurse

compensation antitrust class actions are currently organized and represented by the SEIU. Yet,

the SEIU is paying some of the legal fees and the costs for the Plaintiffs in all of those cases.

Why is the SEIU interested in recovering alleged damages for non-dues paying, non-member

nurses? Defendants are entitled to broad discovery to establish that the SEIU hopes to use these

cases as a tactical weapon in a broader arsenal to press/persuade Defendants and others to

"partner" or enter into a "strategic alliance" with the union.[5] Defendants are entitled to discovery

---

[4] Four of these actions, *Unger v. Albany Med. Ctr.*, No. 06-765 (N.D.N.Y.), *Reed v. Advocate Health Care*, No 06-3337 (N.D. Ill.), *Clarke v. Baptist Mem'l Healthcare Corp.*, No. 06-02377 (W.D. Tenn.), and *Madernzo v. VHS San Antonio Partners, L.P.*, No. 06-535 (W.D. Tex.), were all filed on June 20, 2006. The Detroit action was filed on December 15, 2006.

[5] In this context "Partnering" means entering into neutrality and card check agreements with the SEIU or a union with which it is engaged in a joint organizing campaign. In the typical neutrality/card check agreement, the employer agrees not to campaign against the union, grants the union access to the employer's premises during working hours, gives the union the names and addresses of its employees comprising the putative collective bargaining unit and agrees to recognize the union if it can obtain signature cards from 51 percent of the putative collective bargaining unit members. Such agreements waive the employer's right (and its employees' right) to have an NLRB–supervised, secret-ballot election and greatly enhance the prospects of unionization.

of the motives and incentives behind this litigation and to explore the adequacy of counsel given

their clear affiliation with the SEIU and to explore the potential conflict with absent class

members, who may prefer to remain non-union or join a competing union, such as the United

Auto Workers ("UAW"),[6] the Office and Professional Employees International Union

("OPEIU") or the California Nurses Association.

Defendants already have some information to demonstrate that the SEIU's support of

these class actions are part of a broader effort to organize nurses.  For example, the SEIU has

previously tried to organize the nurses at Oakwood's Annapolis Hospital through the NLRB-

supervised, secret ballot election process without success.  On March 5, 2001 and again on

March 22, 2002, SEIU Local 79 filed petitions with the NLRB seeking elections among the

nurses at Annapolis.  In both instances, the petitions were withdrawn prior to any election.  In the

initial instance, the SEIU withdrew its election petition.[7]

### B. The SEIU's Subsidization Of
### The Five Pending Nurse Wage Antitrust Class Actions

#### 1.  The SEIU's Pre-Litigation Support Of The Nurse Wage Antitrust Class Actions

While not technically a party to any of the five nurse wage class actions, the SEIU has

been the driving force behind all of them.  By its own admission, the SEIU played "a critical

role" in the genesis of the litigation, retaining economists, researchers, investigators and a law

---

[6] On December 21, 2001, the UAW filed a petition with the National Labor Relations Board ("NLRB") seeking an election among the nurses at Oakwood's Heritage Hospital. *See* Exhibit 4, NLRB Petition, 7-RC-22141 (Dec. 21, 2001).

[7] *See* Exhibit 5, NLRB Petition, No. 7-RC-21970 (filed Mar. 5, 2001); Letter from Ms. Leola Banks, Organizer, Local 79, SEIU, to Annapolis Registered Nurse (June 1, 2001); Letter from William C. Schaub, Jr., Regional Director, NLRB to William Thacker, Esq. And Ronald Santo (May 31, 2001); Letter from Tom Kochis, Chief Administrative Officer, and Kathy Cronin, Registered Nurse and Director, Patient Care Services, Oakwood Annapolis Hospital, to Professional Registered Nurse (March 26, 2002); Letter from William C. Schaub, Jr., Regional Director, NLRB to William M. Thacker, Esq. and Ms. Leola Banks, Organizer, Local 79; SEIU (Mar. 28, 2002).

firm to build these purported cases long before any actual plaintiff was identified. *See* Exhibit 6, Declaration of Mary Joyce Carlson ("Carlson Decl.") ¶ 12 (Oct. 4, 2006).

Specifically, in 2004, (before any of the five cases were filed or any of the plaintiffs in such actions had even engaged counsel), the SEIU retained Dr. Barbara Bergmann, a retired economics professor, and the law firm of James & Hoffman ("J&H") to investigate whether hospital collusion on wages was the cause of the long term nursing shortage. *Id.* ¶ 13. In April 2005, the SEIU retained the Farber Group, a group of economists, through J&H, then, SEIU's counsel, and, later, counsel for the Plaintiffs in each of the five pending nurse wage antitrust class actions, to provide support for such litigation. *See* Exhibit 7, Revised Declaration of Mary Joyce Carlson ("Revised Carlson Decl") ¶¶ 8-9, 11 (July 13, 2007). In approximately August 2005, the SEIU retained the Feldman Group, a Washington, DC, polling firm, to develop a questionnaire for a telephone poll of hospital nurses in 24 markets in the United States.[8] In August 2005, a telephone bank of SEIU Local 1199 used the Feldman Group's questionnaire to make telephone calls to over 9,000 hospital nurses to ascertain, among other things, whether the nurses had reason to believe that their hospital management was sharing wage information with other hospitals. During such calls, the SEIU employees identified themselves as representatives of "National Opinion Surveys," a fictitious entity, and did not disclose their SEIU affiliation.[9]

During late August and early September 2005, an SEIU Field Research Team comprised of SEIU employees traveled to various cities to interview hospital Human Resources employees, hospital Nurse Recruiters, hospital trade association employees and Deans of Nursing schools either in person or by telephone to get any "dirt" on hospital collusion involving nurses wages.[10]

---

[8] *See* Exhibit 8, Memorandum from Diane Feldman and Ruth Steinmetz, The Feldman Group, Inc., to Mike Kapsa and Elizabeth Buchannan (Oct. 21, 2005); SEIU-DET 03936-44.

[9] *See* Exhibit 9, Final Questionnaire, SEIU Nurse Survey (Aug. 4, 2005); SEIU-DET 01043-52.

[10] *See* Exhibit 10, Email from Jamie Cohen to Stacey Kelly; Subject: Field Research Team (Aug. 29,

Once again the SEIU researchers did not reveal their true affiliation during these contacts, but represented themselves as "researcher[s] working with Professor Barbara Bergmann of American University in Washington DC, who is working on an economic study of the nurse shortage and the related issue of nurse wages."[11]

In October 2005, the SEIU retained the Mintz Group, a private investigative firm, to find retired nurse administrators, who – as Dr. Bergmann put it – would "rat" on the hospitals.[12]    Dr. Bergmann speculated that the SEIU "spent what must've been hundreds of thousands for a premier detective agency to assemble evidence for these cases."[13]  The Mintz Group billed SEIU and/or J&H in excess of $250,000 and $150,000 for services performed in 2005 and 2006 on the nurse pay matter, respectively.[14]

On January 30, 2006, J&H provided a memorandum to the SEIU entitled "Advice To SEIU Organizers On Referring Nurses To Counsel" along with a "Sign-Up Sheet For Further Information" to be signed by nurses interested in exploring their legal rights and faxed back to

---

2005); SEIU-MEM 00121.

[11] *See* Exhibit 11, Email from Arne Anderson to Stacey Kelly, Subject:  Script (Aug. 18, 2005); SEIU-DET 01970.

[12] *See* Exhibit 12, Email from Barbara Bergmann to Charles Lieb, subject:  nurses antitrust suits (July 28, 2006); Bergmann-CH 0399.

[13] *See* Exhibit 13, Email from Barbara Bergmann to BeverlyC@pipeline.com, subject:  nurses antitrust suits (Aug. 16, 2006); Bergmann-CH 0444.

[14] *See* Exhibit 14, Letter from James Mintz, James Mintz Group, to Mary Joyce Carlson, Esq., SEIU (Nov. 17, 2005) and letters from James Mintz, James Mintz Group, to David P. Dean, Esq., James & Hoffman, dated December 13, 2005, January 31, 2006, and February 24, 2006, and enclosed invoices in Nurse Pay matter; SEIU-DET 00952-01003.

J&H.[15] The memorandum provides SEIU organizers with advice on "how best to refer nurses to counsel, if those nurses suspect they may have been victims of hospital collusion on wages."[16]

Thus, the SEIU effectively retained and paid for the efforts of Dr. Bergmann, J&H, the Farber Group, the Feldman Group, the SEIU Field Research Team and the Mintz Group in the investigation preceding the filing of the nurse wage antitrust class action complaints in June 2006.

In short, the SEIU, while not technically a party, has been the driving force behind all five of these nurse wage antitrust class actions. The SEIU was responsible for finding potential plaintiffs for the cases.

> 2.   The SEIU's Continuing Subsidization Of
>       The Five Pending Nurse Antitrust Class Actions

The SEIU continues to subsidize all five nurse wage antitrust class actions by paying J&H's legal fees at a reduced hourly rate plus expenses.

On October 31, 2006, the SEIU and J&H signed a letter agreement memorializing the funding relationship for the nurse wage antitrust litigation. The agreement provides that the SEIU will fund the litigation through the payment of partial hourly fees and costs and that the SEIU shall be compensated for such funding and the risk involved with a fee premium as follows:

> By signing this letter of understanding below, your firm agrees to the following: first, your office agrees that the [SEIU Legal Defense] Fund will be paid out of any recovery obtained for your firm (whether in costs or fees award) for all monies advanced before any further distribution of fees and costs awards to your firm. Second, to the extent permitted by any applicable laws and rules of professional conduct, your firm agrees to share any fee recovery allocated to the hours worked by your firm which is above and beyond the amounts advanced by

---

[15] *See* Exhibit 15, Facsimile from Mary Joyce Carlson, James & Hoffman to Jamie Cohen, SEIU Nurse Alliance (Jan. 30, 2006) and enclosures: Advice To SEIU Organizers On Referring Nurses To Counsel and Sign-Up Sheet For Further Information; SEIU-DET 01110-13.

[16] *Id.* at 2; SEIU-DET 01111.

> SEIU or the Fund in the following manner. After payment to the Fund of the
> costs and fees advanced in connection with the litigation, if any additional
> amounts attributable to fees and costs remain, the amounts will be distributed as
> follows: 75% will be retained by your firm, with the remaining 25% returned to
> the Fund.

*See* Exhibit 16, Letter from Norman M. Gleichman, Deputy General Counsel, SEIU, to David P.

Dean, Esq., James & Hoffman (June 5, 2007) (footnote omitted), SEIU-DET 02628-29.

The SEIU's Form LM-2s, Labor Organization Annual Reports, reflect that the union paid

J&H a total of $756,421 for legal services and consulting in CY 2005 and $2,067,394 for legal

services and expenses in CY 2006.[17]

C. Documents Requested By the Subpoena

The Subpoena, Request No. 1, calls for the production of copies of class action and/or

collective action complaints of any kind in which the SEIU has, or had, a funding relationship

with any of the named plaintiffs' counsel relating to legal fees, costs and/or expenses during the

period from January 1, 2000 until the present.

Requests No.'s 2 through 4 are limited to certain documents in the SEIU's possession

relating to the defendants in SEIU-subsidized class actions. Request No. 2 seeks copies of

voluntary recognition agreements, neutrality agreements and/or card check agreements with

defendants in SEIU-subsidized class actions, while Request No. 3 seeks documents concerning

communications with such defendants relating to such agreements or possible agreements. The

final request, Request No. 4, seeks documents concerning SEIU attempts, efforts or plans to seek

such agreements with defendants in any such SEIU-subsidized class actions.

After conferring with SEIU counsel, Oakwood offered to limit the search for hard copy

documents and electronic files responsive to Requests Nos. 3 and 4, as follows:

---

[17] *See* Exhibits 17 and 18, excerpts of SEIU's Form LM-2s, Labor Organization Annual Reports for CYs
2005 and 2006.

1.    The SEIU will comply with Request Nos. 1 and 2 of the Subpoena;

2.    The SEIU will provide a Declaration listing the names of any defendants in any SEIU Subsidized Class Action during the period from January 1, 2000 until present from which it attempted and/or planned to obtain any voluntary recognition agreement, neutrality agreement and/or card check agreement during the same time period. The Declaration will also identify, by defendant, the names, office addresses and positions of the SEIU personnel principally involved in the attempt, plan and/or effort to obtain any such Recognition Agreement from each such defendant.

3.    Based upon the above disclosures, Oakwood will identify five SEIU employees for each defendant listed in the Declaration, who will have their hard copy and electronic files searched. The SEIU will search the five SEIU employees' files and produce documents responsive to Request Nos. 3 and 4 of the Subpoena.

4.    Oakwood agrees not to request searches of additional SEIU employees' hard copy and electronic files for documents responsive to Requests Nos. 3 and 4 except for good cause.

*See* Exhibit 3 at 2.

III.   LEGAL ARGUMENT

A.   The Documents and Information Sought Are Relevant To One of the Prerequisites For Class Certification, Namely, Adequacy Of Representation

Rule 23(a) of the Federal Rules of Civil Procedure lists four prerequisites for class

certification:  (1) the class is so numerous that joinder is impracticable, (2) there are questions of

law or fact common to the class, (3) the claims or defenses of the representative parties are

typical of the claims or the defenses of the class, and (4) the representative parties will fairly and

adequately protect the interest of the class.  Plaintiffs bear the burden of establishing each of the

requirements of Rule 23.  *General Tel. Co. v. Falcon*, 457 U.S. 147, 161 (1982); *In re American*

*Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996).

Adequacy of representation is measured by two standards.  First, class counsel must be

qualified, experienced and generally able to conduct the litigation.  Second, the class members

must not have interests that are antagonistic to one another. *Smith v. Babcock*, 19 F.3d 257, 265, n.13 (6th Cir. 1994).

To satisfy the adequacy requirement, the named Plaintiffs must demonstrate, among other things, that neither they, nor their attorneys are subject to extraneous influences that would create a conflict. Sources of potential conflict are not confined to pecuniary interests. Lawsuits fueled by an ulterior motive unrelated to the claims alleged in the complaint may also prevent class certification. *Martinez v. Barasch*, No. 01-2289, 2004 WL 1367445, at *4 (S.D.N.Y. June 16, 2004) (denying class certification because plaintiffs were pawns in a battle between rival unions and, thus, failed to meet adequacy requirements); *Kamean v. Local 363*, 109 F.R.D. 391, 397 (S.D.N.Y. 1986) (denying class certification because of conflicts of interest between plaintiffs and their attorneys, and other class members), *appeal dismissed*, 833 F.2d 1002 (2d Cir. 1986), *cert. denied*, 481 U.S. 1024 (1987).

Oakwood is entitled to broad evidence bearing upon whether the SEIU has an ulterior motive funding the five pending nurse wage antitrust class actions that conflicts with the interest of absent class members. Widespread subsidization of class actions suggests that the SEIU may be using costly litigation as a strategy to exhaust employers[18] resisting unionization and to gain an edge on competing nurse unions by promoting the SEIU brand name. These are goals which are not necessarily consistent with the interests of all class members—particularly those who have no interest in joining the SEIU or another union.

B. The Subpoena Is Not Overly Broad Or Unduly Burdensome

A subpoena "must specify the documents sought with reasonable particularity, because vague or duplicative demands may cause confusion and disarray in responding to the subpoena."

---

[18] All of the defendants in this case, like those in the parallel Chicago and Albany cases, are not-for-profit hospitals or systems. The considerable resources (direct and indirect) they are expending in the defense of this litigation come at the expense of their primary mission – which is the delivery of highest quality health care services

*United States v. Int'l Business Machine Corp. (IBM)*, 83 F.R.D. 97, 107 (S.D.N.Y. 1979). This Subpoena, particularly Requests Nos. 1 and 2, is very specific. Surely, there is nothing difficult or burdensome about producing copies of complaints in class actions and collective actions of all kinds in which the SEIU has, or had, a funding relationship with the named plaintiffs counsel in response to Request No. 1 of the Subpoena.

Similarly, producing copies of any voluntary recognition arguments, neutrality agreements and/or any card check agreements that the SEIU or its affiliates have obtained from any defendant in any such subsidized class action in response to Request No. 2 is neither difficult, nor burdensome.

The SEIU bears the burden of demonstrating that compliance with the Subpoena's remaining requests would be unreasonable and oppressive. *Wiwa v. Royal Dutch Petroleum Co.*, 392 F.3d 812, 818 (5th Cir. 2004). Whether an allegedly burdensome subpoena is reasonable "must be determined according to the facts of the case," such as the party's need for the documents and the nature and importance of the litigation. *Linder v. Dep't of Defense*, 133 F.3d 17, 19 (D.C. Cir. 1998). Requests Nos. 3 and 4 seek documents and electronically stored information ("ESI") essentially on attempts, efforts and plans to obtain voluntary recognition agreements, neutrality agreements and card check agreements from defendants in SEIU subsidized class actions. This information may establish that one of the SEIU's motives is to exhaust the Defendants resources and intimidate non-defendant employers into granting the union neutrality and card check agreements, and, thereby, circumvent the NLRB-supervised, secret ballot election process.

The burden a party or non-party faces is relative to the size of the responding party.[19]

---

to its patients.

[19] *IBM*, 83 F.R.D. at 108.

> Inconvenience is relative to size. Any witness who is subpoenaed
> suffers inconvenience. An individual operating a small business,
> for example, a corporation operated by a sole shareholder, may
> suffer, in like circumstances, more inconvenience than the movant
> with its thousands of employees. But this inconvenience, whether
> suffered by witnesses, grand jurors, or jurors, is part of the price
> we pay to secure the effective administration of justice and the
> enforcement of laws.[20]

The SEIU is clearly capable of complying with this Subpoena, particularly as modified

by Exhibit 3, Oakwood's October 29, 2007 proposal. The SEIU certainly knows which class

action defendants it attempted to organize through requests for voluntary recognition agreements,

neutrality agreements and/or card check agreements. It also knows the identities of the SEIU

employees principally involved in attempting to organize the employees of such defendants.

Oakwood's offer to limit the search for responsive documents to five SEIU employees for each

organizing drive of each defendant in any SEIU subsidized class action eviscerates any credible

argument that the Subpoena, as modified, is unduly burdensome.

The SEIU chose to instigate and partially fund the current litigation, and Defendants

believe that the union is behind other class actions. The SEIU's extensive involvement includes

the retention of economists, lawyers, a polling group and a private investigative firm, as well as

use of a telephone bank, a field research team and its organizers in recruiting plaintiffs. The

decision to sponsor this litigations should subject it to compliance with the Subpoena, as

modified.

C. Under The Protective Order In This Action, Documents
   Designated As Confidential Or Highly Confidential May
   Only Be Used For Purposes Of Conducting This Litigation

The SEIU also objects to the Subpoena on grounds that it calls for the production of

"confidential and proprietary documents for use in matters wholly collateral to the pending

---

[20] *In re Radio Corp. of America,* 13 F.R.D. 167, 172 (S.D.N.Y. 1952).

lawsuits by entities whose interests are adverse or potentially adverse to those of the SEIU."[21]

The SEIU asserts that the Subpoena demands production of documents containing the unions

organizing goals, plans and strategies with respect to employers not involved in the pending

lawsuit and that such information constitutes a trade secret or other confidential research,

development or commercial information.[22]

Given the Protective Order entered in this action, the SEIU need not fear that information

produced in response to the Subpoena will be used for an improper purpose.  The Protective

Order provides:

> Confidential or Highly Confidential Information shall not be used by any
> person, other than the Producing Party, for any purpose other than conducting
> this Litigation, and in no event shall Confidential or Highly Confidential
> Information be used for any business, competitive, personal, private, public,
> organizational or other labor or employee relations purpose.

*See* Exhibit 19, excerpt of Stipulation And Protective Order Governing The Production And

Exchange Of Confidential Information, at 8 ¶ 4 (May 30, 2007).

Indeed, the SEIU has already produced documents in this litigation which have been

designated as "Confidential" and/or "Highly Confidential."

Consequently, the Protective Order obviates the SEIUs objections to this aspect of the

Subpoena.

---

[21] *See* Exhibit 2, at 1.

[22] *Id.* at 2.

IV. <u>Conclusion</u>

Defendant Oakwood respectfully requests that this Court enter an order requiring the SEIU to produce the documents requested in the Subpoena, as modified by its October 29, 2007 proposal.

Dated:  November 7, 2007

Respectfully submitted,

DYKEMA GOSSETT PLLC

By:  _Howard E. O'Leary Jr._

Howard E. O'Leary, Jr.
DC Bar No. 15664
Howard Iwrey
1300 I Street, NW, Suite 300
Washington, DC  20005
holeary@dykema.com
hiwrey@dykema.com
(202) 906-8601
***Attorneys For Defendant***
**Oakwood Healthcare, Inc.**

DC01\127117.1
ID\HEO

-13-

## CERTIFICATE OF SERVICE

I, William M. Jack, hereby certify that on this 7TH day of November, 2007, I served a

copy of Oakwood Healthcare, Inc's Motion to Compel Production of Documents In Compliance

with Rule 45(c) of the Federal Rules of Civil Procedure, Supporting Memorandum of Law and

attached exhibits via electronic mail and first-class mail to counsel for Service Employees

International Union, Matthew Clash-Drexler, Esq., Bredhoff & Kaiser, 805 Fifteenth Street, NW,

Washington, D.C. 20005, and a copy of the foregoing via electronic mail on all counsel of record

and by first-class mail on all Plaintiffs' counsel in *Merendo and Jeffrey A. Suhre v. Detroit*

*Medical Center et al.*, No. 06-15601 (E.D. Mich.).

| VIA ELECTRONIC AND U.S. MAIL | |
|---|---|
| Stephen F. Wasinger<br>STEPHEN F. WASINGER PLC<br>26862 Woodward Avenue, Suite 100<br>Royal Oak, MI 48067-0958<br>Email: *sfw@sfwlaw.com* | Mark A. Griffin<br>Raymond J. Farrow<br>KELLER ROHRBACK<br>1201 Third Avenue, Suite 3200<br>Seattle, WA 98101<br>Email: *mgriffin@kellerrohrback.com,*<br>*rfarrow@kellerrohrback.com* |
| Charles P. Tompkins<br>COHEN, MILSTEIN, HAUSFELD & TOLL,<br>P.L.L.C.<br>1100 New York Avenue, NW<br>West Tower, Suite 500<br>Washington, DC 20005<br>Email: *ctompkins@cmht.com* | David P. Dean<br>JAMES & HOFFMAN<br>1101 17th Street, NW, Suite 510<br>Washington, DC 20036<br>Email: *dpdean@jamhoff.com* |
| **VIA ELECTRONIC MAIL** | |
| Alethea A. Wilson<br>Charles N. Raimi<br>Patricia C. Schabath<br>DETROIT MEDICAL CENTER<br>3990 John R, 7 Brush W.<br>Detroit, MI 48201<br>Email: *awilson4@dmc.org, craimi@dmc.org,*<br>*pschabat@dmc.org* | Kenneth J. McIntyre<br>L. Pahl Zinn<br>DICKINSON WRIGHT PLLC<br>500 Woodward Avenue, Suite 4000<br>Detroit, MI 48226-3425<br>Email: *kmcintyre@dickinsonwright.com,*<br>*pzinn@dickinsonwright.com* |

| | |
|---|---|
| David Marx, Jr.<br>Benjamin J. Hanauer<br>David L. Hanselman, Jr.<br>Stephen Y. Wu<br>MCDERMOTT, WILL & EMERY<br>227 W. Monroe Street<br>Chicago, IL  60606<br>*Email: dmarx@mwe.com,*<br>*bhanauer@mwe.com; dhanselman@mwe.com,*<br>*swu@mwe.com* | Mark S. Wilkinson<br>Terrence J. Miglio<br>Jonathon A. Rabin<br>KELLER THOMA<br>440 E. Congress, 5th Floor<br>Detroit, MI  48226-2918<br>*Email: msw@kellerthoma.com,*<br>*tjm@kellerthoma.com, jar@kellerthoma.com* |
| David A. Ettinger<br>Peter E. Boivin<br>HONIGMAN MILLER SCHWARTZ AND<br>COHN LLP<br>660 Woodward Avenue, Suite 2290<br>Detroit, MI  48226-3506<br>*Email: dettinger@honigman.com,*<br>*pboivin@honigman.com* | Michael J. Bommarito<br>MCLAREN HEALTH CARE<br>G3235 Beecher Road, Suite C<br>Flint, MI  48532-3615<br>*Email: michaelb@mclaren.org* |
| Phillip A. Proger<br>Toby G. Singer<br>Michael R. Shumaker<br>JONES DAY<br>51 Louisiana Avenue, NW<br>Washington, DC  20001-2113<br>*Email: paproger@jonesday.com,*<br>*tgsinger@jonesday.com,*<br>*mrshumaker@jonesday.com* | Thomas M.J. Hathaway<br>CLARK HILL P.L.C.<br>500 Woodward Avenue, Suite 3500<br>Detroit, MI  48226<br>Telephone:  (313) 965-8300<br>Facsimile: (313) 965-8252<br>*Email:  thathaway@clarkhill.com* |
| Arthur N. Lerner<br>Shari Ross Lahlou<br>CROWELL & MORING LLP<br>1001 Pennsyulvania Avenue, NW<br>Washington, DC  20004<br>*Email: alerner@crowell.com,*<br>*slahlou@crowell.com* | Fred K. Herrman<br>KERR, RUSSELL & WEBER, PLC<br>500 Woodward Avenue, Suite 2500<br>Detroit, MI  48226-3406<br>*Email: fkh@krwlaw.com* |
| Margo Weinstein<br>Sandra D. Hauser<br>SONNENSCHEIN NATH & ROSENTHAL<br>LLP<br>1221 Avenue of the Americas<br>New York, NY  10020<br>*Email: mweinstein@sonnenschein.com,*<br>*shauser@sonnenschein.com* | David B. Gunsberg<br>322 N. Old Woodward Avenue, Suite 200<br>Birmingham, MI  48009<br>*Email: davidgunsberg@hotmail.com* |

| Christopher Q. King<br>SONNENSCHEIN NATH & ROSENTHAL<br>LLP<br>7800 Sears Tower<br>233 South Wacker Drive<br>Chicago, IL  60606-6404<br>*Email: cking@sonnenschein.com* | Catherine F. Wenger<br>TRINITY HEALTH<br>27870 Cabot Drive<br>Novi, MI  48337<br>*Email:  wengerc@trinity-health.org* |
| --- | --- |
| Sheldon H. Klein<br>William D. Slowey<br>BUTZEL LONG<br>150 W. Jefferson, Suite 100<br>Detroit, MI  48226-4430<br>*Email:  klein@butzel.com, slowey@butzel.com* | |

William M. Jack

DC01\127117.1
ID\HEO

-3-

# EXHIBIT 1

AO88 (Rev. 12/06) Subpoena in a Civil Case

**Issued by the**

# UNITED STATES DISTRICT COURT

|  |  |
|---|---|
| For The | DISTRICT OF | Columbia |

Pat Cason-Merendo and Jeffrey A.Suhre

V.

