## UNITED STATES DISTRICT COURT
## OF THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| Oakwood Healthcare, Inc., | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) Case No. 1:07-mc-0458-HHK |
| | ) |
| | ) |
| Service Employees International Union, | ) |
| | ) |
| Respondent. | ) |

_____)

### MOTION BY THE SERVICE EMPLOYEES INTERNATIONAL UNION FOR RECONSIDERATION OF MAGISTRATE JUDGE'S RULING GRANTING OAKWOOD HEALTHCARE INC.'S MOTION TO COMPEL

Pursuant to Rule 72.2 of the Local Rules of the United States District Court for the District of Columbia, the Service Employees International Union ("SEIU") files this motion for reconsideration of the Order by the Magistrate Judge granting the motion to compel filed by Oakwood Healthcare, Inc. ("Oakwood")

The grounds for this motion are set forth in the accompanying memorandum in support of the motion for reconsideration. For the reasons set forth therein, SEIU respectfully requests that the Court grant this motion and deny Oakwood's motion to compel.

Respectfully submitted,

_____/s/ Robert Weinberg_____

Robert Weinberg (DC 085530)
rweinberg@bredhoff.com
Matthew Clash-Drexler (DC 477334)
mcdrexler@bredhoff.com
Bredhoff & Kaiser, P.L.L.C.
805 15th Street, NW
Suite 1000
Washington, DC   20005
202-842-2600
202-842-1888 (fax)

## UNITED STATES DISTRICT COURT
## OF THE DISTRICT OF COLUMBIA

_____

Oakwood Healthcare, Inc.,                        )
                                                 )
              Petitioner,                    )
                                                 )
    v.                                         )          Case No. 1:07-mc-
                                                 )          00458-HHK
                                                 )
Service Employees International Union,           )
                                                 )
            Respondent.                       )
_____)

### MEMORANDUM BY THE SERVICE EMPLOYEES INTERNATIONAL UNION IN SUPPORT OF MOTION FOR RECONSIDERATION OF MAGISTRATE JUDGE'S ORDER GRANTING MOTION TO COMPEL

On December 14, 2007, Magistrate Judge Kay issued an order granting the motion to compel compliance with a subpoena issued by Oakwood Healthcare, Inc. ("Oakwood") to the Service Employees International Union ("SEIU" or the "union"). As we now show, the Magistrate Judge's ruling applies a clearly erroneous legal standard regarding the determination of adequate class representatives under Rule 23 of the Federal Rule of Civil Procedure. Accordingly, pursuant to Local Rule 72.2, the ruling should be reversed.

### INTRODUCTION

A.    **The *Cason-Merendo* Lawsuit**

The dispute between SEIU and Oakwood arises in the context of a lawsuit brought by two registered nurses on their own behalf and on behalf of a proposed class of similarly-situated nurses alleging that they have been the victims of a conspiracy among Detroit hospitals to depress their wages in violation of the federal antitrust laws. *See Cason-Merendo v. Detroit Medical Center*, 2:06-cv-15601 (E.D. Mich.). The *Cason-Merendo* lawsuit is one of five

companion lawsuits brought by registered nurses against various hospital corporations in Albany, Memphis, San Antonio, and Chicago.[1]

SEIU is not a party to any of the five antitrust cases. There is no dispute, though, that the union has had a role in the genesis of these lawsuits and in providing a measure of financial support to the plaintiffs in these cases. In particular, SEIU (i) participated in the initial investigation of facts that triggered the steps by plaintiffs' counsel that culminated in the filing of these five lawsuits and (ii) has provided, and continues to provide, financial assistance to one of the numerous law firms – James & Hoffman – representing the plaintiffs in these lawsuits.

On September 14, 2007, Oakwood served SEIU with a Rule 45 subpoena for documents. As the Magistrate Judge described in his ruling, Oakwood's subpoena seeks discovery in support of its contention that the interests of the Named Plaintiffs in the *Cason-Merendo* lawsuit and their counsel conflict with the interests of the putative class. *See* Order (d/e 6) at 2. Rather than focusing its discovery on any conflict between the interests of the Named Plaintiffs, their counsel, and the putative class (discovery that SEIU has already provided in response to other subpoenas served on SEIU in this lawsuit), Oakwood's subpoena seeks to discover facts related to the union's involvement in other lawsuits, filed in different markets, and involving different parties.

Specifically, Oakwood's subpoena demands production of all "class action[s] and/or collective action[s]" where SEIU "has, or had, a funding relationship with any of the named plaintiffs' counsel relating to legal fees, costs and/or expenses." With respect to each of the defendants in any of those complaints, the subpoena seeks all documents related to "any

---

[1] *See Unger v. Albany Med. Ctr.*, No. 06-CV-0765 (N.D.N.Y.); *Reed v. Advocate Healthcare*, No. 1:06-cv-3337 (N.D. Ill.); *Clarke v. Baptist Mem'l Healthcare Corp.*, No. 2:06-cv-02377 (W.D. Tenn.); *Maderazo et al. v. VHS San Antonio Partners, L.P., et al.*, Civ. A. No. SA06CA0535 (W.D. Tex.).

agreement" recognizing SEIU or a "labor organization engaged in a joint organizing campaign with the SEIU" as the collective bargaining representative of the employees of that defendant, any "attempt, effort and/or plan" to become the collective bargaining representative of the employees of that defendant, and "any communication between the SEIU and any defendant [in those other class actions or collective actions]. . . relating to any prospective or possible agreement that might lead to the recognition of the SEIU" as the collective bargaining representative of the employees of that defendant. *See* Oakwood Subpoena (attached as exhibit 1 to Oakwood Motion to Compel (d/e 1)).

The subpoena's request for discovery related to SEIU's involvement in other lawsuits and against other employers is relevant, Oakwood argues, because it will allegedly explain the union's motivations for its involvement in *this lawsuit*, a motivation that Oakwood contends is not consistent with the interests of the class members. Specifically, Oakwood argues that SEIU seeks to use this lawsuit to achieve an "ulterior motive," which Oakwood defines as "using costly litigation . . . to exhaust employers resisting unionization" so that the employers will enter into agreements with SEIU. *See* Oakwood Mem. In Support of Mot. to Compel at 9 (d/e 1).

SEIU objected to the subpoena on two principal grounds. First, in response to other subpoenas served on SEIU in this lawsuit, the union has already provided discovery on the question of whether the *Cason-Merendo* lawsuit was part of any plan to organize the employees at any particular hospital. Second, the documents sought by the subpoena, seeking discovery regarding SEIU's efforts to organize workers of employers *other than those named in this lawsuit*, are not relevant to whether or not the interests of the Named Plaintiffs and class counsel are consistent with the interests of the class. Oakwood's motion to compel followed.

**B.      The Magistrate Judge's Ruling**

On December 14, 2007, Magistrate Judge Kay granted Oakwood's motion to compel.

The heart of the Magistrate Judge's ruling is as follows:

> The Court disagrees with the SEIU's analysis because evidence of the SEIU's involvement in similar lawsuits and evidence of their motive for such involvement *could assist Oakwood in demonstrating that the SEIU had an improper motive in funding and supporting the present lawsuit*. Therefore the documents that are detailed in the subpoena are relevant to whether the named plaintiffs and class counsel can adequately represent the class or whether there is a conflict of interest that would defeat Rule 23's adequacy requirement.

*Oakwood Healthcare, Inc. v. Service Employees International Union*, 07-MC-458, Order at 5 (d/e 6) (Dec. 14, 2007) (emphasis added).

## ARGUMENT

The Magistrate Judge's ruling is due to be reversed for three reasons. First, the holding that *SEIU's motivation*, as opposed to the motivation or interests of the party representatives, is relevant to whether or not the Named Plaintiffs and class counsel can adequately represent the putative class is contrary to Rule 23 of the Federal Rules of Civil Procedure and the cases upon which the Magistrate Judge relied. Second, the Magistrate Judge's ruling is inconsistent with the ruling of the court in the related nurse wage antitrust case filed in Albany, New York, which court was presented with this very question. Finally, the ruling is contrary to the recognition, which is well established in the caselaw, of the important role, as guaranteed by the First Amendment, that advocacy organizations have played and continue to play in the use of class-action lawsuits to further social and economic justice goals.

1.      Rule 23 of the Federal Rules of Civil Procedure provides that a class action can be maintained only if the "representative parties will fairly and adequately protect the interests of

the class." Fed. R. Civ. P. 23(a). As the Magistrate Judge correctly held, adequacy under Rule 23 has "two components:" that class counsel is "qualified, experienced and generally able to conduct the litigation" and that the "class members must not have interests that are antagonistic to one another." Order at 4 (internal citations omitted). In other words, the focus of the adequacy prong of the Rule 23 analysis is on whether the representative party is "motivated by interests adverse to the class a whole." Order at 4.

While correctly citing the Rule 23 standard, the Magistrate Judge proceeds to order discovery not on the ground that it will assist Oakwood in assessing the motivations and interests of the Named Plaintiffs or their counsel, but instead because it "could assist Oakwood in demonstrating that *the SEIU* had an improper motive." Order at 5 (emphasis added). This ruling is contrary to Rule 23's adequacy requirement, because even if the discovery into SEIU's motivations revealed that the union has used other litigation as part of an effort to "exhaust [other] employers resisting unionization," *see* Oakwood Mem. at 9 (d/e 1), the question would still remain whether that motivation affects the independence of the Named Plaintiffs and their counsel.

And, as to that question, the only proper discovery would focus on the relationship, if any, between the SEIU and the Named Plaintiffs and the relationship between *this lawsuit* and any plan to organize the employees of any of the defendants in this lawsuit. Notably, other subpoenas served on SEIU by Oakwood's co-defendant have requested those very documents.[2] As a result, the Defendants in this action have already sought – and SEIU has produced – discovery regarding (i) the relationship between SEIU and the Named Plaintiffs, (ii) all agreements between SEIU and counsel for the Named Plaintiffs relating to the payment of

---

[2] *See* Subpoena (attached as exhibit 1); *see also* Subpoena for Rule 30(b)(6) deposition (attached as exhibit 2).

attorneys' fees or litigation costs for the Named Plaintiffs, (iii) SEIU's role in the investigation of whether hospitals were engaged in collusion to suppress nurse wages, and (iv) any connection between this lawsuit and any plan by SEIU to organize the employees of any of the defendants in this action.  It is this discovery that will lead to evidence regarding the adequacy of the Named Plaintiffs and their counsel.  To grant additional discovery into *SEIU's* motivations as revealed by SEIU's conduct in other cases is reversible error.

Moreover, the ruling by the Magistrate Judge is also contrary to the primary case upon which his decision relies.  *Kamean v. Local 363*, 109 F.R.D. 391 (S.D.N.Y. 1986), a case cited by the Magistrate Judge, *see* Order at 4, involved a lawsuit brought by current and former members of a labor union to recover unpaid wages allegedly owed to them in connection with work on certain projects.  The named plaintiffs were "former members" of the union, but, at the time of the lawsuit, belonged to a "rival union."  *Kamean*, 109 F.R.D. at 395.  In order to assess whether their membership in the rival union created a conflict with the other class members, the court focused not, as the Magistrate Judge does in this matter, on the motivations of the rival union as such but instead on the motivations of the named plaintiffs.  The *Kamean* court found that the named plaintiffs did not satisfy the adequacy requirement because there was an incentive on the part of those plaintiffs to "dismember [the defendant union] and divide it from its affiliated contractors" in order to benefit the rival union, to which they belonged.  *Id.*; *see also Martinez*, 2004 WL 1367445, at *5-*6 (focusing on competition between the two unions as basis for finding that named Plaintiffs' association with rival union "renders them antagonistic to the other members of the class").

Thus, from *Kamean* is derived the principle that proper discovery under Rule 23's adequacy requirement would make it possible to assess whether the Named Plaintiffs and their

lawyers can act independently of the union.  The Magistrate Judge's ruling, which instead
ordered discovery that does not relate in any way to the interests or intent of the representative
parties or their lawyers, must be reversed.[3]

        2.      Not only does the Magistrate Judge err by misinterpreting the primary case cited
in his decision, but the ruling also ignores entirely the contrary ruling reached by the court in the
related nurse wage antitrust case filed in Albany.  There, the defendants served a subpoena on
SEIU and an SEIU local union seeking, among other things, documents showing the motivation
of the SEIU and the local union for their involvement in the lawsuits.  Both unions objected to
the subpoenas, and the defendants filed a motion to compel.  In the hearing on that motion,
defense counsel – who also represents Defendant St. John Health in the Detroit action – raised
precisely the same arguments that Oakwood now raises, namely that it was entitled to discovery
regarding "to what extent . . . SEIU [is] driving this case."  *See* Transcript at 10, *Unger v. Albany
Med. Ctr.*, No. 06-CV-0765 (N.D.N.Y.) (Jan. 23, 2007) (attached hereto as exhibit 4).  As with
Oakwood, defense counsel in Albany argued that because the SEIU had a funding relationship
with one of the plaintiffs' law firms and was involved in investigating facts that led to the filing
of this lawsuit, the discovery was necessary to show that the "class representative is a pawn for
the SEIU."  *Id.* at 11, 15-16.

---

[3] We also note that, as to the Named Plaintiffs, there is no suggestion that they would choose to
serve SEIU's interests over that of the class.  The Named Plaintiffs stated in their interrogatories
that their decision to become plaintiffs was not because of any contact from the union.  *See* Pls.
Resp. to St. John Health's Second Set of Interrogatories at 2-3 (attached as exhibit 3).  Thus, any
contention that the "SEIU was responsible" for finding the plaintiffs in this case, as Oakwood
suggests, is without foundation.  *See* Oakwood Mem. at 6 (d/e 1).  Moreover, this is not the case
where the SEIU is providing the sole support for the litigation.  James & Hoffman is only *one of
seven* different law firms that represent the plaintiffs in the Detroit action, and there is no
argument that SEIU has any relationship with the other six law firms.  *See* SEIU Opp. to Mot. to
Compel at 9 n.8.

The Albany court squarely rejected the defendant's arguments, holding that while discovery into the motivations of the "particular *individual Plaintiffs* may be relevant" in determining whether they and their counsel are adequate representatives, "[d]iscovery regarding the *union's* purposes generally is not." *Id.* at 21 (emphasis added); *see also id.* at 30 ("[T]he relevancy of the Union's involvement in bringing this law suit [to] class certification is non-existent."). Put simply, "impure thoughts on behalf of non parties" are "irrelevant" to the adequacy determination. *Id.* at 32. This ruling by a court in a companion nurse wage antitrust case cannot be squared with the ruling reached here.

3.    The Magistrate Judge's ruling is also due to be reversed because it ignores the critical role that advocacy organizations, such as labor unions, have played in supporting class action litigation to further social and economic justice goals and seeks to make the provision of that support more difficult.[4] As is well-established, the First Amendment protects the right of advocacy organizations, like the SEIU, to provide financial support for litigation. *Cf. United Mine Workers of Am., Dist. 12 v. Illinois State Bar Assn.*, 389 U.S. 217, 225 (1967) (holding injunction prohibiting union from paying attorney to represent workers violates First Amendment); *see also United Transp. Union v. State Bar of Michigan*, 401 U.S. 576, 585-86 (1981) ("The common thread running through out decisions . . . is that collective activity undertaken to obtain meaningful access to the courts is a fundamental right within the protection of the First Amendment. However, that right would be a hollow premise if courts could deny

---

[4] *See Eastex, Inc. v. NLRB*, 437 U.S. 556, 565 (1978) ("Congress knew well enough that labor's cause is advanced on fronts other than collective bargaining," including by "resort to administrative and judicial forums."); *Shaffer v. Farm Fresh, Inc.*, 966 F.2d 142 (4th Cir. 1992) (litigation by grocery store workers forced to work off the clock and deprived of overtime pay); *Bureerong v. Uvawas*, 922 F. Supp. 1450 (C.D. Cal. 1996) (garment workers held in virtual slavery in an El Monte, California sweatshop).

association of workers or others the means of enabling their members to meet the costs of legal

representation.").

This First Amendment protection is critical because, absent financial support from

outside organizations, such as the SEIU, many cases would never have been filed, including

many civil rights cases and cases on behalf of low-wage workers.[5]  Indeed, this is precisely the

conclusion reached by the Magistrate Judge in the related nurse antitrust case filed in Chicago.

Specifically, he held that

> The investigation that is required to verify the possibility of a successful class
> action arising under complicated statutory provisions is time-consuming, detailed,
> and hugely expensive.  Very few lawyers have the funds necessary to pay for such
> an investigation. . . .
>
> It is not surprising, therefore . . ., that the genesis of most modern class actions
> lies in the coiffeurs of organizations such as the SEIU in this case.  There are
> some law firms, of course, which have become so enormously wealthy that the
> firms themselves can undertake the investigation and pay for it out of the firm
> treasury, but that's unusual.

*Reed v. Advocate Health Care, et al.*, 06-cv-3337 (N.D. Ill.) (Order at 26-27) (attached as exhibit

5).  The Magistrate Judge's ruling, which is based on the legal theory that the SEIU's

motivations are relevant regardless of whether it taints the independence of the Named Plaintiffs,

improperly chills the exercise of the First Amendment rights described above.

---

[5] *See, e.g., Brown v. Board of Educ.*, 349 U.S. 294 (1955) (class action desegregation case
brought by attorneys from the NAACP); *Crawford v. Board of Educ.*, 200 Cal.App.3d 1397
(1988) (describing history of desegregation litigation brought by American Civil Liberties Union
on behalf of Los Angeles students).

## CONCLUSION

For the foregoing reasons, the Magistrate Judge's ruling should be reversed.