Detroit Medical Center, et al

**SUBPOENA IN A CIVIL CASE**

Case Number:[1]  2:06 cv 15601 (E.D. Mich.)

TO:  Service Employees International Union
     1800 Massachussetts AVe., N.W.
     Washington, DC  20036

☐  YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☐  YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|

☒  YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See Attached

| PLACE  Dykema Gossett PLLC | DATE AND TIME |
|---|---|
| 1300 I Street, NW, Suite 300 West, Washington,DC 20005 | 10/5/07  10:00 am |

☐  YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

   Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify.  Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| *Howard E. O'Leary* | 9/14/07 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Howard E. O'Leary, Jr.; Attorney for Defendant Oakwood Healthcare, Inc.
Dykema Gossett PLLC; 1300 I Street, NW, Suite 300 West, Washington, DC  20005; (202) 906-86(

(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

AO88 (Rev. 12/06) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), as amended on December 1, 2006:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection, copying, testing, or sampling of designated electronically stored information, books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection, copying, testing, or sampling may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to producing any or all of the designated materials or inspection of the premises — or to producing electronically stored information in the form or forms requested. If objection is made, the party serving the subpoena shall not be entitled to inspect, copy, test, or sample the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production, inspection, copying, testing, or sampling. Such an order to compel shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection, copying, testing, or sampling commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held;

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject

to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) (A) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(B) If a subpoena does not specify the form or forms for producing electronically stored information, a person responding to a subpoena must produce the information in a form or forms in which the person ordinarily maintains it or in a form or forms that are reasonably usable.

(C) A person responding to a subpoena need not produce the same electronically stored information in more than one form.

(D) A person responding to a subpoena need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or to quash, the person from whom discovery is sought must show that the information sought is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) (A) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial-preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

(B) If information is produced in response to a subpoena that is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has and may not use or disclose the information until the claim is resolved. A receiving party may promptly present the information to the court under seal for a determination of the claim. If the receiving party disclosed the information before being notified, it must take reasonable steps to retrieve it. The person who produced the information must preserve the information until the claim is resolved.

(e) CONTEMPT. Failure of any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena issued. An adequate cause for failure to obey exists when a subpoena purports to require a nonparty to attend or produce at a place not within the limits provided by clause (ii) of subparagraph (c)(3)(A).

## SCHEDULE A -- DOCUMENT REQUESTS

1.      All Complaints, including any Amended Complaints, in any class action and/or collective action, including, but not limited to any collective action brought pursuant to Section 216(b) of the Fair Labor Standards Act, 29 U.S.C. § 216(b), in which the SEIU has, or had, a funding relationship with any of the named plaintiffs' counsel relating to legal fees, costs and/or expenses.

2.      All Documents consisting of, concerning or referring to any agreement relating to the recognition of the SEIU or a labor organization engaged in a joint organizing campaign with the SEIU as the collective bargaining representative of any employees of any defendant in any Complaint identified and/or produced in response to Request No. 1 above, including, but not limited to, any voluntary recognition agreement, card check agreement and/or neutrality agreement.

3.      All Documents consisting of, concerning or referring to any communication between the SEIU and any defendant in any Complaint identified or produced in response to Request No. 1 above, relating to any prospective or possible agreement that might lead to the recognition of the SEIU or a labor organization engaged in a joint organizing campaign with the SEIU as the collective bargaining representative of any of the employees of such defendant, including, but not limited to, any voluntary recognition agreement, card check agreement or neutrality agreement.

4.      All Documents consisting of, concerning or referring to any attempt, effort and/or plan to seek an agreement and/or possible agreement relating to the recognition of the SEIU or a labor organization engaged in a joint organizing campaign with the SEIU as the collective bargaining representative of any employees of any defendant in a Complaint identified or produced in response to Request No. 1 above, including, but not limited to, any voluntary recognition agreement, card check agreement and/or neutrality agreement.

This subpoena is to be responded to in accordance with the following definitions and instructions.

## DEFINITIONS

1.      "Communication" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise) between individuals or entities whether oral, written, electronic or otherwise; whether in-person or telephonic; whether direct or through an intermediary.

2.      "Complaint" means any complaint or amended complaint in a class action asserting a claim of any kind in any court, including any federal, state or local court.

3.      "Document" has the same meaning as in Rule 34 of the Federal Rules of Civil Procedure, and includes, without limitation, any writing, notes, photograph, chart, graph, video tape, audio tape, computer disk, or electronically stored data (including electronic mail) and metadata, which is in your actual or constructive possession, custody or control, and includes, without limitation, all originals, copies, drafts (sent or unsent), or other nonconforming copies of every kind.

4.    "SEIU" means the Service Employees International Union and its officers, agents, employees, representatives, members, affiliates, local, representatives and attorneys (in-house and outside counsel), including without limitations, the SEIU's Nurse Alliance, Hospital Systems Division and SEIU Healthcare.

5.    The definition of "SEIU" includes the past and present officers, agents, organizers, employees, attorneys, predecessors and successors, of each SEIU local or affiliate.

## INSTRUCTIONS

1.    All documents covered by this request shall be produced in a manner consistent with Fed. R. Civ. P. 45(d)(1) at the place and time indicated by the subpoena or, if it is more convenient to do so, copies may be produced to Howard Iwrey at Dykema Gossett, PLLC, 39577 Woodward Avenue, Suite 300, Bloomfield Hills 48304-2820.

2.    Only a single copy of each responsive document is requested; however, all drafts and non-identical duplicates of each responsive document are requested, whether different from the original because of notes, marginalia, or attachments not present in or on the original document.

3.    If you refuse to disclose any document requested herein (or any portion thereof) on the grounds of privilege or otherwise, please provide the following information, as required by Fed. R. Civ. P. 45(d)(2): (a) the nature and type of document (e.g., memorandum, letter, report, etc.); (b) the subject matter of the document; (c) the date of the document; (d) any identification of each specific privilege or other claim asserted as grounds for non-production; (e) the holder of the privilege; and (f) such other information as is sufficient to identify the document, including the author(s), addressee(s), and any other recipient(s) of the document, and, where not apparent, the relationship of the author(s), addressee(s), and any other recipient(s) to each other.

4.    Unless otherwise indicated, all requests seek documents from January 1, 2000 through the present.

DC01\122854.1
ID\HEO

# EXHIBIT 2

# BREDHOFF & KAISER, P.L.L.C.

*Attorneys & Counselors*

Robert M. Weinberg
Jeffrey L. Gibbs
Julia Penny Clark
Jeffrey R. Freund
W. Gary Kohlman
Jeremiah A. Collins
Mady Gilson
Bruce R. Lerner
Andrew D. Roth
John M. West
Douglas L. Greenfield
Roger Pollak
Anne Ronnel Mayerson
Leon Dayan
Alice O'Brien
Devki K. Virk
Robert Alexander

805 Fifteenth Street, NW
Washington, D.C. 20005
(202) 842-2600
Facsimile: (202) 842-1888
www.bredhoff.com

Kathleen Keller
Abigail V. Carter
Matthew Clash-Drexler
Jennifer L. Hunter
Charlotte Garden
Joshua B. Shiffrin
Benjamin Takis

Laurence Gold
Patricia Polach
Susan G. Lahne
Todd E. Edelman
Sarah M. Fox
Of Counsel

October 16, 2007

Elliot Bredhoff
(1921-2004)
Henry Kaiser
(1911-1989)

**Via Facsimile and First-Class Mail**

Howard E. O'Leary
Dykema Gossett PLLC
Franklin Square Third Floor West
1300 I Street, NW
Washington, DC 20005

Re:    Pat Cason-Merendo et al. v. Detroit Medical Center et. al., Civ. A. No. 06-15601
       (E.D. Mich.)

Dear Mr. O'Leary,

Pursuant to Fed. R. Civ. P. 45(c)(2)(B), this letter states the objections of the Service Employees International Union ("SEIU") to the subpoena for documents issued in connection with the case styled Pat Cason-Merendo et al. v. Detroit Medical Center et, al., Civ. A. No. 06-15601 (E.D. Mich.) (the "Lawsuit"), and served on the SEIU by one of the defendants in the Lawsuit – Oakwood Healthcare, Inc.

At the outset, we note that the SEIU is not a party to the Lawsuit, which is an action brought by two registered nurses on their own behalf and on behalf of a proposed class of similarly-situated nurses alleging that they have been the victims of a conspiracy among Detroit hospitals to depress their wages in violation of the federal antitrust laws. The subpoena served on the SEIU in this matter is on its face so overbroad, so unduly burdensome, and so intrusive as to fall well outside the bounds of a proper third-party subpoena. Indeed, the subpoena reveals no attempt to limit the request to the issues that are relevant to this Lawsuit. The apparent design of these requests is to obtain the SEIU's confidential and proprietary documents for use in matters wholly collateral to the pending Lawsuit by entities whose interests are adverse or potentially adverse to those of the SEIU, and in the process to impose an undue burden on the SEIU.

For example, the subpoena seeks documents related to all "class action and/or collective complaints" or amended complaints where SEIU "has, or had, a funding relationship with any of the named plaintiffs' counsel relating to legal fees, costs, and/or expenses." With respect to each of the defendants in any of those complaints, the subpoena seeks all documents related to "any agreement" recognizing SEIU or a "labor organization engaged in a joint organizing campaign with the SEIU" as the collective bargaining representative of the employees of that defendant,

October 16, 2007
Page 2

any "attempt, effort, and/or plan" to become the collective bargaining representative of the
employees of that defendant, and "any communication between the SEIU and any defendant [in
those other class actions or collective actions]. . . relating to any prospective or possible
agreement that might lead to the recognition of the SEIU" as the collective bargaining
representative of the employees of that defendant.

     1.    The SEIU first objects to the subpoena as overly broad and thus unduly
burdensome and not reasonably calculated to lead to the discovery of admissible evidence in this
case. In particular, the subpoena does not seek documents just about the defendants in this
lawsuit or even to hospitals in the Detroit market. Instead, the subpoena demands production of
documents related to any efforts by SEIU, directly or indirectly, to become the collective
bargaining representative of the employees of <u>any</u> employer against whom a lawsuit has been
filed where SEIU has a funding relationship with the named plaintiffs' counsel. Production of
such documents that are unconnected to the parties to this Lawsuit or to efforts to use this
Lawsuit as part of an organizing campaign against a defendant to this Lawsuit would, to the
extent complied with by the SEIU in accordance with the broad and literal terms of the
subpoena, require the SEIU to search for, compile and produce a truly massive amount of
materials relating to employers having nothing whatsoever to do with any issue presented in the
Lawsuit.[1]

     2.    The SEIU also objects to the subpoena to the extent that compliance therewith
would require the SEIU to disclose "a trade secret, or other confidential research, development or
commercial information." Fed. R. Civ. P. 45(c)(3)(B)(1). Specifically, the subpoena requests
documents relating to any "attempt, effort, and/or plan" to become the collective bargaining
representative of employees of employers not involved in this Lawsuit. Put simply, the subpoena
demands production of SEIU's organizing goals, plans, and strategies with respect to those
employers. This request, which would require the SEIU to disclose those documents on the
transparent pretext that such information is relevant in some way to the issues presented in this
Lawsuit, is particularly objectionable. The Hospital Defendants in this Lawsuit, who stand in a
potentially adverse relationship to the SEIU, have no legitimate interest – and certainly no
interest in connection with this Lawsuit – for obtaining that strategic planning information.

     There is ample precedent in the labor relations context for the proposition that documents
reflecting such internal strategic deliberations are protected from disclosure to one's adversaries
or potential adversaries. <u>See, e.g.</u>, <u>In Berbiglia, Inc.</u>, 233 NLRB 1476, 1495 (1977); <u>Champ
Corp.</u>, 291 NLRB 803, 817 (1988), enforced, 933 F.2d 688 (1990); <u>Illinois Educational Labor
Relations Board v. Homer Community Consolidated School District No. 208</u>, 547 N.E.2d 182,
183-88 (Ill. 1989). Thus, even if responsive documents of this nature were relevant in some way
to the issues in this Lawsuit – which they plainly are not – they would not be subject to
production by the SEIU in connection with this Lawsuit.

     3.    Finally, SEIU objects to the subpoena because it seeks documents that have
already been produced by SEIU in this matter. As you are well aware, the SEIU has already
been served with a subpoena in this matter by your co-defendant Seton Health Care. In response

---

[1] Moreover, and as we explain in more detail below, these requests are equally objectionable
because they require SEIU to turn over documents that disclose SEIU's proprietary information,
trade secrets and/or confidential and strategic information.

October 16, 2007
Page 3

to that subpoena, SEIU has produced nearly 5,000 pages of documents. Among other things, SEIU produced documents that discuss the relationship, if any, between this Lawsuit and any effort to organize nurses at any of the Hospital Defendant's facilities. Accordingly, SEIU has already produced all documents in response to this subpoena that are not subject to the above objections.

Please feel free to contact me with any questions.

Sincerely,

Robert M. Weinberg
Matthew Clash-Drexler

# EXHIBIT 3



Dykema Gossett PLLC
Franklin Square, Third Floor West
1300 I Street N.W.
Washington, DC 20005
WWW.DYKEMA.COM
Tel: (202) 906-8600
Fax: (202) 906-8669

**Howard E. O'Leary, Jr.**
Direct Dial: (202) 906-8601
Email: HOLEARY@DYKEMA.COM

October 29, 2007

Matthew Clash-Drexler, Esq.
Bredhoff & Kaiser, P.L.L.C.
805 Fifteenth Street, NW
Washington, DC 20005

Re:    *Pat Cason-Merendo et al v. Detroit Medical Center et al.*, Civ. A. No. 06-15601 (E.D.
Mich.)

Dear Matthew:

The purpose of this letter is to attempt to resolve certain objections to Request Nos. 3 and 4 in
the subpoena served by our client, Oakwood Healthcare, Inc. ("Oakwood") on your client, the
Service Employees International Union ("SEIU") on September 14, 2007 (the "Subpoena:").

While we understand you question the relevance of the Subpoena in its entirety, I think you will
agree that Request Nos. 1 and 2 are very specific and not at all burdensome. Request No. 1 calls
for the production of any complaints and/or amended complaints in any class action or collective
action where the SEIU has a funding relationship with named Plaintiffs' counsel relating to legal
fees, costs and/or expenses (hereinafter "SEIU Subsidized Class Actions"). Request No. 2
requires the SEIU to produce copies of any voluntary recognition agreements, neutrality
agreements and/or card check agreements with any defendants (or their subsidiaries or affiliates)
in any SEIU Subsidized Class Action.

During our October 25 telephone conversation, you referred to the SEIU's campaign to organize
the registered nurses at Advocate Health Care in Chicago to illustrate the purported breadth of
the search that would be involved in complying with Requests Nos. 3 and 4 of the Subpoena.
You asserted that the search required for all SEIU employees who may have responsive materials
relating to the Advocate Health Care campaign alone would be "massive" and, thus,
burdensome.

To alleviate these concerns, Oakwood is willing to agree to reasonable limitations on the scope
of any such search. The SEIU obviously knows the defendants in SEIU Subsidized Class
Actions that it attempted to organize and whether such attempts involved efforts or plans to

California | Illinois | Michigan | Texas | Washington D.C.

# DYKEMA

Matthew Clash-Drexler, Esq.
October 29, 2007
Page 2

obtain voluntary recognition, neutrality and/or card check agreements. Similarly, it knows who worked on and supervised organizing campaigns such as the Advocate Health Care campaign. Accordingly, Oakwood is willing to limit the SEIU's search to the files of the individuals primarily responsible for such campaigns.

Thus, to avoid the necessity for a judicial resolution[1] of the issues raised in your October 16, 2007 letter of objections, we suggest that Oakwood and the SEIU agree as follows:

    1.    The SEIU will comply with Request Nos. 1 and 2 of the Subpoena;

    2.    The SEIU will provide a Declaration listing the names of any defendants in any SEIU Subsidized Class Action during the period from January 1, 2000 until present from which it attempted and/or planned to obtain any voluntary recognition agreement, neutrality agreement and/or card check agreement during the same time period. The Declaration will also identify, by defendant, the names, office addresses and positions of the SEIU personnel principally involved in the attempt, plan and/or effort to obtain any such Recognition Agreement from each such defendant.

    3.    Based upon the above disclosures, Oakwood will identify five SEIU employees for each defendant listed in the Declaration, who will have their hard copy and electronic files searched. The SEIU will search the five SEIU employees' files and produce documents responsive to Request Nos. 3 and 4 of the Subpoena.

    4.    Oakwood agrees not to request searches of additional SEIU employees' hard copy and electronic files for documents responsive to Requests Nos. 3 and 4 except for good cause.

Please advise me of the SEIU's position on this proposal by the close of business on Wednesday, October 31, 2007. If you have any questions, please feel free to contact me.

Very truly yours,

DYKEMA GOSSETT PLLC

Howard E. O'Leary, Jr.

HEO:jmg

DC01\127162.1
ID\HEO

California | Illinois | Michigan | Texas | Washington D.C.

# EXHIBIT 4

**INSTRUCTIONS:** Submit an original and 4 copies of this Petition to the NLRB Regional Office in the Region in which the employer concerned is located. If more space is required for any one item, attach additional sheets, numbering item accordingly.

The Petitioner alleges that the following circumstances exist and requests that the National Labor Relations Board proceed under its proper authority pursuant to Section 9 of the National Labor Relations Act.

1. **PURPOSE OF THIS PETITION** (If box RC, RM, or RD is checked and a charge under Section 8(b)(7) of the Act has been filed involving the Employer named herein, the statement following the description of the type of petition shall not be deemed made.) (Check One)

[X] **RC-CERTIFICATION OF REPRESENTATIVE** - A substantial number of employees wish to be represented for purposes of collective bargaining by Petitioner and Petitioner desires to be certified as representative of the employees.

[ ] **RM-REPRESENTATION (EMPLOYER PETITION)** - One or more individuals or labor organizations have presented a claim to Petitioner to be recognized as the representative of employees of Petitioner.

[ ] **RD-DECERTIFICATION (REMOVAL OF REPRESENTATIVE)** - A substantial number of employees assert that the certified or currently recognized bargaining representative is no longer their representative.

[ ] **UD-WITHDRAWAL OF UNION SHOP AUTHORITY (REMOVAL OF OBLIGATION TO PAY DUES)** - Thirty percent (30%) or more of employees in a bargaining unit covered by an agreement between their employer and a labor organization desire that such authority be rescinded.

[ ] **UC-UNIT CLARIFICATION** - A labor organization is currently recognized by Employer, but Petitioner seeks clarification of placement of certain employees: (Check one)  [ ] In unit not previously certified.  [ ] In unit previously certified in Case No. _____

[ ] **AC-AMENDMENT OF CERTIFICATION** - Petitioner seeks amendment of certification issued in Case No. _____
Attach statement describing the specific amendment sought.

| 2. Name of Employer Oakwood Heritage Hospital | Employer Representative to contact Rick Hillson, CAO | Telephone Number 313-295-5233 |
|---|---|---|
| 3. Address(es) of Establishment(s) involved (Street and number, city, State, ZIP code) 10000 Telegraph    Taylor, MI  48180-3349 | | Telecopier Number (Fax) 313-295-5085 |

| 4a. Type of Establishment (Factory, mine, wholesaler, etc.) Hospital | 4b. Identify principal product or service Health Care |
|---|---|

| 5. Unit involved (In UC petition, describe present bargaining unit and attach description of proposed clarification.) | 6a. Number of Employees in Unit |
|---|---|
| Included  All full-time, regular part-time, contingent, flex, reserve, Registered Nurses | Present  220 |
| | Proposed (By UC/AC) |
| Excluded  All physicians, technical employees, other professionals, business office clericals, support service employees, skilled maintenance employees, confidential employees, managers, supervisors and guards as defined in the Act. | 6b. Is this petition supported by 30% or more of the employees in the unit? [X] Yes   [ ] No *Not applicable in RM, UC, and AC |

If you have checked box RC in 1 above, check and complete EITHER item 7a or 7b, whichever is applicable.

7a. [X] Request for recognition as Bargaining Representative was made on (Date) *Let the petition serve as a* _____ and Employer declined recognition on or about (Date) *request for recognition.* _____ (If no reply received, so state.)

7b. [ ] Petitioner is currently recognized as Bargaining Representative and desires certification under the Act.

| 8. Name of Recognized or Certified Bargaining Agent (If none, so state.) None | | Affiliation |
|---|---|---|
| Address, Telephone No. and Telecopier No. (Fax) | | Date of Recognition or Certification |

| 9. Expiration Date of Current Contract, if any (Month, Day, Year) None | 10. If you have checked box UD in 1 above, show here the date of execution of agreement granting union shop (Month, Day, and Year) |
|---|---|

| 11a. Is there now a strike or picketing at the Employer's establishment(s) involved?  Yes ____ No X | 11b. If so, approximately how many employees are participating? |
|---|---|

11c. The Employer has been picketed by or on behalf of (Insert Name) _____ , a labor organization, of (insert Address) _____ Since (Month, Day, Year) _____

12. Organizations or individuals other than Petitioner (and other than those named in items 8 and 11c), which have claimed recognition as representatives and other organizations and individuals known to have a representative interest in any employee in unit described in item 5 above. (If none, so state.)

| Name | Affiliation | Address | Date of Claim |
|---|---|---|---|
| | | | Telecopier No. (Fax) |

13. Full name of party filing petition (If labor organization, give full name, including local name and number)
International Union United Automobile Aerospace and Agricultural Implement Workers of America, UAW

| 14a. Address (street and number, city, state, and ZIP code) 8000 E. Jefferson Detroit, MI 48214 | 14b. Telephone No. 313-926-5268 |
|---|---|
| | 14c. Telecopier No. (Fax) 313-926-5475 |

15. Full name of national or international labor organization of which it is an affiliate or constituent unit (to be filled in when petition is filed by a labor organization)
International Union United Automobile Aerospace and Agricultural Implement Workers of America, UAW

I declare that I have read the above petition and that the statements are true to the best of my knowledge and belief.

| Name (Print) Jan Schulz | Signature Jan Schulz | Title (if any) International Representative |
|---|---|---|
| Address (street and number, city, state, and ZIP code) 8000 E. Jefferson Detroit, MI 48214 | | Telephone No. 313-926-5268 |
| | | Telecopier No. (Fax) 313-926-5475 |

**WILLFUL FALSE STATEMENTS ON THIS PETITION CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE. TITLE 18, SECTION 1001)**

# EXHIBIT 5

FROM HERITAGE CENTER AR            313 295 5205            200  '05-08   10:11   #754 P.07/07
MAR 05 2001 16:08 FR NLRB REGION 7 DETROITS 226 2088117  TO 913059951197 P.05/08

**NATIONAL LABOR RELATIONS BOARD**
**PETITION**

| Case No. | Date Filed |
|---|---|
| 7-RC-21970 | 3-5-01 |

INSTRUCTIONS: Submit an original and 4 copies of this Petition to the NLRB Regional Office in the Region in which the employer concerned is located. If more space is required for any one item, attach additional sheets, numbering item accordingly.