Respectfully submitted,


_____/s/ Robert Weinberg_____
Robert Weinberg (DC 085530)
rweinberg@bredhoff.com
Matthew Clash-Drexler (DC 477334)
mcdrexler@bredhoff.com
Bredhoff & Kaiser, P.L.L.C.
805 15th Street, NW
Suite 1000
Washington, DC   20005
202-842-2600
202-842-1888 (fax)

# Exhibit 1

AO88 (Rev. 12/06) Subpoena in a Civil Case

## Issued by the

# UNITED STATES DISTRICT COURT

For the _____ **DISTRICT OF** _____ Columbia

Pat Cason-Merendo and Jeffrey A. Suhre

V.

Detroit Medical Center, et al.

**SUBPOENA IN A CIVIL CASE**

Case Number:[1]  2:06cv15601 (E.D. Mich)

TO:   Service Employees International Union
c/o Matthew Clash-Drexler, Esq.
Bredhoff & Kaiser
805 Fifteenth Street NW, Washington, DC 20005

☐   YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☐   YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|

☑   YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See attached Schedule A.

| PLACE          Jones Day, 51 Louisiana Avenue, NW, Washington, D.C. 20001 | DATE AND TIME          6/1/2007 10:00 am |
|---|---|

☐   YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify.  Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE      5/8/07 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Michael R. Shumaker, Jones Day, 51 Louisiana Avenue, N.W., Washington, D.C., 20001, (202) 879-3939

(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

AO88  (Rev.  12/06) Subpoena in a Civil Case

---

## PROOF OF SERVICE

|  | DATE | PLACE |
|---|---|---|
| **SERVED** | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| | |

---

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____          _____
                          DATE                                    SIGNATURE OF SERVER

                                                              _____
                                                              ADDRESS OF SERVER

                                                              _____

---

Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), as amended on December 1, 2006:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.
  (1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.
  (2) (A) A person commanded to produce and permit inspection, copying, testing, or sampling of designated electronically stored information, books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.
  (B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection, copying, testing, or sampling may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to producing any or all of the designated materials or inspection of the premises — or to producing electronically stored information in the form or forms requested. If objection is made, the party serving the subpoena shall not be entitled to inspect, copy, test, or sample the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production, inspection, copying, testing, or sampling. Such an order to compel shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection, copying, testing, or sampling commanded.
  (3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it
    (i) fails to allow reasonable time for compliance;
    (ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held;
    (iii) requires disclosure of privileged or other protected matter and no exception or waiver applies; or
    (iv) subjects a person to undue burden.
  (B) If a subpoena
    (i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or
    (ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or
    (iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.
  (1) (A) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.
  (B) If a subpoena does not specify the form or forms for producing electronically stored information, a person responding to a subpoena must produce the information in a form or forms in which the person ordinarily maintains it or in a form or forms that are reasonably usable.
  (C) A person responding to a subpoena need not produce the same electronically stored information in more than one form.
  (D) A person responding to a subpoena need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or to quash, the person from whom discovery is sought must show that the information sought is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.
  (2) (A) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial-preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.
  (B) If information is produced in response to a subpoena that is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has and may not use or disclose the information until the claim is resolved. A receiving party may promptly present the information to the court under seal for a determination of the claim. If the receiving party disclosed the information before being notified, it must take reasonable steps to retrieve it. The person who produced the information must preserve the information until the claim is resolved.

(e) CONTEMPT. Failure of any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena issued. An adequate cause for failure to obey exists when a subpoena purports to require a nonparty to attend or produce at a place not within the limits provided by clause (ii) of subparagraph (c)(3)(A).

## SCHEDULE A – DOCUMENT REQUESTS

1.      All Documents consisting of, concerning or referring to any of (i) the Named

Plaintiffs, (ii) the Hospital Defendants, (iii) the Lawsuit, (iv) compensation for nurses employed

in or living in the Detroit MSA, (v) the employment options for nurses employed in or living in

the Detroit MSA, (vi) any contemplated legal or other action against the Hospital Defendants or

any other employer of nurses employed in the Detroit MSA, and (vii) any contemplated legal or

other action against the Hospital Defendants outside the Detroit MSA.

**To the extent they are not encompassed by the foregoing general request, Hospital**

**Defendants request the following Documents:**

2.      All Documents consisting of, concerning or referring to Communications between

or among, or sent or received by, the SEIU and Counsel of Record regarding any of the persons,

entities, matters or subjects identified in Request 1 above.

3.      All Documents consisting of, concerning or referring to any pre-filing

investigation of the allegations or issues in the Lawsuit, including all notes or memoranda

relating to any interviews or meetings with any nurse or any other individual.

4.      All Documents consisting of, concerning or referring to Communications between

or among, or sent or received by, any SEIU official, employee, agent, consultant, committee,

affiliate or ad hoc working group regarding any of the persons, entities, matters or subjects

identified in Request 1 above.

5.      All Documents consisting of, concerning or referring to efforts by anyone to

identify individuals to function as named plaintiffs for the Lawsuit.

6.      All Documents consisting of, concerning or referring to efforts to encourage any Named Plaintiff or anyone else to obtain or accept employment with any Hospital Defendant.

7.      All Documents consisting of, concerning or referring to contracts or agreements (including drafts or proposed contracts or agreements) between or among the SEIU and any Counsel of Record, or any partner, agent, or employee of such counsel.

8.      All Documents consisting of, concerning or referring to the payment or guarantee of payment, in whole or in part, of the Named Plaintiffs' attorneys fees or litigation costs in the Lawsuit, or the payment or guarantee of any funds, fee or cost, to or for any of the Named Plaintiffs.

9.      All Documents consisting of, concerning or referring to any assistance or information that the SEIU offered or provided to any Named Plaintiff or any Counsel of Record relating to the persons, entities, matters or subjects identified in Request 1 above.

10.     All Documents consisting of, concerning or referring to Communications between or among the SEIU and any of the Named Plaintiffs.

11.     All Documents consisting of, concerning or referring to Communications between or among the SEIU and any member of the putative class in the Lawsuit relating to the persons, entities, matters or subjects identified in Request 1 above.

12.     All Documents consisting of, concerning or referring to any contract or agreement (including drafts or proposed contracts or agreements) between, among or including the SEIU and any of the Named Plaintiffs.

13.     All Documents consisting of, concerning or referring to Communications between or among the SEIU and any of the Hospital Defendants relating to the persons, entities, matters or subjects identified in Request 1 above.

14.     All Documents consisting of, concerning or referring to Communications between or among the SEIU and any hospital alleged in the Complaint to be a co-conspirator with the Hospital Defendants relating to the persons, entities, matters or subjects identified in Request 1 above.

15.     All Documents consisting of, concerning or referring to Communications between or among the SEIU and any RN Employer in the Detroit MSA relating to the persons, entities, matters or subjects identified in Request 1 above.

16.     All Documents consisting of, concerning or referring to Communications between or among the SEIU and any person or entity, other than those referred to in Requests 2 through 15 above, that relate to any Hospital Defendant or any Named Plaintiff.

17.     All Documents consisting of, concerning or referring to (i) the Lawsuit and (ii) any plan, proposal or action to organize the employees of any of the Hospital Defendants and/or obtain certification of the SEIU as the collective bargaining representative of any unit of any such Hospital Defendant's employees.

18.     All press releases, draft press releases and Documents relating thereto created or distributed by the SEIU concerning or referring to any of the Named Plaintiffs, any of the Hospital Defendants, or the Lawsuit.

19.    All Documents consisting of, concerning or referring to the allegations in the

Complaint that any of the Hospital Defendants engaged in Communications, exchanges of

information or agreements with each other concerning wages of nurses, or otherwise engaged in

conduct implicating the Sherman Act.

20.    All Documents consisting of, concerning or referring to research, studies or

reports prepared or funded in whole or in part by the SEIU regarding compensation paid to

nurses or a nursing shortage, including, without limitation, the study titled "Solving the Nursing

Shortage Through Higher Wages," purportedly issued by the Institute for Women's Policy

Research.

21.    All Documents consisting of, concerning or referring to Communications with the

Institute for Women's Policy Research, Vicky Lovell, Ph.D. or Heidi Hartman.

22.    All Documents consisting of, concerning or referring to any "neutrality" or

"cooperation" agreement between the SEIU, or any other union, and any RN Employer within

the Detroit MSA, or any request that any RN Employer within the Detroit MSA enter into any

such agreement.

23.    All Documents consisting of, concerning or referring to the SEIU's Corporate

Campaign or Public Campaign against any Hospital Defendant.

24.    All Documents consisting of, concerning or referring to how to run a Corporate

Campaign or Public Campaign, such as manuals, guidelines, procedures, strategies, etc.,

including, without limitation, the use of litigation as a tool in a Corporate Campaign or Public

Campaign.

25.     All Documents consisting of, concerning, or referring to the alleged market for registered nurses in the Detroit MSA, including but not limited to the number of registered nurses that are employed and/or live within the Detroit MSA, the Detroit MSA's geographic boundaries, the employment opportunities for registered nurses within and outside the Detroit MSA, and the staffing levels or trends for registered nurses within and outside the Detroit MSA.

26.     All Documents consisting of, concerning or referring to registered nurses that live or work within the Detroit MSA and who also work outside the Detroit MSA.

27.     All Documents consisting of, concerning or referring to registered nurses who live outside the Detroit MSA, but who would or could work within the Detroit MSA.

28.     All Documents consisting of, concerning or referring to the actual or potential effect of this lawsuit on the SEIU and/or its efforts to organize registered nurses.

29.     All Documents consisting of, concerning or referring to the SEIU's payment of any funds, money or other items of value for or towards the investigation of the allegations or issues in the Lawsuit, including any checks, correspondence or bills for services rendered.

30.     All Documents consisting of, concerning or referring to the SEIU's employment of registered nurses, including but not limited to their job descriptions, roles, compensation and benefits received.

31.     All Documents consisting of, concerning or referring to Communications, payment or agreements (including drafts or proposed agreements) between the SEIU and the Mintz Group relating to the persons, entities, matters or subjects identified in Request 1 above.

32.      All Documents consisting of, concerning or referring to research, studies, reports, or notes or memoranda relating to any interviews or meetings with any nurse or any other individual prepared by The Mintz Group relating to the persons, entities, matters or subjects identified in Request 1 above.

33.      All Documents consisting of, concerning or referring to Communications, payment or agreements (including drafts or proposed agreements) between the SEIU and Barbara Bergman, including her agents and employees, relating to the persons, entities, matters or subjects identified in Request 1 above.

34.      All Documents consisting of, concerning or referring to research, studies, reports, or notes or memoranda relating to any interviews or meetings with any nurse or any other individual prepared by Barbara Bergman, including her agents and employees, relating to the persons, entities, matters or subjects identified in Request 1 above.

35.      All Documents consisting of, concerning or referring to Communications, payment or agreements (including drafts or proposed agreements) between the SEIU and The Feldman Group relating to the persons, entities, matters or subjects identified in Request 1 above.

36.      All Documents consisting of, concerning or referring to research, studies, reports, or notes or memoranda relating to any interviews or meetings with any nurse or any other individual prepared by The Feldman Group relating to the persons, entities, matters or subjects identified in Request 1 above.

37.     All documents consisting of, concerning or referring to the SEIU's, or any other person's or entity's, petition or effort to encourage the Department of Justice or any other federal or state agency to investigate the alleged suppression of nurse compensation by hospitals.

38.     All e-mails consisting of, concerning or referring to any of the foregoing Requests.

The subpoena is to be responded to in accordance with the following definitions and instructions.

## DEFINITIONS

1.    "Communication" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise) between individuals or entities whether oral, written, electronic or otherwise; whether in-person or telephonic; whether direct or through an intermediary.

2.    "Complaint" means the Complaint and all amended Complaints filed by the Named Plaintiffs in the Lawsuit.

3.    "Corporate Campaign" means any attempt by a union or other labor organization to persuade or influence an employer, either directly or through its employees, to yield to the union's or organization's requests to enter into a neutrality agreement, to recognize the union or organization as a bargaining representative, or to enter into labor negotiations or a collective bargaining agreement; or to yield to the union's or organization's position in connection with labor negotiations or an attempt to organize a place of business for the purpose of labor negotiations.

4.    "Counsel of Record" means any attorney or firm representing a party to the Lawsuit, including any partner, member, shareholder, affiliate, employee, agent, or representative of such attorney or firm.

5.    "Detroit MSA" means the Detroit Metropolitan Statistical Area as that term is defined in the Complaint.

8

6.    "Document" has the same meaning as in Rule 34 of the Federal Rules of Civil Procedure, and includes, without limitation, any writing, notes, photograph, chart, graph, video tape, audio tape, computer disk, or electronically stored data (including electronic mail) and metadata, which is in your actual or constructive possession, custody or control, and includes, without limitation, all originals, copies, drafts (sent or unsent), or other nonconforming copies of every kind.

7.    "Hospital Defendant" means any defendant named in the Lawsuit, including Detroit Medical Center; Henry Ford Health System; Mount Clemens General Hospital, Inc.; St. John Health; Oakwood Healthcare Inc.; and Bon Secours Cottage Health Services.

8.    "Lawsuit" means the action captioned <u>Pat Cason-Merendo and Jeffrey A. Suhre, et al. v. Detroit Medical Center, et al.</u>, Case Number 2:06cv15601, currently pending in the United States District Court for the Eastern District of Michigan (Southern Division), and includes any of the allegations made in the Complaint.

9.    "Named Plaintiffs" means Pat Cason-Merendo and Jeffrey A. Suhre, and any plaintiffs subsequently named in any amended Complaints, and any of their employees, agents, attorneys or representatives.

10.    "Public Campaign" means any attempt by a union or other labor organization to persuade or influence public opinion in connection with labor negotiations or an attempt to organize a place of business for the purpose of labor negotiations.

11.    "RN Employer" means any person or entity that employs one or more registered nurses, including but not limited to a hospital, surgery center, ambulatory care center, nursing home, nurse agency, clinic or physician's office.

12.    "SEIU" means the Service Employees International Union, including but not limited to SEIU Local 79, and its officers, agents, employees, representatives, members, affiliates, representatives and attorneys (in-house and outside counsel), including without limitations, the SEIU's Nurse Alliance.

13.    The definitions of "Named Plaintiffs," "Hospital Defendants," and "SEIU" include the past and present officers, directors, agents, employees, attorneys, general partners, limited partners, members, representatives, divisions, subsidiaries, affiliates, predecessors and successors, of each individual or entity described therein.

## INSTRUCTIONS

1.    All Documents covered by this request shall be produced in a manner consistent with Fed. R. Civ. P. 45(d)(1) at the place and time indicated by the subpoena.

2.    Only a single copy of each responsive document is requested; however, all drafts and non-identical duplicates of each responsive document are requested, whether different from the original because of notes, marginalia, or attachments not present in or on the original document.

3.    If you refuse to disclose any document requested herein (or any portion thereof) on the grounds of privilege or otherwise, please provide the following information, as required by Fed. R. Civ. P. 45(d)(2): (a) the nature and type of document (e.g., memorandum,

10

letter, report, etc.); (b) the subject matter of the document; (c) the date of the document; (d) an identification of each specific privilege or other claim asserted as grounds for non-production; (e) the holder of the privilege; and (f) such other information as is sufficient to identify the document, including the author(s), addressee(s), and any other recipient(s) of the document, and, where not apparent, the relationship of the author(s), addressee(s), and any other recipient(s) to each other.

       4.    Unless otherwise indicated, all requests seek Documents from January 1, 2002 through the present.

# Exhibit 2

# JONES DAY

51 LOUISIANA AVENUE, N.W. • WASHINGTON, D.C. 20001-2113

TELEPHONE: 202-879-3939 • FACSIMILE: 202-626-1700

(202) 879-5411
lpgabel@jonesday.com

May 31, 2007

<u>VIA E-MAIL AND FED/EX</u>

Matthew Clash-Drexler, Esq.
BREDHOFF & KAISER, P.L.L.C.
805 Fifteenth Street, N.W.
Washington, D.C. 20005

Re:    *Cason-Merendo, et al. v. Detroit Medical Center, et al.*, Case No. 06-CV-15601
(E.D. Mich.)

Dear Matthew:

Please find enclosed a subpoena commanding deposition testimony from the Service
Employees International Union ("SEIU") pursuant to Federal Rules of Civil Procedure 45 and
30(b)(6).  Based upon our correspondence with Andy Roth at your firm, it is our understanding
that you have agreed to accept service on the SEIU's behalf.  Please contact me if you have any
questions.

Sincerely yours,

Louis P. Gabel

cc: Andrew Roth, Esq.

AO88  (Rev. 12/06) Subpoena in a Civil Case

### Issued by the

# UNITED STATES DISTRICT COURT

### DISTRICT OF COLUMBIA

Pat Cason-Merendo, et al.

      V.

Detroit Medical Center, et al.

**SUBPOENA IN A CIVIL CASE**

Case Number:[1]  06-CV-15601 (E.D. Mich.)