The Petitioner alleges that the following circumstances exist and requests that the National Labor Relations Board proceed under its proper authority pursuant to Section 9 of the National Labor Relations Act.

1. PURPOSE OF THIS PETITION (If box RC, RM, or RD is checked and a charge under Section 8(b)(7) of the Act has been filed involving the Employer named herein, the statement following the description of the type of petition shall not be deemed made.) (Check One)

☒ RC-CERTIFICATION OF REPRESENTATIVE - A substantial number of employees wish to be represented for purposes of collective bargaining by Petitioner and Petitioner desires to be certified as representative of the employees.

☐ RM-REPRESENTATION (EMPLOYER PETITION) - One or more individuals or labor organizations have presented a claim to Petitioner to be recognized as the representative of employees of Petitioner.

☐ RD-DECERTIFICATION - A substantial number of employees assert that the certified or currently recognized bargaining representative is no longer their representative.

☐ UD-WITHDRAWAL OF UNION SHOP AUTHORITY - Thirty percent (30%) or more of employees in a bargaining unit covered by an agreement between their employer and a labor organization desire that such authority be rescinded.

☐ UC-UNIT CLARIFICATION - A labor organization is currently recognized by Employer, but Petitioner seeks clarification of placement of certain employees: (Check one)  ☐ In unit not previously certified  ☐ In unit previously certified in Case No. _____

☐ AC-AMENDMENT OF CERTIFICATION - Petitioner seeks amendment of certification issued in Case No. _____
Attach statement describing the specific amendment sought.

| 2. Name of Employer | Employer Representative to contact | Telephone Number |
|---|---|---|
| Annapolis Hospital | Mr. Kathy Carrix | 734-467-4500 |

3. Address(es) of Establishment(s) Involved (Street and number, city, State, ZIP code)
33155 Annapolis Wayne Mich. 48188

| 4a. Type of Establishment (Factory, mine, wholesaler, etc.) | 4(b) Identify principal product or service |
|---|---|
| Hospital | Professional Patient Care |

5. Unit Involved (In UC petition, describe present bargaining unit and attach description of proposed clarification.)

Included: All full + Part time Registered Nurses, All full + part time flex Pool ... Registered nurses, of all departments.

Excluded: All Technical, Guards, Supervisors, Business office Clerical and all other Professional units as defined by the act.

| 6a. Number of Employees in Unit: |
|---|
| Present 188 |
| Proposed (By UC/AC) |

6b. Is this petition supported by 30% or more of the employees in the unit?  ☒ Yes  ☐ No
*Not applicable in RM, UC, and AC

(If you have checked box RC in 1 above, check and complete EITHER item 7a or 7b, whichever is applicable)

7a. ☐ Request for recognition as Bargaining Representative was made on (Date) _____ and Employer declined recognition on or about (Date) _____ (If no reply received, so state).

7b. ☐ Petitioner is currently recognized as Bargaining Representative and desires certification under the Act.

| 8. Name of Recognized or Certified Bargaining Agent (If none, so state) | Affiliation |
|---|---|
| | |

| Address and Telephone Number | Date of Recognition or Certification |
|---|---|
| | |

| 9. Expiration Date of Current Contract, if any (Month, Day, Year) | 10. If you have checked box UD in 1 above, show here the date of execution of agreement granting union shop (Month, Day, and Year) |
|---|---|
| | |

11a. Is there now a strike or picketing at the Employer's establishment(s) involved?  Yes ___  No ___   11b. If so, approximately how many employees are participating? _____

11c. The Employer has been picketed by or on behalf of (insert Name) _____ a labor organization, of (insert Address) _____ Since (Month, Day, Year) _____

12. Organizations or individuals other than Petitioner (and other than those named in items 8 and 11c), which have claimed recognition as representatives and other organizations and individuals known to have a representative interest in any employees in unit described in item 5 above. (If none, so state)

| Name | Affiliation | Address | Date of Claim (Required only if Petition is filed by Employer) |
|---|---|---|---|
| | | | |

I declare that I have read the above petition and that the statements are true to the best of my knowledge and belief.

Local 79 Service Employees International Union, AFL-CIO-
(Name of Petitioner and Affiliation, if any)

By _____ Akilo Banks _____   Organizer
(Signature of Representative or person filing petition)   (Title, if any)

Address 2604 Faust Av. Det (Mich) 48201  313-965-9450
(Street and number, city, State, and ZIP Code)   (Telephone Number)

WILLFUL FALSE STATEMENTS ON THIS PETITION CAN BE PUNISHED BY FINE AND IMPRISONMENT (U. S. CODE, TITLE 18, SECTION 1001)

90/90'd  #721 F:06/06        90:18  90-20-90  1901       313 467 6623       FROM: ANNAPOLIS HUMAN RESOURCE

**LOCAL 79 SEIU**

Leading the Way

WILLIE HAMPTON
President

DORIS CROXTON
Vice President

JOHN DAY
Secretary/Treasurer

CARRIE BRADFORD
Recording Secretary

RICHARD W. COROTZ
Executive Auditor

SERVICE EMPLOYEES
INTERNATIONAL UNION
AFL-CIO, CLC

2604 Fourth Street
Detroit, Michigan 48201
313.965.9450
800.LOCAL79
Fax: 313.965.0422
e-mail:

LANSING
419 S. Washington
Lansing, MI 48933
517.482.1076
800.292.5974
Fax: 517.482.5361

MUSKEGON
450 W. Western Ave.
Muskegon, MI 49440
231.722.6303
800.824.4195
Fax: 231.726.6764

UPPER PENINSULA
1614 Bernard Street
Saginaw, MI 48602
888.819.7811
FAX: 906.387.4416

June 1, 2001

Dear Annapolis Registered Nurses:

The professional nurses at Annapolis Hospital recently turned to Service Employees International Union, the largest health care union in the country, for help in attaining a voice in the workplace.

Since that time, the Annapolis administration has conducted themselves in an unprofessional manner through negative remarks, insinuation, and innuendo which has caused some of the nurses to become too afraid to stand strong against these anti-union efforts.

With that in mind, we have decided to withdraw the union election at this time to allow those nurses who feel overwhelmed by management's tactics some time for thought and reflection.

Your future and your patients future is our first priority and should the professional nurses again wish to organize with SEIU Local 79, please contact me at (313) 928-4390, Extension 161.

In Unity,

Leola Banks, Organizer



United States Government
**NATIONAL LABOR RELATIONS BOARD**
**Region 7**
477 Michigan Avenue - Room 300
Detroit, MI 48226-2569

Telephone (313) 226-3200
FAX      (313) 226-2090

May 31, 2001

William M. Thacker, Esq.                Bruce A. Miller Esq.
Dykema Gossett, PLC                     Miller Cohen, PLC
315 E. Eisenhower                       600 West Lafayette, 4th Floor
Ann Arbor, MI 48108                     Detroit, MI 48226

Ronald J. Santo
Dykema Gossett, PLLC
400 Renaissance Center
Detroit, MI 48243

Re:     Oakwood Healthcare, Inc.,
        d/b/a Oakwood Annapolis Hospital
        Case No. 7-RC-21970

Gentlemen:

This is to advise you that the petition in the above-captioned matter has, with my approval, been withdrawn. Any petition filed by Local 79, Service Employees International Union, AFL-CIO within six (6) months from this date concerning the same unit involved herein will not be entertained unless good cause is shown to the contrary. Accordingly, the election scheduled for June 6, 2001, is canceled.

Very truly yours,

William C. Schaub, Jr.
Regional Director

KG:sm

cc:     Local 79, S. E. I. U.
        Attn: Ms. Leola Banks
        2604 Fourth St.
        Detroit, MI 48210

**Oakwood**
**Annapolis Hospital**

33155 Annapolis Rd.
Wayne, MI 48184

734-467-4000



Oakwood

March 26, 2002

Dear Professional Registered Nurse:

Yesterday, we were extremely disappointed to receive, via fax, a petition filed with the National Labor Relations Board by the Service Employees International Union (SEIU), Local 79, which once again is seeking to represent Annapolis Registered Nurses. SEIU's petition lists the following classifications as included in its proposed bargaining unit,

> "All full-time and regular part-time registered nurses employed by the Employer at its Oakwood Annapolis Hospital facility in Wayne, Michigan, including in-house flex pool and contingent nurses, staff nurses, RN first assistants, staff nurse anesthetists, cardiac cath lab nurses, clinical educators, and case managers."

You may recall SEIU filed a petition last March and withdrew that petition one week prior to the election because it realized it did not have the support of the nurses. This is the same union that currently represents the Nurse Aides, Orderlies, and Desk Secretaries at Annapolis. They also represent the Registered Nurses at Riverside Hospital which recently announced the closure of their inpatient medical and surgical beds.

Because the decision to support or reject the union is very serious and may be long term, we are committed, as we were before, to ensuring that you have all the information you need to make an informed decision when it is time to vote.

Over the next few weeks, we will provide you with factual information about unionization, what unions can and cannot do; as well as provide any answers to questions you may have about unionization, collective bargaining, strikes or any other related topic of concern to you. Don't be afraid to ask questions about the campaign. We want you to make the decision that best represents your interests and this can only be accomplished by your careful evaluation of the information provided to you by both the hospital and union before making your choice.

Rather than addressing arguments regarding unionization, we would prefer to be discussing our financial successes, growth opportunities, master facility plan, and the vision of nursing for the future. However, in the days ahead, we will exhaust all of our resources to make sure you know the truth about SEIU, Local 79 and

unionization.  We also welcome any questions you may have regarding the future growth of Annapolis Hospital.

Sincerely,


Tom Kochis,                                    Kathy Cronin, RN
Chief Administrative Officer                   Director Patient Care Services

::ODMA\PCDOCS\DET02\141868\2

 United States Government
NATIONAL LABOR RELATIONS BOARD - REGION 7
477 Michigan Avenue – Room 300
Detroit, MI 48226-2569          Telephone (313) 226-3200
                               FAX  (313) 226-2090
                               Web:  www.nlrb.gov

March 28, 2002

William M. Thacker, Esq.
315 E. Eisenhower Parkway
Suite 100
Ann Arbor, Michigan 48108

Ms. Leola Banks, Organizer
Local 79, Service Employees International Union, AFL-CIO
2604 Fourth Street
Detroit, Michigan 48201

                    Re:     Annapolis Hospital
                            Case No. 7-RC-22209

Dear Sir and Madam:

    This is to advise you that, with my approval, the petition in the above-captioned
matter has been withdrawn.

                            Very truly yours,

                            William C. Schaub, Jr.
                            Regional Director

KP: bjpm

cc:

Ms. Kathy Cronin
Annapolis Hospital
33155 Annapolis
Wayne, Michigan 48188

# EXHIBIT 6

## Declaration of Mary Joyce Carlson

I, Mary Joyce Carlson, declare as follows,

1.  I am of counsel to the law firm of James & Hoffman, P.C. ("J&H"), currently designated co-lead counsel in the litigation <u>Reed v. Advocate, Civ. No. 06 3337 (N.D. Ill)</u>. Ms. Lisa Reed, the lead plaintiff, retained J&H through me to bring a class action lawsuit against hospitals in the Chicago area who were colluding on nurse wages. As former Deputy General Counsel to the National Labor Relations Board from 1994 – 2000, as a long time practitioner of employee-side law in the Health Care industry, and as a long time representative and advocate for nurses in licensing and other contexts, I bring essential expertise, contacts and experience to the leadership counsel group here.

2.  I understand that certain Defendant hospitals are nevertheless currently proposing to designate certain information in discovery undiscloseable to any plaintiffs counsel "who currently represents, or who has represented at any time in the past five years, the SEIU or any other labor organization in a matter in which the labor organization was adverse to a hospital or health care system, including Mary Joyce Carlson, David Dean, and the members, associates, of counsel, and employees of James & Hoffman, P.C."

3.  I further understand that Defendants' exclusion proposal is based on the argument that the Service Employees International Union ("SEIU") is the real party in interest to the litigation; that plaintiffs are acting on behalf of the SEIU; and that information from discovery will or could be used to further SEIU public relations, organizing campaigns, or employee bargaining with the defendant hospitals.

4.  I offer the following Declaration to clarify the relationship of the SEIU to this litigation, to J&H, David Dean and myself. In short, SEIU is not the real party in interest to this

litigation; plaintiffs are acting on behalf of themselves and similarly situated nurses; and confidential information from discovery will not be available to SEIU to be used in public relations, organizing campaigns or bargaining with defendant hospitals.

## MY ROLE AT SEIU AND IN CHICAGO

5.    I advise and represent a wide variety of clients in my legal practice. For example, I was recently retained by the Ministry of Labor for the Republic of Taiwan to instruct their staff on United States employment and labor law. I will be traveling in November 2006 to Taiwan to teach such classes at the Ministry. I also recently devoted substantial time to advising the United Food and Commercial Workers on NLRB preemption issues in relation to an ongoing litigation. SEIU, however, has a retainer for a year with J&H for my services to provide advice to the SEIU Health Care Division -- though my actual activities are often driven by the SEIU's priorities at a given time. For example, in the 2004 election cycle, I spent four months, full-time, managing and litigating a voting rights case that the union was sponsoring. Under the retainer, however, I sometimes call myself "Counsel" or "Special Counsel" to the Health Care Division.

6.    My principal current responsibility for SEIU is to negotiate and maintain national agreements with Health Care systems. SEIU presently has such agreements with HCA, Tenet Health Systems and Doctors Community Healthcare Corporation. In addition, I may provide other advice on an 'as requested' basis. I utilize an office part time and some support at SEIU's headquarters in Washington to help fulfill my responsibilities. I am not an employee or officer of the SEIU and am not related by blood or marriage to any employee or officer of the SEIU.

SEIU-DET 01105

7.  I've had very limited involvement in the Chicago health care market for SEIU. The principal SEIU attorney with responsibility for SEIU health care activities in Chicago is Craig Becker, an SEIU Associate General Counsel based in Chicago. Doctors Community is the only healthcare system with whom SEIU has a national agreement that has a subsidiary in Chicago: Michael Reese hospital. Pursuant to my responsibilities to implement the national agreement with Doctors Community, I have on occasion represented SEIU in dealings with that facility. (Though I understand that Michael Reese has not joined with Defendants' proposal on the protective order). In the past, I have also given the SEIU advice regarding discrete legal issues which have arisen in the context of SEIU or its Chicago local's organizing, bargaining or legislative activities directed toward other health care facilities in the Chicago Area. For example, I assisted in the development of an internal policy paper with health care analysts which explored opportunities to secure state funding for quality initiatives at Chicago inner-city hospitals, and I assisted Mr. Becker in locating a law firm to argue a Title VI case.

8.  Due to the limited nature of my responsibilities in the Chicago area, I have sometimes attended meetings where SEIU officials considered whether or not to engage in organizing or bargaining activities at health care facilities in Chicago. In order to address Defendants' concerns about confidentiality in the future, I am willing to affirm in writing that during the course of this litigation and for one year afterward, if I review or am otherwise exposed to information marked "CONFIDENTIALCNOT TO BE DISCLOSED TO UNION COUNSEL" from any hospital in Chicago, then during any SEIU organizing or bargaining campaign at that hospital, I will refrain from advising the SEIU with regard to any matter directly concerning that hospital.

SEIU-DET 01106

9.     Because SEIU has its own in-house legal staff consisting of more than ten full-time lawyers, and has relationships with multiple outside counsel, I can easily make this commitment consistent with my duties both to SEIU and to the plaintiffs in this matter.

SEIU AND J&H

10.    In addition to my retainer, SEIU has a retainer with J&H for the services of Judy Scott, who serves as SEIU's full time General Counsel. Ms. Scott works full time out of the SEIU headquarters in Washington and, to avoid any potential conflicts, has been fully walled off since January 2006 from all the nurse wage antitrust litigations filed in June 2006 on which J&H is working. Ms. Scott is not involved in any capacity in, has no access to any of the files or records relating to, and receives no confidential information about these nurse wage antitrust cases.

11.    J&H presently comprises eleven other attorneys in addition to Judy and me. Those attorneys represent a wide variety of clients, both union and nonunion. David Dean, and several of the other attorneys at J&H, have in the past represented or advised the SEIU Health Care Division on discrete matters when asked. Mr. Dean plays no role in the SEIU's competitive decisions to organize or bargain with any particular employer. He has never represented SEIU against any of the Chicago defendants. Aside from the long term retainers for Ms. Scott and my services, I understand that SEIU work represented approximately 13% of J&H's overall billings in 2005. No J&H attorney is an employee or officer of the SEIU or related by blood or marriage to any employee or officer of the SEIU.

SEIU-DET 01107

<u>SEIU'S ROLE IN THE NURSE WAGE LITIGATIONS</u>

12.    The SEIU has played absolutely no role in the direction or management of this lawsuit, exerts no control over the attorneys prosecuting it, and has not and cannot impose any conditions on any potential settlement of it. Nevertheless, SEIU played a critical role in the genesis of the nurse wage antitrust lawsuits and offers ongoing support consistent with the public service nature of the suit and its own interests in championing nurse issues.

13.    In 2004, Barbara Bergman, an economist with American University, circulated an article to the SEIU seeking to show that hospital collusion on nurse wages was a likely cause of the long term nurse shortage. SEIU engaged her and the law firm of J&H to investigate the issue. Based on my experience in the industry, I found Ms. Bergman's thesis more than plausible.

14.    J&H's legal and factual research on behalf of SEIU indicated that collusion was in fact occurring in certain jurisdictions. J&H, through David Dean and me, brought this research to Cohen Milstein Hausfeld and Toll for their advice on whether the antitrust laws had been violated. Following further research and investigation, SEIU began referring interested nurses to the law firms as potential plaintiffs. Once potential plaintiffs entered into serious discussions with the firms to bring suit in Chicago, SEIU played no further role in the direction or control of the developing litigation. One nurse referred by the SEIU and one referred from elsewhere eventually retained the firms to bring suit.

15.    In addition to referring potential plaintiffs, SEIU is currently providing support to the lawsuits through paying J&H a reduced fee for its work on the suits and for certain

SEIU-DET 01108

expenses. Such support is fully consistent with J&H's representation of Ms. Reed and the other members of the nurse class. See, e.g., Shaffer v. Farm Fresh, 966 F.2d 142, 146 (4th Cir. 1992). Accord, Barton v. Albertson's, Inc., 1997 U.S. Dist. LEXIS 22577 (D. Idaho Dec. 23, 1997).

16.  I have been an attorney for over 25 years, and have never been accused, charged, or in any way punished for violating a confidentiality agreement, for violating any other professional ethical obligation, or for any crime involving dishonesty.

17.  The nature of the SEIU, its Health Care Division, and my practice is such that any projects or assignments which would present a conflict with my responsibility to avoid the unconscious or inadvertent disclosure of Defendants' confidential information can be easily be handled by other attorneys without my participation.

I declare, under penalty of perjury, that the foregoing is true and correct to the best of my recollection. Executed on Oct 24, 2006 at Washington, DC.

_Mary Joyce Carlson_
Mary Joyce Carlson

SEIU-DET 01109

# EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Wendy Fleischman and Cindy Cullen, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> Albany Medical Center; Ascension Health, Inc.; Catholic Health East; Ellis Hospital; Northeast Health; Seton Health System; St. Peter's Health Care System, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> Civil Action No. : 06-CV-765 (THM/DRH) |

## Revised Declaration of Mary Joyce Carlson

I, Mary Joyce Carlson, declare as follows,

1.    I am of counsel to the law firm of James & Hoffman, P.C. ("J&H") and counsel for Plaintiffs in the above captioned litigation. J&H partner David Dean is a lead counsel.

2.    Defendant hospitals have filed with the Court a ten page letter dated May 10 requesting that the Court order the production of certain documents from Plaintiffs' privilege log that are designated as attorney work product. Defendants' letter appends various highly selective documents (including drafts not identified as such) from the document productions in several related litigations, without offering testimonial support or accurate factual context for the documents. Defendants also request an order that Plaintiffs' attorneys cease instructing the Service Employees International Union ("SEIU"), the Mintz Group and Barbara Bergmann to withhold certain documents based on the attorney work product privilege (even though Plaintiffs' attorneys have not instructed Ms. Bergmann to withhold any documents from production in this litigation

on that basis). I offer this Declaration in support of Plaintiffs' Opposition to those requests and to provide the necessary factual context to evaluate Defendants' requests and appended documents.

3.    In short, as detailed below, each of the documents or relevant portions of documents designated attorney work product and listed on Plaintiffs' Privilege Log (attached as Exhibit 1 to this Declaration) was created by or for attorneys currently seeking to represent the class of Albany-area hospital Registered Nurses (RNs) in the above captioned litigation. Each designated document or document portion was created exclusively because of this anticipated litigation in Albany, or because of anticipated nurse wage-fixing litigations in several metropolitan areas collectively that included Albany.

4.    In general, the documents sought by Defendants comprise the pre-filing investigation, including legal, economic and factual analysis and research, for claims under the Sherman Act on behalf of a class of hospital RNs who were employed by colluding hospitals in the Albany metropolitan labor market. None of the documents would have been created in substantially similar form (or at all) but for the prospect of nurse wage-fixing litigations against those hospitals, and colluding hospitals in other jurisdictions, for agreeing to exchange detailed nurse wage information and agreeing to fix nurse wages.

5.    Defendants fail to mention that Plaintiffs, the SEIU and Professor Bergmann have already produced to defendants in these nurse wage litigations many thousands of pages of documents and databases created by the SEIU, by the Institute for Women's Policy Research ("IWPR"), by the Feldman Group and by Professor Bergmann. Many of those documents were created in preparation for and in pursuit of a parallel SEIU public

communications campaign on nurse wages. The difference between those documents and the ones at issue here are simply that the documents currently designated work product on the Albany Log exist <u>only</u> because of the anticipated litigation.

<u>HISTORY OF THE DEVELOPMENT OF THE NURSE WAGE LITIGATIONS</u>:

6.    In or about July 2004, SEIU received a copy of a draft article by Professor Barbara Bergmann, "Mystery of the Nurse Shortage" (attached as Exhibit 2). The article argued that the continuing nurse shortage in the U.S. was likely the result of collusion on nurse wages among hospitals in metropolitan areas, facilitated by area hospital organizations. Professor Bergman focused in part on a consent decree from a 1996 federal antitrust case in Utah concerning hospital exchanges of nurse wage information and subsequent Department of Justice ("DOJ") and Federal Trade Commission guidelines nationalizing the consent decree.

7.    The Nurse Alliance of SEIU, a national organization of nurses that was at that time focused on legislative and lobbying work to improve professional and patient care standards, found Professor Bergmann's thesis credible -- based on nurses' own experience of flat, relatively stagnant wages within some metropolitan areas, even in the face of the nurse shortage; based on comments made by hospital management across the table in some collective bargaining situations; based on industry "scuttlebutt" indicating that hospital exchanges of detailed wage information was commonplace despite the DOJ guide lines; and based on Professor Bergmann's own anecdotal accounts.

8.    After a period of analysis and review, the Nurse Alliance decided to follow up on Ms. Bergmann's thesis in two distinct ways: (1) through a public communication campaign, carried on by the Nurse Alliance and the Union's organizing department in the normal course of their activities; and (2) through separately supporting the development of

potential class action law suits by nurses in regional markets challenging hospitals for
colluding to suppress nurse wages, initially through legal and economic analysis and
then factual research, all under the direction and control of J&H.