TO:  Service Employees International Union
c/o Matthew Clash-Drexler, Esq.
805 Fifteenth Street, N.W.
Washington, D.C. 20005

☐  YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☑  YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION  Jones Day<br>51 Louisiana Avenue, N.W., Washington, D.C. 20001 | DATE AND TIME<br>7/10/2007 9:00 am |
|---|---|

☐  YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

| PLACE | DATE AND TIME |
|---|---|

☐  YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

    Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify.  Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
|  | 5/31/2007 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Michael R. Shumaker, Attorney for Defendant St. John Health
Jones Day, 51 Louisiana Avenue, N.W., Washington, D.C. 20001    Telephone: (202) 879-3939

(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

AO 88  (Rev.  12/06) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
                         DATE

_____
SIGNATURE OF SERVER

_____
ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), as amended on December 1, 2006:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENA.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena.  The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection, copying, testing, or sampling of designated electronically stored information, books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection, copying, testing, or sampling may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to producing any or all of the designated materials or inspection of the premises — or to producing electronically stored information in the form or forms requested.  If objection is made, the party serving the subpoena shall not be entitled to inspect, copy, test, or sample the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued.  If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production, inspection, copying, testing, or sampling. Such an order to compel shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection, copying, testing, or sampling commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held;

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject

to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) (A) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(B) If a subpoena does not specify the form or forms for producing electronically stored information, a person responding to a subpoena must produce the information in a form or forms in which the person ordinarily maintains it or in a form or forms that are reasonably usable.

(C) A person responding to a subpoena need not produce the same electronically stored information in more than one form.

(D) A person responding to a subpoena need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost.  On motion to compel discovery or to quash, the person from whom discovery is sought must show that the information sought is not reasonably accessible because of undue burden or cost.  If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C).  The court may specify conditions for the discovery.

(2) (A) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial-preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

(B) If information is produced in response to a subpoena that is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it.  After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has and may not use or disclose the information until the claim is resolved. A receiving party may promptly present the information to the court under seal for a determination of the claim. If the receiving party disclosed the information before being notified, it must take reasonable steps to retrieve it.  The person who produced the information must preserve the information until the claim is resolved.

(e) CONTEMPT. Failure of any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena issued.  An adequate cause for failure to obey exists when a subpoena purports to require a nonparty to attend or produce at a place not within the limits provided by clause (ii) of subparagraph (c)(3)(A).

<u>**SCHEDULE A  - DEPOSITION TOPICS**</u>

Pursuant to Rules 45 and 30(b)(6) of the Federal Rules of Civil Procedure, St. John

Health ("St. John") will take the testimony upon oral examination of the Service Employees

International Union ("SEIU") on the following subjects:

1. The relationship between the SEIU and the Named Plaintiffs or their agents, including

    any and all communications regarding:

    (a)    the Lawsuit identified in the subpoena or any other actual or potential lawsuits
           regarding registered nurse (RN) compensation (including the SEIU's involvement
           in such lawsuits);

    (b)    the identification of individuals to function as named plaintiffs (including the
           SEIU's involvement in the recruiting and selection of potential plaintiffs); and

    (c)    efforts of the SEIU, or others, to encourage any Named Plaintiff or anyone else to
           obtain or accept employment with any Hospital Defendant.

2. The support, financial or otherwise, offered and/or provided by the SEIU to the Named

    Plaintiffs and their counsel in the Lawsuit identified in the subpoena, and the SEIU's role

    in the Lawsuit including:

    (a)    resources, assistance, and/or financial support provided by the SEIU to the Named
           Plaintiffs or their counsel (including the retention of, and payments to, the law
           firm James & Hoffman prior to, and subsequent to, the filing of the above-
           captioned case);

    (b)    the purported pre-filing investigation conducted by the SEIU and any other
           information, studies, surveys, or reports that have been, or will be, provided to
           Named Plaintiffs or their counsel; and

    (c)    the retention of, and collaboration with any consultants, including but not limited
           to Barbara Bergmann, the Feldman Group, the Mintz Group, and the Global
           Strategy Group.

3. The SEIU's decision to investigate allegations that nurse wages were impacted by a

    conspiracy amongst employers in the Detroit MSA, or to fund such an investigation or

    otherwise commit resources to such an investigation, including:

(a)    the circumstances upon which the SEIU became aware of the theory that nurse wages may have been impacted by alleged violations of antitrust laws;

(b)    the circumstances upon which the SEIU became aware of any facts to support the allegations in the Complaint;

(c)    who within the SEIU decided to investigate, or fund investigations into whether any antitrust laws were violated in the Detroit MSA;

(d)    the factors that the SEIU considered in determining whether to investigate, fund investigations, or otherwise commit resources to the Lawsuit identified in the subpoena; and

(d)    the duration and cost of the SEIU's investigation of nurse wages in the Detroit MSA.

4.    The individuals and entities that the SEIU communicated with in connection with its investigation of the allegations contained in the Complaint or considered for inclusion in the Complaint, both before and after the filing of the initial Complaint in this Litigation.

5.    Studies, reports, surveys, or other information collected, compiled, commissioned, or created by the SEIU concerning the nursing market in Detroit, including, but not limited to, nurse wages, nurse benefits, nurse mobility, and nurse employment options.

6.    All information collected by the SEIU, or on its behalf, concerning or relating to whether employers in the Detroit MSA conspired with respect to RN wages, including any evidence of agreements or communications amongst any employers in the Detroit MSA concerning or relating to nurse wages, benefits, or working conditions.

7.    The SEIU's efforts to encourage any individuals or entities, including the United States Department of Justice, to investigate the allegations contained in the Complaint.

8.    The actual or potential impact of this lawsuit on the SEIU, including the lawsuits impact on the SEIU's visibility or status amongst nurses in the San Antonio MSA, and the role this Litigation plays in the SEIU's organizing activities, campaign, or efforts in the Detroit area.

9.  The SEIU's collection, preservation, and production of documents in response to the subpoena issued by St. John, including:

(a)    the scope of the search performed;

(b)    the identification of the individual employees, files, computers, location, and divisions within the SEIU that were searched for responsive documents; and

(c)    identification, by specific Bates ranges, of the individual custodians or sources for the documents that have been produced by the SEIU.

## INSTRUCTIONS AND DEFINITIONS

The deposition will take place before a notary public, or any other officer authorized to administer oaths, at the office of Jones Day, 51 Louisiana Avenue, N.W., Washington, D.C., 20001-2113, on July 10, 2007, beginning at 9:00 a.m. and continuing on successive days as necessary.  Such deposition will be recorded by stenographic and/or sound and visual means.

The following definitions apply to the topics listed above:

1.    "Communication" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise) between individuals or entities whether oral, written, electronic or otherwise; whether in-person or telephonic; whether direct or through an intermediary.

2.    "Detroit MSA" means the Detroit Metropolitan Statistical Area as that term is defined in the Complaint.

3.    "Hospital Defendant" means any defendant named in the Lawsuit, including Detroit Medical Center; Henry Ford Health System; Mount Clemens General Hospital; Inc.; St. John Health; Oakwood Healthcare Inc.; and Bon Secours Cottage Health Services.

3

4.      "Lawsuit" means the action captioned <u>Pat Cason-Merendo, et al. v. Detroit Medical Center, et al.</u>, case number 06-15601, currently pending in the United States District Court for the Eastern District of Michigan, and includes any of the allegations made in previous or subsequent Complaints.

5.      "Named Plaintiffs" means Pat Cason-Merendo and Jeffrey A. Suhre, and any further plaintiffs subsequently named in any amended complaints, and any of their employees, agents, attorneys or representatives.

6.      "SEIU" means the Service Employees International Union and its officers, agents, employees, representatives, members, affiliates, representatives and attorneys (in-house and outside counsel), including without limitations, the SEIU's Nurse Alliance.

7.      The definitions of "Named Plaintiffs," "Hospital Defendants," and "SEIU" further include the past and present officers, directors, agents, employees, attorneys, general partners, limited partners, members, representatives, divisions, subsidiaries, affiliates, predecessors and successors, of each individual or entity described therein.

# Exhibit 3

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| PAT CASON-MERENDA and JEFFREY A. SUHRE on behalf of themselves and others similarly situated, ) ) ) | |
| ) | Case No. 06-15601 |
| Plaintiffs, ) | |
| ) | Hon. Gerald E. Rosen |
| v. ) | |
| ) | Magistrate: Mona K. Majzoub |
| DETROIT MEDICAL CENTER, HENRY FORD HEALTH SYSTEM, MOUNT CLEMENS GENERAL HOSPITAL, INC., ST. JOHN HEALTH, OAKWOOD HEALTHCARE INC., BON SECOURS COTTAGE HEALTH SERVICES, WILLIAM BEAUMONT HOSPITAL d.b.a BEAUMONT HOSPITALS, and TRINITY HEALTH CORP., ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. ) | |

PLAINTIFFS' RESPONSES TO ST. JOHN HEALTH'S
SECOND SET OF INTERROGATORIES

Plaintiffs Pat Cason-Merenda and Jeffrey A. Suhre ("Plaintiffs"), by and through their

attorneys of record, respond to Defendant St. John Health's Second Set of Interrogatories,

pursuant to Rule 33 of the Federal Rules of Civil Procedure.

GENERAL OBJECTIONS

1. Plaintiffs are continuing to investigate the facts relating to this action. Plaintiffs'

answers contained herein are therefore based only upon such information and documents as are

presently available to, and specifically known to, Plaintiffs. The responses are given without

- 1 -

prejudice to Plaintiffs' right to produce evidence of any facts that Plaintiffs may later recall or find through research, investigation, analysis, and discovery.

2. Plaintiffs object to each Interrogatory that purports to impose obligations greater than those imposed by the Federal Rules of Civil Procedure or any applicable Local rules.

3. Plaintiffs object to each Interrogatory to the extent it seeks information that calls for the disclosure of information that invades the attorney client privilege, the attorney work product doctrine or any other privilege or protection. Information covered by such privileges is not subject to disclosure and the Interrogatories will be construed as not seeking such information.

### **Responses and Objections**

19.    Identify all persons who you believe have knowledge of relevant facts relating to the allegations in the Complaint and identify the allegations upon which you believe they have knowledge.

RESPONSE:  Plaintiffs object to this Request because it seeks information protected by the attorney-client privilege and/or the work product doctrine. Subject to, and without waiving this objection, Plaintiffs state that in addition to Ms. Cason-Merenda and Mr. Suhre, the persons identifying in Exhibit A to these responses have information regarding hospital nurse compensation practices in Detroit area hospitals and other matters as identified in Exhibit A.

20.    Identify and describe with particularity the circumstances by which each of the Plaintiffs became acquainted with Plaintiffs' counsel and retained or otherwise engaged counsel to represent them in this lawsuit, including the dates on which Plaintiffs' counsel was retained.

RESPONSE BY PLAINTIFF PAT CASON-MERENDA:    Plaintiff objects to this

Request because it seeks information protected by the attorney-client privilege. Subject to, and without waiving this objection, Plaintiff states: I received a telephone call from my friend, Maureen Taylor, who said that she had spoken with Stephen Wasinger, a lawyer who represents Ms. Taylor. Mr. Wasinger was interested in speaking with any of Ms. Taylor's nurse friends who might be interested in becoming involved in a lawsuit about nurse wages. Ms. Taylor gave Mr. Wasinger's telephone number to me, and I called him to discuss this possibility. I signed a retainer agreement on October 2, 2006.

RESPONSE BY PLAINTIFF JEFF SUHRE: Plaintiff objects to this Request because it seeks information protected by the attorney-client privilege. Subject to, and without waiving this objection, Plaintiff states: I received a telephone call from Pat Cason-Merenda who asked if I was interested in speaking with attorney Stephen Wasinger about becoming involved in a lawsuit about nurse wages. Ms. Cason-Merenda gave Mr. Wasinger's telephone number to me, and I called him to discuss this possibility. I signed a retainer agreement on October 5, 2006.

21.     Identify each person who participated in any investigation of the facts that formed the basis for the claims asserted in this lawsuit or in gathering any evidence or information supporting, refuting or otherwise relating to the allegations in the Complaint, including without limitation any employee or representative of the Mintz Group, the Feldman Group, Barbara Bergmann, and the Global Strategy Group, and describe with particularity all such facts and evidence collected or gathered.

# Exhibit 4

```
 1                UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF NEW YORK
 2   ------------------------------
     MARJORY UNGER, on behalf of      : Docket No. 06-CV-00765-TJM-DRH
 3   herself and all others
     situated,                        : Albany, New York
 4                                       January 23, 2007
                            Plaintiff, :
 5
                                       :
 6                 v.
                                       :
 7   ALBANY MEDICAL CENTER et al,
                                       :
 8                           Defendants.
     ------------------------------
 9          TRANSCRIPT OF STATUS/DISCOVERY CONFERENCE
             BEFORE MAGISTRATE-JUDGE DAVID R. HOMER
10                 UNITED STATES DISTRICT JUDGE

11   A P P E A R A N C E S :

12   For the Plaintiff:   MICHAEL RHODES-DEVY, ESQ.
                          Of Counsel to Towne Law
13                        Office of Michael Rhodes-Devey
                          P.O. Box 15072, 7 Wembley Court
14                        Albany, New York 12212-5072
                          518-452-1800
15                        518-452-6435 fax
                          Email: DeveyLaw@aol.com
16
17   For the Plaintiff:   DANIEL A. SMALL, ESQ.
                          Cohen, Milstein Law Firm
18                        1100 New York Avenue, N.W.
                          West Tower, Suite 500
19                        Washington, DC 20005
                          202-408-4600
20                        202-408-4699 fax
                          Email: dsmall@cmht.com
21
     For the Plaintiff:   ALLYSON B. BAKER, ESQ.
22                        Cohen, Milstein Law Firm
                          1100 New York Avenue, N.W.
23                        West Tower, Suite 500
                          Washington, DC 20005
24                        202-408-4600
                          202-408-4699 fax
25                        Email: abaker@cmht.com
```

```
1    A P P E A R A N C E S   (Cont'd.):

2
     For the Plaintiff:      JAMES THOMPSON TOWNE, JR., ESQ.
3                            The Towne Law Offices, P.C.
                             7 Wembley Court
4                            Albany, New York 12205-3851
                             518-452-1800; 518-452-6435 fax
5                            Email: james.towne@townelaw.com

6    For the Plaintiff:      DAVID P. DEAN, ESQ.
                             James, Hoffman Law Firm
7                            1101 17th Street, N.W., Suite 510
                             Washington, DC 20036-4704
8                            202-496-0500; 202-496-0555 fax
                             Email: dpdean@jamhoff.com
9
     For The Defendant       NICHOLAS J. D'AMBROSIO, ESQ.
10   Ellis Hospital:         Bond, Schoeneck Law Firm - Albany
                             111 Washington Avenue
11                           Albany, New York 12210-2280
                             518-533-3000; 518-533-3299 fax
12                           Email: dambron@bask.com

13
     For the Defendant       DANIEL J. HURTEAU, ESQ.
14   Northeast Health:       Nixon, Peabody Law Firm - Albany Office
                             Omni Plaza, Suite 900
15                           30 South Pearl Street
                             Albany, New York 12207
16                           518-427-2650; 518-427-2666 fax
                             Email: DHurteau@nixonpeabody.com
17
     For the Defendant       MICHAEL R. SHUMAKER, ESQ.
18   Seton Health:           Jones, Day Law Firm - DC Office
                             51 Louisiana Avenue, N.W.
19                           Washington, DC 20001
                             202-879-3939; 202-626-1700 fax
20                           Email: mrshumaker@jonesday.com

21
     for the Defendant       MARK THOMAS, ESQ.
22   Ascension Health:       Wilson, Elser Law Firm - Albany Office
                             677 Broadway - 9th floor
23                           Albany, New York 12207-2996
                             518-449-8893; 518-449-4292 fax
24                           Email: Mark.Thomas@wilsonelser.com

25
```

```
 1    A P P E A R A N C E S   (Cont'd.):

 2    For the Defendant     BRIAN M. CULNAN, ESQ.
      St. Peter's Health:   Iseman, Cunningham Law Firm
 3                          9 Thurlow Terrace
                            Albany, New York 12203
 4                          518-462-3000
                            518-462-4199 fax
 5                          Email: BCulnan@ICRH.com

 6    For the Defendant     DAVID MARX, ESQ.
      Albany Medical        McDermott, Will Law Firm - Chicago Office
 7    Center:               227 West Monroe Street, Suite 4700
                            Chicago, Illinois 60606
 8                          312-372-2000;
                            312-984-7700 fax
 9                          Email dmarx@mwe.com

10    For the Defendant,    RICHARD L. WEISZ, ESQ.
11    Local Counsel for     Hodgson, Russ Law Firm - Albany Office
      Albany Medical        677 Broadway, Suite 301
12    Center:               Albany, New York 12207
                            518-465-2333
13                          518-465-1567 fax
                            Email: rweisz@hodgsonruss.com
14
      For the Non-Party     ROBERT M. WEINBERG, ESQ.
15    Service Employees     Bredhoff & Kaiser, PLLC
      Int'l. Union:         805 Fifteenth Street, NW, Suite 1000
16                          Washington, DC 20005-2207
                            202-842-2600
17                          202-842-1888 fax

18    For the Local:        RICHARD ALAN LEVY, ESQ.
19                          DANA LOSSIA, ESQ.
                            Levy Ratner, P.C.
20                          80 Eighth Avenue
                            New York, New York 10011-5126
21                          212-627-8100

22    Court Transcriber:    Typing At Your Doorstep
                            (866) 634-4380; (800) 860-5722 fax
23                          Email: TAYDS@optonline.net
                            www.TypingAtYourDoorstep.com
24
      Proceedings recorded by electronic sound recording, transcript
25    produced by transcription service.
```

                                INDEX
1

2   WITNESSES                 DIRECT  CROSS   REDIRECT   RECROSS

3   No Witnesses

4

5

6

7

8

9   EXHIBITS          DESCRIPTION          MARKED    RECEIVED

10  No Documents

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Marjory Unger v. Albany Medical Center et al                    5

1          THE CLERK:  On the record; the date is January 23,

2    2007.  The time is 10:05 a.m.  The matter is Unger versus Albany

3    Medical Center, docket 06-CV-765.  Could we have appearances,

4    please?