9.      In February 2005, J&H, on SEIU's behalf, entered into negotiations with IWPR, on
whose advisory Board Professor Bergmann sits, to explore whether IWPR should be
engaged on two distinct but related research projects: (1) research to support a national
communication campaign on nurse wage issues; and (2) research to support a series of
nurse-wage class-action antitrust litigations.  J&H, on SEIU's behalf, entered into a
letter agreement with IWPR on February 4' 2005 to preserve the confidentiality of those
negotiations (attached as Exhibit 3).  While the parties reached agreement on the former
project, IWPR was not engaged to do research in support of the latter, litigation project.

10.     In or about April 2005, SEIU signed a retainer agreement with IWPR directly (attached
as Exhibit 4) that provided for a comprehensive public communications report on nurse
wages and an economic analysis focusing on the relation between unionization and
nurse wages.    The retainer also incorporated the possibility that IWPR might
confidentially comment on separate economic research undertaken by another firm in
anticipation of antitrust litigations, under the direction and control of J&H.  Although
the parties had ultimately rejected the possibility that IWPR provide primary research in
support of antitrust litigations, the earliest documents on Plaintiffs' Privilege Log stem
from J&H's proposal to IWPR outlining its legal analysis and specifying the required
research tasks flowing from J&H's own conceptualization of the likely claims and
evidence in the case, along with IWPR's detailed responses and proposals.  See Exhibit
1, Item Nos. 82, 86, 115, 116 and 117.

11.    In April 2005, J&H entered into negotiations with another group of economists to provide the required litigation support, reaching agreement on preliminary terms on April 15 (attached as redacted pursuant to the parties' stipulation on experts as Exhibit 5) -- and resulting in a retainer agreement between SEIU and that firm in May 2005 for a "Nurse Wage Litigation Support Project." This firm of experts was engaged to perform economic analyses exploring evidence of antitrust conspiracies in certain Metropolitan Statistical Areas, including Albany. Pursuant to the retainer, the work was carried out under the direction and control of J&H and SEIU in anticipation of antitrust litigations on behalf of nurses in the affected markets and, secondarily, to assist J&H in providing legal advice to the SEIU on the viability of these litigations in SEIU's role as third party payor for some suit fees and expenses. The SEIU allowed IWPR to use one underlying calculation by these experts in a table in the IWPR's public Report, citing an "unpublished [SEIU] analysis of 2003 data from the American Hospital Association's Annual Survey of Hospitals and the Center for Medicare and Medicaid Medicare Cost Reports and Historical Impact Files." (IWPR's report is attached as Exhibit 11). In addition, SEIU apparently considered a ranking of cities by the experts in prioritizing cities for its own internal research in support of its public campaign on nurse wages and of this litigation.

12.    Plaintiffs have currently retained these experts as consultants and, potentially, as testifying experts and so, pursuant to a stipulation among the parties concerning expert discovery, the documents created by the firm in 2005 and 2006 under the May 2005 agreement are not listed on Plaintiffs' privilege log. However, comments for J&H by IWPR on a draft report by these experts is listed on the Log at 141. Documents created by J&H but incorporating the expert's analysis are listed at 113 and 114 on the Log.

13.    Professor Bergmann also commented on these experts' work as listed at item 81 on the
Log.    In November 2004 and June 2005, the SEIU had entered formal retainer
agreements with Professor Bergmann to assist the SEIU in publicizing the artificial
ceiling on nurse wages through its national communication campaign, and also in
further developing facts and avenues of research in support of litigation to end the
artificial ceiling on nurse wages (attached as Exhibits 6 and 7).    The initial retainer
provided that her work would occur under my guidance; the second agreement provided
that an SEIU official would provide general guidance but that any portion of her work
that exclusively involved litigation development would be carried out under the
direction and control of J&H.    Aside from commenting on proposals or work from the
expert firm, Ms. Bergmann's only work that occurred under the direction and control of
J&H occurred in connection with J&H's retention of private investigators in October
2005, discussed below, to follow up on the work by the expert economic consultants and
SEIU's earlier research.    Documents authored by her in this role are listed as Items 87
and 88 on the Log.    Professor Bergmann continued to consult with J&H in this role
through approximately April 2006.    Plaintiffs have not directed Professor Bergmann to
withhold any documents in Albany.    Rather, the SEIU and Bergmann productions in
Chicago appear to contain multiple documents concerning her role consulting on
SEIU's public campaign, factual research and publications.

14.    In October 2005, after receiving the work of the expert economic consultants, J&H
retained an investigative firm, the Mintz Group, on behalf of the SEIU expressly "to
provide investigative services to assist J&H in rendering legal advice to the SEIU on
possible collusion by hospital employers in violation of the antitrust laws, and also in
anticipation of class action litigations on behalf of nurses in several labor markets

against hospital employers, utilizing the results of the investigation." Although the Mintz Group began its investigation in late October, the parties only reached agreement on final terms for the engagement in February 2006, when they signed a formal retainer (attached as Exhibit 8).

15.    The Mintz Group conducted its investigation under the direction and control of J&H and, beginning in or about November 2005, also Cohen Milstein, Hausfeld and Toll ("CMHT"). Documents generated by the Mintz Group during its investigation are listed on the privilege log at 9-31, 50, 55, 84, 118-24. As noted by Defendants, the Mintz Group misdirected its first bill to me at an SEIU address. But, as Defendants well know but omit mentioning (since SEIU produced redacted versions of all the Mintz bills in its Chicago production), every subsequent bill was sent directly to J&H.

16.    The work product of the Mintz Group has been utilized exclusively for the nurse wage litigations. Plaintiffs' counsel shared none of the Mintz work product listed on Plaintiff's Privilege log with SEIU personnel before filing the Complaint in this case. Only after SEIU received a subpoena from Defendants in this case did J&H provide SEIU's outside counsel for responding to discovery in this litigation, Bredhoff & Kaiser ("BK"), copies of Mintz work product generated before any representative plaintiff had retained J&H -- with the understanding that SEIU and BK would protect the documents as work product. The DC ethical rules have been construed by the DC Bar very broadly to require a lawyer to provide a former client a "copy [of] any document possessed by the lawyer *relating to the representation*, unless substantial grounds exist to refuse". See, e.g., D.C. Bar Op. 333. Because the Mintz work product informed J&H's advice to SEIU on the viability of the litigations in its role as third party payor; because SEIU and BK were willing to treat the material as Plaintiffs' counsel's work product; and because

J&H did not wish to frustrate legitimate discovery in this case, J&H disclosed the documents to BK.

17.    As counsel began drafting a complaint, counsel made specific inquiries to the SEIU research department concerning the interpretation of certain public data sources. Plaintiffs are withholding those inquires and certain responses to those inquires to the extent those responses tend to reveal the inquiring attorney's legal analysis or opinion. Ex. 1 Items 39, 53-4, 92, 96-7, 99.   Plaintiffs did not withhold responses from SEIU's research department that do not reveal an attorney's legal analysis or opinion.

18.    As individual representative nurse plaintiffs retained J&H and CMHT in March through October 2006, SEIU became solely a third party payor as to some fees and expenses for litigations in San Antonio, Chicago, Memphis, Albany and Detroit.  That relationship was later confirmed and generally formalized in an October 2006 letter agreement (attached as Exhibit 9).  Such support is fully consistent with J&H's representation of the Plaintiffs and other members of the putative nurse class.  The SEIU has agreed not to make any demands on J&H concerning the litigations or otherwise interfere with J&H's professional judgment about how best to serve the plaintiffs and the plaintiff class' interests.  If the Plaintiff class prevails, J&H will reimburse SEIU for its payments and pay a certain share of its fees into a segregated litigation fund maintained at the SEIU by its General Counsel and Associate General Counsel and dedicated by the SEIU Executive Board by resolution dated January 11, 2006, to the sole purpose of providing legal representation as permitted by applicable laws and legal ethics. See Exhibit 10.

I declare, under penalty of perjury, that the foregoing is true and correct to the best of my recollection. Executed on 7/13, 2007 at _Washington, DC_

_Mary Joyce Carlson_
Mary Joyce Carlson

# EXHIBIT 8



# THE FELDMAN GROUP, INC.

October 21, 2005

TO:    Mike Kapsa
       Elizabeth Buchanan

FR:    Diane Feldman
       Ruth Steinmetz

RE:    Nurses Wage Survey Memo – Introduction

Across 24 different geographic markets and a diverse array of hospitals, registered nurses' wages range from less than 24 dollars an hour to more than 33 dollars an hour. There are significant distinctions by market, with over half of nurses in Washington DC earning more than 33 dollars an hour (one of the best markets for nurses) as compared to Scranton, where 52 percent of nurses earn less than 24 dollars an hour (and where nurses, not surprisingly, are disproportionately unhappy on the job). Experienced nurses and those who work in the OR and ICU/CCU units are also more likely to earn more than their colleagues.

Overall, these nurses are satisfied with many aspects of their job, including their job security (in a reflection of the nursing shortage) and their schedule. They are satisfied with their wages – but it is tepid satisfaction, at best – and some (particular younger, less experienced nurses) see room for improvement in their health insurance, pensions, and other benefits. Approximately half of nurses, particularly those who are well paid, are satisfied with their hospital management, but half are not – and those who feel dissatisfied feel more passionately.

Many nurses are also concerned about the staffing levels at their hospital. They are keenly aware of the nursing shortage and agree that low wages are exacerbating the shortage.

These conclusions are drawn from a groundbreaking survey of 9,230 nurses in 24 different targeted markets. SEIU will shortly receive a detailed synopsis of key indicators in every market where there is a sufficient sample size to look deeper. Each synopsis will summarize key indicators within that market, including nurses' demographics, job satisfaction, wages, and finally, attitudes toward the shortage and hospital management. In each individual market agency and nurses who do not receive health insurance benefits or pensions or who do not know if they receive these benefits were eliminated from the memo. This memo summarizes overall findings and particularly significant subgroup differences in advance of those market-level details.

SEIU-DET 03936

**Methodology**

This survey includes 9,230 interviews with registered nurses in 24 selected markets from across the country. The nurses contacted for this survey were selected randomly from a list of nurses who were eligible to participate. Random sample surveys should be interpreted as providing an estimate of the likely results had all members of the population of interest been interviewed. This estimate is subject to sampling error that is larger for smaller subgroups and for responses with a wider range of variation.

*This survey is based on interviews in 24 selected markets and as such the results should not be construed as reflective of all nurses nationally.* The overall numbers cited herein describe results for those 24 markets, and the margin of error for those results is less than 1 percent at the 95 percent confidence level. This means that if *every single* registered nurse in each of those markets who was eligible to participate in this survey did so, those results would fall within 1 percentage point of the reported results 95 percent of the time. Ninety-five (95) percent is the standard confidence level for most surveys, both public and private.

Within smaller subgroups, where there are fewer than 9,230 interviews, the margin of error is larger. The survey includes 404 interviews with registered nurses, for example, from the Cleveland market, and any results that are specific to that market have a margin of error of 4.9 percent.

The following summary does not refer to any subgroup or market results where there are fewer than 100 interviews, because the margin of error at that sample size or less is prohibitive to meaningful analysis. In particular, the Tampa, Syracuse, and West Palm Beach markets include fewer than 100 interviews and as such specific results for those markets are not discussed here. With only a few exceptions, this survey also did not include more than 100 interviews with nurses at any one hospital. For that reason, this summary does not reference results by individual hospitals.

The market areas used in this analysis are Phoenix (AZ), Albany (NY), Austin (TX), Chicago (IL), Cincinnati (OH), Cleveland (OH), Columbus (OH), Detroit (MI), Houston (TX), Kansas City (MO), Las Vegas (NV), Knoxville (TN), Memphis (TN), Nashville (TN), Milwaukee (WI), Pittsburgh (PA), Rochester (NY), St. Louis (MO), San Antonio (TX), Scranton (PA), and Washington, D.C.

**Profile of the Nurses**

Six (6) percent of nurses in the current survey are employed by an agency, while the vast majority are not (94 percent). Of those nurses who are not employed by an agency, a majority work as staff nurses (80 percent), while 15 percent work in direct patient care and only 5 percent work as case managers.

Nearly one quarter (24 percent) of nurses work in medical surgical units, and another 20 percent work in the intensive care unit (ICU). Fewer nurses work with mothers and infants (12

SEIU-DET 03937

SEIU National Nurses Wage Survey – October 2005                          Page 3
**The Feldman Group, Inc.**

percent), in the operating room (10 percent), and in the emergency room (8 percent). A quarter of nurses (25 percent) work in another unit altogether.

SEIU-DET 03938

Twenty-nine (29) percent of nurses have worked one to ten years as a nurse, 30 percent have worked 11 to 20 years, 28 percent have worked 21 to 30 years, and 12 percent have worked 31 to 50 years. Nurses in the OR have the most experience (52 percent have over 21 years), while newer, less experienced nurses with less than 10 years of experience are more likely to work in the ICU (34 percent) and Medical/Surgical (35 percent).

## Job Satisfaction

Over half of nurses are satisfied with a wide range of on-the-job conditions, leading off with their job security (a reflection of the nursing shortage) and scheduling. Nurses are satisfied with their wages but do not feel strongly, and express the most concern about staffing levels in their unit.

In a reflection of the nursing shortage, nurses are most satisfied with their job security. As the table below shows, 91 percent of nurses are satisfied (59 percent very) with their job security, while only 8 percent are dissatisfied overall. Nurses in every unit feel secure about their job, as do both less experienced and more experienced nurses. Scheduling ranks a very strong second source of satisfaction on the job (86 percent satisfied, 51 percent very). In terms of intensity, both job security and scheduling rank far ahead of other on-the-job conditions.

| Table 1: Job Satisfaction | | | |
|---|---|---|---|
| | Very Satisfied | Total Satisfied | Total Dissatisfied |
| Your job security | 59 | 91 | 8 |
| Scheduling | 51 | 86 | 13 |
| Your workload | 28 | 70 | 29 |
| Mandatory overtime required of you | 26 | 42 | 16 |
| Staffing in your unit | 25 | 63 | 35 |
| Your wages or salary | 24 | 74 | 25 |
| Health care benefits | 24 | 59 | 26 |
| Retirement or pension plan | 22 | 60 | 32 |

Seventy (70) percent of nurses are satisfied with their workload, including 28 percent who are very satisfied. Nurses in the OR (83 percent) are disproportionately content with their workload, while those in the ER (66 percent) and Medical/Surgical (62 percent) are less satisfied.

Nurses express tempered satisfaction with their wages. Nearly three quarters (74 percent) of nurses are satisfied with their wages overall, but only 24 percent are *very* satisfied and the majority (51 percent) are just somewhat satisfied. The most experienced nurses are as satisfied (76 percent) as nurses who have worked less than 10 years (74 percent) – a likely reflection of wage stagnation. Logically, nurses' satisfaction with their wages increases in a fairly linear relationship with their income.

Fifty-three (53) percent of nurses receive both health insurance and a pension, 13 percent receive just insurance, and 14 percent receive only a pension; 19 percent receive neither. Not

surprisingly, there is a significant distinction between those groups in their satisfaction with benefits. Overall, 59 percent of nurses are satisfied with their health insurance and 60 percent are satisfied with their pensions. Among nurses who receive both benefits, 73 percent are happy with their health care and 70 percent are satisfied with their pensions. Among those who receive neither, just a third are satisfied with their insurance (30 percent) and pension (36 percent).

Nurses are least satisfied, but still positive, about the level of staffing in their unit. Sixty-three (63) percent of nurses are satisfied with staffing, while 35 percent are not. Only 25 percent are very satisfied, as compared to 38 percent who are somewhat satisfied. Satisfaction with staffing hits a ceiling of 70 percent among OR nurses and a floor or 59 percent among nurses in the ER.

Finally, a slight 42 percent plurality of nurses are satisfied with the mandatory overtime required of them, while 16 percent are dissatisfied and fully 36 percent are unsure (likely because these nurses work little overtime, if any). There are few significant differences by years of experience or unit, although OR nurses are slightly more dissatisfied (22 percent) than their peers. Nearly half of nurses in the ER are unsure how they feel about mandatory overtime (44 percent). Interestingly, even among nurses who work the most overtime – over 8 hours a week – 39 percent are satisfied, while 25 percent are not and 29 percent are unsure.

## Hospital Management

Nurses are ambivalent about the management at their hospital. Exactly half of nurses are satisfied overall (50 percent), but few feel strongly; just 10 percent are very satisfied while 40 percent – the plurality – are just somewhat satisfied. Forty-nine (49) percent are dissatisfied and intensity is slightly stronger, as 18 percent are very dissatisfied and 31 percent are just somewhat dissatisfied.

Across markets, nurses in Albany are most satisfied (61 percent) and those in Scranton – where the nursing shortage appears particularly acute and wages artificially low – are most dissatisfied (a very strong 72 percent) with management. Results across the different units, and by years of experience, are relatively flat. Nurses who earn more, however, are more likely to evaluate management positively than less well paid nurses.

## Wages and Benefits

Nurses' pay ranges from approximately 24 dollars an hour to over 33 dollars an hour. As table 2 shows, overall, 15 percent of nurses earn less than $24 per hour, 14 percent earn $24 to $26 an hour, 14 percent earn $26 to $28 an hour, 14 percent earn $28 to $30 an hour, 18 percent earn $30 to $33 an hour, and 13 percent earn over $33 an hour.

Nurses' pay varies significantly across markets. The best markets for nurses, not accounting for cost of living, include Washington DC (where a striking 52 percent of nurses are in the top hourly wage bracket), Columbus (32 percent), Chicago (24 percent), and Houston (22

SEIU-DET 03940

SEIU National Nurses Wage Survey – October 2005                              Page 6
**The Feldman Group, Inc.**

percent). Nurses earn significantly less than average in Knoxville (54 percent), Scranton
(52 percent), Rochester (30 percent), and St. Louis (30 percent).

By unit, nurses in the ICU and OR are better paid than their peers (17 percent and 18
percent, respectively, earn over 33 dollars an hour). Medical/Surgical nurses earn less (18
percent earn under 24 dollars an hour) than other units. Nurses in the ER resemble nurses overall
in their wages.

Logically, the most experienced nurses also earn more than their less experienced peers.
Forty-one (41) percent of nurses with over 30 years of experience earn over 30 dollars an hour,
as compared to 31 percent of all nurses and just 21 percent of nurses with less than 10 years of
experience. Indeed, 28 percent of the least experienced nurses earn less than 24 dollars an hour –
almost double the overall average of 15 percent among all nurses.

| Table 2: Hourly Wage Information | | | | | |
|---|---|---|---|---|---|
| | Under $24 | $24-$26 | $26-$28 | $28-$30 | $30-$33 | Over $33 |
| **Total** | **15** | **14** | **14** | **14** | **18** | **13** |
| Albany | 22 | 15 | 10 | 11 | 22 | 10 |
| Austin | 16 | 25 | 20 | 17 | 8 | 6 |
| Chicago | 15 | 10 | 7 | 10 | 25 | 24 |
| Cincinnati | 18 | 16 | 16 | 17 | 8 | 11 |
| Cleveland | 8 | 27 | 30 | 12 | 9 | 4 |
| Columbus | 12 | 8 | 10 | 9 | 20 | 32 |
| Detroit | 6 | 7 | 16 | 22 | 30 | 9 |
| Houston | 9 | 8 | 12 | 14 | 23 | 22 |
| Kansas City | 18 | 16 | 19 | 19 | 9 | 7 |
| Knoxville | 54 | 18 | 8 | 3 | 2 | 4 |
| Memphis | 13 | 21 | 16 | 20 | 10 | 8 |
| Milwaukee | 8 | 13 | 13 | 16 | 28 | 12 |
| Nashville | 14 | 16 | 16 | 16 | 13 | 9 |
| Pittsburgh | 25 | 28 | 15 | 11 | 8 | 4 |
| Rochester | 30 | 15 | 9 | 14 | 12 | 5 |
| St. Louis | 30 | 14 | 12 | 9 | 19 | 6 |
| San Antonio | 25 | 14 | 16 | 10 | 14 | 9 |
| Scranton | 52 | 24 | 10 | 1 | 1 | 4 |
| Washington, D.C. | 2 | 5 | 4 | 10 | 15 | 52 |
| ICU | 15 | 13 | 12 | 12 | 20 | 17 |
| ER | 15 | 15 | 14 | 15 | 18 | 14 |
| OR | 12 | 13 | 14 | 13 | 19 | 18 |
| Medical surgical | 18 | 15 | 14 | 14 | 18 | 11 |
| Mother/Infant | 14 | 14 | 15 | 17 | 18 | 11 |
| Other | 15 | 15 | 16 | 14 | 17 | 11 |
| 1-10 years exp | 28 | 19 | 14 | 9 | 11 | 10 |
| 11-20 years exp | 12 | 14 | 16 | 16 | 20 | 13 |

SEIU-DET 03941

SEIU National Nurses Wage Survey – October 2005                    Page 7
**The Feldman Group, Inc.**

| | | | | | | |
|---|---|---|---|---|---|---|
| 21-30 years exp. | 9 | 11 | 14 | 17 | 22 | 15 |
| 31 or more exp. | 10 | 12 | 11 | 15 | 24 | 17 |

SEIU-DET 03942

Nearly half of nurses received a raise within the past six months (49 percent) and 27 percent received a raise within the past six months to a year. Nurses in each of the major units are equally likely to have received a raise in the past year, but across markets nurses in Columbus (60 percent in the last six months), Pittsburgh (56 percent), Rochester (62 percent), and St. Louis (65 percent) are most likely to have received a recent raise.

For most nurses, their wage raise was less than four percent within the last year. Eight (8) percent of nurses say their raise was less than 1 percent, 14 percent report a rate change between 1 and 2 percent, 24 percent say their raise was between 2 and 3 percent, 20 percent say 3 to 4 percent, 9 percent say 4 to 5 percent, and finally 8 percent say their raise was more than 8 percent. Nurses' raises are fairly stable across units and years of experience.

In addition to raises, nearly two-thirds of nurses also receive a range of pay differentials or premium pay options. Twenty-seven (27) percent of nurses receive a differential for working nights and 21 percent each receive additional pay for working on call and on weekend nights. Eleven (11) percent receive a charge differential, 5 percent get a differential for additional education, and 2 percent for a training certificate. Thirty-seven (37) percent of nurses, however, do not receive any pay differentials.

Sixteen (16) percent of nurses report a change in their differentials within the past six months and 14 percent experienced a change within the last six months to a year. Fifteen (15) percent received a differential within the last one to two years, 18 percent received one within the last two to five years, and 13 percent received a change 5 or more years ago.

Changes to the differentials have mostly focused on working nights (26 percent) and weekend nights (23 percent), followed by being on call (18 percent) and the charge differential (12 percent). Fewer nurses have seen a change in their differential for education (4 percent) or receiving a training certificate (2 percent). For over half of nurses, those differentials increased by under a dollar an hour (32 percent) or by 1 to 2 dollars an hour (20 percent).

Finally, just over half of nurses receive both health insurance and a retirement plan from their employer (53 percent), while 13 percent receive just health insurance and 14 percent receive only a retirement plan. Nineteen (19) percent of nurses receive neither benefit. The most experienced nurses are more likely to receive both benefits (57 percent), while less experienced nurses with less than 10 years of experience are more likely to receive neither (23 percent). A third of nurses (33 percent) say those benefits have stayed the same over the last five years, while 19 percent say they have increased and 26 percent say they have decreased.

**The Nursing Shortage**

Nearly all nurses, in every part of the country, agree that nursing shortages in their area hospitals have become worse over the past five years, and many feel that low wages are to blame.

Eighty-five (85) percent of nurses overall agree that the nurses shortage in hospitals in their area has gotten worse over the five years, including 33 percent who strongly agree.

**The Feldman Group, Inc.**

Agreement is strikingly consistent across each of the targeted markets although the shortage is perceived to be particularly acute in Scranton (97 percent agree), Memphis (92 percent), Pittsburgh (91 percent), and Nashville (90 percent). The shortage is also pronounced across each unit and particularly with ER (89 percent) and OR (also 89 percent) nurses.

Nurses agree that insufficient wages and raises play a role in the shortage. Seventy-seven (77 percent) of nurses agree that the shortage exists because nurses' pay has not increased enough over the last decade, including 30 percent who strongly agree. Not surprisingly, the less each nurse earns, or the longer since they have received a raise, the more they are likely to agree that low wages are fueling the shortage.