5          THE COURT:  Appearances for the Plaintiff, please?

6          MR. RHODES-DEVEY:  Michael Rhodes-Devey, Of Counsel to

7    the Towne Law Office as Local Counsel for Plaintiff.

8          MR. SMALL:  Daniel Small with Cohen, Milstein for the

9    Plaintiffs.

10          THE COURT:  And for Albany Medical Center?

11          MS. BAKER:  Allyson Baker with Cohen Milstein for the

12    Plaintiffs.

13          MR. TOWNE:  James Towne, Local Counsel for the

14    Plaintiffs, Judge.

15          MR. DEAN:  This is David Dean on the phone with James

16    and Hoffman for the Plaintiffs.

17          THE COURT:  All right.  And for Ellis Hospital?

18          MR. D'AMBROSIO:  Nicholas D'Ambrosio.

19          THE COURT:  For Northeast Health?

20          MR. HURTEAU:  Dan Hurteau with Nixon Peabody.

21          THE COURT:  For Seton Health?

22          MR. SHUMAKER:  Michael Shumaker of Jones, Day.

23          MR. THOMAS:  Mark Thomas of Wilson, Elser Law Firm.

24          THE COURT:  And for St. Peter's Health?

25          MR. CULNAN:  I'm Brian Culnan.

1   THE COURT:  I believe there's a non-party, the

2   National Union.

3   MR. WEINBERG:  This is Bobby Weinberg for the Service

4   Employees International Union.

5   THE COURT:  And for the Local?

6   MR. LEVY:  Richard Levy, Levy Ratner.

7   MS. LOSSIA:  Dana Lossia from Levy Ratner is on the

8   phone.

9   THE COURT:  All right.  Did we leave anybody out?

10  MR. MARX:  David Marx from McDermott, Will & Emery for

11  Albany Medical Center is also on the phone.

12  MR. WEISZ:  And Dick Weisz, Local counsel for Albany

13  Medical Center.

14  THE COURT:  All right.  I take it that's everybody

15  then.  All right, thank you.

16  MR. WEINBERG:  Your Honor, this is Bob Weinberg; we

17  can clearly hear it when you're speaking, but I'm having

18  difficulty hearing when other people in the courtroom are

19  speaking.

20  THE COURT:  Well, we'll do our best, but the

21  accommodations are -- we've done the best we've could in

22  appearances by telephone and accommodation to the parties

23  appearing by telephone.  So, I'm afraid that if you're unable to

24  hear something, you're unable to respond, it's going to be your

25  loss by virtue of your choice to appear by telephone.  But do

Marjory Unger v. Albany Medical Center et al                    7

1    the best we can.  But that's the way it's going to end up.

2              There are several issues that have been raised by the

3    parties and non-parties in letters to the Court.  I would

4    propose to take first the issues between -- I believe it's --

5    Defendants Seton Health and the National and Local Union with

6    respect to the subpoenas first and then address the disputes

7    between the parties.  With respect to the Seton Health

8    subpoenas, I'll hear from Seton Health first.

9              MR. SHUMAKER:  Your Honor, Michael Shumaker --

10             THE COURT:  You're going to have to pull the

11   microphone as close as you can.

12             MR. SHUMAKER:  Michael Shumaker of Jones Day on behalf

13   of Seton Health.  Can you people hear me?

14             THE COURT:  Don't worry about them.

15             MR. SHUMAKER:  Your Honor, as I'm sure you saw from

16   the papers, Seton Health has served subpoenas duces tecum on the

17   SEIU.

18             THE COURT:  Let's start with the National.  How does

19   this Court have jurisdiction?

20             MR. SHUMAKER:  This Court has jurisdiction --

21             MR. WEINBERG:  Your Honor, I don't want to be rude but

22   I can't -- if anybody's speaking, I can't hear it.  It's Bob

23   Weinberg from the SEIU.

24             THE COURT:  Well, we're doing our best.

25             MR. WEINBERG:  Well, thank you.

1              THE COURT:  Go ahead.

2              MR. SHUMAKER:  Your Honor, the subpoenas were issued

3    both out of this Court as well as from the District of Columbia.

4              THE COURT:  The one to the Local was issued out of

5    this Court?

6              MR. SHUMAKER:  Yes.

7              THE COURT:  The one for the National was issued out of

8    the District of Columbia.

9              MR. SHUMAKER:  Yes, Your Honor.

10             THE COURT:  That's the one I'm asking you about.

11             MR. SHUMAKER:  Okay.  The Court does not have

12    jurisdiction over the subpoena issued out of the DDC.

13             THE COURT:  All right.

14             MR. SHUMAKER:  There is no question about that.  What

15    the Court does have jurisdiction over is Local 1199.  And the

16    SEIU tends to use as a corporate formality to not comply with

17    its obligation under the federal rules.  The standard is --

18             THE COURT:  It's not often I hear defense counsel

19    talking about corporate formalities.

20             MR. SHUMAKER:  Understood, Your Honor.  But this is

21    the situation where the SEIU, both the National and the Local,

22    worked together to bring this case and to recruit Named

23    Plaintiffs.  The documentation is very clear on that.  It would

24    seem that if they're going to work together to bring this case,

25    they should be treated as one with respect to their obligations

Marjory Unger v. Albany Medical Center et al                    9

1  in responding to discovery.

2        There are a number of cases out there that what is

3  important is actual and constructive control over the documents.

4  They have the ability to control the documents and the ability

5  to share information and they worked together to bring this

6  case.  It would seem that fairness would dictate that they have

7  control over the documents relating this entire investigation

8  that led to this.

9        THE COURT:  But everything else about the two entities

10  suggests that they are separate; separate constitutions,

11  separate bylaws, separate offices, separate locations, separate

12  everything.

13        MR. SHUMAKER:  And I do not dispute that.  And there

14  are a number of cases, Your Honor, where people have made the

15  similar argument usually in a parent subsidiary context.  Once

16  the courts say that if the subsidiary and the parent work

17  together with respect to a transaction that is an issue in the

18  litigation, they will determine they have constructive notice

19  over the documents held by the parent.  We would submit that the

20  same situation applies here.

21        If Local 1199 worked with this entity to bring this

22  case, they should be treated as one with respect to this case.

23  At a minimum, this Court has jurisdiction over Local 1199.

24        THE COURT:  Well, let's start with the minimum then

25  because I'm not inclined to find a unity here where the Local

Marjory Unger v. Albany Medical Center et al                10

1   would be dictating what documents are produced by the National.

2   And you do have a remedy with respect to your subpoena to the

3   National.

4        MR. SHUMAKER:  Absolutely.  And we will follow through

5   with that.  We just felt that given that we had Your Honor's

6   attention here on the 23rd that we would bring the issue before

7   you.

8        THE COURT:  I understand.  Let's talk about the Local.

9        MR. SHUMAKER:  With respect to the Local, they have

10  raised a number of objections; over breadth, undue burden,

11  Section 7, Constitution.  When you cut through the hyperbole and

12  numerous objections, at the end of the day what we do have is

13  the Union admitting that they have "massive amount of material"

14  relating to nursing compensation and nursing recruiting.

15       THE COURT:  We're still focused on class certification

16  here, so this is not matched discovery.

17       MR. SHUMAKER:  I understand.  And what the discovery

18  seeks to get at is to what extent is the SEIU driving this case.

19  We have knowledge --

20       THE COURT:  Let's assume that they're driving it.

21       MR. SHUMAKER:  Okay.

22       THE COURT:  So what?

23       MR. SHUMAKER:  The fact that they are driving this

24  case suggests that the representative of this class is not a

25  proper representative.  If you look at the case law, there is

Marjory Unger v. Albany Medical Center et al                11

1    case law out there --

2            THE COURT:  What facts are in issue for which you seek

3    discovery?

4            MR. SHUMAKER:  The fact that the class representative

5    is a pawn for the SEIU.

6            THE COURT:  Well, pawn is perhaps a legal conclusion,

7    but it's a conclusion.  What is the fact -- what facts do you

8    seek to assert?

9            MR. SHUMAKER:  The facts we seek to establish is

10   exactly how these Named Plaintiffs came to be --

11           THE COURT:  There's one Named Plaintiff.

12           MR. SHUMAKER:  There's one Named Plaintiff but she's

13   being withdrawn.  We found out just last week that the only

14   Plaintiff -- as we sit here before Your Honor, we have no Named

15   Plaintiff; there is no one.  They had sought to amend the

16   Complaint.  Defendants gave that consent to that Amended

17   Complaint with the assumption that she would stay.  Now, we

18   learn that she's going to not participate in this case, and

19   that's one of the issues we were hoping to raise with you.

20           THE COURT:  All right, hold on for a second.

21           MR. SHUMAKER:  We're changing Plaintiffs here?

22           MR. SMALL:  Yes, Your Honor; with the Court's

23   permission, we will asking the Court to do that.  If I may refer

24   to Ms. Baker to address that issue?

25           THE COURT:  All right, as long as Ms. Baker uses the

Marjory Unger v. Albany Medical Center et al        12

1  microphone.

2       MR. BAKER:  Thank you, Your Honor.  Yes, we previously

3  submitted an unopposed proposed amended complaint that was

4  jointly stipulated to in which we would be adding two additional

5  Plaintiffs; Cindy Cullen and Wendy Fleishman, in addition to

6  Marjory Unger.  Subsequently, after that, Ms. Unger has informed

7  us that she -- and this is not -- this came after we agreed that

8  Cindy Cullen and Wendy Fleishman would be added as amended

9  Plaintiffs -- amended the complaint.

10      Ms. Unger has informed us that she's not interested in

11  continuing with her discovery obligations as a class

12  representative.  And this has been something that she's

13  expressed.  I further understand that Ms. Unger is leaving the

14  Albany area and that she's not interested in continuing in her

15  position as class representative.  And as soon as we became

16  aware of this, we informed Defendants' counsel through a letter

17  responding to their interrogatories in stating that we are not

18  able to respond to these interrogatories because Ms. Unger has

19  indicated that she's no longer interested in continuing in her

20  discovery role or her role as class representative and her

21  subsequent discovery obligations that are attendant with that

22  role.

23      THE COURT:  The issues for class certification with

24  respect to numerosity have nothing to do with a particular Named

25  Plaintiff, but technicality and sufficiency as a representative

1   depend on who the Named Plaintiff is.

2          The subpoenas went out with the idea of Ms. Unger in

3   mind, I believe.  At least that's what it appears to me.  Are we

4   back to square one on this for class certification?

5          MS. BAKER:  I don't believe so, Your Honor.

6          THE COURT:  If I may address that -- Dan Small for the

7   Plaintiffs -- Your Honor?  I believe the issue that the

8   Defendants have raised with the Court about whether the SEIU is

9   the driving force behind the litigation or somehow is involved

10  in this litigation will be in this case regardless of who the

11  Plaintiff is.  And I think that issue will be wholly unchanged

12  by the substitution of two new Plaintiffs.

13         THE COURT:  All right.  Mr. Shumaker, do you have a

14  view on that?

15         MR. SHUMAKER:  Yes, Your Honor, a little bit of

16  context here as to how Defendants learned about this dismissal.

17  Discovery was moving on just fine in this case.  Defendants'

18  Production Requests were outstanding.  They were answered by Ms.

19  Under at the end of December with Interrogatories pending.

20  Responses were due the first week of January.

21         We were contacted by Plaintiff's counsel requesting

22  our agreement to an amendment Complaint to add two new people.

23  Based upon the premise that we're simply adding two more class

24  representatives and not switching out two for one, we consented

25  to that.  The interrogatory responses were then due the first

1   week January.  They requested an extension.  At that point in

2   time, no one informed us that there was a concern that Ms. Unger

3   was would be dropped.

4          On the day that the Interrogatory responses were

5   actually due -- in fact I think they may have been a couple of

6   days late -- we were then informed that Ms. Unger would be

7   dropped from the case.

8          THE COURT:  Well, let's assume all that's true, how

9   does it change your contention that whether it's Ms. Unger or

10  the two presently named individuals or two other Union members;

11  how does it change your contention that it's the Union that is

12  driving the force -- that is the driving force here?

13         MR. SHUMAKER:  In fact, it supports it in our view.

14         THE COURT:  All right.

15         MR. SHUMAKER:  It's completely indicative of what's

16  going on; that the SEIU is driving this case, and setting up

17  individuals --

18         THE COURT:  Well, let me discuss that.  I think most

19  of the discovery that you seek -- I'm not sure what's in dispute

20  here.  There's probably no dispute that that the two remaining

21  named putative Named Defendants -- Named Plaintiffs are Union

22  members.

23         MR. TOWNE:  Excuse me; I think --

24         MR. SHUMAKER:  I don't know that, Your Honor.

25         THE COURT:  Are they?

1          MR. TOWNE:  Excuse me, Your Honor, I have the answer

2    to that.

3          THE COURT:  Okay.

4          MR. TOWNE:  This is James Towne.  They are not Union

5    members.

6          THE COURT:  Okay.

7          MR. TOWNE:  Ms. Fleishman contacted -- for the record

8    -- Ms. Fleishman contacted my office through one of my

9    relatives.  Ms. Cullen is the sister of one of our attorneys in

10   our office.

11         THE COURT:  You're going to turn your family into

12   this, aren't you?

13         MR. TOWNE:  I have to.

14         THE COURT:  (Laughter.)

15         MR. TOWNE:  They have no connection with the Union,

16   Your Honor.

17         THE COURT:  All right.

18         MR. SHUMAKER:  And that's the first I've heard of

19   that, Your Honor.  The fact of the matter is the SEIU has funded

20   the litigation; they've admitted to that.  They have a 25

21   percent financial interest in this case, notwithstanding that

22   they assert that they are not a party and have no control over

23   this case.  They're even paying the Plaintiff's counsel's fees,

24   Jams & Hoffman in bringing this case.

25         It would seem to us, Your Honor, the SEIU clearly has

1    some interest in this case.  And for that reason they have an

2    obligation to respond to discovery related to such poor issues

3    as their role in bringing the case, documentation relating to

4    nursing compensation.

5            They talk about this huge investigation relating to

6    nursing compensation and the assertion --

7            THE COURT:  What difference does it make what they

8    have done with respect to documentation of nurse compensation

9    for class certification?

10           MR. SHUMAKER:  Because the information they have, the

11   data about the compensation is relevant to how this case will be

12   maintained as a class action.

13           THE COURT:  How?

14           MR. SHUMAKER:  They have collected information that

15   presumably relates to showing that the compensation of these

16   individuals was somehow negatively affected.  In much the same

17   way that the Plaintiffs have subpoenaed 20 plus associations

18   seeking documentation on 50 some odd requests, including much

19   the same the information we're seeking.  If it's relevant to the

20   Korean Nurses Association, we would submit the same information

21   is relevant at a minimum --

22           THE COURT:  It may be relevant on the merits.  How is

23   it relevant to class certification?

24           MR. SHUMAKER:  Because -- what is at issue, Your

25   Honor?

1          THE COURT:  It's numerosity, it's typicality,

2    sufficiency of representation.  I know that was a rhetorical

3    question, but --

4          MR. SHUMAKER:  The adequacy of the representative and

5    the fact that each individual nurse must be treated differently.

6    If there is information in the SEIU's possession that shows that

7    one nurse gets tax compensation, Y-nurse gets this compensation;

8    it shows the differences.  And that information is exactly going

9    to one of our key claims is that you cannot maintain this as a

10   class action with each nurse different.

11          And it would seem that you are undertaking an

12   investigation at least to this law suit, making claims about

13   compensation, and how that's negatively affecting -- and you

14   have information and data relating to that compensation that is

15   in their view a massive amount of material; it would seem that

16   that data, that information would be open for discovery in much

17   the same way that Plaintiffs are seeking that information from

18   us and from other parties.

19          THE COURT:  Well, whether the Plaintiffs get it or not

20   at this stage, is another question.  All right, what else?

21          MR. SHUMAKER:  With respect to the SEIU, we would

22   submit Your Honor that they're arguing form over substance.

23   This whole corporate formality thing is really --

24          THE COURT:  You're on the record here, you know.

25          MR. SHUMAKER:  I understand that.

1          THE COURT:  I hope this doesn't appear with respect to

2    some of your other clients in other litigation.

3          MR. SHUMAKER:  I understand that.  But this is an

4    instance where they have worked together to bring this case, and

5    we think it's only fair that they be treated as one in

6    responding to the discovery obligations.

7          THE COURT:  All right.  I'm not going to treat them as

8    one.  Let's just focus on the Local.

9          MR. SHUMAKER:  Now, they also, they raise a Section 7

10   concern under the NLRB, Your Honor.  And we directed the Court's

11   attention to the American Broadcasting case.  And that was a

12   case that we think is squarely on fours with this case.  That

13   was a case where a class action was brought by a Named Plaintiff

14   for hour and labor violations.

15          The concerns from the Defense in that case were that

16   it was being driven by the Union, and Section 7 claims were made

17   that we will not get discovery as against the Union because it

18   raises Section 7 issues.

19          The Court squarely rejected that claim saying that it

20   seemed to them that the discovery into the Union's interests in

21   bringing this case is particularly relevant whether this

22   individual was a proper representative of the class, and on that

23   basis granted the discovery, and the facts were very similar.

24          Plaintiff's counsel in that case was also the Union

25   counsel; much the same as we have here.  In addition, they were

Marjory Unger v. Albany Medical Center et al                    19

1   funding the litigation; the same as what we have here.  The

2   assertion was that the case was being driven by the Union; same

3   assertion that we have here.  The Section 7 claim that is raised

4   by the Union here, we do not think stands up to that very clear

5   precedent under the NLRB decision.