# # #

SEIU-DET 03944

# EXHIBIT 9

## FINAL QUESTIONAIRE
## SEIU NURSES SURVEY
## AUGUST 4, 2005

Hello. Is (READ NAME BELOW) there?

(AFTER RESPONDENT ON THE PHONE) This is (caller name), and I'm calling for Nationwide Opinion Surveys. I would like to ask you a few questions concerning the problems facing the nursing profession. I am not selling anything. This is a research study, and it won't take much time.

(ref:0)

---

Q.1 First, do you currently work as a registered nurse?

  [ ] -01 Yes
  [ ] -02 OTHER RESPONSE (TERMINATE)

(ref:NURSESCRN)

---

Q.2 Which of the following best describes the place in which you work?

  [ ] -01 Hospital
  [ ] -02 Doctor's office (TERMINATE)
  [ ] -03 Nursing home (TERMINATE)
  [ ] -04 Other response (TERMINATE)

(ref:EMPLOY)

---

Q.3 Are you employed by an agency?

  [ ] -01 Yes (SKIP TO QUESTION 22)
  [ ] -02 No
  [ ] -03 Other response (TERMINATE)

(ref:AGNCY)

---

Q.4 (If not employed by an agency) Which of the following best describes your current nursing position?

  [ ] -01 Staff nurse
  [ ] -02 Direct patient care
  [ ] -03 Case manager
  [ ] -04 Supervisor/manager or Administrator (TERMINATE)

(ref:POSITION)

---

SEIU NURSES SURVEY-August 2005                                    Page        2
**The Feldman Group, Inc.**

Q.5 Now, please tell me whether you are very satisfied, somewhat satisfied, somewhat dissatisfied, or very dissatisfied with each of the following aspects of your job?

(PROBE AFTER EACH ASPECT: Are you very satisfied, somewhat satisfied, somewhat dissatisfied, or very dissatisfied with that?)
(ROTATE Q.5 to Q.12)


1 = Very Satisfied
2 = Somewhat Satisfied
3 = Somewhat Dissatisfied
4 = Very Dissatisfied
5 = Don't know (VOL)
6 = Other/refused (VOL)

_____ 5 Your wages or salary

_____ 6 Retirement or pension plan

_____ 7 Health care benefits

_____ 8 Your workload

_____ 9 Scheduling

_____ 10 Your job security

_____ 11 Staffing in your unit

_____ 12 Mandatory overtime required of you

(ref:SATIS)

------------------------------------------------------------------

SEIU-DET 01044

SEIU NURSES SURVEY-August 2005                    Page        3
**The Feldman Group, Inc.**

Q.13 Here are some statements people have made about the nursing shortage in
hospitals. Please tell me whether you agree or disagree with each one. If you
agree or disagree strongly, please say so. -
1=Strongly agree
2=Agree
3=Disagree
4=Strongly disagree
5=Don't know ROTATE Q.13 TO Q.16

_____ 13 One reason there is a nursing shortage is that nurses' pay has not
increased enough over the last decade

_____ 14 Although many hospitals offer signing bonuses or other incentives,
hospitals do not compete with each other for nurses by increasing
their base wages.

_____ 15 Shortages in other occupations have disappeared when wages
increase, however for the nursing profession; hospitals have agreed
to keep wages low.

_____ 16 Nursing shortages in area hospitals have gotten worse in the past
five (5) years.

(ref:NURSESTMNTS)

------------------------------------------------------------

Now I would like to speak to you about hospital management.

------------------------------------------------------------

Q.17 When thinking about hospital management staff, would you say you are very
satisfied, somewhat satisfied, somewhat dissatisfied, or very dissatisfied with
hospital management?

[ ] -01 Very satisfied
[ ] -02 Somewhat satisfied
[ ] -03 Somewhat dissatisfied
[ ] -04 Very dissatisfied
[ ] -05 Don't know (VOL)

(ref:MANGMT)

------------------------------------------------------------

SEIU NURSES SURVEY-August 2005                                    Page      4
**The Feldman Group, Inc.**

Q.18 Are you aware of any meetings or interactions your nursing director and/or
Human Resource people have with other hospitals?

   [ ] -01 Yes
   [ ] -02 No
   [ ] -03 Don't know

                   (ref:ASK1)
-------------------------------------------------------------------

Q.19 (If yes) How many times a year did the nursing director and/or Human
Resource people have these meeting or interactions with other hospitals?

   [ ] -01 Once a year
   [ ] -02 One to two times a year
   [ ] -03 Over two times a year
   [ ] -04 Don't know

                   (ref:TIMES)
-------------------------------------------------------------------

Q.20 Do you have any reason to believe that hospital management is sharing wage
information with other hospitals?

   [ ] -01 No
   [ ] -02 Yes
   [ ] -03 Don't know (VOL)

                   (ref:ASK2)
-------------------------------------------------------------------

Q.21 (If yes) What comments or meetings would lead you to believe that your
employer is sharing wage information with other hospitals?

       _____

       _____

       _____

       _____

       _____

                   (ref:COLL)
-------------------------------------------------------------------

SEIU-DET 01046

SEIU NURSES SURVEY-August 2005                    Page        5
**The Feldman Group, Inc.**

Thank you. I would like to ask you a few final questions for statistical
purposes.

---

Q.22 What year did you graduate from nursing school?

(ref:GRAD)

---

Q.23 How many years have you been a hospital nurse?

(ref:NURSE)

---

Q.24 What best describes the unit you work in?

[ ] -01 ICU/CCU
[ ] -02 Emergency Room
[ ] -03 Operating Room (OR)
[ ] -04 Medical Surgical
[ ] -05 Mother/Infant
[ ] -06 Other (VOL)

(ref:UNIT)

---

Q.25 What hospital do you work in?

_____

_____

_____

_____

_____

(ref:HOSPT)

---

Q.26 How many years have you worked at this hospital?

(ref:YEARS)

---

SEIU-DET 01047

SEIU NURSES SURVEY-August 2005                                    Page        6
**The Feldman Group, Inc.**

Q.27 On average how much overtime do you work each week?

[ ] -01 Less than 2 hours
[ ] -02 2 to 4 hours
[ ] -03 4 to 6 hours
[ ] -04 6 to 8 hours
[ ] -05 Over 8 hours

(ref:OVRTIME)

-----------------------------------------------------------------

Q.28 Please tell me if you receive any of these employer benefits?

[ ] -01 Health insurance
[ ] -02 Pension
[ ] -03 Both health insurance and pension
[ ] -04 None of the above
[ ] -05 Don't know/refused (VOL)

(ref:BENIES)

-----------------------------------------------------------------

Q.29 And have those benefits increased or decrease or stayed the same in the last five years?

[ ] -01 Increased
[ ] -02 Decreased
[ ] -03 Stayed the same
[ ] -04 Don't know/refused (VOL)

(ref:BENCHANGE)

-----------------------------------------------------------------

Q.30 Has any other hospital attempted to recruit you away from your current job by offering more compensation than what you currently receive?

[ ] -01 Yes
[ ] -02 No

(ref:RECRUIT)

-----------------------------------------------------------------

Q.31 (If yes) How much in additional wages did the other hospital offer you?

[ ] -01 Under 1 dollar an hour
[ ] -02 1 to 2 dollars an hour
[ ] -03 2 to 3 dollars an hour
[ ] -04 3 to 5 dollars an hour
[ ] -05 over 5 dollars an hour

(ref:RECRUITAMT)

-----------------------------------------------------------------

SEIU-DET 01048

SEIU NURSES SURVEY-August 2005                              Page        7
**The Feldman Group, Inc.**

Q.32 Would you please tell me into which of the following categories your basic
hourly wage rate falls? Just stop me when I get to your category (READ
CATEGORIES):

[ ] -01 less than $16 an hour
[ ] -02 $16 to $17
[ ] -03 $17 to $18
[ ] -04 $18 to $19
[ ] -05 $19 to $20
[ ] -06 $20 to $21
[ ] -07 $21 to $22
[ ] -08 $22 to $23
[ ] -09 $23 to $24
[ ] -10 $24 to $25
[ ] -11 $25 to $26
[ ] -12 $26 to $27
[ ] -13 $27 to $28
[ ] -14 $28 to $29
[ ] -15 $29 to $30
[ ] -16 $30 to $31
[ ] -17 $31 to $32
[ ] -18 $32 to $33
[ ] -19 $33 to $34
[ ] -20 $34 to $35
[ ] -21 Over $35 an hour
[ ] -22 (DON'T READ) don't know/refused

                              (ref:INCOME)
------------------------------------------------------------
Q.33 When was the last time your wage rate changed?

[ ] -01 In the past six months
[ ] -02 Six months to a year ago
[ ] -03 A year ago to two years ago
[ ] -04 Two years ago to five years ago

                              (ref:RATE)
------------------------------------------------------------
Q.34 How much did your wage rate change?

[ ] -01 0 to 1 percent
[ ] -02 1 to 2 percent
[ ] -03 2 to 3 percent
[ ] -04 3 to 4 percent
[ ] -05 4 to 5 percent
[ ] -06 more than five percent

SEIU NURSES SURVEY-August 2005
**The Feldman Group, Inc.**

(ref:RTCHANGE)

----------------------------------------------------------------

Q.35 Did you receive a signing bonus when you were hired?

[ ] -01 Yes
[ ] -02 No
[ ] -03 Don't know/refused (VOL)

(ref:BONUS)

----------------------------------------------------------------

Q.36 (If yes) What was the amount of your signing bonus?

[ ] -01 Under $1,000
[ ] -02 $1,000 to $2,000
[ ] -03 $2,000 to $3,000
[ ] -04 $3,000 to $4,000
[ ] -05 Over $4,000

(ref:BONUSAMT)

----------------------------------------------------------------

Q.37 Did you receive a retention/longevity bonus in the last two years?

[ ] -01 Yes
[ ] -02 No
[ ] -03 Don't know/refused (VOL)

(ref:LONG)

----------------------------------------------------------------

Q.38 (If yes) What was the amount of your last retention/longevity bonus?

[ ] -01 Under $1,000
[ ] -02 $1,000 to $2,000
[ ] -03 $2,000 to $3,000
[ ] -04 $3,000 to $4,000
[ ] -05 Over $4,000

(ref:LONGAMT)

----------------------------------------------------------------

SEIU NURSES SURVEY-August 2005                              Page        9
**The Feldman Group, Inc.**

Q.39 Which one of the following pay differentials or premium pay do you receive?
(ACCEPT MULTIPLE RESPONSES)

    [ ] -01 On call
    [ ] -02 Night
    [ ] -03 Weekend Night
    [ ] -04 Education
    [ ] -05 Training Certificate
    [ ] -06 Charge Differential
    [ ] -07 Other
    [ ] -08 None of the above

                    (ref:DIFFRT)

------------------------------------------------------------

Q.40 When was the last time one of your differentials or premium pay changed?

    [ ] -01 In the past six months
    [ ] -02 Six months to a year ago
    [ ] -03 A year ago to two years ago
    [ ] -04 Two years ago to five years ago

                    (ref:DIFFPAY)

------------------------------------------------------------

Q.41 Which one of the following pay differentials or premium pay changed?

    [ ] -01 On call
    [ ] -02 Night
    [ ] -03 Weekend Night
    [ ] -04 Education
    [ ] -05 Training Certificate
    [ ] -06 Charge Differential
    [ ] -07 Other

                    (ref:WHICH)

------------------------------------------------------------

Q.42 How much did that differential or premium pay change?

    [ ] -01 Under 1 dollar an hour
    [ ] -02 1 to 2 dollars an hour
    [ ] -03 2 to 3 dollars an hour
    [ ] -04 3 to 5 dollars an hour
    [ ] -05 over 5 dollars an hour

                    (ref:DIFFCHG)

------------------------------------------------------------

Thank you for your time and have a nice evening.

SEIU NURSES SURVEY–August 2005                              Page        10
The Feldman Group, Inc.

My supervisor verifies 20% of my work.  For that reason I would like to verify
that your name is _____ and that I reached you at _____.

[Validation Calls: Floor supervisors confirm name and phone number and
readminister the screener in 20% of cases.]

SEIU-DET 01052

# EXHIBIT 10

**Stacey Kelly**

| | | | |
|---|---|---|---|
| **From:** | Jamie Cohen | **Sent:** | Mon 8/29/2005 10:12 AM |
| **To:** | Stacey Kelly | | |
| **Cc:** | | | |
| **Subject:** | For field research team | | |
| **Attachments:** | | | |

stacey: this needs to go out to the field research team, along with the reminder about tonight's call. You should drop into the body of the email and also as an attachment. I am sending the chart separately and it should also get attached.

Dr. Bergman thought of an additional line of questions that are useful for talking with nurse recruiters. Her thinking was that nurse recruiters might be less alert to illegalities and more likely to spill the beans than the people in the hospital associations. Because the purpose of communicating wages among hospitals is presumably to prevent a hospitals' raiding of other hospitals' staffs by raising wages unilaterally; she thought it might be good to ask questions about movements of nurses from one hospital in the region to another like the following:

1. Is there much movement of nurses from one hospital to another in the region?

2. If not, why not? If there is little hope of picking up nurses from other hospitals in the area, where do they get them from?.

3. Do nurses working for one hospital in the region ever try to approach another hospital asking for more pay? If so, what would the hospital's response be?

4. What does a hospital do if it has so many agency nurses that the cost is excessive? Would it make sense to raise pay of staff nurses and hope to attract more?

5. What causes hospitals to raise pay? Is there a communication with other hospitals to let them know it is happening?

6. Is there a regular time of year for raising pay? Do all the hospitals do it at the same time?

7. Is there any concern of hospital administrators that nurses in their hospital might be attracted to another hospital in the area? If not, why not?

8. Do hospital administrators have an opinion as to why the nursing labor market is unlike almost all other labor markets, and seldom operates in a timely way to get rid of the nurse shortage?

SIUE-MEM 01121

# EXHIBIT 11

**Michael Kapsa**

| | |
|---|---|
| **From:** | Arne Anderson |
| **Sent:** | Thursday, August 18, 2005 12:49 PM |
| **To:** | Stacey Kelly |
| **Cc:** | Mary Kay Henry; Jamie Cohen; Michael Kapsa |
| **Subject:** | script |

MY NAME IS ---------------------.  I AM A RESEARCHER WORKING WITH
PROFESSOR BARBARA BERGMAN OF AMERICAN UNIVERSITY IN
WASHINGTON DC, WHO IS WORKING ON AN ECONOMIC STUDY OF
THE NURSE SHORTAGE AND THE RELATED ISSUE OF NURSE
WAGES.

COULD I TAKE A FEW MINUTES OF YOUR TIME TO ASK YOU SOME
SHORT QUESTIONS?

SEIU-DET 01970

# EXHIBIT 12

# Barbara R. Bergmann

**From:**    Barbara R. Bergmann
**Sent:**    7/28/2006 11:15:56
**o:**    'charlieb@umich.edu' charlieb@umich.edu;
**Cc:**
**Bcc:**
**Subject:**    RE: nurse anti-trust suits

They hired the ꞏedacte group of labor economists --ꞏRedacted, etc. They spent a lot of time trying to figure out, using CPS wage data, in which met areas the monopsonies were the worst, although I kept telling them that the practice was universal. (In any case the number of nurses in the CPS in any year in many met areas is like 2). More to the point, they hired a premier detective agency to find retired nurse-administrators who would rat on the hospitals.

Barbara R. Bergmann
Professor Emerita of Economics, University of Maryland and American University
mailing address: 5430 41 Place NW, DC 20015
brberg@verizon.net   202-537-3036
-----Original Message-----
From: charlieb@umich.edu [mailto:charlieb@umich.edu]
Sent: Friday, July 28, 2006 1:14 AM
To: Barbara R. Bergmann
Subject: Re: nurse anti-trust suits

I gather the hospitals haven't hired their experts yet.  Any idea who
did the expert work for the nurses?  (I'm not looking for work, I'm
just curious.)

Quoting "Barbara R. Bergmann" <brbergmann@verizon.net>:


> <http://www.nytimes.com/>
>
> The idea that I previously corresponded with you about -- that the nurse
> shortage has been a result of hospitals' behavior in reducing competition
> for nurses, keeping their salaries below the level at which supply equals
> demand -- has resulted in a set of lawsuits, as reported in the NY Times.
>
>
>
> Link to the NY Times:
>
> NATIONAL  | June 21, 2006
> Suit Claims Hospitals Fixed Nurses' Pay
> <http://www.nytimes.com/2006/06/21/us/21nurses.html?emc=eta1>
>
>
>
>
> Barbara R. Bergmann
> Professor Emerita of Economics, University of Maryland and American
> University
> mailing address: 5430 41 Place NW, DC 20015
> brberg@verizon.net   202-537-3036
>
>

# EXHIBIT 13

# Barbara R. Bergmann

**From:**    Barbara R. Bergmann
**Sent:**    8/16/2006 21:49:35
**To:**    'beverly' beverlyc@pipeline.com;
**Cc:**
**Bcc:**
**Subject:**    RE: nurse anti-trust suits

Redacted

As to the nurses, I tried for donkey's years to interest the Am Nurses Assn, which has union chapters, but they couldn't be bothered. It turns out that the org is dominated by nurse-administrators, who are the very ones doing the dirty work. I also tried interesting the California Nurses Assn, which is the militant bunch that pushed the nurse-patient ratio legislation through the Assembly. But they weren't interested either. Maybe the hypothesis seemed too far out. What did the trick was writing up the paper I sent you, which I did for a meeting of the Am Anti-Trust Inst, an org patronized by the plaintiffs bar. The SEIU became wildly interested when they saw my writeup, and spent what must have been hundreds of thousands for a premier detective agency to assemble evidence for these cases. What is curious, though, is that in their publicity even they do not emphasize pay, but better patient care. No doubt based on focus groups. It must be un-nurse-like to admit wanting more money.

Redacted

Love, Barbara

Barbara R. Bergmann
Professor Emerita of Economics, University of Maryland and American University
mailing address: 5430 41 Place NW, DC 20015
brberg@verizon.net   202-537-3036

--Original Message-----
From: beverly [mailto:beverlyc@pipeline.com]
Sent: Wednesday, August 16, 2006 8:33 PM
To: Barbara R. Bergmann
Subject: Re: nurse anti-trust suits

Redacted

Redacted    As for the nurses, I read the story you
mentioned.  It's ghastly if the hospitals have been doing that.  It's
too bad there isn't more of a union presence in the market today.
That's why it took so long for the nurses to take action.   Do you
detect anything yet that gives you a lift about the progress of world
affairs?   The Republicans are hoping Lieberman wins.   Time is flying
so quickly that it's almost October 25 already and we'll be at the
opera.    Love,   Bev

>
>
>_____
>Barbara R. Bergmann
>Professor Emerita of Economics, University of Maryland and American
>University
>mailing address: 5430 41 Place NW, DC 20015
>brberg@verizon.net   202-537-3036
>
>
>

# EXHIBIT 14

13

JAMES
MINTZ
GROUP

November 17, 2005

Mary Joyce Carlson, Esq.
Service Employees International Union
1313 L Street, NW
Washington, DC 20005

Dear Mary:

Herewith please find our invoice in the Nurse Pay matter for October 2005.

Please let me know if you have any questions.

Sincerely,

James Mintz

JM/ab
Enclosures

JAMES MINTZ GROUP, INC.

32 AVENUE OF THE AMERICAS • 21ST FLOOR • NEW YORK, NY • 10013 • PHONE: 212-489-7100 • FAX: 212-489-7037
1150 18TH STREET, NW • SUITE 500 • WASHINGTON, D.C. • 20036 • PHONE: 202-887-9100 • FAX: 202-887-9122
621 SANSOME STREET • SAN FRANCISCO, CA • 94111 • PHONE: 415-765-9900 • FAX: 415-765-9910 • LIC. #24029
44 WEST FLAGLER STREET • SUITE 1050 • MIAMI, FL • 33130 • PHONE: 305-373-8838 • FAX: 305-373-3234 • LIC. #A9700128
205 NORTH MICHIGAN AVENUE • SUITE 912 • CHICAGO, IL • 60601 • PHONE: 312-861-9500 • FAX: 312-861-9558
JAMES MINTZ & ASSOCIATES • 8 GRAY'S INN SQUARE • GRAY'S INN • LONDON WC1R 5AZ • ENGLAND • PHONE: 011-44-207-242-1226 • FAX: 011-44-207-242-6682

SEIU-CH 0121

SEIU-DET 00952

J·A·M·E·S
M·I·N·T·Z
G·R·O·U·P

November 17, 2005

Invoice #      305964
FEDERAL ID#   133699793

**PRIVILEGED AND CONFIDENTIAL**
Mary Joyce Carlson, Esq.
Service Employees International Union
1313 L Street, NW
Washington, DC  20005

Our File No.:   1887-12899
RE:   <u>Nurse Pay Matter</u>

**PROFESSIONAL SERVICES RENDERED THROUGH 10/31/05**
**Payment is due upon receipt of this invoice. Thank you for your prompt payment.**

| DAY-BY-DAY SERVICES | Hrs/Rate |
|---|---|
| 10/03/2005 | 1.50<br>275 /hr |
| 10/04/2005 | 1.25<br>275 /hr |
| | 1.50<br>375 /hr |
| | 0.75<br>250 /hr |
| | 0.50<br>250 /hr |
| REDACTED | 0.50<br>250 /hr |
| 10/05/2005 | 0.50<br>375 /hr |
| 10/06/2005 | 2.50<br>275 /hr |
| | 2.00<br>375 /hr |
| | 2.00<br>250 /hr |

Service Employees Internationa

November 17, 2005

Page    2

Invoice #    305964

| DAY-BY-DAY SERVICES | Hrs/Rate |
|---|---|
| 10/11/2005 | 2.50 |
| | 275 /hr |
| | 0.50 |
| | 375 /hr |
| | 1.00 |
| | 250 /hr |
| 10/12/2005 | 3.25 |
| | 275 /hr |
| | 0.25 |
| | 375 /hr |
| | 1.00 |
| | 250 /hr |
| | 4.00 |
| | 250 /hr |
| 10/13/2005 | 1.75 |
| | 275 /hr |
| | 1.00 |
| | 250 /hr |
| | 2.25 |
| | 250 /hr |
| 10/14/2005 | 3.00 |
| | 275 /hr |
| | 4.00 |
| | 250 /hr |
| 10/17/2005 | 3.25 |
| | 275 /hr |
| | 2.50 |
| | 250 /hr |
| | 2.25 |
| | 250 /hr |

REDACTED

SEIU-DET 00954

Service Employees Internationa

November 17, 2005

Page    3

Invoice #    305964

| DAY-BY-DAY SERVICES | Hrs/Rate |
|---|---|
| 10/18/2005 | 4.00<br>275 /hr |
| | 1.75<br>375 /hr |
| | 0.50<br>250 /hr |
| | 1.25<br>250 /hr |
| | 5.50<br>150 /hr . |
| 10/19/2005 | 0.50<br>275 /hr |
| | 3.75<br>150 /hr |
| 10/20/2005 | 1.75<br>275 /hr |
| | 0.50<br>375 /hr |
| | 0.25<br>250 /hr |
| | 5.50<br>150 /hr |
| 10/21/2005 | 0.25<br>375 /hr |
| | 1.25<br>275 /hr |
| | 2.75<br>250 /hr |
| | 6.25<br>150 /hr |

REDACTED

SEIU-DET 00955

Service Employees Internationa

November 17, 2005

Page    4

Invoice #    305964

| DAY-BY-DAY SERVICES | Hrs/Rate |
|---|---|
| 10/24/2005 | 1.00<br>375 /hr |
| | 3.25<br>275 /hr |
| | 0.50<br>250 /hr |
| | 5.25<br>150 /hr |
| 10/25/2005 | 0.50<br>375 /hr |
| | 2.75<br>275 /hr |
| | 7.25<br>150 /hr |
| 10/26/2005 | 0.25<br>375 /hr |
| | 3.50<br>200 /hr |
| | 2.50<br>275 /hr |
| | 1.00<br>250 /hr |
| | 4.00<br>250 /hr |
| | 0.75<br>150 /hr |
| | 8.50<br>150 /hr |

REDACTED

SEIU-DET 00956

Service Employees Internationa
November 17, 2005

| DAY-BY-DAY SERVICES | Hrs/Rate |
|---|---|
| | 5.00 |
| 10/27/2005 | 200 /hr |
| | 2.50 |
| | 275 /hr |
| | 0.25 |
| | 375 /hr |
| | 2.50 |
| | 250 /hr |
| | 4.00 |
| | 250 /hr |
| | 3.00 |
| | 150 /hr |
| | 8.00 |
| | 150 /hr |

**REDACTED**

| | 5.00 |
|---|---|
| 10/28/2005 | 200 /hr |
| | 2.25 |
| | 275 /hr |
| | 2.50 |
| | 250 /hr |
| | 6.25 |
| | 150 /hr |
| | 7.25 |
| | 150 /hr |
| | 3.25 |
| 10/31/2005 | 275 /hr |
| | 5.25 |
| | 250 /hr |

SEIU-DET 00957

Service Employees Internationa

November 17, 2005

Page    6

Invoice #    305964

| DAY-BY-DAY SERVICES | Hrs/Rate |
|---|---|
| | 4.00 |
| | 250 /hr |
| | 2.50 |
| | 150 /hr |
| REDACTED | 4.50 |
| | 150 /hr |

|  | 190.25 | $41,506.25 |
|---|---|---|
| **TOTAL FEES** | | |

| **CHARGES AND DISBURSEMENTS** | Amount |
|---|---|
| Copies | $229.00 |
| Databases | $869.86 |
| Telephone | $746.88 |
| **TOTAL DISBURSEMENTS** | $1,845.74 |
| **Total amount of this bill** | $43,351.99 |
| **Balance due** | $43,351.99 |

Remit payment to: James Mintz Group,
            32 Avenue of the Americas, 21st Floor, New York, NY 10013

JAMES
MINTZ
GROUP

December 13, 2005

David P. Dean, Esq.
James & Hoffman
1101 Seventeenth Street, NW, Suite 510
Washington, DC 20036

Dear David:

Herewith please find our invoice in the Nurse Pay matter for November 2005.