6        They also raise a claim about burden, over breadth; we

7   tried to work with them Your Honor.  We offered to drop six

8   requests to pare back.  We never received a response.  It is

9   hard to negotiate a subpoena response if you don't receive a

10  response.  These requests were as narrowly tailored as can be;

11  to get at the SEIU, and what its role is in this case, and its

12  role in backing these Plaintiffs.  And the fact that no one has

13  tried to work with us in negotiating any alleged over breadth

14  makes it very difficult.

15        THE COURT:  Well, I still don't see how the Union's

16  involvement in this is at issue.  First of all, there's no

17  dispute with that the Union was involved.  They held a press

18  conference.

19        MR. SHUMAKER:  They're asserting that they have no

20  control over this case, Your Honor.

21        THE COURT:  Well, control over the case is a different

22  matter.

23        MR. SHUMAKER:  Okay.  And they assert that this class

24  representative is its proper representative.  And we will

25  maintain, now that's not a proper representative, and that her

1   interest as aligned to the Union to the extent that can be

2   developed will illustrate that there's an interclass conflict

3   between her interest and the class interest.

4           THE COURT:  That has to do with the particular

5   communications if they exist between the Named Plaintiffs and

6   the Union; does it not?

7           MR. SHUMAKER:  It does, but we also maintain that this

8   is really a part of a Union strategy to unionize nurses.  And

9   for that reason, the SEIU's position --

10          THE COURT:  Unless it's a strategy of the Named

11  Plaintiffs, so what?

12          MR. SHUMAKER:  We're maintaining it's not a strategy.

13          THE COURT:  Well, then how is it relevant?

14          MR. SHUMAKER:  Because it's the bringing of this case,

15  is really part and parcel of a strategy of the Union to unionize

16  employees that suggests that the representative is improper.

17  And for that reason --

18          THE COURT:  There's a logical gap there, I believe.

19          MR. SHUMAKER:  Okay.

20          THE COURT:  You're making a big leap.

21          MR. SHUMAKER:  If you look at the American

22  Broadcasting case, Your Honor; I could pull that out for you?

23          THE COURT:  You're suggesting that because the Union

24  may have a different motive, the individually named plaintiffs

25  make improper representatives.  If I accept that argument, there

1    are no proper representatives.

2            MR. SHUMAKER:  That's not what I'm saying.  I'm saying

3    that we have the ability to look into whether in fact that

4    representative has interests so in line with the Union that they

5    cannot serve the proper representative.

6            THE COURT:  Well, then you need to -- the discovery

7    regarding the particular individual Plaintiffs may be relevant.

8            MR. SHUMAKER:  Okay.

9            THE COURT:  Discovery regarding the Union's purposes

10   generally is not.

11           MR. SHUMAKER:  Okay.  In addition to that though, the

12   information in their file relating to nurse compensation and the

13   nurse shortage issue seems to be particularly relevant to a case

14   in which those principles are the core of the case, and they

15   admit that they have this information; they admit that they did

16   the investigation; and that that investigation --

17           THE COURT:  Which relates to what, typicality?

18           MR. SHUMAKER:  It relates the ability for this class

19   to be proven on a class-wide basis.

20           THE COURT:  Well, that's a different issue from the

21   particular Plaintiffs.  You're not talking about -- I think

22   you're talking about typicality if I'm not mistaken; that the

23   members of the putative class -- that these individuals are

24   typical of the members of the class.

25           MR. SHUMAKER:  That is exactly right, Your Honor.  I

Marjory Unger v. Albany Medical Center et al                22

1   mean the fact that they have information that shows from this

2   investigation that various nurses have different compensation at

3   different times, at that relates to whether this case can be

4   maintained or proven on a class-wide damage or class-wide impact

5   basis.  And that information we would suggests is particularly

6   relevant for a class action in much the same way that they have

7   sought that information.

8          THE COURT:  All right, anything else?

9          MR. SHUMAKER:  Just going back to this American

10  Broadcasting case, in there we're talking about, "The court

11  concludes that the employer's request for information relating

12  to the Union is highly relevant.  Each of the discovery request

13  at issue concerns factors relevant to the adequacy of class

14  counsel and the Named Plaintiffs, specifically whether they have

15  interest that may conflict with those of the putative class

16  members."  They then cite a case from Martinez v. Verash, 2004

17  Westlaw 1367445.  And in that case the class must be certified,

18  but the Named Plaintiffs were "handpicked" and approached for

19  litigation by a rival union and were affectively assigned

20  counsel by the rival union.  We would submit, Your Honor, that's

21  exactly what we're dealing with here.  And that's why we're

22  trying to find out the SEIU role in this litigation in

23  connection to the Named Plaintiff.

24         THE COURT:  All right, class counsel is the other

25  issue that you raised.

1          MR. SHUMAKER:  Class counsel is certainly an issue,

2     but the advocacy of the representative is of primarily focus.

3          THE COURT:  All right.  I don't mean to foreclose the

4     National Union's counsel, but in my view the subpoena to the

5     National Union is, for the reason set forth in your letter,

6     unenforceable in this Court.  And I will so-rule.  So, I'd like

7     to hear from the Local union's counsel in response.

8          MR. LEVY:  Good morning, this Richard Levy.  I'm

9     representing 1199.  As you have indicated already, but I think

10    is important to restate, this is an autonomous union of about

11    275,000 members.  It operates completely independently of the

12    SEIU, although it has an affiliation there.  It was not always

13    affiliated with SEIU.  In fact when I first years ago became the

14    general counsel it was affiliated with another international

15    union that was then independently chartered by the AFL-CIO, and

16    ultimately affiliated with SEIU.  But it keeps all of its own

17    documents and it keeps its own counsel and negotiates its own

18    contract.  In fact this weekend, we negotiated probably the

19    National, United States' major, Hospital Worker Contract --

20         THE COURT:  Just so we're clear, we're talking about

21    documents in the care custody and possession of the local union

22    here.

23         MR. LEVY:  That's what I wanted to clarify.

24         THE COURT:  All right.

25         MR. LEVY:  Because the discovery conflates the Union

1    International and the Local and asks for all documents, and (A)

2    we don't have any documents of the SEIU, except the few that we

3    turned over.  We have turned those over that were related in the

4    law suit or the Plaintiff in any way.  So, it leaves us in --

5            THE COURT:  We have two more Plaintiffs here.

6            MR. LEVY:  Yes, typically about that, Your Honor,

7    because at this stage of the proceeding there is no 1199

8    Plaintiff in this case and no 1199 involvement except that we

9    put out a sign-up sheet which has been handed over on which

10   people could sign up if they were interested in talking to the

11   Cohen Milstein firm.  And one nurse -- a couple of nurses did

12   and then some backed out and then Unger remained and now she's

13   apparently backed out.  So, the extent of our involvement was so

14   minimal.

15           Now, you have to put that involvement, which has been

16   disclosed and turned over with proper documents in the context

17   of a discovery demand -- and I'll try to avoid hyperbola --

18   which asks for every communication between 1199 and its offices

19   and its agents with every RN in the Albany area, and everywhere

20   else, and every communication they have had and every oral

21   conversation and every writing that reflects any of those

22   conversations.

23           It asks for every document that refers to any

24   organizing campaign or any corporate campaign or any plans of

25   collective bargaining.  It's a document that asks for --

1          THE COURT:  Let me see if I can focus the response

2    here.

3          MR. LEVY:  Yes.

4          THE COURT:  I take it you have provided everything

5    that you have regarding communications between the local and Ms.

6    Unger?

7          MR. LEVY:  Yes, we have.

8          THE COURT:  All right.  There probably will be a

9    demand forthcoming and the two other Named Plaintiffs, but we'll

10   address that if we have to at the time.

11         What, if any, documents are there in your possession

12   that you have produced regarding nurse compensation during the

13   period alleged in the Complaint?

14         MR. LEVY:  We have not produced anything regarding

15   nurse compensation, although I will say the following --

16         THE COURT:  But you have such documents?

17         MR. LEVY:  No.  The Union in the course of all of it's

18   conversations with nurses in probably every communication with

19   nurses from time in memoriam discusses wages.  I mean that's

20   what we do.  We are always asking about it, talking to people;

21   what are your wages, what are your benefits, how are you doing?

22   It's mostly informal, and there maybe documents around about it.

23   That's part of our organizing, part of our collective

24   bargaining.  It was not done in furtherance of this law suit.

25         THE COURT:  Well, the fact that it was not done in

1  furtherance of this law suit may make them more discoverable,
2  not less.
3      MR. LEVY:  Well, but there are also proprietary
4  materials of the Union that are very important to its
5  discussion.  To disclose those would also probably disclose the
6  names of the nurses who have been involved, who come to our
7  meetings --
8      THE COURT:  How is it proprietary to determine when
9  you have information and what the wages were that paid?  We're
10  not talking about negotiation strategies.  We're not talking
11  about thought processes.  We're talking essentially available
12  information that's been gathered by the Union.
13      MR. LEVY:  Because the request is for any document
14  referring to any such.  And that will be our organizing
15  documents, that will be our collective bargaining proposals
16  among the members --
17      THE COURT:  Well, you can call them whatever you want,
18  but what I'm focusing on here is the type of information here
19  that might be discoverable.  There's an issue here as to
20  typicality of these representatives for the class.  And the
21  issue becomes what were the wages paid to the class versus what
22  were the wages paid to these representatives; I think.  That's
23  at least one of the issues.
24      MR. LEVY:  It is one of the issues, Your Honor, but
25  there's an irony in this, and I don't know how --

Marjory Unger v. Albany Medical Center et al                    27

1          THE COURT:  No, ironies are not permitted here.

2          MR. LEVY:  All of the information about the wages

3    being paid in this area is known to all of the counsel and their

4    clients who are sitting in this room.  And if we --

5          THE COURT:  How?  How are they known?

6          MR. LEVY:  How are known?

7          THE COURT:  Yes.

8          MR. LEVY:  Because they represent the people who set

9    the wages.  Nurses don't set the wages and the Union doesn't set

10   the wages.

11         THE COURT:  Can you point to any document generally

12   available to the Defendants that contains that information?

13         MR. LEVY:  Yeah.  There's document -- there's a

14   woman's policy health group that prepared a document available

15   on a website and discloses the wages of the nurses.

16         THE COURT:  Do you have documents within the Union

17   that disclose the wages paid to nurses during the period in

18   question?

19         MR. LEVY:  We have probably a document or documents

20   that would state the wages as we understand them from some

21   communication about the wages paid to nurses.

22         THE COURT:  I want you to correct me if I'm wrong.  I

23   assume that there are a number of documents within the Union

24   with respect to wages paid during the period in question.  Some

25   may be contained in documents that might properly be classified

Marjory Unger v. Albany Medical Center et al          28

1   as proprietary, discussing strategies or whatever.  There may be

2   other documents that contain the same information that are in

3   less sensitive documents and can be disclosed.  You don't have

4   to disclose the same information ten times.  But whatever is

5   there, it seems to me as relevant and has to be disclosed.  How

6   would you propose to do that?

7           MR. LEVY:  Well, if there are listings of wages that

8   we're aware of, we can make them known.  I think that this is

9   somewhat unreasonable in the following sense.  We're not a party

10  to this case.

11          THE COURT:  Well, please.

12          MR. LEVY:  And there are parties to this case who have

13  all of this information and to pull in a non-party and ask them

14  to provide to the hospital their raise rate --

15          THE COURT:  Let's talk about the non-party issue for a

16  minute.

17          MR. LEVY:  Yeah.

18          THE COURT:  The Union had the press conference to

19  announce these law suits.  The involvement of the Union -- the

20  interests of the Union certainly are identical to the Plaintiffs

21  in this case; correct?

22          MR. LEVY:  Yes.

23          THE COURT:  All right.  And the Union -- correct me if

24  I'm wrong -- played an active role in generating this law suit?

25          MR. LEVY:  This Union played a minor role, but active

Marjory Unger v. Albany Medical Center et al                29

1    you can call it.

2            THE COURT:  To call yourself a non-party is in fact

3    putting formality over substance.

4            MR. LEVY:  Oh, I don't think so at all.

5            THE COURT:  I understand your position; I'm telling

6    you mine.  So, let's go forward.  Do you have documents that you

7    can produce disclosing the wages?

8            MR. LEVY:  Some documents that the Union has will

9    disclose wages.

10           THE COURT:  All right.  Mr. Shumaker?

11           MR. SHUMAKER:  I just wanted to make one point, Your

12   Honor, that Your Honor did issue a protective order in this case

13   that expressly allows for third-parties to --

14           THE COURT:  We're not disclosing proprietary

15   information during class certification discovery.

16           MR. SHUMAKER:  I'm just simply saying that --

17           THE COURT:  I understand.

18           MR. SHUMAKER:  -- if they want to claim

19   confidentiality, they have a device of doing so.

20           THE COURT:  I understand.

21           MR. SHUMAKER:  What seems very clear to me, Your

22   Honor, is that they have these documents.  They have --

23           THE COURT:  I'm going to require -- I'm proposing to

24   require that they disclose the information they have on wages

25   paid to nurses during the period during the period alleged in

1    the Complaint --

2             MR. SHUMAKER:  Okay.  And I --

3             THE COURT:  -- period.  That's going to pare down the

4    scope of you demand.

5             MR. SHUMAKER:  I understand that, and I believe that

6    the other information that's being sought with respect to the

7    Union's role in bringing this case.  Documents relating to what

8    is it we're going to do, how are we going to move on this to

9    develop this action, is relevant to --

10            THE COURT:  I understand your position.  We talked

11   about it before and in my view that the relevancy of the Union's

12   involvement in bringing this law suit class certification is

13   non-existent.  The relevancy with the Union's involvement with

14   particular named putative class representatives is relevant.  I

15   am told that that's already been disclosed, so I've moved onto

16   other issues.  I don't want to go back and revisit the other

17   ones.

18            MR. SHUMAKER:  The other issue that pops in my head,

19   Your Honor, is the identity of the other individual that they

20   contacted and potentially serviced as a class of

21   representatives.

22            THE COURT:  Who declined?

23            MR. SHUMAKER:  Yes, Your Honor.

24            THE COURT:  How is that relevant?

25            MR. SHUMAKER:  It would seem that that would suggest

Marjory Unger v. Albany Medical Center et al                31

1    that their -- the fact that they decide who is or who is not an

2    adequate representative to be relevant to determine whether this

3    individual is in fact an adequate representative.

4            THE COURT:  Well, in my view, the only relevants are

5    the people who are actually named and you're entitled to

6    discovery regarding them.  Anybody who might have been wooed and

7    declined, who offered themselves and were rejected, it's

8    irrelevant at this point.

9            All right, so far I'm going to order two things -- oh,

10   one has already been produced; information regarding Ms. Unger,

11   and communications between the Local and Ms. Unger.  And the

12   second, I'm going to direct the Union to produce wage

13   information -- documents setting forth wage information for

14   nurses during the period alleged in the Complaint.  You don't

15   have to do it more than once, but you do have to produce

16   complete information regarding that.

17           MR. SHUMAKER:  Can I make one additional request, Your

18   Honor?

19           THE COURT:  Yes.

20           MR. SHUMAKER:  Documentation that would relate to

21   whether it's profitable -- whether it can be brought -- the

22   class action can be brought to the extent documents of that

23   (inaudible).  For example; if there's an internal discussion

24   among the SEIU individuals that we can bring a class action

25   (inaudible).  That was of particular relevance to whether they

Marjory Unger v. Albany Medical Center et al                32

1  view this as a class-wide treatment in common (inaudible).

2          THE COURT:  Well, your curiosity is going to kill you,

3  Mr. Shumaker.  No, no, that's irrelevant as well.  What the

4  Union's motives were -- I mean if we're going to suggest impure

5  thoughts on behalf of non-parties here, the parties are full of

6  impure thoughts themselves, sir.

7          MR. SHUMAKERS:  I'm not casting impure thoughts, I'm

8  simply saying clearly they're behind this case and to the extent

9  they're behind this case and whether it can be maintained as a

10 class action that would seem to be relevant.

11         THE COURT:  Okay, I understand.  That request is

12 denied.

13         MR. LEVY:  I don't know if it's necessary in light of

14 your ruling, but the case cited by NLRB decision provided by

15 counsel really isn't adequate to this situation.  (Inaudible).

16 This he only questions that were asked for discovery were about

17 the law suit information, and this is a completely different

18 matter for discovery.

19         THE COURT:  I understand.  An order will be entered.

20 I am directing the Union to produce the wage information that I

21 described before.

22         MR. SHUMAKER:  Just one matter of clarification in

23 terms of the wage information from the SEIU.  Is it just the

24 information --

25         THE COURT:  It's from the local.

1      MR. SHUMAKER:  I'm sorry, the Local 1199, from

2  hospitals or any healthcare providers that employ nurses within

3  the Albany Metropolitan area?

4      THE COURT:  I had assumed that was what we were

5  talking about.  Does anybody have any dispute as to that?

6  I just wanted to make sure that we were clear on that.

7      (Whereupon, there was no response from the parties and

8  non-parties.)

9      THE COURT:  Okay.  I believe that resolves the issue

10  with respect to the non-party subpoena.  All right, the only

11  issue that has been brought to my attention on disputes between

12  the parties is a letter from the Plaintiff regarding their

13  request.  So, I'll hear from the Plaintiff on that.

14      MR. SMALL:  Thank you, Your Honor, Dan Small for the

15  Plaintiff.  We brought four disputes to your attention, Your

16  Honor, and the first one which I would like to focus on -- and I

17  think the others can be handled briefly -- raises a relevance

18  issue.  In fact all disputes raise the same relevance issue.