The previous balance refers to our October 2005 invoice, a copy of which I have enclosed for your convenience.

Please let me know if you have any questions.

Sincerely,

James Mintz

JM/ab
Enclosures

JAMES MINTZ GROUP, INC.

32 AVENUE OF THE AMERICAS • 21ST FLOOR • NEW YORK, NY • 10013 • PHONE: 212-489-7100 • FAX: 212-489-7037
1150 18TH STREET, NW • SUITE 500 • WASHINGTON, D.C. • 20036 • PHONE: 202-887-9100 • FAX: 202-887-9122
621 SANSOME STREET • SAN FRANCISCO, CA • 94111 • PHONE: 415-765-9900 • FAX: 415-765-9910 • LIC. #24029
44 WEST FLAGLER STREET • SUITE 1050 • MIAMI, FL • 33130 • PHONE: 305-373-8838 • FAX: 305-373-3234 • LIC. #A9700128
205 NORTH MICHIGAN AVENUE • SUITE 912 • CHICAGO, IL • 60601 • PHONE: 312-861-9500 • FAX: 312-861-955B
JAMES MINTZ & ASSOCIATES • 8 GRAY'S INN SQUARE • GRAY'S INN • LONDON WC1R 5AZ • ENGLAND • PHONE: 011-44-207-242-1226 • FAX: 011-44-207-242-6682

J A M E S
M I N T Z
G R O U P

December 13, 2005

Invoice #    306211
FEDERAL ID#    133699793

**PRIVILEGED AND CONFIDENTIAL**
David P. Dean, Esq.
James & Hoffman
1101 Seventeenth Street, NW,
Suite 510
Washington, DC  20036

Our File No.:    1887-12899
RE:    Nurse Pay Matter

**PROFESSIONAL SERVICES RENDERED THROUGH 11/30/05**
**Payment is due upon receipt of this invoice. Thank you for your prompt payment.**

| DAY-BY-DAY SERVICES | Hrs/Rate |
|---|---|
| 11/01/2005 | 5.50<br>200 /hr |
| | 2.75<br>275 /hr |
| REDACTED | 6.50<br>250 /hr |
| | 7.00<br>250 /hr |
| | 4.25<br>150 /hr |
| | 7.00<br>150 /hr |
| 11/02/2005 | 4.00<br>200 /hr |

SEIU-DET 00960

Service Employees Internationa

December 13, 2005

Page     2

Invoice #   306211

| DAY-BY-DAY SERVICES | Hrs/Rate |
|---|---|
| | 3.50<br>275 /hr |
| | 3.00<br>250 /hr |
| | 6.00<br>250 /hr |
| | 4.50<br>150 /hr |
| | 6.00<br>150 /hr |

REDACTED

| 11/03/2005 | 4.50<br>200 /hr |
|---|---|
| | 3.00<br>275 /hr |
| | 2.25<br>350 /hr |
| | 4.50<br>250 /hr |
| | 5.00<br>250 /hr |
| | 4.75<br>150 /hr |
| | 1.00<br>250 /hr |
| | 5.00<br>150 /hr |

Service Employees Internationa
December 13, 2005

| DAY-BY-DAY SERVICES | Hrs/Rate |
|---|---|
| 11/04/2005 | 2.00<br>200 /hr |
| | 4.25<br>275 /hr |
| | 0.75<br>375 /hr |
| | 1.25<br>375 /hr |
| | 2.00<br>250 /hr |
| | 3.00<br>300 /hr |
| REDACTED | 5.00<br>250 /hr |
| | 5.25<br>150 /hr |
| | 3.00<br>250 /hr |
| | 6.15<br>150 /hr |
| 11/05/2005 | 5.00<br>200 /hr |
| | 3.50<br>275 /hr |
| | 0.25<br>375 /hr |
| | 5.50<br>250 /hr |

SEIU-DET 00962

Service Employees Internationa

December 13, 2005

Page    4

Invoice #   306211

| DAY-BY-DAY SERVICES | Hrs/Rate |
|---|---|
| | 4.75<br>300 /hr |
| | 6.00<br>250 /hr |
| | 1.00<br>250 /hr |
| 11/06/2005 | 3.00<br>200 /hr |
| | 2.75<br>275 /hr |
| | 0.25<br>375 /hr |
| REDACTED | 5.00<br>250 /hr |
| | 6.00<br>300 /hr |
| | 1.00<br>250 /hr |
| | 2.00<br>250 /hr |
| 11/07/2005 | 5.00<br>200 /hr |
| | 7.25<br>275 /hr |
| | 2.25<br>375 /hr |
| | 7.00<br>250 /hr |

SEIU-DET 00963

Service Employees Internationa                                    Page      5
December 13, 2005                                    Invoice #    306211

| DAY-BY-DAY SERVICES | Hrs/Rate |
|---|---|
| | 6.00 |
| | 300 /hr |
| | |
| | 6.00 |
| | 250 /hr |
| | 2.00 |
| | 250 /hr |
| | 3.25 |
| | 150 /hr |
| 11/08/2005 | 9.00 |
| | 200 /hr |
| | 6.00 |
| | 275 /hr |
| | 1.25 |
| | 375 /hr |
| | 5.00 |
| | 250 /hr |
| | 6.00 |
| | 300 /hr |
| | 0.50 |
| | 175 /hr |
| | 5.00 |
| | 250 /hr |
| | 3.50 |
| | 250 /hr |
| | 4.25 |
| | 150 /hr |

REDACTED

SEIU-DET 00964

Service Employees Internationa

Page     6

December 13, 2005

Invoice #    306211

| DAY-BY-DAY SERVICES | Hrs/Rate |
| --- | --- |
| 11/09/2005 | 8.00<br>200 /hr |
| | 7.00<br>275 /hr |
| | 4.00<br>250 /hr |
| | 8.25<br>300 /hr |
| | 2.00<br>250 /hr |
| | 2.00<br>250 /hr |
| | 4.00<br>250 /hr |
| | 3.85<br>150 /hr |
| 11/10/2005 | 7.25<br>275 /hr |
| | 1.75<br>375 /hr |
| | 7.00<br>250 /hr |

REDACTED

Service Employees Internationa

December 13, 2005

Page    7

Invoice #    306211

| DAY-BY-DAY SERVICES | Hrs/Rate |
|---|---|
| | 9.25 |
| | 300 /hr |
| | 1.00 |
| | 250 /hr |
| | 4.25 |
| | 250 /hr |
| | 4.50 |
| | 275 /hr |
| | 5.00 |
| | 150 /hr |
| 11/11/2005 | 2.75 |
| | 275 /hr |
| | 1.25 |
| | 375 /hr |
| | 8.75 |
| | 300 /hr |
| | 1.00 |
| | 150 /hr |
| | 3.00 |
| | 250 /hr |
| | 10.00 |
| | 275 /hr |
| | 4.25 |
| | 150 /hr |

REDACTED

SEIU-DET 00966

Service Employees Internationa

December 13, 2005

| DAY-BY-DAY SERVICES | Hrs/Rate |
|---|---|
| 11/12/2005 | 1.75<br>275 /hr |
| 11/13/2005 | 2.00<br>275 /hr |
| 11/14/2005 | 1.50<br>275 /hr |
|  | 1.25<br>375 /hr |
| 11/17/2005 | 1.00<br>275 /hr |
|  | 0.75<br>375 /hr |
|  | 1.00<br>300 /hr |
|  | 0.50<br>250 /hr |
| 11/18/2005 | 3.50<br>275 /hr |
|  | 0.25<br>375 /hr |
|  | 5.75<br>300 /hr |
|  | 1.50<br>250 /hr |
|  | 2.00<br>200 /hr |
| 11/19/2005 | 0.50<br>275 /hr |

REDACTED

Service Employees Internationa ·

December 13, 2005

Page     9

Invoice #    306211

| DAY-BY-DAY SERVICES | Hrs/Rate |
|---|---|
| | 3.50<br>300 /hr |
| 11/21/2005 | 3.00<br>275 /hr |
| | 3.50<br>250 /hr |
| | 4.75<br>300 /hr |
| | |
| | 3.50<br>200 /hr |
| **REDACTED** | 2.25<br>150 /hr |
| 11/22/2005 | 0.75<br>200 /hr |
| | 3.50<br>275 /hr |
| | |
| | 0.25<br>350 /hr |
| | 0.50<br>375 /hr |
| | 4.00<br>250 /hr |
| | 6.50<br>300 /hr |
| | |
| | 7.00<br>200 /hr |

SEIU-DET 00968

Service Employees Internationa

December 13, 2005

Page    10

Invoice #    306211

| DAY-BY-DAY SERVICES | Hrs/Rate |
|---|---|
| | 4.75<br>150 /hr |
| 11/23/2005 | 2.50<br>275 /hr |
| | 1.00<br>250 /hr |
| | 4.25<br>300 /hr |
| | 2.00<br>150 /hr |
| REDACTED | 4.50<br>200 /hr |
| 11/28/2005 | 2.75<br>275 /hr |
| | 0.50<br>250 /hr |
| | 5.00<br>300 /hr |
| | 2.75<br>275 /hr |
| | 1.00<br>200 /hr |
| 11/29/2005 | 4.25<br>275 /hr |

SEIU-DET 00969

Service Employees Internationa

December 13, 2005

Page    11

Invoice #    306211

| DAY-BY-DAY SERVICES | Hrs/Rate |
|---|---|
| | 5.75<br>300 /hr |
| | 7.00<br>150 /hr |
| | 5.50<br>275 /hr |
| 11/30/2005    REDACTED | 4.00<br>275 /hr |
| | 0.50<br>375 /hr |
| | 2.00<br>250 /hr |
| | 4.00<br>300 /hr |
| | 4.00<br>150 /hr |
| | 5.75<br>275 /hr |
| **TOTAL FEES** | 498.00    $121,900.00 |

| CHARGES AND DISBURSEMENTS | Amount |
|---|---|
| Copies | $325.50 |
| Databases | $3,895.53 |
| Meals | $9.00 |

SEIU-DET 00970

Service Employees Internationa

Page    12

December 13, 2005

Invoice #    306211

| | |
|---|---|
| Taxis | $77.90 |
| Telephone | $1,933.44 |
| **TOTAL DISBURSEMENTS** | **$6,241.37** |
| **Total amount of this bill** | **$128,141.37** |
| **Previous balance** | **$43,351.99** |
| **Balance due** | **$171,493.36** |

Remit payment to: James Mintz Group,

32 Avenue of the Americas, 21st Floor, New York, NY 10013

SEIU-DET 00971



JAMES
MINTZ
GROUP

January 31, 2006

David P. Dean, Esq.
James & Hoffman
1101 Seventeenth Street, NW, Suite 510
Washington, DC 20036

Dear David:

Herewith please find our invoice in the Nurse Pay matter for December 2005.

As you will see, we have discounted the bill by 15%, per our agreement. This amounted to a discount of over $20,000. This discount is itemized at the end of the bill.

Please let me know if you have any questions.

Sincerely,

James Mintz

JM/ab
Enclosures

JAMES MINTZ GROUP, INC.

32 AVENUE OF THE AMERICAS • 21ST FLOOR • NEW YORK, NY • 10013 • PHONE: 212-489-7100 • FAX: 212-489-7037
1150 18TH STREET, NW • SUITE 500 • WASHINGTON, D.C. • 20036 • PHONE: 202-887-9100 • FAX: 202-887-9122
621 SANSOME STREET • SAN FRANCISCO, CA • 94111 • PHONE: 415-765-9900 • FAX: 415-765-9910 • LIC. #24029
44 WEST FLAGLER STREET • SUITE 1050 • MIAMI, FL • 33130 • PHONE: 305-373-8838 • FAX: 305-373-3234 • LIC. #A9700128
205 NORTH MICHIGAN AVENUE • SUITE 912 • CHICAGO, IL • 60601 • PHONE: 312-861-9500 • FAX: 312-861-9558
JAMES MINTZ & ASSOCIATES • 8 GRAY'S INN SQUARE • GRAY'S INN • LONDON WC1R 5AZ • ENGLAND • PHONE: 011-44-207-242-1226 • FAX: 011-44-207-242-6682

SEIU-DET 00972

J A M E S
M I N T Z
G R O U P

January 31, 2006

Invoice #    306465
FEDERAL ID#    133699793

<u>PRIVILEGED AND CONFIDENTIAL</u>
David P. Dean, Esq.
James & Hoffman
1101 Seventeenth Street, NW,
Suite 510
Washington, DC 20036

Our File No.:    1887-12899
RE:   <u>Nurse Pay Matter</u>

**PROFESSIONAL SERVICES RENDERED THROUGH 12/31/05**
**Payment is due upon receipt of this invoice. Thank you for your prompt payment.**

| DAY-BY-DAY SERVICES | Hrs/Rate |
|---|---|
| 12/01/2005 | 2.75<br>275 /hr |
| | 0.50<br>375 /hr |
| | 1.50<br>250 /hr |
| REDACTED | 6.75<br>300 /hr |
| | 3.50<br>275 /hr |
| | 2.75<br>150 /hr |
| | 0.25<br>275 /hr |

SEIU-DET 00973

Service Employees Internationa                                        Page      2
January 31, 2006                                            Invoice #   306465

| DAY-BY-DAY SERVICES | Hrs/Rate |
|---|---|
| | 5.50 |
| | 150 /hr |
| 12/02/2005 | 4.00 |
| REDACTED | 275 /hr |
| | 1.00 |
| | 375 /hr |
| | 6.50 |
| | 300 /hr |
| | 4.00 |
| | 300 /hr |
| | 1.50 |
| | 275 /hr |
| | 4.50 |
| | 275 /hr |
| | 2.25 |
| | 150 /hr |
| 12/03/2005 | 0.25 |
| | 275 /hr |
| | 2.75 |
| | 275 /hr |
| 12/04/2005 | 0.25 |
| | 275 /hr |
| | 5.25 |
| | 300 /hr |
| | 1.50 |
| | 175 /hr |
| | 1.25 |
| | 275 /hr |
| 12/05/2005 | 3.00 |
| | 275 /hr |

SEIU-DET 00974

Service Employees Internationa                                      Page     3

January 31, 2006                                        Invoice #    306465

| DAY-BY-DAY SERVICES | Hrs/Rate |
|---|---|
| | 5.75 |
| | 300 /hr |
| | 1.25 |
| | 275 /hr |
| 12/06/2005 | 1.50 |
| | 275 /hr |
| | 0.25 |
| | 250 /hr |
| | 3.25 |
| | 300 /hr |
| 12/07/2005 | 2.75 |
| | 275 /hr |

REDACTED

| | |
|---|---|
| | 0.50 |
| | 375 /hr |
| | 4.00 |
| | 300 /hr |
| | 1.25 |
| | 275 /hr |
| 12/08/2005 | 0.50 |
| | 275 /hr |
| | 1.25 |
| | 300 /hr |
| 12/09/2005 | 1.50 |
| | 275 /hr |
| | 5.25 |
| | 275 /hr |
| | 0.50 |
| | 375 /hr |

SEIU-DET 00975

Service Employees Internationa                                    Page      4

January 31, 2006                                          Invoice #   306465

| DAY-BY-DAY SERVICES | Hrs/Rate |
|---|---|
| | 0.75 |
| | 300 /hr |
| | 7.00 |
| | 150 /hr |
| | 2.50 |
| | 275 /hr |
| | 2.00 |
| | 200 /hr |
| | 1.25 |
| | 150 /hr |
| 12/10/2005 | 3.50 |
| | 275 /hr |
| | 1.50 |
| | 275 /hr |
| 12/11/2005 | 3.00 |
| | 275 /hr |
| | 0.75 |
| | 275 /hr |
| | 2.75 |
| | 300 /hr |
| 12/12/2005 | 6.00 |
| | 275 /hr |
| | 5.00 |
| | 275 /hr |
| | 0.50 |
| | 300 /hr |
| | 0.50 |
| | 275 /hr |
| | 3.25 |
| | 200 /hr |
| | 6.75 |
| | 150 /hr |

REDACTED

SEIU-DET 00976

Service Employees Internationa

January 31, 2006

## DAY-BY-DAY SERVICES

|  | Hrs/Rate |
|---|---|
|  | 6.00<br>200 /hr |
|  | 6.00<br>275 /hr |
| 12/13/2005 | 7.00<br>275 /hr |
|  | 6.25<br>275 /hr |
|  | 0.50<br>300 /hr |
| REDACTED | 2.00<br>275 /hr |
|  | 4.00<br>200 /hr |
|  | 6.50<br>150 /hr |
|  | 6.75<br>200 /hr |
|  | 8.00<br>275 /hr |
|  | 3.50<br>200 /hr |
|  | 1.00<br>150 /hr |
| 12/14/2005 | 4.00<br>275 /hr |
|  | 5.50<br>275 /hr |

SEIU-DET 00977

Service Employees Internationa

January 31, 2006

Page    6

Invoice #    306465

| DAY-BY-DAY SERVICES | Hrs/Rate |
|---|---|
| | 1.50 |
| | 300 /hr |
| | 3.25 |
| | 275 /hr |
| | 4.50 |
| | 200 /hr |
| | 3.50 |
| | 150 /hr |
| | 7.50 |
| | 200 /hr |
| | 6.00 |
| | 275 /hr |
| | 6.00 |
| | 200 /hr |
| 12/15/2005 | 5.00 |
| | 275 /hr |
| | 6.75 |
| | 275 /hr |
| | 4.25 |
| | 300 /hr |
| | 2.25 |
| | 275 /hr |
| | 2.00 |
| | 175 /hr |
| | 3.50 |
| | 200 /hr |
| | 6.50 |
| | 150 /hr |

REDACTED

SEIU-DET 00978

Service Employees Internationa

January 31, 2006

Page 7

Invoice #  306465

| DAY-BY-DAY SERVICES | Hrs/Rate |
|---|---|
| | 4.00<br>200 /hr |
| | 7.25<br>275 /hr |
| | 6.50<br>200 /hr |
| 12/16/2005 | 4.00<br>275 /hr |
| | 6.25<br>275 /hr |
| | 4.00<br>300 /hr |
| REDACTED | 3.25<br>200 /hr |
| | 6.00<br>150 /hr |
| | 7.50<br>200 /hr |
| | 4.00<br>275 /hr |
| | 6.50<br>200 /hr |
| 12/17/2005 | 2.50<br>275 /hr |
| | 0.75<br>275 /hr |
| | 4.75<br>300 /hr |
| | 2.75<br>275 /hr |

SEIU-DET 00979

Service Employees Internationa                          Page    8

January 31, 2006                              Invoice #   306465

| DAY-BY-DAY SERVICES | | Hrs/Rate |
|---|---|---|
| | | 2.50 |
| | | 200 /hr |
| | | 3.50 |
| | | 150 /hr |
| 12/18/2005 | | 2.00 |
| | | 275 /hr |
| | | 1.00 |
| | | 275 /hr |
| | | 5.00 |
| | | 300 /hr |
| | | 2.00 |
| | | 200 /hr |
| | | 2.75 |
| | | 275 /hr |
| 12/19/2005 | REDACTED | 2.50 |
| | | 275 /hr |
| | | 6.50 |
| | | 275 /hr |
| | | 4.50 |
| | | 300 /hr |
| | | 3.00 |
| | | 200 /hr |
| | | 5.25 |
| | | 150 /hr |
| | | 7.00 |
| | | 200 /hr |
| | | 7.25 |
| | | 275 /hr |

Service Employees Internationa
January 31, 2006

Page    9
Invoice #    306465

| DAY-BY-DAY SERVICES | Hrs/Rate |
|---|---|
| | 1.00<br>200 /hr |
| 12/20/2005 | 8.00<br>275 /hr |
| | 5.75<br>275 /hr |
| | 4.25<br>300 /hr |
| | 7.00<br>275 /hr |
| | 3.50<br>200 /hr |
| | 4.00<br>150 /hr |
| | 4.00<br>200 /hr |
| | 8.00<br>275 /hr |
| 12/21/2005 | 7.00<br>275 /hr |
| | 6.00<br>275 /hr |
| | 5.50<br>300 /hr |
| | 3.25<br>275 /hr |
| | 2.00<br>200 /hr |

REDACTED

SEIU-DET 00981

Service Employees Internationa

January 31, 2006

| DAY-BY-DAY SERVICES | Hrs/Rate |
|---|---|
| | 4.25<br>150 /hr |
| | 4.00<br>200 /hr |
| | 6.50<br>275 /hr |
| 12/22/2005 | 5.00<br>275 /hr |
| | 1.00<br>200 /hr |
| | 3.00<br>200 /hr |
| | 3.00<br>200 /hr |
| | 5.00<br>275 /hr |
| | 3.50<br>200 /hr |
| 12/23/2005 | 3.00<br>275 /hr |
| | 1.75<br>275 /hr |
| | 3.00<br>200 /hr |
| | 3.25<br>275 /hr |
| | 3.00<br>200 /hr |

REDACTED

SEIU-DET 00982

Service Employees Internationa

January 31, 2006

| DAY-BY-DAY SERVICES | Hrs/Rate |
|---|---|
| 12/27/2005 | 0.50<br>275 /hr |
| | 0.25<br>250 /hr |
| | 5.75<br>300 /hr |
| | 3.00<br>200 /hr |
| | 2.00<br>275 /hr |
| | 6.00<br>200 /hr |
| | 5.00<br>150 /hr |
| 12/28/2005 | 1.50<br>275 /hr |
| | 5.00<br>300 /hr |
| | 2.50<br>275 /hr |
| | 2.00<br>200 /hr |
| | 0.50<br>275 /hr |
| | 1.50<br>200 /hr |
| | 3.00<br>150 /hr |

REDACTED

SEIU-DET 00983

Service Employees Internationa

January 31, 2006

Page · 12

Invoice #    306465

| DAY-BY-DAY SERVICES | Hrs/Rate | |
| --- | --- | --- |
| 12/29/2005 | 3.75 300 /hr | |
| | | |
| REDACTED | 3.25 275 /hr | |
| | 3.00 200 /hr | |
| | 2.00 200 /hr · | |
| 12/30/2005 | 0.25 275 /hr | |
| | 3.00 200 /hr | |

| TOTAL FEES | 564.50 | $137,518.75 |
| --- | --- | --- |

| CHARGES AND DISBURSEMENTS | Amount |
| --- | --- |
| Copies | $842.00 |
| Databases | $2,737.52 |
| Meals | $69.00 |
| Taxis | $119.30 |
| Telephone | $1,275.20 |
| **TOTAL DISBURSEMENTS** | **$5,043.02** |
| **Total amount of this bill** | **$142,561.77** |
| Courtesy Discount applied to this bill | -$20,627.81 |
| Previous balance | $171,493.36 |
| Total payments applied to previous balance | -$146,982.42 |
| Total adjustments applied to previous balance | -$24,510.94 |
| Balance due | $121,933.96 |

SEIU-DET 00984

Service Employees Internationa                                    Page    13

January 31, 2006                                    Invoice #    306465

Remit payment to: James Mintz Group,

32 Avenue of the Americas, 21st Floor, New York, NY 10013

**SEIU-CH 0154**

SEIU-DET 00985

JAMES
MINTZ
GROUP

February 24, 2006

David P. Dean, Esq.
James & Hoffman
1101 Seventeenth Street, NW, Suite 510
Washington, DC  20036

Dear David:

Herewith please find our invoice in the Nurse Pay matter for January 2006.