19  That is, are the documents received relevant to class

20  certification issues in this case?

21      The first category of documents that we seek is

22  communications among the Defendants by which they exchange

23  nurse-wage or compensation information.  I believe, Your

24  Honor --

25      THE COURT:  Relevance comes to mind to me.

Marjory Unger v. Albany Medical Center et al                    34

1              MR. SMALL:  Exactly.  I believe Your Honor just

2     addressed that very issue in the context of Local 1199 that if

3     they have wage information pertaining to nurses and how all

4     healthcare employers in the area that that information is

5     relevant to class certification.  And we believe that ruling

6     applies completely to the issue of wage information that is

7     exchanged among the Defendants.

8              THE COURT:  What difference does it make whether it is

9     exchanged or not.

10             MR. SMALL:  I believe it doesn't and that's our point

11    that it's just as relevant to this case whether it's exchanged

12    among the Defendants or not.  I will add that I think it gives

13    it increased relevance for class certification purposes if it

14    was wage information that was exchanged.  The reason goes

15    exactly to the --

16             THE COURT:  So, you want wage information from each of

17    the Named Defendants regarding the wages paid to nurses during

18    the period in question?

19             MR. SMALL:  That's correct.  Whether or not that

20    information was exchanged, but certainly including if it was

21    exchanged with other hospitals.

22             THE COURT:  Whether it was exchanged is irrelevant.

23             MR. SMALL:  Yeah.

24             THE COURT:  What they may possess with regard to wages

25    may be relevant to the issue of typicality for the same reasons

1    previously discussed.

2         MR. SMALL:  Yes.  There is a what I would call a

3    nuance to that issue, Your Honor, which is the fact that it was

4    communicated to other Defendants increases its relevance for

5    this reason.  The Defendants are going to argue as they already

6    have here today that we cannot use class-wide evidence to prove

7    that all the nurses in the class were affected and harmed by the

8    conspiracy.  So, what we need to see as one available means of

9    proving with classified evidence that all the nurses in the

10   class were affected is the evidence -- is the exchange of the

11   wage information because that's how they effectuated the

12   conspiracy.  And we can see which hospitals exchanged the

13   information.  Was it all the Defendants, did it include other

14   hospitals, was it less than all the Defendants; that goes to the

15   class-wide impact of the conspiracy.

16        We can also see from the wage information exchange,

17   which nurses were involved.  Did the wage information exchange

18   include --

19        THE COURT:  The only thing relevant to typicality is

20   the wage information.  We're not going to prove the merits of

21   the case during class certification; that's not going to be an

22   issue.

23        MR. SMALL:  I agree that --

24        THE COURT:  Any of the Defendants wish to be heard on

25   wage information?

1          MR. SHUMAKER:  Your Honor, that's exactly the issue

2    that we raised.  Wage information they will receive.  And

3    communication between the hospital to the extent they exist

4    relates to the conspiracy.

5          THE COURT:  You said the wage information they will

6    receive in response to their demand, correct?

7          MR. SHUMAKER:  Absolutely.

8          THE COURT:  All right.  Does anybody else want to

9    object to that?

10         MR. SMALL:  Can I just seek clarification, Your Honor?

11         THE COURT:  Sure.

12         MR. SMALL:  Does that include the wage information

13   that they did exchange with each other?  In other words --

14         THE COURT:  It's not going to be -- you're not going

15   to find out during class certification unless they volunteer it

16   what was exchanged among the Defendants.  You're going to find

17   out what they individually possessed.

18         MR. SMALL:  The one thing that I just want to point

19   out to the Court is the Defendants can't have it both ways.  In

20   other words, if they are going to successfully withhold

21   production of evidence that would show the scope of a

22   conspiracy, then I think that precludes them from arguing, "Hey,

23   this conspiracy didn't affect certain nurses."  Because certain

24   nurses were the subject of these exchanges or somehow some of

25   the nurses' wages weren't affected because the information we're

1  seeking goes precisely to that issue.  We want to be able to

2  show that the wage information they exchange included elements

3  of compensation that would apply to every nurse that the

4  hospitals hired.  And that each type of nurse involved in our

5  class was the subject of the exchange of the wage information

6  for which they implemented the conspiracy.  We just don't want

7  to be caught, Your Honor, on the one hand facing arguments from

8  the Defendants that make these kind of documents relevant, and

9  on the other hand, not having access to that information.

10         THE COURT:  Well, I don't know what the Defendants are

11  going to argue, but I'm not going to preclude any arguments

12  based on discovery issues here.  We're not going to open the

13  door during class certification to discovery on the merits of

14  the allegations in the Complaint themselves.  The only thing

15  that's relevant in my judgment is the wage information.  Either

16  there's typicality by virtue of the wages or there's not;

17  whether there's a conspiracy or not is for another day.  All

18  right, I've made my ruling on that, what's next?

19         MR. SMALL:  The next issue, Your Honor, is the time

20  period of the compensation data that we're looking for.  This

21  simply goes, Your Honor, to our experts' work in the case to

22  come up with a formula or proving damages to the class on a

23  classified basis.  The experts have told us simply that they

24  need a period before the four-year period that we sued for as a

25  potential benchmark to compare the wages during the damage

1    period and the pre-period as well as when they do regression

2    analyses to look at what factors affect wages taken into account

3    non-conspiratorial factors so that you can explain wages.  If

4    you have additional data, you get better results.

5            And so both as a pre-damages period benchmark and as

6    an additional source of data to do regression analysis, the

7    experts would like to have data for a period beginning in 1999

8    which would give them a decent period of time before the damages

9    period to use that data.

10           THE COURT:  What's the period alleged in the claim;

11   what's the four-year period?

12           MR. SMALL:  It's June of 2002 to the present.  I would

13   also add, I think the burden issue here is relevant.  The

14   Defendants have agreed, Your Honor, to produce data for the

15   period June 2002 to the present.  We're simply asking when you

16   press your button on the computer to produce that data, change

17   one parameter to go back earlier and then produce more complete

18   data to us.  I believe it doesn't --

19           THE COURT:  You want to go back three and a half

20   years?

21           MR. SMALL:  Yes, Your Honor.

22           THE COURT:  Why?

23           MR. SMALL:  For the two reasons I said, Your Honor;

24   one --

25           THE COURT:  But why three and a half as opposed to

1   five or one?

2          MR. SMALL:  There's no magic to the three and a half,

3   Your Honor.  It's what we think is a reason period of time.  I

4   mean I'm not going to stand before you and say it couldn't be

5   three years and it couldn't be four years.

6          THE COURT:  Or it couldn't be two years.

7          MR. SMALL:  Well, two is obviously significantly

8   different than three and a half in our view.  I mean I think we

9   would want at least three years, Your Honor for the experts to

10  have a sufficient source of data as well as a sufficient

11  benchmark period to do their work.

12         THE COURT:  Defendants wish to be heard?

13         MR. SHUMAKER:  Mr. Small is contending that they want

14  benchmark data.  That is actually a term that we have discussed

15  throughout our meet and confers and I think (inaudible).  We see

16  some logic to them receiving some benchmark data to compare that

17  to the class period.  We have offered to go back to a time

18  period to some period to give them that.  What they are seeking

19  though is not benchmark data.  They have asked for seventeen

20  different requests going back to January 1, 1999.  And what they

21  seek is not data.  It's all documents relating to the method by

22  which you determine compensation.  Documents referring to

23  proposals --

24         THE COURT:  Just so we're clear, I'm ordering you to

25  produce data.

1          MR. SHUMAKER:  Understood.  If we're simply talking

2     about data for some period of time prior to class, that's fine.

3     We have agreed to do it for a six-month buffer going back to

4     January 1 --

5          THE COURT:  I'm proposing a three-year buffer; June of

6     '99.

7          MR. SHUMAKER:  Just for data?

8          THE COURT:  Just for data.

9          MR. SHUMAKER:  Okay, Your Honor.

10         THE COURT:  Any other Defendant want to be heard?

11         MR. DAN HURTEAU:  Well, Your Honor, there still is the

12    issue of costs on some of these things.  We're not really

13    certain depending on how the data flies and just pressing a

14    button.  Some Defendants some have been advised that to do this

15    it's going to cost thousands of dollars.  So, we just wanted to

16    report that it's not an issue of producing, but there may be a

17    cost that sneaks in on us depending on the system; Y-2K and all

18    those other changeovers that might have more significant costs

19    going back to three years.

20         THE COURT:  Well, I mean we're speculating now on

21    whether there's going to be any substantial additional costs or

22    not.  I don't know.  I assume there will not be, but it won't be

23    substantial and June of 1999 is for wage information alone is

24    agreeable data.

25         Now, I got to back up to the subpoena to finding the

1    period of time.  I didn't give the Defendants an opportunity to

2    seek a similar benchmark period.  Is that part of their desire?

3    Since you have experts as well I assume.

4              MR. SHUMAKER:  Our subpoenas sought information going

5    back to January 1, 2002, which we believe is the relevant time

6    period.

7              THE COURT:  All right.

8              MR. SHUMAKER:  However, if we're going to go back to

9    1999, it seems to make sense that it would to apply to 1999 as

10   well.

11             THE COURT:  Union, you want to object?

12             MR. LEVY:  I object.

13             THE COURT:  Overruled.  We're back to June of 1999 for

14   the Union as well.  All right, what's next?

15             MR. SMALL:  All right, Your Honor, just to finish off

16   the topic about the data, it is true that we're focused on the

17   data.  I think there is a very limited set of documents that

18   explain the data.  In other words to tell us what it means in

19   the database is not always so readily apparent, and that

20   normally in my experience is produced together with the data and

21   that's what we're also looking for.

22             THE COURT:  You get the data and what else?

23             MR. SMALL:  And documents that explain what the data

24   mean.  When you get produced a large database with several

25   fields, it's not always readily apparent, Your Honor, just

Marjory Unger v. Albany Medical Center et al                42

1    looking at the fields what the data are and --

2              THE COURT:  I'm assuming it will be crystal clear.  If

3    it's not, we can talk about it.  What's next?

4              MR. HURTEAU:  Your Honor, on that issue, just one

5    quick point.  I want to make sure we're talking about the

6    nurses' wages, RN wages; that's what we're talking about, and

7    nothing else, because they're probably going to raise it in a

8    few seconds --

9              THE COURT:   If I say nurses' wages, is that not

10   precise enough?

11             MR. HURTEAU:  It is, but they've been asking for more,

12   so maybe we'll get (inaudible).  I just wanted to clarify it.

13   So, you said nurses, that's fine.

14             THE COURT:  The putative class is nurses; is it not?

15             MR. HURTEAU:  Right.

16             MR. SMALL:  Yes.

17             THE COURT:  RN's only; is that correct?

18             MR. SMALL:  That is correct.

19             THE COURT:  All right, it's going to be RN's.

20             MR. SMALL:  But the Defendants do anticipate the next

21   issue, Your Honor, which does overlap with the data issue, and

22   that is, are we entitled to production of documents and data for

23   non-nurses?  And this gets exactly for the same --

24             THE COURT:  You want to define who's not in the class;

25   how is that relevant?

1          MR. SMALL:  That is relevant, Your Honor, because of

2    the necessity in these cases to have a benchmark that you can

3    compare the conspiratorial wages with some non-conspiratorial

4    wages.  So, we have to either have a period of wages where the

5    conspiracy began as the benchmark, after the conspiracy ended --

6          THE COURT:  It sounds like you want to use this to

7    prove the existence of the conspiracy?

8          MR. SMALL:  No, Your Honor, one argument the

9    Defendants -- well, it is true that it will be relevant for

10   that, but one argument the Defendants make every time on class

11   certification is that the Plaintiffs cannot come up with a

12   appropriate formula for proving the class' damages.  We want to

13   be able to show for class certification purposes, not a final

14   damages analysis like we would do for the merits, but to show

15   that there is a formula and the type of data that we would

16   eventually use for merits and to satisfy the Court that we have

17   a basis going forward that we can prove damages on a class-wide

18   basis.  So, we need to get some information about potential

19   benchmarks to show the court yes there are benchmarks out there

20   we could use; there are data out there that we could use to

21   implement that benchmark.  And this is exactly what we're

22   looking for.  We're looking for a benchmark.

23          Another one besides time period, before and after, is

24   wages of comparable type employees to compare the nurses' wages

25   to to come up with a formula that says have their been no

1    conspiracies --

2           THE COURT:  What do you contend are the comparable

3    types of positions?

4           MR. SMALL:  Well, we of course need some assistance

5    probably in discovery to know for certain what the best

6    comparative benchmarks will be.  We have some idea now that it's

7    going to be other types of employees that work in the hospitals.

8    Maybe some that do some functions that are similar to nurses.

9    And so to get production, we could work out, I assume, with the

10   Defendants if they gave us a list of their other types of

11   employees which ones we think would be the best benchmarks,

12   limit our requests to those and get the data for those benchmark

13   employees.  So, that would be our proposal.

14          THE COURT:  Who wishes to speak for the defense?

15          MR. SHUMAKER:  Your Honor, Mike Shumaker, again.  This

16   case is about registered nurses, just registered nurses; nothing

17   more; nothing less.  The argument about benchmark data and the

18   desire to look at some other employees by a benchmark is one

19   thing.  It's quite another to seek data relating to the

20   compensation for every employee in the hospital.  And that's

21   what they've sought.  They want all documents relating to the

22   compensation wages of all our employees; how it's relevant.

23   What the orthopedic surgeon is making as compared to the

24   standard is completely far off base.  We would maintain that the

25   same applies for an LPN or some other person who is closer to a

1    registered nurse.  What rollback has in a case alleging a

2    conspiracy for registered nurses is in our view far afield, and

3    it doesn't seem to serve any purpose.

4            THE COURT:  Well, if I understand Plaintiff correctly

5    it serves a purpose only if the Defendants are going to raise

6    arguments to which other positions might be relevant.  Are you

7    foregoing any such arguments?

8            MR. SHUMAKER:  I'm not sure what exactly they're

9    saying we're going to argue before we argue it.  The point of

10   the matter is that this is a case about registered nurses.  If

11   they can't maintain that there's a class-wide impact on the

12   class they alleged, we're going to go on a fishing expedition to

13   see if the LPN's may have been affected --

14           THE COURT:  I would agree with that unless there's an

15   argument reasonably anticipated from the Defendants to which

16   it's relevant.  I'm not clear what that argument might be

17   though.

18           MR. SMALL:  Your Honor, we're -- I believe not

19   speculating about what the argument will be for a couple of

20   reasons.

21           THE COURT:  What's the argument?

22           MR. SMALL:  The argument is that Plaintiffs cannot

23   come up with an appropriate damages formula and do not have

24   appropriate data to implement that formula to prove the class'

25   damages on a class-wide basis.

1       THE COURT:  How for example would the LPN's be

2    relevant to that?

3       MR. SMALL:  The LPN's are a possible benchmark where

4    we can say look, Your Honor here is a group of employees that we

5    believe were not affected by the conspiracy.  We don't know that

6    for sure, but we want to look at the data to see if that might

7    be the case.  And that group is a good comparison for benchmark

8    purposes, for damages purposes.  And let's look at their wages

9    and see how their wages and see how they compare to the wages

10   for the nurses during the conspiracy --

11      THE COURT:  The premises for your argument then, is

12   that it would be a group not affected by the conspiracy?

13      MR. SMALL:  That's correct.

14      THE COURT:  You're not going to have any discovery on

15   the conspiracy during class certification, so how does the

16   (inaudible) group become relevant at this stage.  It may be

17   relevant at trial.

18      MR. SMALL:  We don't have to prove we believe the

19   class certification, Your Honor, that in fact the LPN's were not

20   affected by the conspiracy.  We just need to say there is a

21   source of data out there; we can see the characteristics of the

22   LPN's; and how their wages move compared to wages for nurses.

23   You know some of this is hard to know until you actually see the

24   data, but I can tell you that it's a very common statistical and

25   economic technique to compare either wages or prices affected by

1   a conspiracy with wages or prices that are not affected.

2          THE COURT:  The relevance of the additional groups to

3   class certification rests on the assertion that they were not

4   affected by a conspiracy.

5          MR. SMALL:  We will ultimately want to show that.

6          THE COURT:  Ultimately, but they're in class

7   certification.

8          MR. SMALL:  Right.  But what I see coming and they've

9   already made these arguments, Your Honor, in a closely related

10  case in San Antonio where they did have to file a brief on class

11  certification and one of the things they say, "Plaintiffs must

12  also show that the claimed damages for each class member can be

13  calculated using a common formula."  Then they go on,

14  "Plaintiffs have not even attempted to devise a common formula

15  that can be used to calculate and claim damages for each class

16  member."

17         THE COURT:  And I don't see how that has anything to

18  do with LPN's or other positions.

19         MR. SMALL:  Because what I'm saying is a damages'

20  formula could be based on the wages that are paid to LPN's.

21         THE COURT:  I understand.  This is limited to RN's the

22  wage information.  What's next?

23         MR. SMALL:  I think we just have one more issue, Your

24  Honor, which is the market studies requested by document request

25  number 29.  And basically what we're saying there, Your Honor,

1  is we don't expect market definition to be an issue.  That the

2  Defendants will argue is anything but a common issue for the

3  class.  And if that is the case, then we agree that we don't

4  need to have the market studies requested by 29 for class

5  certification purposes.  But if the Defendants are going to make

6  some argument, I'm not sure what it would be that the market

7  definition or the rule of reason claim in this case is somehow

8  relevant to class certification, then we would want to get those

9  documents.