As you will see, I have discounted our fees by 15%, per our agreement.  This amounted to a discount of nearly $30,000.  This discount is itemized at the end of the bill.

The previous balance refers to our December 2005 invoice, a copy of which I have enclosed for your convenience.

Please let me know if you have any questions.

Sincerely,

James Mintz

JM/ab
Enclosures

JAMES MINTZ GROUP, INC.

32 AVENUE OF THE AMERICAS † 21ST FLOOR • NEW YORK, NY • 10013 • PHONE: 212-489-7100 • FAX: 212-489-7037
1150 18TH STREET, NW • SUITE 500 • WASHINGTON, D.C. • 20036 • PHONE: 202-887-9100 • FAX: 202-887-9122
621 SANSOME STREET • SAN FRANCISCO, CA • 94111 • PHONE: 415-765-9900 • FAX: 415-765-9910 • LIC. #24029
44 WEST FLAGLER STREET • SUITE 1050 • MIAMI, FL • 33130 • PHONE: 305-373-8838 • FAX: 305-373-3234 • LIC. #A9700128
205 NORTH MICHIGAN AVENUE • SUITE 912 • CHICAGO, IL • 60601 • PHONE: 312-861-9500 • FAX: 312-861-9558
JAMES MINTZ & ASSOCIATES • 8 GRAY'S INN SQUARE • GRAY'S INN • LONDON WC1R 5AZ • ENGLAND • PHONE: 011-44-207-242-1226 • FAX: 011-44-207-242-6682

SEIU-DET 00986

JAMES
MINTZ
GROUP

February 24, 2006

Invoice #    306649
FEDERAL ID#    133699793

**PRIVILEGED AND CONFIDENTIAL**
David P. Dean, Esq.
James & Hoffman
1101 Seventeenth Street, NW,
Suite 510
Washington, DC  20036

Our File No.:    1887-12899
RE:    Nurse Pay Matter

**PROFESSIONAL SERVICES RENDERED THROUGH 01/31/06**
Payment is due upon receipt of this invoice. Thank you for your prompt payment.

| DAY-BY-DAY SERVICES | Hrs/Rate |
|---|---|
| 01/02/2006 | 0.50<br>275 /hr |
| 01/03/2006 | 6.50<br>275 /hr |
| **REDACTED** | 0.50<br>375 /hr |
| | 2.50<br>150 /hr |
| | 3.00<br>275 /hr |
| | 5.50<br>300 /hr |

SEIU-DET 00987

Service Employees Internationa

Page    2

February 24, 2006

Invoice #    306649

| DAY-BY-DAY SERVICES | Hrs/Rate |
|---|---|
| | 4.50<br>275 /hr |
| | 2.50<br>175 /hr |
| | 2.00<br>150 /hr |
| | 7.50<br>200 /hr |
| | 2.50<br>200 /hr |
| 01/04/2006 | 8.00<br>275 /hr |
| **REDACTED** | 6.50<br>275 /hr |
| | 0.25<br>150 /hr |
| | 2.00<br>150 /hr |
| | 3.00<br>275 /hr |
| | 7.00<br>300 /hr |
| | 5.25<br>275 /hr |
| | 5.50<br>200 /hr |
| 01/05/2006 | 8.00<br>275 /hr |

SEIU-DET 00988

Service Employees Internationa

February 24, 2006

Page    3

Invoice #    306649

| DAY-BY-DAY SERVICES | Hrs/Rate |
|---|---|
| | 6.75<br>275 /hr |
| | 2.00<br>150 /hr |
| | 0.50<br>375 /hr |
| | 2.00<br>150 /hr |
| | 3.00<br>275 /hr |
| REDACTED | 4.75<br>300 /hr |
| | 4.50<br>275 /hr |
| | 0.75<br>200 /hr |
| | 8.00<br>200 /hr |
| | 3.50<br>200 /hr |
| 01/06/2006 | 5.00<br>275 /hr |
| | 3.00<br>200 /hr |
| | 5.75<br>275 /hr |
| | 1.00<br>150 /hr |

Service Employees Internationa                                    Page    4

February 24, 2006                                        Invoice #   306649

| DAY-BY-DAY SERVICES | Hrs/Rate |
|---|---|
| | 4.00<br>275 /hr |
| | 1.25<br>300 /hr |
| | 2.50<br>275 /hr |
| | 5.75<br>150 /hr |
| | 6.00<br>200 /hr |
| 01/07/2006 | 2.75<br>275 /hr |
| | 4.75<br>300 /hr |
| 01/08/2006 | 3.00<br>275 /hr |
| | 4.00<br>300 /hr |
| 01/09/2006 | 6.00<br>275 /hr |
| | 1.00<br>200 /hr |
| | 5.50<br>275 /hr |
| | 1.00<br>150 /hr |
| | 1.00<br>150 /hr |
| | 3.25<br>275 /hr |

REDACTED

SEIU-DET 00990

Service Employees Internationa

February 24, 2006

Page      5

Invoice #    306649

| DAY-BY-DAY SERVICES | Hrs/Rate |
|---|---|
| | 4.00<br>300 /hr |
| | 4.00<br>175 /hr |
| | 3.50<br>275 /hr |
| | 3.50<br>175 /hr |
| | 3.00<br>200 /hr |
| REDACTED | 6.75<br>200 /hr |
| 01/10/2006 | 6.50<br>275 /hr |
| | 6.25<br>275 /hr |
| | 6.25<br>150 /hr |
| | 1.00<br>275 /hr |
| | 0.75<br>150 /hr |
| | 4.00<br>300 /hr |
| | 3.25<br>275 /hr |

SEIU-DET 00991

Service Employees Internationa

February 24, 2006

Page     6

Invoice #    306649

| DAY-BY-DAY SERVICES | Hrs/Rate |
|---|---|
| | 5.00<br>200 /hr |
| | 2.50<br>250 /hr |
| | 7.50<br>200 /hr |
| 01/11/2006 | 8.00<br>275 /hr |
| REDACTED | 0.50<br>150 /hr |
| | 1.25<br>150 /hr |
| | 2.50<br>275 /hr |
| | 2.75<br>150 /hr |
| | 3.00<br>300 /hr |
| | 3.00<br>175 /hr |
| | 1.50<br>275 /hr |
| | 4.25<br>150 /hr |
| | 2.00<br>200 /hr |
| | 2.25<br>250 /hr |

SEIU-DET 00992

Service Employees Internationa

February 24, 2006

Page    7

Invoice #    306649

| DAY-BY-DAY SERVICES | Hrs/Rate |
|---|---|
| | 7.50<br>200 /hr |
| 01/12/2006 | 7.50<br>275 /hr |
| | 6.00<br>275 /hr |
| | 1.50<br>150 /hr |
| | 4.00<br>275 /hr |
| | 1.25<br>150 /hr |
| | 6.25<br>300 /hr |
| | 3.50<br>275 /hr |
| | 3.50<br>150 /hr |
| | 3.00<br>200 /hr |
| | 0.25<br>250 /hr |
| | 7.00<br>200 /hr |
| 01/13/2006 | 6.50<br>275 /hr |
| | 5.25<br>275 /hr |

REDACTED

SEIU-DET 00993

Service Employees Internationa

February 24, 2006

Page    8
Invoice #    306649

| DAY-BY-DAY SERVICES | Hrs/Rate |
|---|---|
| | 3.75 |
| | 150 /hr |
| | 0.50 |
| | 375 /hr |
| | 4.00 |
| | 275 /hr |
| | 0.25 |
| | 150 /hr |
| | 3.75 |
| | 175 /hr |
| | 0.75 |
| | 150 /hr |
| | 1.50 |
| | 200 /hr |
| 01/14/2006 | 3.00 |
| | 275 /hr |
| | 1.00 |
| | 275 /hr |
| | 5.50 |
| | 300 /hr |
| 01/15/2006 | 1.25 |
| | 275 /hr |
| | 2.75 |
| | 275 /hr |
| | 4.00 |
| | 275 /hr |
| 01/16/2006 | 0.50 |
| | 275 /hr |
| | 4.00 |
| | 300 /hr |
| 01/17/2006 | 5.00 |
| | 275 /hr |

REDACTED

SEIU-DET 00994

| DAY-BY-DAY SERVICES | Hrs/Rate |
|---|---|
| | 4.75<br>275 /hr |
| | 1.25<br>150 /hr |
| | 3.00<br>150 /hr |
| | 7.25<br>275 /hr |
| | 4.25<br>150 /hr |
| REDACTED | 2.75<br>300 /hr |
| | 1.00<br>275 /hr |
| | 3.00<br>200 /hr |
| | 5.00<br>200 /hr |
| 01/18/2006 | 7.25<br>275 /hr |
| | 3.50<br>275 /hr |
| | 2.25<br>150 /hr |
| | 2.50<br>150 /hr |
| | 3.75<br>250 /hr |

SEIU-DET 00995

Service Employees Internationa

Page    10
Invoice #    306649

February 24, 2006

| DAY-BY-DAY SERVICES | Hrs/Rate |
|---|---|
| | 6.75 |
| | 275 /hr |
| | 4.50 |
| | 150 /hr |
| | 7.00 |
| | 300 /hr |
| | 3.50 |
| | 175 /hr |
| | 4.00 |
| | 275 /hr |
| | 4.50 |
| | 200 /hr |
| 01/19/2006 | 5.25 |
| | 275 /hr |
| | 5.25 |
| | 275 /hr |
| | 3.00 |
| | 250 /hr |
| | 7.00 |
| | 275 /hr |
| | 1.00 |
| | 150 /hr |
| | 7.25 |
| | 300 /hr |
| | 4.75 |
| | 275 /hr |
| | 0.75 |
| | 150 /hr |

**REDACTED**

Service Employees Internationa

Page    11
Invoice #    306649

February 24, 2006

| DAY-BY-DAY SERVICES | Hrs/Rate |
|---|---|
| | 1.00 |
| | 150 /hr |
| | 1.00 |
| | 200 /hr |
| 01/20/2006 | 1.00 |
| | 275 /hr |
| | 5.00 |
| | 275 /hr |
| | 3.25 |
| | 150 /hr |
| | 3.00 |
| | 250 /hr |
| REDACTED | 5.75 |
| | 275 /hr |
| | 2.00 |
| | 150 /hr |
| | 5.00 |
| | 300 /hr |
| | 1.25 |
| | 150 /hr |
| | 0.50 |
| | 200 /hr |
| 01/21/2006 | 2.50 |
| | 275 /hr |
| | 0.50 |
| | 275 /hr |
| | 1.25 |
| | 275 /hr |

SEIU-DET 00997

Service Employees Internationa

February 24, 2006

Page    12

Invoice #    306649

| DAY-BY-DAY SERVICES | Hrs/Rate |
|---|---|
| | 4.00<br>300 /hr |
| 01/22/2006 | 2.50<br>275 /hr |
| | 1.25<br>275 /hr |
| 01/23/2006 | 6.25<br>275 /hr |
| | 3.25<br>275 /hr |
| | 2.50<br>150 /hr |
| | 1.00<br>250 /hr |
| | 5.00<br>275 /hr |
| | 6.50<br>138 /hr |
| | 6.25<br>300 /hr |
| | 1.50<br>275 /hr |
| | 5.50<br>175 /hr |
| | 3.50<br>150 /hr |
| 01/24/2006 | 7.00<br>275 /hr |

REDACTED

SEIU-DET 00998

Service Employees Internationa

February 24, 2006

Page    13

Invoice #    306649

| DAY-BY-DAY SERVICES | Hrs/Rate |
|---|---|
| | 3.50 |
| | 275 /hr |
| | 5.00 |
| | 275 /hr |
| | 6.50 |
| | 275 /hr |
| | 4.25 |
| | 300 /hr |
| | 4.50 |
| | 175 /hr |
| REDACTED | 5.75 |
| | 150 /hr |
| 01/25/2006 | 2.00 |
| | 250 /hr |
| | 6.00 |
| | 275 /hr |
| | 2.00 |
| | 250 /hr |
| | 2.75 |
| | 275 /hr |
| | 7.00 |
| | 275 /hr |
| | 6.25 |
| | 300 /hr |
| | 2.00 |
| | 175 /hr |

SEIU-DET 00999

Service Employees Internationa

February 24, 2006

Page    14
Invoice #    306649

| DAY-BY-DAY SERVICES | Hrs/Rate |
|---|---|
| | 2.75 |
| | 150 /hr |
| 01/26/2006 | 7.50 |
| | 275 /hr |
| | 5.00 |
| | 250 /hr |
| | 5.25 |
| | 275 /hr |
| | 6.00 |
| | 275 /hr |
| REDACTED | 6.75 |
| | 300 /hr |
| | 8.00 |
| | 150 /hr |
| | 2.50 |
| | 150 /hr |
| 01/27/2006 | 7.50 |
| | 275 /hr |
| | 4.00 |
| | 250 /hr |
| | 5.25 |
| | 275 /hr |
| | 6.50 |
| | 275 /hr |

SEIU-DET 01000

Service Employees Internationa                                    Page    15

February 24, 2006                                    Invoice #    306649

| DAY-BY-DAY SERVICES | Hrs/Rate |
|---|---|
| | 4.75 |
| | 300 /hr |
| | 1.50 |
| | 175 /hr |
| | 6.50 |
| | 150 /hr |
| | 5.00 |
| | 150 /hr |
| 01/28/2006 | 1.50 |
| | 275 /hr |
| REDACTED | 4.00 |
| | 250 /hr |
| | 0.50 |
| | 275 /hr |
| | 2.00 |
| | 250 /hr |
| | 3.50 |
| | 300 /hr |
| 01/29/2006 | 2.50 |
| | 275 /hr |
| | 3.00 |
| | 250 /hr |
| | 2.50 |
| | 275 /hr |
| 01/30/2006 | 6.00 |
| | 275 /hr |
| | 5.00 |
| | 250 /hr |
| | 3.75 |
| | 275 /hr |

SEIU-DET 01001

Service Employees Internationa

February 24, 2006

| DAY-BY-DAY SERVICES | Hrs/Rate |
|---|---|
| | 0.50 |
| | 350 /hr |
| | 3.75 |
| | 275 /hr |
| | 5.75 |
| | 300 /hr |
| | 2.00 |
| | 150 /hr |
| | 4.00 |
| | 200 /hr |
| | 3.50 |
| | 150 /hr |
| REDACTED | 4.00 |
| 01/31/2006 | 250 /hr |
| | 1.50 |
| | 275 /hr |
| | 3.25 |
| | 150 /hr |
| | 2.50 |
| | 250 /hr |
| | 2.50 |
| | 275 /hr |
| | 6.25 |
| | 300 /hr |
| | 4.00 |
| | 150 /hr |
| | 2.75 |
| | 275 /hr |
| **TOTAL FEES** | 816.25    $199,512.50 |

SEIU-DET 01002

Service Employees Internationa
February 24, 2006

| CHARGES AND DISBURSEMENTS | Amount |
|---|---|
| Auto | $323.85 |
| Copies | $422.00 |
| Databases | $2,230.57 |
| Documents | $53.73 |
| Hotel | $207.34 |
| Meals | $443.80 |
| Taxis | $71.00 |
| Telephone | $3,223.68 |
| **TOTAL DISBURSEMENTS** | **$6,975.97** |
| **Total amount of this bill** | **$206,488.47** |
| Courtesy Discount applied to this bill | -$29,926.88 |
| Previous balance | $121,933.96 |
| Balance due | $298,495.55 |

Remit payment to: James Mintz Group,
32 Avenue of the Americas, 21st Floor, New York, NY 10013

# EXHIBIT 15

14



## JAMES & HOFFMAN
A Professional Corporation
1101 17TH STREET, N.W., SUITE 510
WASHINGTON, D.C. 20036-4704

PACE
(202) 496-0500
Facsimile: 202-496-0555
www.jamhoff.com

Edgar N. James
Steven K. Hoffman
Judith A. Scott
Kathy L. Krieger
David P. Dean
Marie Chopra
Amy B. Fettig
Sean G. Bajkowski*
Katie B. Feiock

Of Counsel:
Mary Joyce Carlson*
Martha Walfoort
Christy L. Hoffman

* Not Admitted in DC

ejames@jamhoff.com
skhoffman@jamhoff.com
scottj@seiu.org
klkrieger@jamhoff.com
dpdean@jamhoff.com
mchopra@jamhoff.com
abfettig@jamhoff.com
sgbajkowski@jamhoff.com
kbfeiock@jamhoff.com

mjcarlson@jamhoff.com
mwalfoort@jamhoff.com
choffman@jamhoff.com

## FACSIMILE COVER SHEET

### PLEASE DELIVER IMMEDIATELY:

To:     Jamie Cohen
        SEIU Nurse Alliance

Facsimile Number:  202-350-6619

From: Mary Joyce Carlson

Client Number:        5200.069

Number of pages, including cover sheet: 3

Date:  January 30, 2006          Time: 2:21 pm

Contact: The Receptionist at (202) 496-0500 if problems occur.

### MESSAGE:

THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY
CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL OR OTHERWISE EXEMPT FROM DISCLOSURE UNDER
APPLICABLE LAW.  IF YOU ARE NOT THE INTENDED RECIPIENT, OR THE EMPLOYEE OR AGENT RESPONSIBLE FOR DELIVERING
THE MESSAGE TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR
COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED.  IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR,
PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA
U.S. POSTAL SERVICE.  THANK YOU.

SEIU-DET 01110

**Confidential Attorney/Client Communication**

<u>**ADVICE TO SEIU ORGANIZERS ON REFERRING NURSES TO COUNSEL**</u>

SEIU has asked for advice on how best to refer nurses to counsel, if those nurses suspect they may have been the victims of hospital collusion on wages.

**I.** <u>**After talking about the overall Value Nurse, Value Care campaign, organizers may make the following points about potential litigations to nurses who have been on staff at acute care hospitals sometime during the last four years (members or nonmembers).**</u> (Use judgment so that management is not immediately notified).

1. As part of its ongoing concern about nurse issues, and in response to various complaints, SEIU undertook an investigation of inappropriate information sharing and nurse wage suppression among hospitals.

2. SEIU's lawyers asked antitrust and class action specialists at an outside firm to confirm whether the results of the investigations revealed that hospitals in certain places conspire to maintain nurse wage levels at artificially low levels in violation of the antitrust laws.

3. If a nurse is interested in exploring her or his legal rights on this topic, ask; **"Would it be OK if we share your name and address with lawyers who are working on preparing an antitrust lawsuit against the hospitals so that they can mail you some written information that complies with the [name of state] rules for lawyer advertising and communication?"** If so, have the nurse sign some version of the sign-in sheet attached to this memo.

4. FAX sign-in sheets to James & Hoffman: 202-496-0555 (fax); 202-496-0500 (ph).

**II.     PROHIBITIONS**

You should avoid saying things that could lead to either of two mis-perceptions:

1. **It is important SEIU not be mis-perceived as controlling the antitrust litigations. It doesn't.** The litigations will be brought on behalf of nurses in an metropolitan area and the lawyers will act solely in those nurses' interests. SEIU will not control the timing of the suits, the prosecution of the suits, or their resolution.

2. **It is important SEIU not be mis-perceived as acting <u>as an agent</u> for some particular attorneys in referring nurses, soliciting legal business, and/or stirring up litigation.** SEIU is referring nurses to lawyers to help the nurses assert their rights because that is part of SEIU's own mission, not on behalf of any lawyers or groups of lawyers.

3. Also, you should <u>not</u> try to answer questions about the lawsuits. E.g. "What money might I get from the suit?  What legal protections would I have as a plaintiff?" **Instead, you should suggest that the person ask the lawyers all their questions, after they get the mailing about the litigations.**

SEIU-DET 01111

## SIGN-UP SHEET FOR FURTHER INFORMATION

By signing below, I ask that my name and address be shared with lawyers who are working on preparing an antitrust lawsuit so that they can mail me some written information that complies with the state rules for lawyer advertising and communications.

| Name | Address | Phone Number |
|------|---------|--------------|
|      |         |              |
|      |         |              |
|      |         |              |
|      |         |              |
|      |         |              |
|      |         |              |
|      |         |              |
|      |         |              |
|      |         |              |
|      |         |              |
|      |         |              |
|      |         |              |

SEIU-DET 01112

**From:**     Stacey Kelly [kellys@SEIU.ORG] on behalf of Jamie Cohen [cohenj@SEIU.ORG]
**Sent:**     Tuesday, January 31, 2006 3:30 PM
**To:**       Lilly Vallee; Barbara Rosenthal; mbseiu@aol.com; Norman Yen; Ha Nguyen
**Cc:**       Jamie Cohen; Aly Young
**Subject:** Attached

Please find attached from James & Hoffman advice on referral of Nurses to legal counsel.

Stacey Kelly
Administrative Assistant
Service Employees International Union
Health Systems Division
Phone:  202-730-7293
Fax:  202-350-6619

SEIU-DET 01113

# EXHIBIT 16



**SEIU.**®

**Stronger Together**

June 5, 2007

David P. Dean, Esq.
James & Hoffman, P.C.
1101 17th Street, NW, Suite 510
Washington, DC  20036

RE:    Nurse Wage Antitrust Litigation
<u>Special Project No. 280U-HSVRNLGL(R3)</u>

Dear David:

This is to formally confirm the retainer and funding relationship between Services Employees International Union ("SEIU") the SEIU Legal Defense Fund ("the Fund") and your firm with respect to the matters referenced above. This letter replaces the retainer entered into by letter dated October 31, 2006.

SEIU retained your firm to follow up on certain research by the SEIU Nurse Alliance on possible hospital collusion in various United States markets to suppress nurse wages. Your firm commenced investigations that found evidence of such unlawful collusion in certain jurisdictions. SEIU has authorized you to share the results of those investigations conducted on SEIU's behalf with other law firms, and to use the results of such investigations to bring a series of class action antitrust suits to stop and remedy such collusion. We agreed that SEIU and Judith Scott would be walled off from any confidential information in such litigations, that your firm would represent the plaintiffs and the plaintiff class in such cases, and that, as a nonparty, SEIU would not make any demands on your firm concerning the litigations or otherwise interfere with your professional judgment about how best to serve the plaintiffs and the plaintiff class' interests. SEIU has referred interested nurses to you as potential plaintiffs in such actions and has entered the following agreements with respect to billing and expenses.

With respect to your billing for services rendered in such cases, you currently bill SEIU at a rate of $175 per attorney hour, representing a partial hourly fee. Paralegal hours are billed at a rate of $75 per hour. Your office breaks down all statements by matter and/or case, identity of attorney performing the service, hours expended, and a brief description of the work involved. With respect to any expenses, you submit copies of receipts of all expenses incurred. Expenses must be listed under the applicable case or matter, and a subtotal for each case or matter including fees and expenses must be provided. Please be advised that the SEIU will not reimburse separately for general overhead expenses, such as secretarial overtime, absent unusual and compelling circumstances. Bills should be addressed to the undersigned at the SEIU Legal Department and reference the case and SEIU Special Project No. 280U-HSVRN(R3). Consistent with our agreement that SEIU will not be privy to confidential information in such cases, we have agreed that your firm will refrain from revealing any confidential information in the billing entries, and that some entries may therefore be less detailed than is the firm's normal practice.

ANDREW L. STERN
International President

ANNA BURGER
International Secretary-Treasurer

MARY KAY HENRY
Executive Vice President

GERRY HUDSON
Executive Vice President

ELISEO MEDINA
Executive Vice President

TOM WOODRUFF
Executive Vice President

SERVICE EMPLOYEES
INTERNATIONAL UNION
CTW, CLC

1800 Massachusetts Ave NW
Washington DC 20036

202.730.7000
TDD. 202.730.7481
www.SEIU.org

David Dean, Esq.
June 5, 2007
Page Two

This litigation is being funded by the SEIU and the Fund through the payment of the partial hourly fee and costs incurred on the express understanding that any amounts SEIU or the Fund pays to your firm in this matter will be distributed to the Fund prior to any other payments to any other party or client, from any monetary recovery to your firm in the nurse wage litigation for which the fee or expense was advanced. In addition, to the extent permitted by any applicable laws and rules of professional conduct, the Fund shall be entitled to share in any fee recovery obtained above and beyond those amounts advanced by SEIU or the Fund in the litigation, pursuant to the sharing agreement provided below. Your firm will use its best efforts to ensure that any settlement obtained in this litigation will be consistent with the plaintiff nurses' interests in the case.