10       THE COURT:  Mr. Shumaker?

11       MR. SHUMAKER:  Your Honor, the request, so we're clear

12  on it, all documents reflecting any market study or analysis

13  that refers or relates in any way to then market for healthcare

14  services (inaudible) Albany area hospital participates.  We're

15  not talking about the nurses -- the market for registered

16  nurses.  That information we'll provide.  What they're trying to

17  get into is where do we draw our patients that come to our

18  emergency room?  How do we best position ourselves in the market

19  for healthcare services?

20       THE COURT:  Is there a challenge to the Plaintiff's

21  definition of the market?

22       MR. SHUMAKER:  There very well may be with

23  respect to the registered nurses and the market of registered

24  nurses and that's defined in the market.  But it's not for

25  healthcare services; that's not the issue.

1    THE COURT:  Then if I understand it correctly, what

2    the Plaintiffs seek is the market studies for registered nurses.

3    MR. SHUMAKER:  They will get that Your Honor.  They're

4    looking for something beyond that; they're looking for the

5    market of healthcare services, not registered nurses.

6    THE COURT:  Yeah.  Why shouldn't it be limited to

7    registered nurses?

8    MR. SMALL:  Well, we heard an argument already that

9    with respect to the production of the SEIU's wage data that they

10    want that not just for hospitals, but all healthcare providers

11    and we've also heard arguments in related cases that the class,

12    I'm sorry, the market definition should not be limited to nurses

13    working at hospitals but should include nurses who work for

14    other healthcare providers.  And if we're going to have to

15    contend with any of those issues for class certification

16    purposes, then we can't be hamstrung without the very evidence

17    that goes to that issue.

18    MR. SHUMAKER:  Let me clear, Your Honor, we do not

19    seek anything but registered nurse information for the SEIU.  We

20    don't seek information relating to market healthcare services.

21    THE COURT:  So, the question is whether or not it's

22    limited to hospitals or whether it should include all healthcare

23    providers?

24    MR. SMALL:  That's a possible issue the Defendants

25    could raise in this case.  And if they're going to raise it, we

Marjory Unger v. Albany Medical Center et al                    50

1    need to be able to address it.

2              THE COURT:  And what you seek are the market studies?

3              MR. SMALL:  Yes.

4              MR. SHUMAKER:  We don't see what the relevance the

5    market for emergency room services or orthopedics has to do with

6    a market with respect to registered nurses.  They are two

7    completely different things.

8              THE COURT:  Well, we're talking about registered

9    nurses who may work outside a hospital, I assume.  Are there

10   such things?

11             MR. SHUMAKER:  Yes, Your Honor, yes.

12             THE COURT:  Well, that's what we're talking about.

13             MR. SMALL: If we have (inaudible) registered nurses

14   and other non-hospital employers, we'll get that.

15             THE COURT:  No, I'm proposing that it be limited to

16   registered nurses employed by healthcare providers if you have

17   such market studies.

18             MR. SHUMAKER:  I don't think we've objected to that,

19   Your Honor.

20             THE COURT:  All right.  Mr. Smalls?

21             MR. SHUMAKER:  We have not objected to that.

22             THE COURT:  That's what I'm proposing that it be

23   narrowed to.

24             MR. SMALL:  Just a housekeeping matter, Your Honor.

25   With respect to the data --

Marjory Unger v. Albany Medical Center et al                51

1          THE COURT:  I'm sorry, what was the time period for

2    the market studies that you demanded?

3          MR. SMALL:  We would seek it for the same period --

4    well, I guess the Court has ruled June 1999 to the present.

5          THE COURT:  Any objection to that, Mr. Shumaker?

6          MR. SHUMAKER:  Again, that was for data, Your Honor;

7    now we're talking about market studies and documents and having

8    to go back into the file.  We would think that January 1, 2002

9    forward would be certainly enough for this type of request.

10          THE COURT:  Yeah, we're not talking about benchmarks

11   here, Mr. Small.

12          MR. SMALL:  That is correct, Your Honor.

13          THE COURT:  June 2002 to present.

14          MR. SMALL:  Okay.  If I could just go back for a

15   housekeeping matter on the data production in the time period

16   issue, Your Honor?  We attempted or we did list in our letter to

17   the court the document request that we thought were implemented

18   by that issue, and we left off one request that those ask for

19   data, and that's request number 9.  So I just want to make that

20   clear.

21          THE COURT:  All right, the order that I've done

22   verbally here and will be incorporated in the written order will

23   define what is required to be produced both by the Local Union

24   and by the Defendants.  In my mind I've been clear, but I'm not

25   sure if the parties agree.  Are there any questions?

1          MR. SHUMAKER:  I just have one.  I just want to

2    clarify that when we provide the wage nurse data that we have I

3    assume you mean for the Albany Metropolitan, this little area?

4          THE COURT:  That's the area defined in the complaint,

5    isn't it?

6          MR. SMALL:  Yes.

7          MR. SHUMAKER:  We have offices in Boston and

8    Maryland --

9          THE COURT:  I understand.  I'm taking my definition

10   for what's alleged in the complaint, and that's the area alleged

11   in the complaint, the Albany area.

12         MR. SMALL:  We have no dispute with that.

13         THE COURT:  All right.  Anything else; anybody else

14   have any questions?

15         MR. SHUMAKER:  We have some additional issues, Your

16   Honor, we want to just raise.

17         THE COURT:  All right, somebody mentioned my favorite

18   word, "deadline."  How long does everybody need for producing

19   this information?

20         MS. BAKER:  Your Honor, we have proposed schedule that

21   we wanted to put before the Court.

22         THE COURT:  Well, hold on.  The stuff -- the things

23   that I've already produced today for the Local Union; how long

24   do you need to produce this?

25         MR. SHUMAKER:  I guess 60 days would be good?

1          THE COURT:  Yeah, how about 30?

2          MR. SHUMAKER:  There are lot of offices --

3          THE COURT:  A lot of what?

4          MR. SHUMAKERS:  Offices, you know, physical locations.

5     I don't know how long it's going to take.

6          THE COURT:  I am assuming the best and it seems to me

7     30 days is enough time for everybody, but if anybody wants to be

8     heard on that?

9          UNKNOWN VOICE:  Your Honor, why don't we make it

10    February 28 because it's 35 days.

11         THE COURT:  March 1, make it March 1.  March 1 for

12    everybody.  All right, I'm sorry, somebody was talking about a

13    schedule.

14         MS. BAKER:  Point of clarification; March 1 for all of

15    the information that you've requested that Defendants produce

16    today?

17         THE COURT:  Correct.

18         MS. BAKER:  Okay.  And we also had proposed a schedule

19    which we've conferred with Defendants about.  Mainly the

20    schedule that we've requested is as follows.  We went to

21    Defendants last week, and we asked them if they would be willing

22    to agree to the following schedule.  Having discovery close on

23    April 15; having class certification, our open brief, due on May

24    2; and then having their response due on July 1, which would

25    effectually move the schedule back 30 days.  And we asked

Marjory Unger v. Albany Medical Center et al                54

1   Defendants if they would agree to this with an eye toward --

2            THE COURT:  What's the discovery deadline now?  Is it

3   April 1?

4            MS. BAKER:  The current discovery deadline now is

5   March 1.

6            THE COURT:  March 1.

7            MS. BAKER:  So, we would move discovery back six

8   weeks, but only move the class certification briefing back 30

9   days; basically shortening the time period for us to get ready

10  for the opening brief.  And we proposed this with an

11  understanding that Defendants probably in light of the fact that

12  many of them have yet to produce paper documents, let alone

13  begun their electronic discovery production, Defendants would

14  probably need more time and we in turn understand that, and

15  we're going to need more time if they need more time because --

16           THE COURT:  When would you propose that your brief

17  would be due?

18           MS. BAKER:  Our brief would be due on May 2.

19           THE COURT:  Everything would just move back 30 days

20  then.

21           MS. BAKER:  So, move everything back 30 days, exactly.

22  That's our proposal.

23           THE COURT:  Anybody object?

24           MR. SHUMAKER:  Your Honor, what we countered and

25  talked with Baker was if we're going to make a request to move

1   the schedule, let's make sure we do it once and only once.  And

2   on that basis we ask whether it would be more worthwhile to move

3   it 60 days as compared to the 30 days, so that we're not back

4   here in 30 days trying to make another request on the theory

5   that the Court is more likely to give one request then two

6   requests.

7           THE COURT:  I'm prepared to consider 60 days as long

8   as everybody understands that there'll be no further extensions.

9           MS. BAKER:  Your Honor, may I speak to that for a

10  moment?

11          THE COURT:  Yes.

12          MS. BAKER:  We've agreed to that.  We actually said to

13  the Defendants we're happy -- not happy -- but we're willing to

14  accept 60 days with one caveat.  And the caveat or the request

15  that we made was that they produce to us the data that we were

16  talking about this morning by February 15.

17          And the reason for that is because we're intending to

18  use this data as I think Mr. Smalls explained in connection with

19  our class certification opening brief, and need to get it to our

20  experts who are data crunchers or number crunchers and they need

21  to have an opportunity to meaningfully use that data.  And

22  because we're talking about data, we're talking about what's

23  called data dictionaries which are basically pieces of

24  technology that get produced with data that explain the way the

25  data is cut down; the way it's broken down.

Marjory Unger v. Albany Medical Center et al                56

1          THE COURT:  I understand, but if we're doing this by

2     60 days, then your brief would not be due until June 1.

3          MS. BAKER:  It would be due June 2, I think or June 1;

4     June 2 or June 1.

5          THE COURT:  It would be June 1.

6          MS. BAKER:  But we still need --

7          THE COURT:  And you would have the data by March 1, so

8     you'll have 90 days.  And you're saying that's not enough time?

9          MS. BAKER:  If we could get an additional two weeks

10    that would be preferred, but it's fine if that's what Your

11    Honor's --

12         THE COURT:  No, I'll extend this 90 days, but it's

13    going to be the final extension.

14         MS. BAKER:  No, Your Honor, we would prefer that we

15    get the data earlier.  We're not proposing that --

16         THE COURT:  You're not getting earlier; we're talking

17    about the deadline for your brief.

18         MS. BAKER:  That schedule is fine then, Your Honor.

19         THE COURT:  Which one?

20         MS. BAKER:  March 1 for data production, June 2 for

21    opening brief and we would propose that discovery close on, I

22    believe it's May 15.  Is that what we -- May 15 for all

23    discovery relating to class certification, except the

24    depositions of experts.

25         THE COURT:  I'm completely confused here; hold on for

1    a second.  I'm looking at the order that entered -- I looking at

2    the order that was dated October 25.  What I'm proposing to do

3    is simply add 60 days to everything in there.

4              MR. SHUMAKER:  Yes.

5              THE COURT:  Is that all we're talking about?

6              MR. SHUMAKER:  That's all we're talking about.

7              THE COURT:  Okay.  Don't get too complicated here.

8              MS. BAKER:  That's right; with the exception of the

9    March 1 data.

10             THE COURT:  Except for the March 1 data; okay.

11             MS. BAKER:  Thank you, Your Honor.

12             THE COURT:  And I'll do that as well.  Are there any

13   other issues that need to be raised today?

14             MS. BAKER:  I don't think so.

15             MR. SHUMAKER:  The only other, Your Honor, is this

16   addition of the new Plaintiffs.  We have asked the Plaintiffs

17   that given this information and given our consent which was

18   given on the basis that we were simply adding two plaintiffs to

19   one that already existed, that Ms. Unger agreed to respond to

20   pending discovery.  Defendants have done that for Plaintiffs

21   related to the dismissal of Ascension and Catholic Health.  They

22   have opposed that.

23             We are not objecting to giving them the amended

24   complaint and consenting to it.  However, it would seem that

25   individual brought this case and cause us hundreds thousands of

1    dollars to defend it, she should at a minimum be required to

2    respond to discovery that's outstanding.  We've done it for

3    them, we think it should go both ways.

4              THE COURT:  What's the Plaintiffs position?

5              MS. BAKER:  Well, Your Honor, if I could speak to that

6    briefly; a couple of things.  First of all, we have provided to

7    Defendants a response to their request for production.  We've

8    also told Defendants that --

9              THE COURT:  Who signed it?

10             MS. BAKER:  Well, the request for production was

11   signed by us.  But when we signed that request for production,

12   we believed that Ms. Unger was continuing with the litigation.

13   Ms. Unger has subsequently, and by that I mean, in January

14   expressed to us on numerous occasions without disclosing the

15   content of our communications with her, that she's no longer

16   interested in being a class representative in this case.  She's

17   no longer interested in undertaking the discovery obligations

18   which we believe at the time --

19             THE COURT:  Is she going to be dismissed from the

20   action or is she going to remain as some named plaintiff who's

21   not a class representative?

22             MS. BAKER:  She will not remain as a named plaintiff,

23   but we believe that because she worked at the hospitals in

24   question during the relevant class periods, she's part of the

25   putative class.  But she will not be put forward as a class

Marjory Unger v. Albany Medical Center et al                    59

1   representative or as a named plaintiff as it is on the

2   complaint.

3           THE COURT:  So, is she being dismissed.

4           MR. SMALL:  Yes, Your Honor; she will no longer be a

5   plaintiff in the case, but --

6           THE COURT:  When do you propose to do that?

7           MR. SMALL:  We can effectuate that very promptly, Your

8   Honor.

9           THE COURT:  All right.  When is the amended complaint

10  going to be filed?

11          MS. BAKER:  Well, we previously filed -- you mean an

12  amended complaint that does not have her name on it?

13          THE COURT:  Yes.

14          MS. BAKER:  We'll file that the same time we bring the

15  motion to dismiss.

16          THE COURT:  And has an amended complaint been filed

17  with the two additional plaintiffs?

18          MS. BAKER:  Yes, Your Honor; we filed that I believe

19  the first week in January or the last week in December.

20          THE COURT:  So, you wanted responses signed by Ms.

21  Unger?

22          MR. SHUMAKER:  Yeah, we want responses to the

23  interrogatories that are pending in much the same way that the

24  Defendants responded to their discovery.

25          THE COURT:  Would you accept the interrogatories as

1   being deemed served on the two named plaintiffs?

2          MR. SHUMAKER:  Well, we believe that's appropriate as

3   well as the Plaintiff that's been dismissed.

4          THE COURT:  Well, if she's dismissed, she's not a

5   party and there's no jurisdiction.

6          MR. SHUMAKER:  I understand that, but so is Ascension

7   and so Catholic Health East.  They were dismissed pursuant to an

8   agreement to respond to their discovery obligations.

9          THE COURT:  That's an agreement.  Apparently, if you

10  want her discovery, you're going to have to serve her with a

11  real 45 subpoena.

12         MR. SHUMAKER:  Given that they have some input with

13  this individual it would seem only fair and that's why we made

14  the request, Your Honor.

15         THE COURT:  I understand your request, but without an

16  agreement, I'm not going to enforce anything, so there's no

17  agreement.

18         MR. SHUMAKER:  And I want to make one other thing

19  clear.  We've had a lot of discussion today about Defendants

20  alleged failures in the discovery arena; we have yet to receive

21  a single document from Plaintiffs; yet to receive interrogatory

22  responses.

23         MS. BAKER:  I may speak to that.  Two things; first of

24  all I told Defendants counsel last week on the phone that with

25  respect to the new plaintiffs we would assume that the request

1    for production that was served on Ms. Unger, would equally apply

2    to them.  And in response to that, I am preparing to produce

3    documents responsive to those requests to Ms. Unger on the

4    assumption that they're also extended to the two new plaintiffs

5    by the end of next week if not sooner.

6          Number two, we are happy -- we are willing to accept

7    the interrogatory served on Ms. Unger as having been served on

8    the two new Plaintiffs and we'll assume that those

9    interrogatories that they wish to propound to Ms. Cullen and Ms.

10   Fleishman, unless I hear otherwise from Defendants' counsel.

11         THE COURT:  Is that agreement, Mr. Shumaker?

12         MR. SHUMER:  We have no problem issuing that

13   discovery.  One other thing with respect to this matter, it

14   would seem that since we're adding two new Plaintiffs, and

15   dismissing the initial, that the class periods have changed in

16   some ways.

17         THE COURT:  The class?

18         MR. SHUMAKER:  The class period to change to

19   correspond to these two new Plaintiffs.  In other words --

20         THE COURT:  Class periods -- well that goes to the

21   merits.  The class period is whatever is alleged in the

22   complaint, at least the putative class period.  So, you can

23   address that at a later date.  All right, anything else?

24         MS. BAKER:  Nothing.

25         MR. SMALL:  Nothing for the Plaintiffs, Your Honor.

Marjory Unger v. Albany Medical Center et al                    62

1          THE COURT:  Anything from the Defendants?

2          MR. SHUMAKER:  I have nothing else other than to put a

3   bug in your mind that we're continuing to engage in

4   communications with Plaintiff's counsel on the discovery side.

5          THE COURT:  Oh, good.

6          MR. SHUMAKER:  It becomes difficult and I just wanted

7   to let you know we may be back in front of you on those issues.

8          THE COURT:  I put this to Plaintiffs and Mr. Shumaker

9   on behalf to the Defendants.  Should we schedule another status

10  conference now?

11         MS. BAKER:  Yes, please, Your Honor.

12         MR. SHUMAKER:  I would join in that, Your Honor.

13         THE COURT:  How long do we need?

14         MS. BAKER:  45 days, please.

15         THE COURT:  Sometime after March 1 I take it?  All

16  right, anybody have a date --

17         (Whereupon, the Judge, left the courtroom to retrieve

18  his calendar book.)

19         THE COURT:  I'm gone the first week in March, so,

20  anytime after March 12 or thereafter.  We can do it Tuesday the

21  13, ten o'clock.