By signing this letter of understanding below, your firm agrees to the following: first, your office agrees that the Fund will be paid out of any recovery obtained for your firm (whether in a costs or fees award) for all monies advanced before any further distribution of fees and costs awards to your firm. Second, to the extent permitted by any applicable laws and rules of professional conduct, your firm agrees to share any fee recovery allocated to the hours worked by your firm[1] which is above and beyond the amounts advanced by SEIU or the Fund in the following manner. After payment to the Fund of the costs and fees advanced in connection with the litigation, if any additional amounts attributable to fees and costs remain, the amounts will be distributed as follows: 75% will be retained by your firm, with the remaining 25% returned to the Fund. Thank you for your assistance in this matter. We look forward to continue working with you.

Sincerely,

Norman M. Gleichman
Deputy General Counsel

So Agreed:

Date: 6/8/07

---

[1] This term contemplates that any division of fees between other attorneys and your firm will occur prior to the application of this provision of the agreement.

**EXHIBIT 17**

Return

# FORM LM-2 LABOR ORGANIZATION ANNUAL REPORT

U.S. Department of Labor
Employment Standards Administration
Office of Labor-Management Standards
Washington, DC 20210

Form Approved
Office of Management and Budget
No. 1215-0188
Expires: 11-30-2006

| MUST BE USED BY LABOR ORGANIZATIONS WITH $250,000 OR MORE IN TOTAL ANNUAL RECEIPTS AND LABOR ORGANIZATIONS IN TRUSTEESHIP |
|---|

This report is mandatory under P.L. 86-257, as amended. Failure to comply may result in criminal prosecution, fines, or civil penalties as provided by 29 U.S.C. 439 or 440.

READ THE INSTRUCTIONS CAREFULLY BEFORE PREPARING THIS REPORT.

| For Official Use Only | 1. FILE NUMBER 000-137 | 2. PERIOD COVERED From 1/1/2005 Through 12/31/2005 | 3. (a) AMENDED - Is this an amended report: No (b) HARDSHIP - Filed under the hardship procedures: No (c) TERMINAL - This is a terminal report: No |
|---|---|---|---|

**4. AFFILIATION OR ORGANIZATION NAME**
SERVICE EMPLOYEES

**5. DESIGNATION (Local, Lodge, etc.)**
NATIONAL HEADQUARTERS

**6. DESIGNATION NBR**

**7. UNIT NAME (if any)**

**9. Are your organization's records kept at its mailing address?**     Yes

**8. MAILING ADDRESS (Type or print in capital letters)**

First Name
ANNA

Last Name
BURGER

P.O Box - Building and Room Number

Number and Street
1313 L STREET, N.W.

City
WASHINGTON

State
DC

ZIP Code + 4
20005

Each of the undersigned, duly authorized officers of the above labor organization, declares, under penalty of perjury and other applicable penalties of law, that all of the information submitted in this report (including information contained in any accompanying documents) has been examined by the signatory and is, to the best of the undersigned individual's knowledge and belief, true, correct and complete (See Section V on penalties in the instructions.)

| 26. SIGNED: Andrew L Stern | PRESIDENT | 27. SIGNED: Anna Burger | TREASURER |
|---|---|---|---|
| Date: Mar 30, 2006   Contact Info: | | Date: Mar 30, 2006   Contact Info: | |

Form LM-2 (Revised 2003)

| (B) | | | |
|---|---|---|---|
| Local Union | | | |

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| Dodge Color | Printing Publications | 2005-07-13 | $7,039 |
| 11941 L Bournefield Way | Total Itemized Transactions | | $7,039 |
| Silver Spring | Total Non-Itemized Transactions | | $13,706 |
| MD | **Total of All Transactions** | | **$20,745** |
| 20904-0000 | | | |
| Type or Classification (B) | | | |
| Printing | | | |

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| Ebsco Subscription Svcs | Books and Publications | 2005-01-10 | $11,502 |
| Suite E | Books and Publications | 2005-01-10 | $23,494 |
| 1163 Shrewsbury Ave | Books and Publications | 2005-12-28 | $17,130 |
| Shrewsbury | Books and Publications | 2005-01-10 | $12,901 |
| NJ | Books and Publications | 2005-12-28 | $29,365 |
| 07702-4321 | Total Itemized Transactions | | $94,392 |
| Type or Classification (B) | Total Non-Itemized Transactions | | $9,608 |
| Subscriptions | **Total of All Transactions** | | **$104,000** |

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| George Meany Ctr. for Labor Studies Inc. | Meetings and Conferences | 2005-03-04 | $9,592 |
| 10000 New Hampshire Ave | Total Itemized Transactions | | $9,592 |
| Silver Spring | Total Non-Itemized Transactions | | $2,166 |
| MD | **Total of All Transactions** | | **$11,758** |
| 20903-0000 | | | |
| Type or Classification (B) | | | |
| University | | | |

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| USAirways | Total Itemized Transactions | | $0 |
| 2345 Crystal Dr. | Total Non-Itemized Transactions | | $422,345 |
| Arlington | **Total of All Transactions** | | **$422,345** |
| VA | | | |
| 22227-0000 | | | |
| Type or Classification (B) | | | |
| Airline | | | |

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| James & Hoffman | Consulting | 2005-01-28 | $18,429 |
| Ste 510 | Consulting | 2005-02-24 | $18,000 |
| 1101 17Th Street NW | Consulting | 2005-03-18 | $18,525 |
| Washington | Consulting | 2005-04-05 | $18,000 |
| DC | Consulting | 2005-04-11 | $5,138 |
| 20036-4704 | Consulting | 2005-05-12 | $18,000 |
| Type or Classification (B) | Consulting | 2005-06-06 | $18,429 |
| Law Firm | Consulting | 2005-01-21 | $18,429 |
| | Legal Services | 2005-01-21 | $7,149 |
| | Legal Services | 2005-06-10 | $50,929 |
| | Legal Services | 2005-07-05 | $18,000 |
| | Legal Services | 2005-07-20 | $20,850 |
| | Legal Services | 2005-07-21 | $18,000 |
| | Legal Services | 2005-08-05 | $10,950 |
| | Legal Services | 2005-08-18 | $9,488 |
| | Legal Services | 2005-08-18 | $51,753 |
| | Legal Services | 2005-09-23 | $18,000 |

| | Date | Amount |
|---|---|---|
| Legal Services | 2005-10-04 | $14,581 |
| Legal Services | 2005-10-17 | $18,000 |
| Legal Services | 2005-10-21 | $36,450 |
| Legal Services | 2005-11-14 | $18,000 |
| Legal Services | 2005-12-14 | $29,831 |
| Legal Services | 2005-07-19 | $63,355 |
| Legal Services | 2005-08-18 | $6,056 |
| Legal Services | 2005-08-05 | $6,037 |
| Legal Services | 2005-08-29 | $6,807 |
| Legal Services | 2005-08-29 | $19,100 |
| Legal Services | 2005-08-29 | $18,563 |
| Legal Services | 2005-12-22 | $25,144 |
| Legal Services | 2005-12-22 | $6,919 |
| Legal Services | 2005-12-22 | $26,681 |
| Total Itemized Transactions | | $633,593 |
| Total Non-Itemized Transactions | | $122,828 |
| **Total of All Transactions** | | **$756,421** |

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| Kelly Press Inc<br><br>1701 Cabin Branch Road<br>Cheverly<br>MD<br>20785-0000 | Total Itemized Transactions | | $0 |
| | Total Non-Itemized Transactions | | $23,587 |
| | **Total of All Transactions** | | **$23,587** |
| Type or Classification (B) | | | |
| Printing | | | |

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| Lexis-Nexis<br><br>Po Box 7247-7090<br>Philadelphia<br>PA<br>19170-7090 | On-Line Services | 2005-11-03 | $6,709 |
| | On-Line Services | 2005-12-16 | $7,371 |
| | On-Line Services | 2005-12-16 | $7,496 |
| | Total Itemized Transactions | | $21,576 |
| | Total Non-Itemized Transactions | | $115,582 |
| Type or Classification (B) | | | |
| Legal Software | **Total of All Transactions** | | **$137,158** |

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| Linemark Printing Inc<br>Suite 1040<br>1220 Caraway Court<br>Largo<br>MD<br>20774-0000 | Mailings | 2005-01-31 | $14,000 |
| | Mailings | 2005-03-04 | $6,800 |
| | Printing Publications | 2005-05-20 | $7,658 |
| | Printing Publications | 2005-09-07 | $8,295 |
| | Printing Publications | 2005-03-09 | $12,049 |
| | Printing Publications | 2005-05-18 | $13,104 |
| | Printing Publications | 2005-07-06 | $9,652 |
| Type or Classification (B) | Printing Publications | 2005-07-08 | $6,089 |
| | Printing Publications | 2005-07-12 | $10,122 |
| Printing | Printing Publications | 2005-08-10 | $10,849 |
| | Printing Publications | 2005-09-07 | $8,599 |
| | Total Itemized Transactions | | $107,217 |
| | Total Non-Itemized Transactions | | $148,888 |
| | **Total of All Transactions** | | **$256,105** |

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| National Conference Of Firemen & Oilers<br>10th Floor<br>1023 15th Street NW<br>Washington<br>DC<br>20005-0000 | Consulting | 2005-01-27 | $9,127 |
| | Total Itemized Transactions | | $9,127 |
| | Total Non-Itemized Transactions | | $81,161 |
| | **Total of All Transactions** | | **$90,288** |
| Type or Classification | | | |

**EXHIBIT 18**

# FORM LM-2 LABOR ORGANIZATION ANNUAL REPORT

U.S. Department of Labor
Employment Standards Administration
Office of Labor-Management Standards
Washington, DC 20210

Form Approved
Office of Management and Budget
No. 1215-0188
Expires: 11-30-2006

| MUST BE USED BY LABOR ORGANIZATIONS WITH $250,000 OR MORE IN TOTAL ANNUAL RECEIPTS AND LABOR ORGANIZATIONS IN TRUSTEESHIP |
|---|

This report is mandatory under P.L. 86-257, as amended.  Failure to comply may result in criminal prosecution, fines, or civil penalties as provided by 29 U.S.C. 439 or 440.

| READ THE INSTRUCTIONS CAREFULLY BEFORE PREPARING THIS REPORT. | | | |
|---|---|---|---|
| For Official Use Only | 1. FILE NUMBER 000-137 | 2. PERIOD COVERED From        1/1/2006 Through    12/31/2006 | 3. (a) AMENDED - Is this an amended report:                         No (b) HARDSHIP - Filed under the hardship procedures:      No (c) TERMINAL - This is a terminal report:                     No |

| 4. AFFILIATION OR ORGANIZATION NAME SERVICE EMPLOYEES | 8. MAILING ADDRESS (Type or print in capital letters) | |
|---|---|---|
| **5. DESIGNATION** (Local, Lodge, etc.) NATIONAL HEADQUARTERS   **6. DESIGNATION NBR** | First Name ANNA | Last Name BURGER |
| 7. UNIT NAME (if any) | P.O Box - Building and Room Number | |
|  | Number and Street 1800 Massachusetts Avenue | |
| 9. Are your organization's records kept at its mailing address?        Yes | City WASHINGTON | |
|  | State DC | ZIP Code + 4 20036 |

Each of the undersigned, duly authorized officers of the above labor organization, declares, under penalty of perjury and other applicable penalties of law, that all of the information submitted in this report (including information contained in any accompanying documents) has been examined by the signatory and is, to the best of the undersigned individual's knowledge and belief, true, correct and complete (See Section V on penalties in the instructions.)

| 26. SIGNED:  Andrew L Stern | PRESIDENT | 27. SIGNED:  Anna Burger | TREASURER |
|---|---|---|---|
| Date:      Mar 30, 2007      Contact Info: | | Date:      Mar 30, 2007      Contact Info: | |

Form LM-2 (Revised 2003)

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| District 1199/Seiu | REIMBURSEMENT OF EXPENSES | 2006-04-03 | $7,162 |
| | Total Itemized Transactions | | $7,162 |
| 1395 Dublin Road Columbus OH 43215-0000 | Total Non-Itemized Transactions | | $0 |
| | Total of All Transactions | | $7,162 |
| Type or Classification (B) | | | |
| Local Union | | | |

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| Dodge Color | PLEDGE POSTER | 2006-05-11 | $8,762 |
| | ARCHIVE NO. 4448 NURSE MAP | 2006-12-27 | $7,147 |
| 11941 L Bournefield Way Silver Spring MD 20904-0000 | Total Itemized Transactions | | $15,909 |
| | Total Non-Itemized Transactions | | $25,157 |
| | Total of All Transactions | | $41,066 |
| Type or Classification (B) | | | |
| Printer | | | |

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| Geffner & Bush Suite 1100 3500 West Olive Ave Burbank CA 91505-0000 | Total Itemized Transactions | | $0 |
| | Total Non-Itemized Transactions | | $11,143 |
| | Total of All Transactions | | $11,143 |
| Type or Classification (B) | | | |
| Attorney | | | |

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| James & Hoffman Ste 510 1101 17Th Street NW Washington DC 20036-4704 | Legal services and expenses | 2006-01-19 | $26,197 |
| | Legal services and expenses | 2006-02-02 | $28,145 |
| | Legal services and expenses | 2006-02-13 | $24,938 |
| | Legal services and expenses | 2006-02-17 | $121,934 |
| | Legal services and expenses | 2006-03-10 | $27,912 |
| Type or Classification (B) | Legal services and expenses | 2006-03-15 | $56,552 |
| | Legal services and expenses | 2006-04-12 | $39,483 |
| Attorney | Legal services and expenses | 2006-04-13 | $34,320 |
| | Legal services and expenses | 2006-04-28 | $176,562 |
| | Legal services and expenses | 2006-05-15 | $25,971 |
| | Legal services and expenses | 2006-05-23 | $42,008 |
| | Legal services and expenses | 2006-06-06 | $68,127 |
| | Legal services and expenses | 2006-06-08 | $29,637 |
| | Legal services and expenses | 2006-06-29 | $307,025 |
| | Legal services and expenses | 2006-07-18 | $29,846 |
| | Legal services and expenses | 2006-08-08 | $29,667 |
| | Legal services and expenses | 2006-08-15 | $159,024 |
| | Legal services and expenses | 2006-08-15 | $10,733 |
| | Legal services and expenses | 2006-08-16 | $55,766 |
| | Legal services and expenses | 2006-09-15 | $28,136 |
| | Legal services and expenses | 2006-09-18 | $34,419 |
| | Legal services and expenses | 2006-10-17 | $168,799 |
| | Legal services and expenses | 2006-10-17 | $44,600 |
| | Legal services and expenses | 2006-10-25 | $27,756 |
| | Legal services and expenses | 2006-12-05 | $130,004 |
| | Legal services and expenses | 2006-12-05 | $33,451 |
| | Legal services and expenses | 2006-12-19 | $25,459 |
| | Legal services and expenses | 2006-12-20 | $57,104 |
| | Legal services and expenses | 2006-12-20 | $41,247 |
| | Legal services and expenses | 2006-12-28 | $132,803 |

| | | | |
|---|---|---|---|
| Legal services and expenses | | 2006-12-28 | $46,015 |
| Total Itemized Transactions | | | $2,063,640 |
| Total Non-Itemized Transactions | | | $3,754 |
| **Total of All Transactions** | | | **$2,067,394** |

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| Kelly Press Inc<br><br>1701 Cabin Branch Road<br>Cheverly<br>MD<br>20785-0000 | Understanding Michigan Budget | 2006-04-25 | $6,875 |
| | Total Itemized Transactions | | $6,875 |
| | Total Non-Itemized Transactions | | $6,150 |
| | **Total of All Transactions** | | **$13,025** |
| Type or Classification (B) | | | |
| Printer | | | |

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| Lexis-Nexis<br><br>Po Box 7247-7090<br>Philadelphia<br>PA<br>19170-7090 | Monthly Subscriptions | 2006-02-16 | $14,419 |
| | Monthly Subscriptions | 2006-06-15 | $44,351 |
| | Monthly Subscriptions | 2006-11-29 | $17,414 |
| | Monthly Subscriptions | 2006-12-14 | $37,402 |
| | Monthly Subscriptions | 2006-12-14 | $54,941 |
| Type or Classification (B) | Total Itemized Transactions | | $168,527 |
| | Total Non-Itemized Transactions | | $0 |
| Legal Software | **Total of All Transactions** | | **$168,527** |

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| Linemark Printing Inc<br>Suite 1040<br>1220 Caraway Court<br>Largo<br>MD<br>20774-0000 | SWU Spanish Brochure | 2006-01-09 | $17,901 |
| | Mailing-MD Child Care Campaign | 2006-01-13 | $6,426 |
| | SWU NEWSLETTER | 2006-01-31 | $11,504 |
| | INSTITUTE FOR CHANGE ENVELOPE | 2006-01-31 | $5,918 |
| | 1199 SEIU UH WORKER EAST POSTC | 2006-02-17 | $15,880 |
| Type or Classification (B) | TABLE TENT CARDS | 2006-02-28 | $17,105 |
| | CD DUPLICATION & FACE PRINTING | 2006-03-20 | $24,089 |
| Printer | SHIPPING TO LOCAL 1 | 2006-05-24 | $38,753 |
| | FACES OF HOME CARE | 2006-05-24 | $18,843 |
| | INTER-OFFICE MAIL ENVELOPES | 2006-06-06 | $92,758 |
| | Printing | 2006-08-07 | $11,884 |
| | FOLDING ONLY | 2006-08-11 | $10,705 |
| | Postage-HCA Hospital | 2006-08-22 | $14,700 |
| | TOTAL HOME CARE | 2006-09-12 | $59,172 |
| | SEIU STATIONARY | 2006-09-13 | $17,114 |
| | WISCONSIN HOME CARE | 2006-09-13 | $31,312 |
| | SHIPPING & FULFILLMENT | 2006-09-15 | $11,103 |
| | Sr. Voter Action | 2006-09-20 | $27,360 |
| | PA Senior Voter | 2006-09-25 | $20,465 |
| | LA HOME CARE BROCHURE | 2006-10-03 | $33,315 |
| | WI PEO LETTERHEAD | 2006-10-05 | $9,861 |
| | INSVA postcards | 2006-11-15 | $10,140 |
| | BOOKLET ENVELOPE | 2006-12-27 | $79,603 |
| | HCA MAILING | 2006-12-27 | $13,986 |
| | Total Itemized Transactions | | $599,897 |
| | Total Non-Itemized Transactions | | $32,372 |
| | **Total of All Transactions** | | **$632,269** |

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| National Conference Of Firemen & Oilers<br>10th Floor<br>1023 15th Street, NW<br>Washington<br>DC<br>20005-0000 | Rebate | 2006-01-27 | $8,458 |
| | Rebate | 2006-01-27 | $9,716 |
| | Rebate | 2006-04-28 | $11,680 |
| | Rebate | 2006-04-28 | $14,759 |
| | Rebate | 2006-07-25 | $12,862 |
| Type or Classification | | | |

# EXHIBIT 19

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| PAT CASON-MERENDO and JEFFREY A. SUHRE, on behalf of themselves and all others similarly situated, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 2:06-cv-15601-GER-MKM |
| DETROIT MEDICAL CENTER, HENRY FORD HEALTH SYSTEM, MOUNT CLEMENS GENERAL HOSPITAL, INC., ST. JOHN HEALTH, OAKWOOD HEALTHCARE INC., and BON SECOURS COTTAGE HEALTH SERVICES, | ) ) ) ) ) ) ) | Hon. Gerald E. Rosen  Magistrate Judge Mona K. Majzoub |
| Defendants. | ) ) | |

### STIPULATION AND PROTECTIVE ORDER GOVERNING
### THE PRODUCTION AND EXCHANGE OF CONFIDENTIAL INFORMATION

Whereas, the Plaintiffs and Defendants in the above-captioned action may seek discovery or documents, information, or other materials that may contain non-public, confidential, competitively-sensitive, or proprietary information of another party or of a third party;

Whereas, Plaintiffs and Defendants wish to ensure that confidential information shall be used only for the purposes of this action and shall not be disclosed or used in any other way;

Whereas, the parties have stipulated and agreed to the terms, and jointly moved this Court for entry of the following Protective Order, and the Court having found that, in light of the nature of the non-public, confidential, competitively-sensitive, proprietary information that may be sought in discovery, good cause exists for entry of the Protective Order,

parties in this Litigation. The interested parties shall promptly meet and confer to attempt to

resolve those objections and, if they cannot be resolved, shall promptly tender those objections

to the Court for resolution. A revised public electronic filing, if any, of that submission shall be

made by the submitting party within six business days after the Court's decision resolving that

dispute.

    4.    <u>Use of Confidential or Highly Confidential Information</u>

    a.    Confidential or Highly Confidential Information shall not be used by any

person, other than the Producing Party, for any purpose other than conducting this Litigation,

and in no event shall Confidential or Highly Confidential Information be used for any business,

competitive, personal, private, public, organizational or other labor or employee relations

purpose.

    b.    Notwithstanding the foregoing, nothing in this Order shall be deemed to

limit or restrict any Producing Party from using its own documents or its own Confidential

Information or Highly Confidential Information for any purpose. The Producing Party may

withdraw or modify any designation.

    5.    <u>Disclosure of Confidential Information</u>

Access to information designated as "CONFIDENTIAL" pursuant to this Order shall be

limited to:

    a.    The Court or any other court exercising jurisdiction with respect to this

Litigation, Court personnel, jurors, and qualified persons (including necessary clerical

personnel), recording, taking or transcribing testimony and argument at any deposition, hearing,

trial or appeal in this Litigation;

    b.    Special masters and mediators or other individuals engaged or consulted

UNITED STATES DISTRICT COURT
OF THE DISTRICT OF COLUMBIA

CIVIL DIVISION

| | |
|---|---|
| Pat Cason-Merendo and<br>Jeffrey A. Suhre,<br><br>        Plaintiffs,<br><br>vs.<br><br>Detroit Medical Center,<br>Henry Ford Health System,<br>Mount Clemens General Hospital, Inc.,<br>St. John Health, Oakwood Healthcare, Inc.,<br>Bon Secours Cottage Health Services, William<br>Beaumont Hospital and Trinity Health Corp,<br><br>        Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

Case Pending in the U.S. District Court
for the Eastern District of Michigan,
Southern Division
Case No.: 2:06 cv 15601 (E.D. Mich.)
Hon. Gerald E. Rosen
Magistrate: Honorable Donald A. Scheer

Miscellaneous No._____

**ORDER GRANTING OAKWOOD HEALTCARE, INC'S
MOTION TO COMPEL PRODUCTION OF DOCUMENTS
FROM THE SERVICE EMPLOYEES INTERNATIONAL UNION**

Having considered Oakwood Healthcare, Inc.'s ("Oakwood") Motion to Compel

Production of Documents In Compliance With Rule 45(c) of the Federal Rules of Civil

Procedure, the Court grants Oakwood's motion. The Court orders the Service Employees

International Union ("SEIU") to comply forthwith with Oakwood's September 14, 2007

Subpoena, as modified by its October 29, 2007 proposal, as follows:

    1.      The SEIU will comply with Request Nos. 1 and 2 of the Subpoena;

    2.      The SEIU will provide a Declaration listing the names of any defendants in any

SEIU Subsidized Class Action during the period from January 1, 2000 until present from which

it attempted and/or planned to obtain any voluntary recognition agreement, neutrality agreement

and/or card check agreement during the same time period. The Declaration will also identify, by defendant, the names, office addresses and positions of the SEIU personnel principally involved in the attempt, plan and/or effort to obtain any such recognition agreement from each such defendant.

3.     Based upon the above disclosures, Oakwood will identify five SEIU employees for each defendant listed in the Declaration, who will have their hard copy and electronic files searched. The SEIU will search the five SEIU employees' files and produce documents responsive to Request Nos. 3 and 4 of the Subpoena.

4.     Oakwood will not request searches of additional SEIU employees' hard copy and electronic files for documents responsive to Requests Nos. 3 and 4 except for good cause.


Dated: _____, 2007

IT IS SO ORDERED:

_____
United States District Court Judge