22         MR. SHUMAKER:  I have a proposed --

23         MR. MARX:  Your Honor, this is David Marx.  Can I

24  request Wednesday the 14th, instead of Tuesday the 13th if that

25  works for everybody else?

1        THE COURT:  Wednesday the 14th at ten o'clock.

2        MR. MARX:  Thank you, Your Honor.

3        THE COURT:  Any objections?

4        MR. LEVY:  Do you think that the Local will need to be

5   back as a non-party at that time?

6        THE COURT:  The answer is no, unless you hear from me.

7        MR. LEVY:  Thank you.

8        THE COURT:  Is that clear enough?

9        MR. LEVY:  Yes.

10        THE COURT:  Okay, Wednesday, the 14th at ten o'clock,

11   next status conference.  And again we'll address any issues in

12   discovery that have risen between the parties and any non-

13   parties.

14        ALL PARTIES:  Thank you, Your Honor.

15        THE COURT:  For those of you that are on the

16   telephone, we're going to hang up now.

17        (Whereupon, the matter was adjourned 'til Wednesday,

18   March 14 at 10:00 a.m.)

19                    * * * * *

20

21

22

23

24

25

1

2                              CERTIFICATION

3

4      I, Rochelle Grant, certify that the foregoing is a correct

5  transcript from the official electronic sound recording of the

6  proceedings in the above-entitled matter.

7

8  Dated:  January 26, 2007

9

10

11                          _____
                            Signature of Approved Transcriber

12

13                          _____
                                    Rochelle V. Grant
                                 Typed or Printed Name

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit 5

```
 1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3   LISA REED, et al.,        )  No. 06 C 3337
                               )
 4               Plaintiffs,   )
                               )
 5            vs.              )  Chicago, Illinois
                               )
 6   ADVOCATE HEALTH CARE, et al.,)
                               )  November 14, 2007
 7               Defendants.   )  2:00 p.m.

 8                  TRANSCRIPT OF PROCEEDINGS
               BEFORE THE HONORABLE JOHN F. GRADY
 9
     APPEARANCES:
10
     For the Plaintiffs:     MR. THOMAS P. DOVE
11                           (The Furth Firm, LLP,
                              225 Bush Street, 15th Floor,
12                            San Francisco, California  94104)

13                           MR. MARVIN A. MILLER
                             MR. MATTHEW E. VAN TINE
14                           (Miller Law LLC,
                              101 North Wacker Drive, Suite 2010,
15                            Chicago, Illinois  60606)

16                           MR. DAVID P. DEAN
                             (James & Hoffman,
17                            1101 Seventeenth Street, N.W.,
                              Suite 510, Washington, D.C.  20036)
18
                             MR. CHARLES E. TOMPKINS
19                           (Cohen, Milstein, Hausfeld & Toll,
                              1100 New York Avenue, Suite 500,
20                            West Tower, Washington, D.C.  20005)

21   For Defendant Advocate
     Health Care:            MR. MICHAEL I. SHAKMAN
22                           MR. EDWARD W. FELDMAN
                             (Miller, Shakman & Breem, LLP,
23                            180 North LaSalle Street, Suite 3600,
                              Chicago, Illinois  60601)

24

25           PATRICK J. MULLEN, Official Court Reporter
       219 South Dearborn Street, Room 2128, Chicago, Illinois  60604
```

```
 1  APPEARANCES:  (Cont.)

 2  For Defendant Children's
    Memorial Hospital:        MR. MARTIN T. TULLY
 3                            (Katten, Muchin, Rosenman, LLP,
                               525 West Monroe Street, Suite 1600,
 4                             Chicago, Illinois  60661)

 5  For Defendant Evanston
    Northwestern Healthcare:  MR. TIMOTHY F. HALEY
 6                            MR. SCOTT A. SCHAEFERS
                               (Seyfarth Shaw, LLP,
 7                             131 South Dearborn, Suite 2400,
                               Chicago, Illinois  60603)
 8
    For Defendant
 9  Resurrection Health Care: MR. DAVID MARX, JR.
                              (McDermott, Will & Emery, LLP,
10                             227 West Monroe, Suite 4400,
                               Chicago, Illinois  60606)
11
    For Defendant University
12  of Chicago Hospitals:     MR. CHRISTOPHER Q. KING
                              MS. MARGO WEINSTEIN
13                            (Sonnenchein, Nath & Rosenthal,
                               233 South Wacker Drive,
14                             7800 Sears Tower,
                               Chicago, Illinois  60606)
15

16

17

18

19

20

21

22

23

24

25
```

3

1          THE CLERK:  06 C 3337, Reed versus Advocate

2     Healthcare.

3          THE COURT:  Good afternoon.  What we have this

4     afternoon is the defendants' motion to compel production of

5     documents improperly withheld by plaintiffs as attorney work

6     product.  I've read about all I can digest, and I have the

7     situation fairly well in mind.  I think I might be benefited by

8     like a five-or-ten-minute presentation from each side summing

9     up.

10     . . . .


4          THE COURT:  Thank you for these arguments, counsel.

5     This is not an easy question.  On the other hand, it's not one

6     that is brand new for us in this case.  It's been visited by

7     other judges, and the results have not been consistent.

8          Mr. Dean concluded with an observation that I think

9     is highly relevant to the problem we have here.  The paradigm

10     of the single practitioner who does a modest amount of

11     investigation before filing an action on behalf of a single

12     client still exists, but it has little relationship to the kind

13     of litigation we're involved with in this case.

14          The investigation that is required to verify the

15     possibility of a successful class action arising under

16     complicated statutory provisions is time-consuming, detailed,

17     and hugely expensive.  Very few lawyers and very few clients

18  have the funds necessary to pay for such an investigation.

19          The investigation will often include payment for

20  expert witnesses, for instance, in order to make sure that

21  there's even a viable legal theory that could be supported by

22  facts.  Witness interviews are wide-ranging geographically and

23  time-consuming in number and duration.

24          It is not surprising, therefore, as Mr. Dean points

25  out, that the genesis of most modern class actions lies in the

27

1    coiffeurs of organizations such as the SEIU in this case.

2    There are some law firms, of course, which have become so

3    enormously wealthy that the firms themselves can undertake the

4    investigation and pay for it out of the firm treasury, but

5    that's unusual.

6          So we have the phenomenon where there is an almost

7    necessary connection between investigation that is done by a

8    body which is not going to be a party to any litigation that

9    ensues from the investigation and the party who actually brings

10   the investigation.  There is no identity between the

11   investigating and subsidizing organization and the individual

12   plaintiff, or in the case of a class action even the individual

13   class members should a class ultimately be certified.

14         Does this mean that if the investigation done and

15   subsidized by the nonparty organization is in anticipation of

16   litigation and results in litigation that that investigation

17   has no work product protection?  Now, the defendants argue that

18   the answer to that question is yes, and that is because there

19   is a status known as nonparty which is occupied by SEIU.

20         Nonparty really in two senses, temporal in the sense

21   that at the time of the investigation there was no lawsuit and

22   there was no party.  So even if SEIU had wanted to be a party

23   conducting the investigation, there was nothing to be a party

24   to.  You can't put the cart before the horse.  You've got to

25   find out whether there is a prospect of successful litigation

1  before the litigation is initiated.  That's what we call

2  investigation, and it's asked in anticipation of litigation.

3          Of course, aside from the temporal disconnection

4  between SEIU and the parties to this case, the parties

5  plaintiff to this case, there is the physical difference that

6  SEIU is not even now, you know, when there is a party and there

7  is a case on file, that SEIU is still not a party to that case.

8          So does this mean that the investigation sponsored by

9  SEIU is not protected?  The rule that is involved here, Rule

10  26(b)(3), talks about "materials prepared in anticipation of

11  litigation or for trial by or for another party" -- and that's,

12  of course, where the defendants' argument springs from,

13  "another party" -- "or by or for that other party's

14  representative" -- parentheses -- "including the other party's

15  attorney, consultants, surety, indemnitor, insurer, or agent."

16          Now, the parenthetical inclusions there make clear

17  that it doesn't have to be an attorney who does the

18  investigation.  An investigation done by an agent is

19  sufficient.  Can SEIU be regarded as the agent of the parties

20  who filed this lawsuit in the same sense that an investigator

21  who does investigation on behalf of a party plaintiff prior to

22  the filing of the suit is an agent of that party plaintiff?

23          The rule doesn't address that particular question and

24  was obviously not drafted with that question in mind.  The rule

25  and the Hickman case arose in situations that didn't

1   contemplate the problem that we're dealing with here today, and

2   they don't specifically address it.

3          I think it would be very unlikely for a sponsoring

4   organization, such as SEIU, who funds the large-scale

5   investigation that may or may not be a precursor to litigation

6   of this kind, would do that investigation without legal advice.

7   The fact that SEIU was being advised by James & Hoffman makes

8   complete sense.  The organization would need to know what to

9   look for, what questions to ask and, generally speaking, what

10  the significance of the answers might be.  So I find that the

11  representation that SEIU was acting in conjunction with

12  James & Hoffman in performing an investigation that was in

13  anticipation of litigation is a fact.

14         Now, does it make a difference in practical terms

15  that this lawyer-guided investigation on behalf of possible

16  litigants in anticipation of their possible litigation is

17  unprotected as work product?  Does it make sense to say that

18  just because the case hadn't been filed yet that there can be

19  no protection when the very purpose of the investigation is to

20  decide whether there should be a case on file?

21         It seems to me that we've got some cart-and-horse

22  problems here in the defendants' position.  If their position

23  were adopted, it seems to me it would encourage the filing of

24  lawsuits so that the necessary investigation which should

25  precede the filing would be protected as work product.  To do

1  the kind of investigation required by Rule 11 prior to filing

2  would rob one of work product protection, if I understand the

3  implications of the defendants' position.  That, it seems to

4  me, would not be a desirable result.

5          I think if the framers of Rule 26(b)(3) had

6  contemplated the specific problem we're addressing, they would

7  have written the rule in such a way that protection would be

8  afforded to attorney-guided investigation in anticipation of

9  litigation when the litigation that ultimately ensues was the

10  product of that investigation.

11          Now, there are some cases that the parties have cited

12  that are worth noting.  Well, I'll cite one, one case in

13  particular that I like the language of because it makes sense

14  to me.  At page 10 of the plaintiffs' memorandum, there is a

15  reference to the case of Goodyear Tire and Rubber Company

16  against Chiles, C-h-i-l-e-s, Power Supply, Inc., a Southern

17  District of Indiana case where court said:

18          "If third parties could not claim work product, the

19  prospect of freeloading by both direct and indirect routes

20  creates exactly the same risks and incentives that led the

21  Supreme Court to recognize the work product privilege in

22  Hickman."

23          It seems to me that what the defendants are asking

24  here does, indeed, smack of freeloading.  Now, what did Hickman

25  say would be permissible as opposed to freeloading?  I'm

1   setting to one side the question of nonparty here.  Hickman

2   said that the reports of the investigation, the witness

3   interviews, and the notes of the interviews could not be

4   obtained by the personal injury plaintiff in that case because

5   there was no showing that it was necessary to invade the work

6   product of the attorney.

7           In that case, as was pointed out today by Mr. Marx,

8   the work had been done by the attorney.  Let me say at this

9   juncture so that I don't forget it that I don't think it makes

10  a bit of difference whether the interview was conducted by an

11  attorney or by an investigator acting at the direction or

12  request of an attorney.  That's nothing new.  That's been the

13  law for a long time.  So I don't think Hickman is

14  distinguishable on the basis that it was the attorney who did

15  the interview.

16          What the court said at 329 U.S. at 512 was this:

17          "The general policy against invading the privacy of

18  an attorney's course of preparation is so well-recognized and

19  so essential to an orderly working of our system of legal

20  procedure that a burden rests upon the one -- on the one who

21  would invade that privacy to establish adequate reasons to

22  justify production through a subpoena or court order."

23          I am applying that rule to the problem before me.  I

24  agree with the plaintiffs and case law to the effect that

25  Hickman goes somewhat beyond the 26 rule -- Rule 26(b)(3), and

1  whether there's a common law of work product or not, I won't

2  get into.  That's not for me to say.

3         But the language of Hickman certainly indicates that

4  invading the work product of an attorney, which for the reasons

5  I've explained I regard the SEIU-sponsored investigations by

6  these various groups to be, requires exceptional circumstances.

7  Hickman itself gave some examples.  The witness may be dead.

8  Conceivably, if the witness refused to talk to the other side,

9  that might well be a reason.

10        But the plaintiff -- or the defendants have made no

11 effort on the present motion to demonstrate any need for the

12 plaintiffs' work product.  If there were any need for it,

13 surely they would have told me what it was.  What they seek, of

14 course, is possibly impeaching statements to use against

15 plaintiffs' witnesses if it turns out that they had been

16 interviewed or, although in this day and age one wonders

17 whether this is ever a consideration, perhaps to avoid doing

18 the work themselves.  But those aren't a showing of need.

19 They're a showing at most of a convenience.

20        I find the dual purpose of the SEIU's investigation

21 to be immaterial.  First of all, it seems to me that the

22 primary and dominant purpose was to find out whether there was

23 a lawsuit worth filing.  Union organization was secondary.  Of

24 course, what I mean by "secondary" is that if a successful

25 lawsuit were filed at the instance of the union, that would

1   probably promote union membership.  It would be a necessary

2   consequence of successful litigation if the litigation turned

3   out to be productive.

4            But the primary purpose was to determine whether

5   litigation had a reasonable prospect of success.  In that

6   sense, it was an investigation conducted in contemplation of

7   litigation, albeit it may have had a secondary effect of

8   stimulating union membership should the litigation be

9   successful, or even perhaps should it be filed.  Maybe even the

10  mere filing of the case would generate union membership.  In

11  any case, it's a secondary consideration.

12           I realize that the rule I'm announcing today may have

13  applications beyond what I foresee in announcing it, but I'm

14  not worried about that because I think if the ruling is

15  confined to the situations having the elements that I've taken

16  pains to emphasize there will be no problem, and those elements

17  are lawyer involvement in an investigation in anticipation of

18  litigation which results in litigation by or on behalf of the

19  persons whose interests were sought to be promoted in the

20  anticipated litigation.

21           If all of those elements are present, then I see no

22  problem with the fact that those persons who turn out to be the

23  parties in the litigation that results from the investigation

24  were not parties to the nonexistent litigation at the time the

25  necessary investigation in anticipation of the litigation was

1   being conducted.

2          For those reasons, the motion of the defendants to

3   compel production of work product is denied.  Did the

4   plaintiffs have a corresponding motion for a protective order,

5   or is the denial of this motion sufficient to cover the

6   subject?

7          MR. DEAN:  It's sufficient, Your Honor.

8          THE COURT:  Are there any questions?

9          MS. WEINSTEIN:  Your Honor, if I may, Margo Weinstein

10  for the University of Chicago Hospitals.  Your comments raised

11  an issue that weren't in the briefs.  I don't think it will

12  change your ruling, but I think it's important.

13         THE COURT:  Go ahead.

14         MS. WEINSTEIN:  It's that I believe the statement you

15  made that the SEIU could be a representative as that's used in

16  26(b)(3), I believe that would be a violation of federal labor

17  law as relates to the University of Chicago nurses.  They are

18  represented by the INA which is their sole representative, and

19  I think that's going to become very important throughout the

20  case.  But to say that the SEIU is the representative of nurses

21  that are in another union, I think that would be a violation of

22  federal labor law.

23         THE COURT:  I was using "representative" not in the

24  technical sense that you are.  A person can have 100

25  representatives for different purposes.  You can have a

35

1   representative for the purpose of going to the grocery store

2   for you, for the purpose of investigating a possible lawsuit,

3   and for the purpose of representing you in union collective

4   bargaining matters.

5           MS. WEINSTEIN:  The purpose of the --

6           THE COURT:  I understand what you're saying.  I think

7   it has no merit, and it doesn't worry me in the least.

8   Anything else?

9       (No response.)

10          THE COURT:  Okay.  Thank you.  I'll see you then on

11  what, January 23rd?

12          MR. MILLER:  January 23rd, Your Honor.

13          THE COURT:  All right.  Thank you.

14      (Proceedings concluded.)

15

16              C E R T I F I C A T E

17          I, Patrick J. Mullen, do hereby certify that the
    foregoing is a complete, true, and accurate transcript of the
18  proceedings had in the above-entitled case before the Honorable
    JOHN F. GRADY, one of the judges of said court in Chicago,
19  Illinois, on November 14, 2007.

20                          _____

21                              Official Court Reporter
                                United States District Court
22                              Northern District of Illinois
                                    Eastern Division
23

24

25

# UNITED STATES DISTRICT COURT
## OF THE DISTRICT OF COLUMBIA

_____

Oakwood Healthcare, Inc.,                    )

                     )

         Petitioner,               )

                     )

     v.                      )      Case No. 1:07-mc-

                     )      00458-HHK

                     )

Service Employees International Union,    )

                     )

         Respondent.        )

_____)

## PROPOSED ORDER GRANTING MOTION FOR RECONSIDERATION BY THE SERVICE EMPLOYEES INTERNATIONAL UNION

The matter is before the Court on the motion by the Service Employees

International Union ("SEIU") for reconsideration, pursuant to Local Rule 72.2, of the

Magistrate Judge's ruling granting the motion to compel filed by Oakwood Healthcare,

Inc.

For good cause shown,

It is **ORDERED** that the motion for reconsideration is **GRANTED**.

It is **FURTHER ORDERED** that the motion to compel by Oakwood Healthcare,

Inc. is **DENIED**.

Dated: _____

_____

Judge Henry H. Kennedy
UNITED STATES DISTRICT JUDGE