UNITED STATES DISTRICT COURT
OF THE DISTRICT OF COLUMBIA

CIVIL DIVISION

_____

| | |
|---|---|
| Oakwood Healthcare Inc., | : |
| | : |
| Petitioner, | : |
| | : |
| vs. | :    Case No. 1:07-mc-00458 (HKK/AK) |
| | : |
| Service Employees International Union, | : |
| | : |
| Respondent. | : |
| | : |

_____

**OAKWOOD HEALTHCARE, INC.'S OPPOSITION
TO SERVICE EMPLOYEES INTERNATIONAL UNION'S MOTION FOR
RECONSIDERATION OF MAGISTRATE JUDGE'S MEMORANDUM ORDER
<u>GRANTING, IN PART, OAKWOOD'S MOTION TO COMPEL</u>**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ....................................................................................... ii

I.  INTRODUCTION ...........................................................................................1

II.  ARGUMENT ..................................................................................................3

   A.  The Magistrate's Order Is Entitled to Great Deference Unless Clearly
       Erroneous Or Contrary To Law ................................................................3

   B.  The SEIU Is The De Facto True Party In Interest In The Detroit Action .............................4

   C.  The Magistrate Judge Ruled Correctly That Evidence Of Similar SEIU
       Subsidized Class Actions And Its Motivation For Such Subsidization
       Could Assist Oakwood In Demonstrating That The SEIU Had
       An Improper Motive In Funding And Supporting The Detroit Action ................................6

   D.  The SEIU Misstates Magistrate Judge David R. Homer's Holding On
       Defendants' Motion To Compel Compliance With Document Subpoenas
       Issued To The SEIU And SEIU Local 1199 In Unger v. Albany Medical
       Center et al. ....................................................................................10

   E.  The SEIU Waived Any Argument That Granting Oakwood's  Motion To
       Compel Would "Improperly Chill" Class Actions By Advocacy Organizations
       To Further Social And Economic Justice ........................................................11

III.  CONCLUSION................................................................................................13

## <u>TABLE OF AUTHORITIES</u>

<u>CASES</u>                                                              <u>PAGE(S)</u>

*Borden v. Secretary of Health and Human Services*,
    836 F.2d 4 (1st Cir. 1987)........................................................... 11

*Chateau de Ville Productions, Inc. v. Tams-Witmark Music Library, Inc.*,
    586 F.2d 962 (2d Cir. 1978)......................................................... 6

*Footbridge Limited Trust v. Zhang*,
    No. 04-347, 2007 WL 1794106 (D.D.C. June 19, 2007).......................................... 3, 4, 12

*Kamean v. Local 363*,
    109 F.R.D. 391 (S.D.N.Y. 1986),
    *appeal dismissed*, 833 F.2d 1002 (2nd Cir. 1986),
    *cert. denied*, 481 U.S. 1024 (1987).......................................... 7, 11

*Martinez v. Barasch*,
    No. 01-2289, 2004 WL 1367445 (S.D.N.Y. June 16, 2004) ........................ 7, 11

*Neuder v. Battelle Pac. Nw. Nat. Lab.*,
    194 F.R.D. 289 (D.D.C. 2000).................................................. 4

*Norman v. ARCS Equity Corp.*,
    727 F.R.D. 502 (S.D.N.Y. 1976) ............................................ 7, 8, 11

*Page v. Pension Benefit Guaranty Corp.*,
    498 F.Supp.2d 223 (D.D.C. 2007) ............................................. 3

*United Mine Workers of Am. Dist. 12 v. Illinois State Bar Assn.*,
    389 U.S. 217 (1967)........................................................... 12

*United Transp. Union v. State Bar of Michigan*,
    401 U.S. 576 (1981)........................................................... 12

**OTHER AUTHORITIES**

Fed. R. Civ. P. 23 ............................................................ 6

Fed. R. Civ. P. 72(a) ......................................................... 3

Local Civil Rule 72(c) ........................................................ 3

## I.  INTRODUCTION

Oakwood Healthcare, Inc. ("Oakwood"), a non-profit hospital system and defendant along with seven other Southeastern Michigan hospital systems in a nurse wage antitrust class action, *Cason-Merendo et al. v. Detroit Medical Center, et al.,* 2:06-CV-15601 (E.D. Mich.), (hereafter the "Detroit Action"), submits that the Motion By The Service Employees International Union For Reconsideration Of Magistrate Judge's Ruling Granting Oakwood Healthcare, Inc.'s Motion to Compel in part (hereinafter "Motion for Reconsideration") should be denied because Magistrate Judge Kay ruled correctly that Oakwood must be afforded an opportunity for discovery prior to class certification so it may "explore whether the prerequisites to class certification set forth in Rule 23(a) are satisfied" and that a proper subject of pre-certification discovery is "whether there is a conflict of interest between class counsel and members of the class."  Memorandum Order, issued December 14, 2007 (hereinafter "Memorandum Order") at 5.  The Magistrate Judge held that "evidence of the SEIU's involvement in similar lawsuits and evidence of their motive for such involvement could assist Oakwood in demonstrating that the SEIU had an improper motive in funding and supporting the present lawsuit" and that the documents sought by Oakwood's subpoena (the "Subpoena") "are relevant to whether the named plaintiffs and class counsel can adequately represent the class or whether there is a conflict of interest that would defeat Rule 23's adequacy requirement."  Memorandum Order at 6.  Accordingly, Magistrate Judge Kay granted Oakwood's motion to compel and ordered SEIU to comply with Oakwood's subpoena, as modified by Oakwood's October 29, 2007 proposal and Magistrate Judge Kay's decision.[1]

---

[1] Magistrate Judge Kay modified Oakwood's Request No. 1 to limit its application to hospitals and hospital systems, as opposed to other types of employers:

All complaints, including any Amended Complaints, in any class action and/or collective, *against a hospital or hospital system*, including, but not limited to any collection action brought pursuant to Section 216(b) of the Fair Labor Standards Act, 29 U.S.C. § 216(b), in which the SEIU has, or

The SEIU asserts that the Magistrate Judge's ruling should be reversed for three reasons. First, it is the motivation of the Named Plaintiffs in the Detroit Action that is relevant and not that of the SEIU in investigating, sponsoring, subsidizing and publicizing the nurse wage antitrust class actions in Albany, Chicago, Memphis and San Antonio or other class actions and collective actions that also involve plans to organize one or more of the defendant's employees. Second, Magistrate Judge Kay's ruling is allegedly inconsistent with that of Magistrate Judge David Homer in *Unger v. Albany Med. Ctr.*, No. 06-CV-0765 (N.D.N.Y.) (hereinafter the "Albany Action"). Third, the ruling is allegedly contrary to the role, "as guaranteed by the First Amendment," that advocacy organizations play in using "class actions to further social and economic justice goals." *See* Memorandum By The SEIU In Support of Motion For Reconsideration (hereinafter "SEIU Memorandum") at 4.

First, it is the extent and scope of the SEIU's role in fomenting and subsidizing class action litigation--known and unknown--that makes discovery into the number of, and motivation for, such suits a proper subject for discovery prior to any class certification determination in the Detroit Action. Perhaps, the word "fomenting" is inappropriate, if the only SEIU subsidized class actions are the pending nurse wage cases, but not if there are five or ten additional such actions where one or more of the defendant/hospital systems is also the subject of a corporate campaign to compel/persuade it to sign a neutrality/card check agreement and waive its right (and its employees' rights ) to an NLRB supervised, secret ballot election. Oakwood does not know the total number of SEIU subsidized class actions because the union has chosen not to disclose such information. As we shall discuss, the SEIU is the de facto party in interest in the

had, a funding relationship with any of the named plaintiffs' counsel *in that class action or collective action* related to legal fees, costs and/or expenses.

Memorandum Order at 6-7 (emphasis in original). Magistrate Judge Kay found that Oakwood's Requests Nos. 2-4, as modified by Oakwood's October 29, 2007 proposals, were sufficient in their present form.

Detroit Action and probably in the four other wage antitrust class actions, and, perhaps, in other class actions. Second, contrary to the SEIU's assertion, Magistrate Judge Homer was not "presented with this very question"[2] in the Albany Action. If one can construe his remarks during the give and take of oral argument to constitute a ruling that the de facto, true party in interest's motivation is irrelevant, Oakwood submits it is Magistrate Judge Homer's ruling that is in error (and not that of Magistrate Judge Kay). Third, the argument that permitting such discovery will have a chilling effect on advocacy organizations seeking social and economic justice was not advanced below and, thus, should not be considered here. A motion for reconsideration is not a vehicle for presenting theories or arguments that could have been advanced earlier. In any event, defendants are entitled to reasonable discovery on the prerequisites for class certification, irrespective of the class action's sponsorship and the purported worthiness of its objective.

Because it has failed to make a showing that Magistrate Judge Kay's Memorandum Order is error, much less clear error as required by LCvR 72.2(c), the SEIU's Motion For Reconsideration should be denied.

## II. ARGUMENT

A. The Magistrate's Order is Entitled to Great
   Deference Unless Clearly Erroneous or Contrary to Law

On review of a request to seek reconsideration of a magistrate judge's order under LCvR 72.2, the magistrate judge's decision is entitled to great deference and will be upheld unless found to be "clearly erroneous or contrary to law." *See Footbridge Limited Trust v. Zhang*, No. 04-347, 2007 WL 1794106, *1-2 (D.D.C. June 19, 2007); *Page v. Pension Benefit Guaranty Corp.*, 498 F.Supp.2d 223, 225 (D.D.C. 2007); *see also* Fed. R. Civ. P. 72(a). Accordingly, the

---

[2] SEIU Memorandum at 4.

court will affirm the magistrate judge's determination unless "on the entire evidence" the court "is left with the definite and firm conviction that a mistake has been committed." *Neuder v. Battelle Pac. Nw. Nat. Lab.,* 194 F.R.D. 289, 292 (D.D.C.2000) *(*quoting *United States v. U.S. Gypsum Co.,* 333 U.S. 364, 365 (1948)).

Furthermore, a motion for reconsideration is "not simply an opportunity to reargue facts and theories upon which the court has already ruled." *Footbridge Limited Trust*, 2007 WL 1794106, at *2 (quoting *United States v. Funds from Prudential Sec.*, 245 F.Supp.2d 41, 44 (D.D.C. 2003) (citation omitted)). Nor is it "a vehicle for presenting theories or arguments that could have been advanced earlier," or a method of introducing evidence that was "available but not offered at the original motion or trial." *Id.* (citations omitted). As explained further below, Magistrate Judge Kay's decision is neither clearly erroneous or contrary to law. SEIU attempts merely to reargue theories it already presented in its opposition to Oakwood's motion to compel or presents newly-formed theories that could have been but were not presented earlier. As such, for the reasons set forth below, SEIU's motion for reconsideration of Magistrate Judge Kay's decision should be denied.

B.  <u>The SEIU Is The De Facto True Party In Interest In The Detroit Action</u>

While acknowledging that it had "a role" in the genesis of the five pending nurse wage antitrust class actions, the SEIU provides an artfully truncated depiction of its pre-litigation investigation and continuing subsidization of these actions. SEIU Memorandum at 2. All the SEIU concedes is that it "participated in the initial investigations" and "has provided, and continues to provide, financial assistance to one of the numerous law firms – James & Hoffman – representing the plaintiffs in these lawsuits." *Id.* at 2. For a more complete description of the extent of the SEIU's role in retaining and using economists, polling firms, an SEIU telephone bank, researchers, private investigators and James & Hoffman to conduct the pre-litigation

investigation, and in continuing to subsidize these actions, including its financial interest in the outcome, *see* Oakwood's Memorandum In Support Of Motion To Compel Production Of Documents In Compliance With Rule 45(c) Of The Federal Rules Of Civil Procedure at 3-7.

Citing the Named Plaintiffs Responses To Defendant St. John Health's Second Set Of Interrogatories, in the Detroit Action, the SEIU also asserts there is "no suggestion" that the Named Plaintiffs "would choose to serve SEIU's interest over that of the class." SEIU Memorandum at 7 n. 3.

The deposition of Jeffrey Suhre, the only Named Plaintiff in the Detroit Action to be deposed so far, however, discloses that he only knows what his attorneys have told him and, therefore, lacks sufficient knowledge to serve any interest other than that of the SEIU and Named Plaintiffs' counsel, much less have any control over Named Plaintiffs' counsel's prosecution of the action:

> **Q:** Okay. And do you have any specific knowledge on how any of the named Defendants set their compensation or wages?
>
> **MR. GRIFFIN**: Objection, form.
>
> **THE WITNESS**: I don't have any personal knowledge. The information I received was through my attorneys.
>
>           *     *     *     *     *
>
> **Q:** And do you have any personal knowledge regarding whether any of the Named Defendants – and I can list them if you like – conspired to fix wages or suppress wages or keep wages at a low level?
>
> **MR. GRIFFIN**: Objection, form.
>
> **THE WITNESS**: I don't have any personal knowledge.
>
> **BY MR. STEFFANS**:
>
>     **Q**: So it's speculation?
>
> **MR. GRIFFIN**: Objection, form.
>
> **THE WITNESS**: Yes.

*See* Exhibit 1, November 14, 2007, Suhre Deposition Transcript ("Suhre Dep. Tr.") at 333-34.

Mr. Suhre also testified that he sought economic justice for all class members, and that "one form" of achieving economic justice for nurses was unionization and that "nurses collectively need to stand up together united." *Id.* at 56-57.  While Mr. Suhre is certainly entitled to that view, his desire to achieve economic justice through unionization conflicts with those Southeastern Michigan hospital nurses who would prefer to remain non-union.  As Oakwood observed in its Memorandum In Support Of Motion To Compel Production Of Documents In Compliance With Rule 45(c), the SEIU has twice tried to organize the nurses at Oakwood's Annapolis Hospital through the NLRB supervised, secret ballot election process without success.[3]

In sum, Mr. Suhre's answers disclose that for all practical purposes, he has no identity or knowledge separate and distinct from that of the SEIU and Named Plaintiffs' counsel.  Instead, he is merely a conduit for filing the Detroit Action because the SEIU lacks standing to prosecute the action in its own name.

C. The Magistrate Judge Ruled Correctly That Evidence Of Similar SEIU Subsidized Class Actions And Its Motivation For Such Subsidization Could Assist Oakwood In Demonstrating That The SEIU Had An Improper Motive In Funding And Supporting The Detroit Action

Magistrate Judge Kay correctly ruled that the "parties to this litigation must be afforded an opportunity for discovery prior to class-certification so that they may explore whether the prerequisites to class certification set for it Rule 23(a) are satisfied."  Memorandum Order at 5.  Indeed, district court decisions to certify a class under Fed. R. Civ. P. 23 have been reversed for a court's failure to allow discovery without the full development of the facts relating to fairness and adequacy of representation.  *See Chateau de Ville Productions, Inc. v. Tams-Witmark Music*

---

[3] *See* Oakwood's Memorandum in Support of Motion to Compel Production of Documents in Compliance with Rule 45(c) (d/e 1) at 3 (and exhibits cited therein).

*Library, Inc.*, 586 F.2d 962, 966 (2d Cir. 1978) (reversing district court's class certification due to failure to permit discovery into allegations that named plaintiffs had used the class action for personal purposes because such evidence would be "highly relevant" to the question of adequacy of named plaintiffs as class representatives).

Contrary to the SEIU's assertions, Magistrate Kay ruled correctly that one proper subject of pre-certification discovery is "whether there is a conflict of interest between class counsel and members of the class" and that "evidence of the SEIU's involvement in similar lawsuits and evidence of their motive for such involvement could assist Oakwood in demonstrating that the SEIU had an improper motive in funding and supporting the present lawsuit." Memorandum Order at 5-6. In *Martinez v. Barasch*, No. 01-2289, 2004 WL 1367445 (S.D.N.Y. June 16, 2004), the court quoted *Kamean v. Local 363*, 109 F.R.D. 391, 395 (S.D.N.Y. 1986), *appeal dismissed*, 833 F.2d 1002 (2nd Cir. 1986), *cert. denied*, 481 U.S. 1024 (1987), in holding that to satisfy that the adequacy of representation requirement:

> [T]he named plaintiffs must demonstrate that neither they nor their attorneys are subject to extraneous influences that would create a conflict. Sources of potential conflict are not confined to pecuniary interests. Lawsuits fueled by the spite or hostility of an unduly antagonistic litigant or by ***some other ulterior motive*** or irrational purposes unrelated to the claims alleged in the complaint may prevent class certification.

*Id*. at *4 (emphasis added); *see also Norman v. ARCS Equity Corp.,* 727 F.R.D. 502, 506 (S.D.N.Y. 1976) (certification denied in securities class action because of finding that representative party would not fairly and adequately represent class based on totality of circumstances, including concerns about maintenance and champerty).

Oakwood contends that the greater the number of SEIU subsidized class actions and collective actions that also involved plans to organize one or more of the defendant's employees, the more likely it is that these suits are being instigated primarily for the SEIU's purposes, and not for those of all class members. In its Opposition To Oakwood's Motion To Compel, the

SEIU attached an exhibit, a copy of a Quarterly Report from Advocate Healthcare Network ("Advocate"), one of the defendants in the Chicago action, indicating that in January 2003, the SEIU had approached Advocate about developing a partnership proposal and that after Advocate's refusal to sign a neutrality agreement in April 2003, it became the subject of a SEIU corporate campaign.[4] Evidence of a linkage between Advocate's refusal to acquiesce in the SEIU's demand for a neutrality agreement and its inclusion as a defendant in the Chicago nurse wage antitrust class action, *Reed v. Advocate Health Care,* would, in Oakwood's view, be relevant on the issue of class certification in the Detroit action and, perhaps, in all of the pending nurse wage antitrust class actions. Absent enforcement of the Subpoena, Oakwood will not have access to the documents the SEIU has produced relating to its organizational campaign against Advocate because the union has designated these documents "Confidential" or "Highly Confidential" pursuant to the Protective Order in the Chicago action. Oakwood lacks access to SEIU documents pertaining to efforts and plans to obtain neutrality and card check agreements from other defendants in the other pending nurse wage antitrust class actions for similar reasons.

Courts have recognized that the burden and risk involved in defending class actions is such that "even those substantially lacking in merit tend to be settled along the way." *Norman*, 727 F.R.D. at 506. Given the potency of the class action as a weapon to pressure an employer, Oakwood seeks evidence showing that the SEIU is misusing other kinds of class actions to send a message to organizational targets that they had better "partner" with the SEIU or find themselves defending costly and disruptive class action lawsuits. The SEIU Contract Campaign Manual encourages SEIU employees and members to "use pressure tactics" and observes that "legal and regulatory pressure can threaten the employer with costly action by government

---

[4] *See* Exhibit 7 to Memorandum by the Service Employees International Union In Opposition To Motion To Compel (d/e 4).

agencies or the courts." *See* Exhibit 2, Contract Campaign Manual, Service Employees

International Union, CTW, CLC at 4-1.  In evaluating possible pressure tactics, SEIU employees

and members are directed to ask themselves:

"What purposes will this tactic serve?

- **Costing the employer money.**  Can you threaten to or actually …

- Reduce productivity?

- Increase costs?

- Affect a private company's relationship with sources of income, such as customers, clients, investors, or lenders?

- Affect a private company's access to public funds?

- Affect a public employer's relationship with legislators or top government executives such as the governor or mayor?

- Create bad publicity which would, in turn, affect the relationships described above?

- Cause the courts or regulatory agencies to enforce laws or regulations the employer has failed to obey?

- Directly affect the careers or other interests of individual management officials.

*Id.* at 4-7 (emphasis in original).

The Winter 2003 edition of "Hospital Monitor", a newsletter published by the SEIU's

"Hospital Accountability Project" in Chicago, publicizes a class action lawsuit filed against

Advocate, *Cristiani v. Advocate Healthcare*, No. 2003 L 014635, in the Circuit Court for Cook

County, Illinois, alleging that Advocate overcharged uninsured patients in violation of the

Illinois Consumer Fraud and Deceptive Business Practices Act.[5]  According to an Advocate

filing in *Reed v. Advocate Health Care*, the SEIU allegedly told Advocate that the Cristiani class

---

[5] *See* Exhibit 3, Hospital Monitor, Winter 2003, "Class Action Lawsuit Repayment to Uninusred Patients," at 2.

action would end if it signed a neutrality agreement.[6]  The missing link here is whether *Cristiani v. Advocate Health Care* is another SEIU subsidized class action.  If it is, the use of the *Cristiani* suit to attempt to compel Advocate to sign a neutrality agreement constitutes a misuse of the class action device.

Evidence that that the SEIU frequently uses class actions or collective actions to pressure employers into granting the union neutrality and/or card check agreements suggests that the Detroit Action may be subject to an extraneous influence, particularly, when coupled with evidence that one of Jeffrey Suhre's motivations in being a Named Plaintiff is to seek economic justice through unionization.

D.  The SEIU Misstates Magistrate Judge David R. Homer's Holding
    On Defendants' Motion To Compel Compliance With Document Subpoenas
    Issued To The SEIU And SEIU Local 1199 In *Unger v. Albany Medical Center et al.*

The SEIU asserts that enforcing Oakwood's Subpoena, as modified, is "inconsistent" with the ruling of Magistrate Judge David Homer in the Albany Action, who "*was presented with this very question*."  SEIU Memorandum at 4 (emphasis added).

At issue before Magistrate Judge Homer in the Albany action was defendant's motion to compel compliance, in effect, with two document subpoenas:  one issued by the U.S. District Court for the Northern District of New York to SEIU Local 1199 and a second subpoena issued by the U.S. District Court for the District of Columbia to the SEIU.  *See* Exhibit 5, Transcript at 9, *Unger v. Albany Med. Ctr.,* No. 06-cv-0765 (N.D.N.Y.) (Jan. 23, 2007).  Magistrate Judge Homer ruled he had no jurisdiction to enforce the subpoena issued to the SEIU by the U.S. District Court for the District of Columbia.  *Id.* at 7-8.

_____

[6] *See* Exhibit 4, Defendants' Memorandum of Law In Opposition To Plaintiffs' Motion For Entry Of Protective Order in *Reed v. Advocate Health Care, et al.*, No. 1:06-cv-03337, filed October 27, 2006, at 5.

The Albany defendants argued that because SEIU Local 1199 and the SEIU worked together during the pre-complaint investigation and to recruit named plaintiffs, both entities should be treated as one for purposes of enforcing the SEIU Local 1199 subpoena. Magistrate Judge Homer declined to so hold. *Id.* at 9-10.

Thereafter, Magistrate Judge Homer dealt with objections to the breadth of the SEIU Local 1199 subpoena. In so doing, Magistrate Judge Homer held that discovery of "the Union's involvement with particular named putative class representatives *is relevant*." *Id.* at 30 (emphasis added). When Defendants sought to extend such discovery to individuals who declined SEIU Local 1199's request to serve as named plaintiffs, he stated that such information was irrelevant. *Id.* at 31.

In sum, Magistrate Judge Homer granted Defendant's motion to compel compliance with certain portions of the SEIU Local 1199 subpoena and declined to enforce other portions of the subpoena.[7]

E.  The SEIU Waived Any Argument That Granting Oakwood's
    Motion To Compel Would "Improperly Chill" Class Actions
    By Advocacy Organizations To Further Social And Economic Justice

Finally, the SEIU argues that Magistrate Judge Kay's decision should be reversed because "it ignores the critical role that advocacy organizations, such as labor unions, have played in supporting class action litigation to further social and economic goals and seeks to make the provision of that support more difficult." SEIU Memorandum at 8. Because it was never raised before him, it is misleading and unfair to claim that Judge Magistrate Kay "ignored" this argument. For this reason, the SEIU has waived this argument. *Borden v. Secretary of*

---

[7] To the extent that Magistrate Judge Homer's remarks during the give and take of oral argument can be construed to be a ruling that adequacy of representation does not depend on the totality of circumstances, including the motivation of the de facto, true party in interest, his decision, Oakwood respectfully submits, is error. *See Martinez*, 2004 WL 1367445 at \*4; *Kamean*, 109 F.R.D. at 395; *Norman*, 727 F.R.D. at 506.

*Health and Human Services*, 836 F.2d 4, 6 (1st Cir. 1987) (affirming district court's holding that party waived argument by failing to raise it before the magistrate); *Footbridge Limited Trust*, 2007 WL 1794106, at *2.

In any event, Magistrate Judge Kay's decision in no way precludes advocacy organizations from continuing to provide financial support for class action litigation for worthy goals, or for ostensibly worthy goals, but with an ulterior motive. The discovery sought here does not prohibit unions from pursuing such goals—it does not prohibit unions from paying attorneys to represent employees in derogation of First Amendment rights, *United Mine Workers of Am. Dist. 12 v. Illinois State Bar Assn.*, 389 U.S. 217 (1967), nor does it deny legal representation to an association's members, *United Transp. Union v. State Bar of Michigan*, 401 U.S. 576 (1981). Given the somewhat unique facts and circumstances of this case, Oakwood simply seeks reasonable discovery to unearth evidence relevant to adequacy of representation, irrespective of the class action's sponsorship. If an advocacy group wishes to sponsor and provide financial support to a class action, it must be prepared to respond to discovery like everyone else. The First Amendment does not provide blanket immunity from discovery that arguably relates to protected speech. Accordingly, the SEIU's objections to Magistrate Judge Kay's decision on "chilling effect" grounds are without merit and should be ignored.

## III.   <u>CONCLUSION</u>

Defendant Oakwood respectfully requests that this Court deny SEIU's Motion for

Reconsideration and enter an order requiring the SEIU to produce documents consistent with

Magistrate Judge Kay's December 14, 2007 Memorandum Order.


Respectfully submitted,

Dated:  January 25, 2008                          DYKEMA GOSSETT PLLC


By:   _____/s/_____
      Howard E. O'Leary, Jr.
      DC Bar No. 15664
      Howard Iwrey
      1300 I Street, NW, Suite 300
      Washington, DC  20005
      hiwrey@dykema.com
      holeary@dykema.com
      (202) 906-8601
      ***Attorneys For Defendant,***
      **Oakwood Healthcare Inc.**

## CERTIFICATE OF SERVICE

I, William M. Jack, hereby certify that on this 25th day of January, 2008, I served a copy of Oakwood Healthcare, Inc's Opposition to the Service Employees International Union's Motion for Reconsideration and attached exhibits via the United States District Court for the District of Columbia's electronic filing system and by first-class mail on counsel for Service Employees International Union, Matthew Clash-Drexler, Esq., Bredhoff & Kaiser, 805 Fifteenth Street, NW, Washington, D.C. 20005.  A copy of the foregoing was also served via electronic mail on all counsel of record and by first-class mail on all Plaintiffs' counsel in *Merendo and Jeffrey A. Suhre v. Detroit Medical Center et al.*, No. 06-15601 (E.D. Mich.).

| **VIA ELECTRONIC AND U.S. MAIL** | |
|---|---|
| Stephen F. Wasinger<br>STEPHEN F. WASINGER PLC<br>26862 Woodward Avenue, Suite 100<br>Royal Oak, MI  48067-0958<br>*Email:  sfw@sfwlaw.com* | Mark A. Griffin<br>Raymond J. Farrow<br>KELLER ROHRBACK<br>1201 Third Avenue, Suite 3200<br>Seattle, WA  98101<br>*Email:  mgriffin@kellerrohrback.com,<br>rfarrow@kellerrohrback.com* |
| Charles P. Tompkins<br>COHEN, MILSTEIN, HAUSFELD & TOLL,<br>P.L.L.C.<br>1100 New York Avenue, NW<br>West Tower, Suite 500<br>Washington, DC  20005<br>*Email:  ctompkins@cmht.com* | David P. Dean<br>JAMES & HOFFMAN<br>1101 17th Street, NW, Suite 510<br>Washington, DC  20036<br>*Email:  dpdean@jamhoff.com* |
| **VIA ELECTRONIC MAIL** | |
| Alethea A. Wilson<br>Charles N. Raimi<br>Patricia C. Schabath<br>DETROIT MEDICAL CENTER<br>3990 John R, 7 Brush W.<br>Detroit, MI  48201<br>*Email:  awilson4@dmc.org, craimi@dmc.org,<br>pschabat@dmc.org* | Kenneth J. McIntyre<br>L. Pahl Zinn<br>Michelle Heikka<br>DICKINSON WRIGHT PLLC<br>500 Woodward Avenue, Suite 4000<br>Detroit, MI  48226-3425<br>*Email:  kmcintyre@dickinsonwright.com,<br>pzinn@dickinsonwright.com;* |

| | |
|---|---|
| | *mheikka@dickinsonwright.com* |
| David Marx, Jr.<br>Benjamin J. Hanauer<br>David L. Hanselman, Jr.<br>Stephen Y. Wu<br>MCDERMOTT, WILL & EMERY<br>227 W. Monroe Street<br>Chicago, IL 60606<br>*Email: dmarx@mwe.com,*<br>*bhanauer@mwe.com; dhanselman@mwe.com,*<br>*swu@mwe.com* | Mark S. Wilkinson<br>Terrence J. Miglio<br>Jonathon A. Rabin<br>KELLER THOMA<br>440 E. Congress, 5th Floor<br>Detroit, MI 48226-2918<br>*Email: msw@kellerthoma.com,*<br>*tjm@kellerthoma.com, jar@kellerthoma.com* |
| David A. Ettinger<br>Peter E. Boivin<br>HONIGMAN MILLER SCHWARTZ AND<br>COHN LLP<br>660 Woodward Avenue, Suite 2290<br>Detroit, MI 48226-3506<br>*Email: dettinger@honigman.com,*<br>*pboivin@honigman.com* | Michael J. Bommarito<br>MCLAREN HEALTH CARE<br>G3235 Beecher Road, Suite C<br>Flint, MI 48532-3615<br>*Email: michaelb@mclaren.org* |
| Phillip A. Proger<br>Toby G. Singer<br>Michael R. Shumaker<br>JONES DAY<br>51 Louisiana Avenue, NW<br>Washington, DC 20001-2113<br>*Email: paproger@jonesday.com,*<br>*tgsinger@jonesday.com,*<br>*mrshumaker@jonesday.com* | Thomas M.J. Hathaway<br>CLARK HILL P.L.C.<br>500 Woodward Avenue, Suite 3500<br>Detroit, MI 48226<br>Telephone: (313) 965-8300<br>Facsimile: (313) 965-8252<br>*Email: thathaway@clarkhill.com* |
| Arthur N. Lerner<br>Shari Ross Lahlou<br>CROWELL & MORING LLP<br>1001 Pennsyulvania Avenue, NW<br>Washington, DC 20004<br>*Email: alerner@crowell.com,*<br>*slahlou@crowell.com* | Fred K. Herrman<br>KERR, RUSSELL & WEBER, PLC<br>500 Woodward Avenue, Suite 2500<br>Detroit, MI 48226-3406<br>*Email: fkh@krwlaw.com* |

| | |
|---|---|
| Margo Weinstein<br>Sandra D. Hauser<br>SONNENSCHEIN NATH & ROSENTHAL LLP<br>1221 Avenue of the Americas<br>New York, NY  10020<br>*Email: mweinstein@sonnenschein.com,*<br>shauser@sonnenschein.com | David B. Gunsberg<br>322 N. Old Woodward Avenue, Suite 200<br>Birmingham, MI  48009<br>*Email: davidgunsberg@hotmail.com* |
| Christopher Q. King<br>SONNENSCHEIN NATH & ROSENTHAL LLP<br>7800 Sears Tower<br>233 South Wacker Drive<br>Chicago, IL  60606-6404<br>*Email: cking@sonnenschein.com* | Catherine F. Wenger<br>TRINITY HEALTH<br>27870 Cabot Drive<br>Novi, MI  48337<br>*Email:  wengerc@trinity-health.org* |
| Sheldon H. Klein<br>William D. Slowey<br>BUTZEL LONG<br>150 W. Jefferson, Suite 100<br>Detroit, MI  48226-4430<br>*Email:  klein@butzel.com,* slowey@butzel.com | |

/s/ William M. Jack

DC01\130257.1<br>ID\HEO

# EXHIBIT 1

Page 1

```
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF MICHIGAN

 3                  SOUTHERN DIVISION

 4   Pat Cason-Merenda and        Case No: 2:06-cv-15601

 5   Jeffrey A. Suhre, on         Judge Gerald E. Rosen

 6   behalf of themselves and

 7   all others similarly situated,

 8          Plaintiffs,          Class Action Complaint

 9       v.

10   Detroit Medical Center; Henry Ford

11   Health System; Mount Clemens General

12   Hospital, Inc.; St. John Health;

13   Oakwood Healthcare, Inc.; Bon Secours

14   Cottage Health Services; William Beaumont

15   Hospital, and Trinity Health Corp.,

16          Defendants.

17   _____/

18        V I D E O   D E P O S I T I O N

19   DEPONENT:   JEFFREY A. SUHRE

20   DATE:       Wednesday, November 14, 2007

21   TIME:       9:03 a.m.

22   LOCATION:   Stephen F. Wasinger, PLC

23               32121 Woodward Avenue, Suite 300

24               Royal Oak, Michigan

25   REPORTER:   Michele E. French, CSR-3091, RMR, CRR
```

Jeffrey A. Suhre
November 14, 2007
Royal Oak, MI

Page 54

1   Q   Okay. Do you know who did undertake a
2   pre-litigation investigation of the Complaint?
3   A   That information is something that my
4   attorneys have had and I have not been afforded
5   that information to me.
6   Q   Was the pre-litigation investigation and
7   the results of that investigation presented to you
8   prior to the filing of the Complaint?
9   A   I do not recall.
10  Q   Do you recall if the SEIU played any role
11  in the pre-litigation investigation of the
12  allegations in the Complaint?
13  A   I have seen the Complaint as it's been
14  presented, but I don't recall the specifics of who
15  was in it.
16  Q   Why did you decide to become a Plaintiff,
17  Mr. Suhre?
18  A   I have been a professional licensed RN
19  for the State of Michigan for 17 years, and based
20  on current data that's out there in regards to
21  supply and demand, I am looking to seek justice
22  economically for all nurses in this class.
23  Q   Okay. And that information is what was
24  supplied to you by counsel; correct?
25      MR. GRIFFIN: Objection, form.

Page 55

1       THE WITNESS: I am a little bit confused
2   here for a second. Let me have that question
3   asked again, please.
4       (Record read as follows:
5       QUESTION: "Okay. And that information
6   is what was supplied to you by counsel; correct?")
7       THE WITNESS: Some of that information
8   was supplied to me, yes.
9   BY MR. SHUMAKER:
10  Q   And the other information was what we
11  referred to earlier and what was handed out to you
12  at the union meetings?
13      MR. GRIFFIN: Objection, form.
14      THE WITNESS: On that information, as it
15  has been previously stated.
16  BY MR. SHUMAKER:
17  Q   So the answer is yes?
18      MR. GRIFFIN: Objection, form.
19      THE WITNESS: Give me a minute here to
20  think. My attorneys have supplied some of that
21  information to me, yes.
22      BY MR. SHUMAKER:
23  Q   Did you have any animosity towards St.
24  John Hospital at the time you filed the Complaint,
25  Mr. Suhre?

Page 56

1   A   No, I do not.
2   Q   No animosity whatsoever?
3   A   No, I do not.
4   Q   Would you agree with me that you have a
5   number of performance issues at St. John Hospital?
6   A   Yes, I do.
7   Q   None of that played any role in your
8   decision to bring this case?
9   A   No, it has not.
10  Q   What are the goals that you have for this
11  litigation?
12  A   My goal is to seek economic justice for
13  all class members.
14  Q   What is economic justice, in your view?
15  A   To be fairly compensated for all nursing
16  wages.
17  Q   Is compensation all that you seek,
18  Mr. Suhre?
19  A   I seek justice for all nurses in this
20  class.
21  Q   Is there something more to justice other
22  than compensation, in your view, Mr. Suhre?
23  A   To basically right the wrong that's been
24  going on for a long time.
25  Q   Okay. And how would you right the wrong

Page 57

1   other than in the form of compensation, in your
2   view?
3   A   By not allowing collusion of healthcare
4   systems to suppress our wages.
5   Q   Let me make sure I understand your
6   testimony, Mr. Suhre. You want compensation and
7   you want to end collusion; correct?
8   A   Correct.
9   Q   Anything more than that?
10  A   No.
11  Q   Are you in favor of unionization of
12  nurses?
13  A   In my opinion, that is one form to use,
14  yes.
15  Q   Okay. So you believe that one way to
16  reach economic justice would involve unionization?
17      MR. GRIFFIN: Objection, form.
18      THE WITNESS: I believe that nurses
19  collectively need to stand up together united.
20      BY MR. SHUMAKER --
21  Q   Okay. So you are -- you are in favor of
22  the unionization of nurses; correct, Mr. Suhre?
23      MR. GRIFFIN: Objection, asked and
24  answered.
25      THE WITNESS: As previously stated, I

15 (Pages 54 to 57)

Jeffrey A. Suhre                                                          November 14, 2007
Royal Oak, MI

| Page 330 | Page 332 |
|---|---|
| 1  A  I do not remember. | 1  A  Because I felt like I wanted to do |
| 2  Q  Do you remember anything about your | 2  something that would help people. |
| 3  conversation with her regarding those subjects? | 3  MR. HANSELMAN:  Okay.  I don't have any |
| 4  A  Just general knowledge and talking while | 4  further questions for you. |
| 5  at work, you know.  Nothing specific other than I | 5  Thank you, Mark. |
| 6  had initiated this or am looking to be signed onto | 6  MR. GRIFFIN:  Okay. |
| 7  this. | 7  MR. STEFFANS:  Before we go off the |
| 8  Q  And does she work concurrently both at | 8  record, Benjamin Steffans for Butzel Long, |
| 9  St. John and Henry Ford? | 9  representing Beaumont.  Beaumont graciously |
| 10  A  To my knowledge, yes, she does. | 10  requests that we be extended five to ten minutes |
| 11  Q  Is it common for registered nurses to | 11  to ask a few questions before we adjourn the |
| 12  work at two employers simultaneously? | 12  deposition today.  I, again, have five to ten |
| 13  A  I don't know if it's common or not, but | 13  minutes tops worth of questions. |
| 14  there are nurses out there that do that. | 14  MR. GRIFFIN:  Let me -- let's take a |
| 15  Q  And how about your communications with | 15  break.  Let me think about that. |
| 16  Pat Corinstine, what were the nature of those | 16  VIDEOGRAPHER:  Okay.  We're going off the |
| 17  communications? | 17  record.  The camera clock is 7:01 p.m. |
| 18  A  She called to say that she saw this class | 18  (Recess at 6:01 p.m. to 6:12 p.m.) |
| 19  action lawsuit. | 19  VIDEOGRAPHER:  We're back on the record. |
| 20  Q  That was a telephone call? | 20  The time now on the camera is 7:12 p.m. |
| 21  A  Yes. | 21  MR. GRIFFIN:  We've received a request |
| 22  Q  Have you had any in-person communications | 22  from Beaumont's attorney to ask five minutes of |
| 23  with her regarding RN compensation or this | 23  questions.  We will accommodate that request.  Go |
| 24  lawsuit? | 24  ahead. |
| 25  A  I may have had one conversation with her | 25  MR. STEFFANS:  Thank you.  Benjamin |

| Page 331 | Page 333 |
|---|---|
| 1  but I don't recall the specifics of that | 1  Steffans, representing Beaumont Hospital.  I |
| 2  conversation other than I'm in the lawsuit. | 2  appreciate the accommodation. |
| 3  Q  And how do you know her? | 3  EXAMINATION |
| 4  A  I used to be neighbors. | 4  BY MR. STEFFANS: |
| 5  Q  When did the conversation with -- let me | 5  Q  Mr. Suhre, I'll try to make this as quick |
| 6  rephrase.  How many conversations have you had | 6  and painless as possible.  I gather from your |
| 7  with Miss Ponce regarding RN compensation or the | 7  testimony earlier today that you've -- of the |
| 8  lawsuit? | 8  Defendants named in the Complaint, you've only |
| 9  A  I'm going to have to take a speculated | 9  worked at St. Johns; is that correct? |
| 10  guess.  About three or four. | 10  A  As an employee of St. Johns, Providence |
| 11  Q  And when did those conversations take | 11  Hospital, yes. |
| 12  place? | 12  Q  Okay.  And do you have any specific |
| 13  A  Various times while I was at work. | 13  knowledge on how any of the named Defendants set |
| 14  Q  Were they before or after the lawsuit was | 14  their compensation or wages? |
| 15  filed? | 15  MR. GRIFFIN:  Objection, form. |
| 16  A  It was -- it was after the lawsuit. | 16  THE WITNESS:  I don't have any personal |
| 17  Q  And how many communications did you have | 17  knowledge.  The information I received was through |
| 18  with Miss Corinstine? | 18  my attorneys. |
| 19  A  I believe it's a couple. | 19  BY MR. STEFFANS: |
| 20  Q  And when did those take place? | 20  Q  And that would be your answer to all the |
| 21  A  Within the last four, five months. | 21  named Defendants? |
| 22  Q  Mr. Suhre, why did you become a | 22  A  That is correct. |
| 23  registered nurse? | 23  Q  And do you have any personal knowledge on |
| 24  A  Why did I become a registered nurse? | 24  who sets the wages or compensation at the named |
| 25  Q  Yes. | 25  Defendant hospitals? |

84 (Pages 330 to 333)

Jeffrey A. Suhre                                                                    November 14, 2007

Royal Oak, MI

Page 334

1        MR. GRIFFIN:  Same objection, form.
2        THE WITNESS:  No, I do not.
3        BY MR. STEFFANS:
4        Q    And that would be the same answer for all
5    the named Defendants?
6        A    Do I have any personal knowledge?
7        Q    On who, yes.
8        A    No, I do not, and that's the same answer
9    throughout.
10       Q    And do you have any personal knowledge
11   regarding whether any of the named Defendants --
12   and I can list them if you like -- conspired to
13   fix wages or suppress wages or keep wages at a low
14   level?
15       MR. GRIFFIN:  Objection, form.
16       THE WITNESS:  I don't have any personal
17   knowledge.
18       BY MR. STEFFANS:
19       Q    So it's speculation?
20       MR. GRIFFIN:  Objection, form.
21       THE WITNESS:  Yes.
22       BY MR. STEFFANS:
23       Q    Okay.  Returning to the monster.com or
24   whatever the name of the Website was, I believe
25   you testified -- and correct me if I'm wrong --

Page 335

1    that you were contacted by U of M and Beaumont; is
2    that correct?
3        A    I have to think on that.  I believe that
4    is correct.
5        (Mr. Gunsberg left the room.)
6        BY MR. STEFFANS:
7        Q    And when you were contacted by Beaumont,
8    what was the nature of the contact?  Did they send
9    you a letter?  Did they -- was it an e-mail?
10       A    I believe that it could have been a phone
11   call, personal phone call.
12       Q    And did they offer you a job?
13       A    I don't recall the specifics on that.
14   They may have asked if I was interested in --
15       Q    And --
16       A    I don't know if it was to ask to come in
17   for an interview or not.
18       Q    Did you say you weren't -- what was your
19   response when they asked if you were interested?
20       A    To the best of my recollection is I
21   wasn't interested at that time.
22       Q    And why would you -- why were you not
23   interested?
24       A    My own personal choice.  I just decided I
25   didn't want to do that.

Page 336

1        Q    Any specific reasons besides just --
2        A    I don't have a specific reason, no.
3        Q    If I listed possible reasons, would you
4    say they could be possibly a reason?
5        A    That's correct.
6        Q    Geography?  Could it be that you didn't
7    want to --
8        A    That is correct.
9        Q    The type of work that you would be doing
10   if you transferred hospitals, could that be a
11   reason why you wouldn't want to --
12       A    I don't believe so, no.
13       Q    The shifts that you possibly could work
14   at the other hospital?
15       A    That's a possibility.  I don't know for
16   sure on that one.
17       Q    But that would be something that you
18   would consider?
19       A    That would be something I would consider,
20   yes.
21       Q    What about the benefits packages; health
22   insurance, life insurance, vision, dental?  Would
23   that be something you would consider when --
24       A    That would be something I would consider.
25       Q    Okay.  You testified earlier regarding

Page 337

1    Trinity being added as a Defendant after the
2    initial Complaint was filed; is that correct?
3        A    That is what I correctly stated earlier.
4        Q    Okay.  Is it your understanding that
5    Beaumont was also named as a Defendant after the
6    initial Complaint was filed?
7        A    As I understand it, yes.
8        Q    And do you know why Beaumont was added as
9    a --
10       A    That was a decision that was made by my
11   attorneys.  I do not know why.
12       Q    Okay.  And do you consider a bonus a part
13   of compensation?
14       A    Do I consider bonus a part of
15   compensation?  That's a possibility, yes.
16       MR. STEFFANS:  Okay.  Nothing further.
17       MR. GRIFFIN:  Okay.  With respect to the
18   Exhibits 40 and 41, I have checked with my office.
19   We did receive a letter from a Dante Stella,
20   including a third production of documents, a
21   letter dated November 8th, that was received by my
22   office November 9th.
23       It included a CD that contained document
24   numbers OAKP0066754 through OAKP0066892, which
25   includes Exhibits 40 and 41, but nowhere in the

85 (Pages 334 to 337)

# EXHIBIT 2

# contract campaign
# manual

SERVICE EMPLOYEES INTERNATIONAL
UNION, CTW, CLC

# Using Pressure Tactics

It's not enough to be right. You need might as well. Union proposals will usually cost the employer money or reduce management's flexibility and control over the workforce—and that means the employer generally will resist unless you create meaningful pressure to reach agreement.

When many people think of union pressure, they think of strikes—and strikes are one form of pressure which may become necessary in some contract campaigns. But many other kinds of pressure are possible as well. For example:

- **Worksite activities,** such as surveys, petition campaigns, and demonstrations can show management that workers will not be satisfied and productive without a fair settlement.

- **Job actions,** such as refusing to do more than required by the contract or engaging in solidarity actions, can demonstrate workers' willingness to take stronger action if necessary.

- **Outside pressure** can affect relationships between the employer and lenders, investors, stockholders, customers, clients, patients, tenants, politicians, or others on whom the employer depends for funds.

- **Legal and regulatory pressure** can threaten the employer with costly action by government agencies or the courts.

- **Community action and use of the news media** can damage an employer's public image and ties with community leaders and organizations.

In planning ways to pressure the employer, consider the following:

- **Assume that pressure tactics will be necessary, and start planning for them well in advance.** It may be tempting to wait to see if you can reach an acceptable settlement without going to all the trouble of developing possible pressure tactics. Unfortunately, by then time will be on management's side because most pressure tactics take considerable time to organize effectively.

  When management sees that you are preparing to apply pressure, it becomes less likely that you will have to use those tactics, while failure to prepare invites management to test the union's strength.

# Evaluating Possible Tactics

As you evaluate possible pressure tactics, make of list of pros and cons of each one. Try to anticipate how the employer will react to each tactic and how the union will respond to that reaction. The following questions can help you decide on tactics to use.

## What purposes will this tactic serve?

- **Costing the employer money.** Can you threaten to or actually ...

  □ Reduce productivity?

  □ Increase costs?

  □ Affect a private company's relationship with sources of income, such as customers, clients, investors, or lenders?

  □ Affect a private company's access to public funds?

  □ Affect a public employer's relationship with legislators or top government executives such as the governor or mayor?

  □ Create bad publicity which would, in turn, affect the relationships described above?

  □ Cause the courts or regulatory agencies to enforce laws or regulations the employer has failed to obey?

  □ Directly affect the careers or other interests of individual management officials?

- **Building solidarity among workers or between your members and potential allies.** Will the tactic ...

  □ Make the campaign more visible?

  □ Increase group spirit?

  □ Increase workers' sense of their own power?

  □ Show workers that they have the support of allies, and draw those allies into making a stronger commitment to the campaign?

- **Making daily life difficult for management.** Will the tactic ...

  □ Distract management officials from other work they need to do?

**EXHIBIT 3**

The Newsletter of the Hospital Accountability Project, Service Employees International Union

# Hospital Monitor WINTER 2003

# State Senate launches inquiry of Advocate Health Care's predatory collection practices

*Report reveals Advocate as Cook County's medical predatory collector*



Unsatisfied with Advocate Health Care's response to charges of predatory collections, the Senate Health and Human Services Committee, led by **Senator Barack Obama** (D-13), vowed Oct. 22 to seek answers from the hospital chain.

Testifying before the committee was **Barbara Baughns**, a silkscreen printer, who lost her child soon after birth and was then sued by Advocate Illinois Masonic for $177,000, testified. "I live with the grief of losing my baby everyday. But this outrageous hospital bill only makes the situation worse. There is no way I will ever be able to pay $177,000," said Baughns. "Advocate has made no effort to reach out to me, to offer charity care or any form of assistance."

The inquiry was launched in response to *Insult to Injury: Hospital Debt and Aggressive Collection Practices*, a report by the Hospital Accountability Project studying the collections prac-

tices of 59 acute care hospitals in Cook County. The report's key findings are that:

- Advocate sues for its uncollected bills at a rate of three times more than other hospitals.
- On average, Advocate sues for nearly twice as much money as other hospitals;
- With only eight hospitals, Advocate sues for nearly 40 percent of the total amount sought by all 59 private hospitals in the Chicago area.

Advocate claimed that federal Medicare regulations mandate these practices. However, Senator Obama noted that the regulations permit "discretion in how hospitals collect on debt—whether they terrorize their patients or offer them reasonable payment plans." Several hospitals did not sue a single patient in 2001, the same year Advocate sued approximately 1,400 individuals for $11 million.

In addition to aggressive litigation, the senators raised concerns about Advocate's high interest loans after hearing testimonies from **Bernetta Pearson**, chair of the Illinois Minority Health Association. "There were no signs for charity care or financial assistance, only a loan application," she said. **Senator Jeffrey Schoenberg** (D-Evanston) noted that, "Federal law does not mandate high-interest loans for those who don't pay their bills. They are simply predatory."

Among the many community, religious, and government officials and health care professionals who testified were **Lt. Governor Pat Quinn** and **Michael Russell** of Jubilee Faith, ELCA.

### INSIDE:

Class Action Lawsuit .................................... 2
General Assembly Task Force ...................... 3
Immigrant and Refugee Health Care ........... 3
Lutheran General Residents Win ................. 4
Lakeview Action Coalition ........................... 5
Attorney General Launches Probe ............... 5
Advocate to Forgive ACORN Debt .............. 6



More than 100 people attended the hearing.

2

## WHO WE ARE

The Hospital Accountability Project is a research and advocacy initiative working to improve health care in Chicago by making quality, affordable health care available to everyone.

The project is improving health care by organizing consumers, the community, and caregivers to have a voice in holding hospitals accountable to their non-profit, charitable mission.

## OUR PROJECT IS

**Winning a voice for consumers** by making affordable health care available to everyone by eliminating discriminatory pricing and predatory collection practices that disproportionately impact the uninsured.

**Winning a voice for the community** by holding hospitals accountable and responsive to the needs of the community by providing charity care and other community benefits that equal its tax subsidies and by disclosing important hospital quality measures to the public.

**Winning a voice for caregivers** by ensuring the delivery of quality care by creating a free and fair union election process for nurses and other health care workers to win a voice in patient care decisions and workplace conditions.

The Hospital Monitor is published by the Hospital Accountability Project, SEIU.

40 North Wells
Third Floor
Chicago, IL 60606
(312) 541-9566
fax: (312) 541-9650
www.hospitalmonitor.org



# Class Action Lawsuit Repayment to Uninsured Patients

*Landmark Suit Could Change the Way Illinois Hospitals Do Business*



Attorneys Thomas Geoghegan and Scott Frankel filed a class action lawsuit in the Cook County Circuit Court today alleging that Advocate Health Care, the largest provider of medical services in Cook County, violates the law by overcharging its uninsured patients and shirking its responsibilities for free and reduced cost medical care expected in exchange for its tax breaks.

As a tax-exempt religious and charitable institution, Advocate is obligated to provide free care to people who cannot afford treatment. Instead, Advocate charges the uninsured two or more times more than it expects insurance companies to pay for treatment. "Non-profit hospitals are expected to provide free care in exchange for generous tax breaks, not overcharge the uninsured," said Geoghegan.

The lawsuit, filed on behalf of seven plaintiffs and other uninsured patients treated at Advocate's eight Chicago-area hospitals, charges that these practices violate the Illinois Consumer Fraud and Deceptive Practices Act and demands repayment of all monies unjustly collected from the uninsured. In addition to repayment, the lawsuit is seeking to prohibit Advocate from overcharging the uninsured and from pursuing collections and legal action against these individuals. The suit also asks the court to require that Advocate implement a meaningful charity care program. "If successful, the suit would not only refund overcharges, but also change the way hospitals do business with the uninsured," said Geoghegan.

The lawsuit seeks to provide relief and assistance to uninsured patients like **Tiffany Montgomery**. Montgomery recently decided to declare bankruptcy after the hospital's wage garnishment left her struggling to pay for rent and food. Montgomery was sued by Advocate Bethany Hospital for $3,338.

If Montgomery was insured, the insurance company would have paid approximately $1,500. The hospital seized more than $300 a month from her paycheck as a food industry worker. To date, she has paid nearly $2,300. "I offered to pay $100 a month because that's what I could afford, but that wasn't enough for the hospital's attorney. They didn't offer me any financial assistance or any relief whatsoever."

The patients' attorneys said that the total number of persons in the class and the total amount of compensatory and punitive damages will become known during the discovery stage of the suit. "The number of exploited patients could be in the thousands because Advocate is the leading private provider of health care to the uninsured in our community," according to attorney Frankel.

3

# Coalition fights for immigrant and refugee health care needs

*Groups tell Advocate "to stop price gouging before more of our constituents become victims"*

CHICAGO—Local immigrants, advocates, community leaders and elected officials testified about their difficulties in navigating the health care system at a Town Hall Meeting on Immigrant and Refugee Health Care Needs August 19. The meeting was organized by the Illinois Coalition for Immigrant and Refugee Rights (ICIRR), an alliance of more than 130 public and private organizations advocating with and on behalf of immigrants and refugees throughout Illinois.

Rosario and Sergio Cruz, unemployed and uninsured immigrants, shared their story of trying to rebuild their lives after Rosario's severe throat infection led to an emergency admission at Illinois Masonic Hospital. Rosario received a bill for $6,000, but later learned that an insurance company—which negotiates large discounts— would have only had to pay Illinois Masonic about $2,000 for the same

services. "Advocate says that they offer charity care, but all they offered me was an inflated bill that I have no way to pay." As a result, Rosario and Sergio were sued by Advocate.

The Cruz's were in a situation faced by many of Chicago's uninsured immigrants.

The Hospital Accountability Project released a report on the impact of discriminatory pricing and predatory collections on Chicago's Latino community. The report found that Advocate Health Care:

- charged the uninsured in Latino neighborhoods 41% more for treatment than other hospitals in Cook County; and
- aggressively sued debtors from Latino neighborhoods, filing 400 lawsuits seeking nearly $4 million in 2001.



Rosario and Sergio Cruz

After the Town Hall meeting, numerous advocacy groups—including Project IRENE, Citizens Health Organization, Centro Sin Fronteras, Apna Ghar, Cambodian Association of Illinois, Coalition of African Service Providers, Korean American Community Services, Logan Square Neighborhood Association, and Access Living— send letters of protest to Advocate Health Care calling on it "stop price gouging before more of our constituents become victims."

# General Assembly Task Force hears from Latino patients

*Rep. Osterman raises concerns with Advocate executives*



Vanessa Cristiani

CHICAGO—State legislators held the first hearing of the Illinois Joint Legislative Task Force on Immigrants and Refugees, co-chaired by State Representative Harry Osterman (D-14) and State Senator Martin Sandoval (D-12) on Sept. 15. The first hearing focused on the problems immigrants and refugees face accessing affordable health care. Several Latino victims of Advocate Health Care's discriminatory pricing and predatory collections testified about their experiences. Lulu Galvez-Galvan of the National

Council of United Latinos also spoke out against Advocate's price-gouging.

"I had a miscarriage at Advocate Illinois Masonic. Only a couple of weeks after losing my baby, we began receiving bills demanding full payment of $14,000," said Vanessa Cristiani, an Argentinean immigrant who testified at the hearing. "They wanted us to pay $4,000 up front and $300 per month. My husband works at a restaurant and I am a Spanish teacher. This bill was almost half our yearly income. It was a very confusing and painful time for us."

At the hearing, Rep. Osterman,

task force co-chair, informed attendees that he sent Advocate Health Care a letter of inquiry formally requesting the hospital chain reconsider the legal actions that had been taken against Vicente Mendez, Rosario Cruz, and Maximiliano Chavez.

Rep. Osterman and a representative from ICIRR met with Advocate executives Oct. 1 to discuss Advocate's charity care and debt collection practices. Shortly after the meeting, Rep. Osterman learned that the cases against the three people he inquired about had been dismissed. Rep. Osterman has committed to keep working to ensure that all immigrants have access to affordable health care at Advocate hospitals.

**4**

# Lutheran General residents win union after three-year struggle

*Congresswoman Schakowsky calls on CEO to stop delays and bargain in good faith*

After nearly three years, the residents at Advocate Lutheran General Hospital in Park Ridge overcame management threats, intimidation, harassment and legal delays and won a voice in how they deliver care. On Oct. 29, the National Labor Relations Board (NLRB) ruled that hospital objections to the doctors forming a union were groundless, and certified **Physicians for Responsible Negotiation** (PRN) as the doctors' representative.

The anti-union campaign began in 2000 when **Meetul Shah**, a resident and a leader of the organizing drive, was threatened by a manager and told "you might soon be without a job" if he continued to encourage coworkers to stand together. Other illegal acts soon followed, including:

- Threatening to close the residency program if doctors voted to form a union;
- Threatening loss of pay and benefits if the residents organized;
- Discriminating against union supporters; and
- Threatening to delay collective bargaining even if they won an election.

After the NLRB found probable cause to believe Advocate violated the law, Lutheran General agreed to post a notice saying it would refrain from future illegal activity. That did not, however, stop Advocate's campaign.

Soon after the union election, hospital attorneys Seyfarth and Shaw—the leading anti-union law firm in Chicago—filed multiple appeals, motions and requests for re-hearing that delayed the counting of ballots from December 8, 2000 until September 15, 2003. "They fought tooth and toenail every step of the way," said Mark Flaherty, General Counsel of PRN. "But their most effective strategy was to use their considerable financial resources to cause legal delays."

---

> *"They fought tooth and toenail every step of the way."*

---

When the vote count showed that the doctors overwhelmingly voted in favor the union, the hospital attorneys immediately filed "objections" to the election, which were overturned by the NLRB in October. The doctors are now waiting for Advocate to begin negotiations.

**U.S. Representative Jan Schakowsky**, whose district includes Lutheran General, is calling on Advocate to stop further delays. In a recent letter to Advocate CEO Jim Skogsbergh, Schakowsky wrote, "After a three-year delay in counting the ballots and determining the outcome of the election, I hope that Advocate will now bargain and move forward in good faith."

"The anti-union campaign was just a tremendous waste of health care resources," said Jill Poznik, chief operating officer of PRN during the organizing drive. "It's just distasteful to be wasting so much money, time and energy fighting something that would only benefit the hospital and the patients. A better quality of life and a voice for the residents would mean better care for the patients."

## A Free and Fair Election Process

Since January, 2003 Advocate has been actively working to persuade registered nurses and other employees against forming a union. Tactics include anti-union memos mailed to employees' homes, showing anti-union videos during work time, captive audience meetings, one-on-one meetings between employees and supervisors, and illegal surveillance of union meetings. Advocate has also hired consultants to conduct trainings on union avoidance techniques for front-line supervisors.

The Hospital Accountability Project is calling on Advocate Health Care to respect the right of its employees to decide whether or not they want to form a union by agreeing to a Code of Election Conduct which establishes ground rules for management and the union during the organizing process.

The conduct agreement includes a secret ballot election and allows both management and the union an equal opportunity to communicate fair and factual information in an atmosphere free from intimidation and coercion.

These types of agreements have been successfully implemented at the largest hospital chains in America, including Catholic Healthcare West, HCA and Tenet. Copies of these agreements are available by calling 312.541.9566x10.

5

# Lakeview Action Coalition ELCA and UCC pastors speak out to stop predatory collections at Advocate Illinois Masonic

Concerned about Advocate Illinois Masonic's treatment of the uninsured, the **Lakeview Action Coalition** (LAC), the largest community organization in the area, began studying the issue last year.

"Illinois Masonic is an elephant in our neighborhood and we have heard questions about whether it takes more than it gives back to the community," said **Matt Moreland-Gross**, executive director of LAC, a coalition of 41 churches and other organizations. Research shows that Illinois Masonic is the leading price gouger of the uninsured and the leading predatory bill collector in Cook County.

"These practices directly violate the teachings of our God, who said, 'whatever you do to these, the least of my brothers and sisters, you do to me,'" said **Patrice Stearly**, former chair of LAC's Church Council and a member of **Wellington United Church of Christ.**

Wellington, along with several other

UCC and Evangelical Lutheran Church in America congregations, which sponsor Advocate, met with Ken Rojek, CEO of Illinois Masonic and demanded the hospital:

■ Provide a copy of Advocate's revised charity care guidelines along with implementation procedures.

■ Provide two seats on Illinois Masonic's Charity Care Committee, one for a representative of the UCC/ELCA clergy and one for the community representative from LAC.

■ Suspend all debt collection lawsuits.

Along with representatives of the **Wellington Church**, clergy from **Resurrection Lutheran Church, Holy Trinity Lutheran Church, Lakeview Lutheran Church, Lutheran Church of St. Luke, Bethlehem UCC,** and UCC clergy from the **Night Ministry** attended the meeting.

"We heard what has happened to our neighbors like **Luis Martinez**, who was hounded and sued by Illinois



One hundred religious leaders called on Advocate Health Care to honor its mission, which is "guided by the principles of justice," and end discriminatory pricing. A sign-on letter was published in the *Chicago SunTimes* Aug. 17 and was signed by Rev. Jesse L. Jackson, Rev. James T. Meeks, Rev. Isaac Singleton, Rev. Addie L. Wyatt, Rev. Dr. Robert C. Reynolds, Rev. Walter "Slim" Coleman, and Rev. Christopher L. Pierson, among many others.

Masonic to pay inflated bills," said Rev. **Barb Bolsen**, president of the LAC and head of the UCC Night Ministry. "It is wrong for a non-profit, Christian hospital to go after the working poor. It must stop."

To date, Advocate Illinois Masonic has not responded to the requests.

## Attorney General launches probe of hospital price gouging

Responding to recent reports about price gouging and predatory collections by Advocate Health Care and other hospitals, Attorney General Lisa Madigan opened an inquiry into hospital billing practices Oct. 23. The investigation will determine whether the practice of charging the uninsured substantially higher prices than third-party health plans is illegal.

"Not only are some hospitals apparently charging

exorbitant rates, but they allegedly are using aggressive collections tactics that may force some Illinois residents to choose between health care and saving their lives," said Madigan. The Attorney General issued subpoenas to Advocate Health Care and nine other hospitals or health systems to determine the extent of the problem.

The investigation comes on the heels of an inquiry launched Oct. 22 by the Illinois Senate's Health and Human Services Committee, led by Senator Barack Obama.



**Hospital Accountability Project**
Service Employees International Union
40 North Wells
Third Floor
Chicago, IL 60606

PreSorted Standard
US Postage
P A I D
Permit No. 7060
Chicago, Illinois

6

# Federal Agency Says OK to Ending Price Gouging

Advocate Health Care claim that federal regulations prevent it from stopping the practice of charging the uninsured more than it charges insurance companies for the same treatment. This summer, however, the federal government approved a plan to end discriminatory pricing by HCA, the largest hospital chain in the nation.

HCA's plan automatically provides free care to anyone below 200% of the federal poverty level, and institutes an automatic sliding scale for patients earning between 200% and 400% of the federal poverty level.

Advocate's new charity care policy, which also offers discounts for individuals up to 400% of the federal poverty level, differs from HCA's automatic discount plan. Under Advocate's policy, the determination of whether or not a patient receives free care or any discount at all is left to hospital administrators' discretion. In fact, nearly 99% of the over 200 patients interviewed by the Hospital Accountability Project who met Advocate's criteria were either denied or not offered charity care by Advocate. Under the HCA plan, these patients would receive an automatic discount.

Federal approval of HCA's plan by the Centers for Medicare and Medicaid Services (CMS) means that Advocate can immediately offer meaningful relief to the uninsured by ending discriminatory pricing. For copies of the CMS approval letter, please call 312.541.9566x10.

# Advocate executives promise to forgive ACORN debts

ACORN met with Advocate executives in August to discuss Christ Medical Center's pricing and collections practices and to request relief for ACORN members unjustly sued by the hospital.

At the meeting, Advocate outlined its new charity care policy and promised to provide charity care retroactively to Hazel Haynes, Miriam Zaghlul, and other debtors present. ACORN also requested that Advocate publicize its new charity care policies, but the Advocate executives were not willing to distribute information that would make the hospital "a magnet for the uninsured."

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LISA REED and MARY McDOWELL, on behalf of themselves and all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | No. 06 C 3337 |
| v. | ) ) ) | Hon. John F. Grady |
| ADVOCATE HEALTH CARE, et al. | ) ) ) | |
| Defendants. | ) ) | |
| JANET SCHULTZ, on behalf of herself and all others similarly situated, | ) ) ) ) | |
| Plaintiff, | ) ) | No. 06 CV 3569 |
| v. | ) ) ) | Hon. John F. Grady |
| EVANSTON NORTHWESTERN HEALTHCARE, et al. | ) ) ) | |
| Defendants. | ) ) ) | |

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR ENTRY OF PROTECTIVE ORDER

This case is one of four putative class action lawsuits pending across the country in which hospitals and health care systems are alleged to have conspired to exchange compensation information and depress the wages paid to registered nurses ("RNs") in violation of the federal antitrust laws. It is also the latest episode in a continuing campaign by the Service Employees International Union ("SEIU") to organize RNs at Defendants' hospitals.

Plaintiffs and Defendants agree on the need for a protective order because discovery will entail the production (particularly by Defendants) of competitively-sensitive and proprietary business information. Despite the parties' best efforts, however, one issue relating to the terms of the protective order remains unresolved and, as Plaintiffs' brief ("Mem.") suggests, requires the Court's intervention.[1]  This memorandum of law is submitted on behalf of Defendants Advocate Health Care Network ("Advocate"), Children's Memorial Hospital, Evanston Northwestern Healthcare, Resurrection Health Care ("Resurrection"), and University of Chicago Hospitals in opposition to Plaintiffs' motion for a protective order.  Defendants request the Court to enter the proposed protective order attached as Exhibit 1.

The only remaining issue to be resolved is the scope of the limitations placed on James & Hoffman ("J&H") to access confidential documents that could be used to further the SEIU's ongoing efforts to unionize hospitals, including both Defendants' hospitals and those of their competitors in the metropolitan Chicago area.  Defendants believe that the protective order must restrict J&H's access to documents that could be used to compromise the Defendants' labor relations interests.  Defendants' concerns arise from the facts that the two attorneys representing Plaintiffs in these actions – David Dean and Mary Joyce Carlson – represent or have represented the SEIU; that another partner at J&H serves as general counsel to the SEIU; that the SEIU financed the investigation culminating in this lawsuit, provided the lead plaintiff, participated in the announcement of the filing of the complaint, and is financially supporting the ongoing litigation; that J&H, a firm with no established antitrust practice and which receives at least 13% of its revenue from the SEIU, sought to become and is serving as Co-Lead Plaintiffs' Counsel in

---

[1] Plaintiffs' brief states that the parties disagree about four provisions. Mem. at 1-2. Since Plaintiffs' motion was filed, however, the parties have resolved their disagreement over the issues relating to Paragraphs 1, 9, and 10 of the protective order. Defendants' proposed protective order, which is attached as Exhibit 1, incorporates the parties' agreement on those paragraphs.

these cases; that the SEIU is currently engaged in "corporate campaigns" to unionize hospitals in various parts of the country, including at least one of the Defendants in this case (Advocate); that one of the named Plaintiffs, Lisa Reed, has taken an active role for over two years in the SEIU's campaign to unionize Advocate's hospitals; and that Plaintiffs have already requested confidential business and personnel information that the SEIU could use in organizational campaigns.

<u>**Argument**</u>

I.    **Plaintiffs' Lawsuit is a Trojan Horse for the SEIU's Corporate Campaigns Against, and Organizing Efforts at, the Defendant-Hospitals.**

Since early 2003, the SEIU has waged a "corporate campaign" against Advocate.[2]  The SEIU had sought Advocate's agreement to permit the SEIU to organize Advocate's nurses and other employees without opposition by Advocate.  The SEIU sought to bypass National Labor Relation Act procedures for certification by election as the bargaining representative of units of Advocate employees.  Advocate refused to agree to the SEIU's request.

To coerce Advocate into agreeing to its request, the SEIU has waged a public relations, media, and legal campaign against Advocate.[3]  This campaign has included tactics – such as the publication of disparaging articles and studies, vexatious litigation, attempts to thwart capital

---

[2] A "corporate campaign" is a tactic some unions use to coerce an employer to enter into a "neutrality" or "cooperation" agreement with the union, whereby the employer agrees not to contest union efforts to represent employees without the union being selected as such by a majority of bargaining unit members after a fair and open election.  Employers who refuse to enter into such agreements are targeted for attacks and harassment.  The union's goal is to inflict a "death by a thousand cuts" until the employer capitulates.  *See* http://www.hospitalmonitor.org/resources_links.htm (containing links to the SEIU's campaigns against Yale-New Haven Hospital and Sutter Health).

[3] One of the named Plaintiffs in this lawsuit, Lisa Reed, has played an active role in this campaign.  In January 2005, she attended a meeting between Advocate's CEO and U.S. Representative Jan Schakowsky on behalf of the SEIU.  *See* Group Exhibit ("Ex.") A (newsletter entitled "ACT Now!," in which Ms. Reed is pictured on page 1) in the separately bound appendix filed contemporaneously with this brief. Additional SEIU publications featuring Ms. Reed are included in Group Exhibit A.

projects, patient steering, and public rallies and picketing directed against Advocate – which are

wholly unrelated to typical labor union concerns about wages and conditions of the workers the

SEIU seeks to organize.    A cursory review of the SEIU's campaign against Advocate

demonstrates the potential for misuse of confidential information produced in this litigation.

    The SEIU has published and disseminated numerous articles and "studies" whose

principal purpose is to attack Advocate's reputation.[4]  For example, the SEIU has published:

- Newsletters and "studies" characterizing Advocate as a greedy oppressor of patients by not giving enough charity care,[5] attacking Advocate for "price gouging" and discriminating against Hispanics,[6] and accusing Advocate of racial discrimination in its allocation of resources among the hospitals in its system;[7] and

- Brochures accusing Advocate of being unfair to employees and attacking Advocate for opposing the SEIU, some of which feature plaintiff Lisa Reed.[8]

---

[4] One of the SEIU's main organs of publication is the "Hospital Monitor," which is published in print and on the internet at www.hospitalmonitor.org, both of which are dedicated to "monitoring" Advocate.

[5] Attached as Group Exhibits B through I are publications entitled "Uninsured & Overcharged, How Advocate Health Care Overcharges Chicago Hospital Patients" (June 2003), "The Myth of Charity Care at Advocate Hospitals" (August 2003), "Insult to Injury, Hospital Debt and Aggressive Collection Practices by Advocate Hospitals" (November 2003), "Neglecting Taxpayer Health, How Advocate Health Care's $40 Million Community Benefits Shortfall Hurts Chicago" (October 2004), *Hospital Monitor* (Winter 2003), *Hospital Monitor* (Summer 2003), *Hospital Monitor* (Late Summer 2003), and *Hospital Monitor* (Fall 2004), respectively.

[6] Attached as Group Exhibit J is a publication entitled "Impact of Discriminatory Pricing on Latinos in Chicago" (August 2003).

[7] Attached as Group Exhibits K and L are publications entitled "Separate & Unequal, Racial Redlining in Investment at Advocate Hospitals" (December 2004) and "Double Standard of Care, How Advocate Health Underserves Urban Chicago Communities" (March 2005), respectively.  An SEIU videotape, "Separate and Unequal," in which plaintiff Lisa Reed appears, was also disseminated and can be made available to the Court.  *See also* http://www.hospitalmonitor.org/video/bethany.wmv (video attacking Advocate for decision to convert Bethany Hospital to long-term acute care center).  Ms. Reed is photographed and quoted in support of this accusation of racial discrimination on page 9 of Group Exhibit K.

[8] Attached as Group Exhibit M is a publication entitled "Faith in Action" (August 2004), which features Lisa Reed prominently on page 12.  Ms. Reed is also pictured in a group photograph on page 1 of Group

(continued...)

The SEIU has supported vexatious litigation against Advocate. For example:

- The SEIU is underwriting a putative class action lawsuit, *Cristiani v. Advocate*, No. 2003 L 014635, pending in the Circuit Court of Cook County, which accuses Advocate of, *inter alia*, violating the Illinois Consumer Fraud Act and breaching hospital-patient contracts by not giving sufficient charity care to patients and by not giving uninsured patients the same discounts negotiated with high-volume insurers such as Blue Cross. The SEIU recruited most or all of the plaintiffs in *Cristiani*, and Advocate believes that the SEIU picked the plaintiffs' lawyers and is financing the suit. SEIU is also promoting the suit publicly. *See* Ex. F (Winter 2003 *Hospital Monitor*). The SEIU told Advocate that the suit would end if Advocate were to enter into a neutrality agreement.

- The SEIU and its allies filed suit in April 2006 to try to block the construction of a new Bed Tower at Lutheran General Hospital. The lawsuit is pending.

- The SEIU caused the filing of an administrative complaint with the United States Department of Health and Human Services accusing Advocate of racial discrimination in its allocation of capital resources. *See* Ex. N (Winter 2005 *Hospital Monitor*).

- The SEIU has provided its in-house lawyers as defense counsel to patients against whom Advocate had filed state court actions to collect unpaid hospital charges. *See* Ex. O ¶¶ 14, 24-33, 44-67. The SEIU's desire to harass Advocate is illustrated by its statements to Donald Fenwick, a defendant in a collection action that Advocate had agreed to dismiss. *See id.* ¶¶ 44-67. According to Mr. Fenwick, the SEIU falsely accused Advocate of lying to him and of intending to trick him into a default judgment in order to seize his house. The SEIU's purpose was to attack Advocate's reputation and increase its litigation expenses.

The SEIU also has vigorously opposed Advocate's applications for approval from regulatory bodies for important capital projects through which Advocate could fulfill its mission of providing health care to the communities it serves. Examples include:

- The SEIU and its allies appeared in 2004 at public hearings by the Health Facilities Planning Board to oppose Advocate's application to build a new hospital in Tinley Park. *See, e.g.*, Ex. P (Spring 2004 *Hospital Monitor*).

---

Exhibit I (*Hospital Monitor* (Fall 2004) regarding "Faith in Action") and appears as a speaker in an SEIU videotape titled "Untie My Hands So I Can Do God's Work."

- The SEIU lobbied the Illinois Finance Authority in the spring of 2005 to oppose Advocate's application for issuance of $225 million of tax-exempt bonds in order to refinance at favorable interest rates debt for hospital capital projects.

- The SEIU organized objectors to appear at five public hearings of the Health Facilities Planning Board between April 2003 and October 2005 to oppose Advocate's applications to: build a new Cancer Center at Lutheran General Hospital; build a new Intensive Care Unit at South Suburban Hospital; expand the Intensive Care Unit at Good Samaritan Hospital; expand the Emergency Department at Good Shepherd Hospital; and build a new Bed Tower at Lutheran General Hospital.

- The SEIU and its allies organized numerous activities to oppose Advocate's application to close the seriously underused Labor/Delivery and Mental Health wards at Bethany Hospital in order to facilitate the conversion of Bethany to a Long-Term Acute Care facility, which is badly needed in the community Bethany serves.    *See, e.g.*, http://www.hospitalmonitor.org/video/bethany.wmv (video attacking Advocate for decision to convert Bethany).

Utilizing a different corporate campaign tactic, the SEIU has encouraged, and sometimes transported, uninsured patients to Advocate emergency rooms. The SEIU's purpose is not to help the patients (who in many cases can go to closer free clinics or emergency rooms), but to burden Advocate and to force it to bear an unequal share of charity care as compared with other hospitals. Examples include:

- The SEIU and its allies bussed patients long distances (some from western suburbs) to Advocate Illinois Masonic's emergency room on Chicago's north side. These patients presented cards (issued by an SEIU surrogate) at the emergency room that purported to state that they had already been pre-qualified to receive free care.

- The SEIU and its allies have gone to other hospital emergency rooms to urge patients to go to an Advocate ER instead. For example, Advocate learned that the SEIU encouraged patients waiting in the ER at Stroger Hospital to leave the ER and go to Advocate Bethany Hospital instead.

Finally, the SEIU has staged or supported public rallies and picketing campaigns making several of the allegations summarized above (*e.g.*, that Advocate oppresses the uninsured, skimps on charity, and engages in racial redlining). *See* Ex. Q. The SEIU has even caused picketers to target the private homes of Advocate officers, including Dr. Lee Sacks, Advocate's Executive

Vice President and Chief Medical Officer, Carol Schneider, President of Advocate Christ

Medical Center, and Ken Rojek, an Advocate Vice President, and to appear at fundraising events

held by Advocate hospitals, including one in May 2006, at which protestors attempted to block

the entrance with hospitals beds, wheelchairs, and IV poles.[9]

## II.    The Protective Order Should Include a Provision Allowing Defendants To Shield Certain Confidential Information from Disclosure to Plaintiffs' Counsel Who Represent the SEIU or Other Labor Organizations.

District courts can enter protective orders "for good cause shown." Fed. R. Civ. P. 26(c).

This Court has held that "good cause" exists if unions can use information in their organizational

activities. *See, e.g., Jennings v. Peters*, 162 F.R.D. 120, 123 (N.D. Ill. 1995) (Grady, J.); *see also*

*Pease v. Production Workers of Chicago and Vicinity Local* 707, No. 02 C 6756, 2003 U.S. Dist.

LEXIS 14751, at *26-31 (N.D. Ill. Aug. 22, 2003).   It has also prohibited disclosure of

confidential information to counsel involved in litigation if "there is an unacceptable risk of or

opportunity for 'inadvertent disclosure' of confidential information." *Autotech Techs. Ltd.*

*P'ship v. AutomationDirect.com, Inc.*, 237 F.R.D. 405, 407 (N.D. Ill. 2006) (citation omitted).[10]

---

[9] Advocate is not the only target of a union's attempt to organize at Defendants' hospitals.  In the fall of 2002, the American Federation of State, County and Municipal Employees ("AFSCME") began attempting to organize various Resurrection Health Care employees.  Later in 2003, AFSCME sent a letter to Resurrection requesting a dialogue to help employees unionize.  Resurrection responded that employees had a right to use the National Labor Relations Board should they want to unionize.

[10] The balancing test to determine the risk of inadvertent disclosure that is advanced by Plaintiffs in their memorandum is materially incomplete because it omits an important factor:  the nature of the claims asserted.  Indeed, the principal cases on which Plaintiffs rely all discuss this factor.  *See Autotech*, 237 F.R.D. at 411 (citing *U.S. Steel Corp. v. United States*, 730 F.2d 1465, 1468 (Fed. Cir. 1984), and *Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1470 (9th Cir. 1992)).  Not surprisingly, this factor strongly supports denying J&H access to Defendants' confidential information because this antitrust claim involves precisely the type of confidential information, such as employees' contact and wage information, that could be used outside the litigation to jeopardize Defendants' labor or employee relations interests.

In this case, Defendants' proposed protective order provides for two levels of protection: "Confidential" and "Highly Confidential." (Ex. 1, ¶¶ 1, 5, 6.) Within each level of confidentiality, the parties have agreed to another layer of protection, to provide that certain Confidential or Highly Confidential Information is "Not To Be Disclosed to Union Counsel." Defendants' proposed Protective Order would prohibit the disclosure of documents or information bearing that designation to any counsel of record who currently represents or, during the past five years, has represented the SEIU or any other labor organization in a matter in which the labor organization was adverse to a hospital or health care system (like the Defendants). Defendants intend to use this designation selectively and do not seek this additional protection to inhibit Plaintiffs' ability to prosecute their claims in this case. (Indeed, twenty lawyers from eight law firms other than J&H have filed appearances on behalf of Plaintiffs, most or all of whom would have full access to any "no union counsel" documents.) Rather, this provision is necessary to ensure that certain discovery – such as the names and contact information of Defendants' RNs or sensitive information about RN compensation – is not disclosed to the SEIU, which is backing this lawsuit and others like it, and is currently trying to unionize Defendants' hospitals. This designation will protect Defendants against the risk that the SEIU will obtain access to competitively sensitive or private information that it may use to advance its unionization efforts.

Plaintiffs contest neither a separate designation of "Not to be Disclosed to Union Counsel" nor the inclusion of documents that "would compromise or jeopardize the Producing Party's competitive business or labor or employee relations interests or the privacy interests of the Producing Party's employees" in that designation. (Ex. 1, ¶ 1d.) Rather, the parties disagree about the access of J&H to documents bearing this designation. Given J&H's close relationship

with the SEIU, the protective order must preclude J&H's access to documents that the SEIU could use to compromise Defendants' employee and labor relations interests.

**A.    The SEIU is Actively Supporting the Nurse Wage Fixing Litigation.**

Plaintiffs admit that the SEIU played a "critical role" in the genesis and "offers ongoing support" of these lawsuits. (Carlson Decl. ¶ 12.) In particular, the SEIU initially engaged J&H to investigate potential hospital collusion on nurse wages (which it apparently was able to do without access to Defendants' confidential information). (*Id.* ¶ 13.)[11] The SEIU then referred potential plaintiffs to J&H. (*Id.* ¶ 14.) Now, the SEIU is paying J&H "a reduced fee for its work on the suits and for certain expenses." (*Id.* ¶ 15.)

**B.    J&H Has a Close Relationship to the SEIU.**

The SEIU accounted for about 13 percent of J&H's billings in 2005, not including retainers paid to partner Judith Scott and "of counsel" Mary Joyce Carlson. (Carlson Decl. ¶ 11.) Ms. Scott serves as the SEIU's full-time general counsel, works out of the SEIU's headquarters (*id.* ¶ 10), and has an email address of "scottj@seiu.org." *See* Ex. T.

The SEIU also has a "long term retainer[]" for the services of Ms. Carlson to advise the its Health Care Division. (Carlson Decl. ¶ 11) Ms. Carlson is referred to as "Counsel" or "Special Counsel" to the Health Care Division (*id.*¶ 5)[12] and uses an office part time at and receives support from the SEIU's headquarters. (*Id.* ¶ 6.) Ms. Carlson has: negotiated national agreements on the SEIU's behalf with a Defendant in this case, Doctors Community Healthcare

---

[11] *See also* Ex. R (press release describing the SEIU's involvement in the investigation and filing of the complaints). In news articles, Daniel Small, co-counsel for the named Plaintiffs, also described the SEIU's role in this lawsuit. *See* Ex. S. Specifically, Mr. Small stated that his firm was assisted by the SEIU, which purportedly uncovered facts leading to this lawsuit.

[12] *See also* http://www.jamhoff.com/JHProfCarlson.shtml, attached as Group Exhibit U (Ms. Carlson's firm biography).

Corporation (*id.*); given advice on the SEIU's or its Chicago local's organizing, bargaining, and legislative activities directed toward other (unspecified) health care facilities in the Chicago area (*id.* ¶ 7); and even attended meetings where SEIU officials considered whether or not to engage in organizing or bargaining activities at health care facilities in Chicago. (*Id.* ¶ 8.)

David Dean has been involved in SEIU disputes with HCA Inc., a defendant in the nurse wage fixing case in San Antonio. *See* Ex T. He has also represented the Health Care Division of the SEIU in the past. (Carlson Decl. ¶ 11.) Mr. Dean is listed in reported cases as having represented the SEIU. *See, e.g., Local 144, Hotel, Hospital, Nursing Home & Allied Services Union v. Stern*, 165 F.3d 14 (2d Cir. 1998).[13]

Given its lack of antitrust expertise and its broad representation of the SEIU, it is difficult to conceive of a legitimate purpose for J&H to obtain access to documents that might compromise Defendants' competitive business and labor relations interests. Even assuming that confidential information produced in this litigation were not inadvertently disclosed to the SEIU, given the nature of J&H's interlocking relationship with SEIU, its modest size (13 total attorneys), and its labor and employment practice, it would be implausible to expect that information gathered during the course of this litigation could be effectively shielded from legal and strategy work that J&H performs for the SEIU. "'[I]t is very difficult for the human mind to compartmentalize and selectively suppress information once learned, no matter how well-

---

[13] In the parallel nurse wage fixing case pending in Albany, New York, the Magistrate Judge accepted the defendants' position that Ms. Carlson should be precluded from access to confidential information designated as "Not To Be Disclosed To Union Counsel," but allowed Mr. Dean to have access to those materials, provided that steps are taken to create "fire walls" to prevent their disclosure to unauthorized J&H firm members and employees. *See* Ex. V (order entered in *Marjory Unger v. Albany Medical Center, et al.,* No. 06-CV-765 (N.D.N.Y. Oct. 26, 2006). Because the SEIU is more actively and directly engaged in corporate and organizational campaigns in Chicago than it is in Albany, however, this Court should deny Mr. Dean access to confidential information that is designated as "Not To Be Disclosed To Union Counsel."

intentioned the effort may be to do so.'" *IJR, Inc. v. Sodick, Inc.*, No. 87 C 6326, 1987 WL

26105, at *2 (N.D. Ill. Nov. 24, 1987) (quoting *FTC v. Exxon Corp.*, 636 F.2d 1336, 1350 (D.C.

Cir. 1980)); *see also Autotech*, 237 F.R.D. at 410 ("Once [an attorney] learns of the confidential

information, it would be manifestly impossible for him to perform the mental gymnastic of

putting the information out of his consciousness and making competitive decisions independent

of that information.").

Recognizing this problem, Plaintiffs have already walled off Ms. Scott and propose that

Ms. Carlson will not advise the SEIU during an SEIU organizing or bargaining campaign at any

hospital whose confidential information she reviews in this litigation. (Mem. at 2.)  However,

Plaintiffs propose no limitations on Mr. Dean's access to such information even though there is

no principled basis for distinguishing in the protective order between Ms. Carlson and Mr. Dean.

Both attorneys work at a law firm with strong ties to the SEIU, and both personally represent the

SEIU.  Although he characterizes it as "de minimis," Mr. Dean concedes that he has been

involved in SEIU matters concerning Chicago health care and has represented the SEIU in

bargaining and organizing campaigns.  *See* Ex. T.  Unlike Ms. Carlson, Mr. Dean has not

promised to refrain from advising the SEIU with regard to any matter directly concerning the

Defendants in this case in future organizing or bargaining activities. (Mem. at 2; Carlson Decl. ¶

8.)[14]  These facts concerning Mr. Dean were not before the court in Albany and render the

Magistrate Judge's ruling as to his involvement distinguishable from this case.

---

[14] Even the narrowly crafted promise by Ms. Carlson "to refrain from advising the SEIU with regard to
any matter directly concerning" the Defendants "during any SEIU organizing or bargaining campaign"
during the litigation and for one year thereafter is troubling.  It says nothing about the potential use of the
Defendants' confidential information in corporate campaigns against the Defendants (like Advocate) or
organizing campaigns of other hospitals in the metropolitan Chicago area.  *See, e.g., Interactive Coupon
Mktg. Group, Inc. v. H.O.T. Coupons, LLC*, No. 98 C 7408, 1999 U.S. Dist. LEXIS 12437, at *11 (N.D.
Ill. Aug. 9, 1999) (granting motion for protective order where "careful wording" of counsel's affidavit
(continued...)

Plaintiffs argue that neither Ms. Carlson nor Mr. Dean serve in the role of a "traditional in-house counsel to the SEIU" and, therefore, the restrictions sought by Defendants are unwarranted. (Mem. at 13.) Nothing in the case law suggests that a protective order must be limited to in-house counsel.[15]

Restricting J&H's access to selective documents designated "Not To Be Disclosed to Union Counsel" will not interfere with Plaintiffs of choice of counsel or prejudice Plaintiffs' ability to prosecute their claims. (Mem. at 7.) Twenty other attorneys from eight other law firms have appeared on behalf of Plaintiffs in this case. Thus, even if J&H does not have access to a limited subset of documents designated "Not To Be Disclosed To Union Counsel," Plaintiffs' other attorneys will have access to those documents, can establish their litigation strategy, and can prosecute Plaintiffs' claims accordingly.

### Conclusion

The tight relationship between J&H and the SEIU, which has a vested interest in this litigation, coupled with the SEIU's ongoing, aggressive efforts to unionize hospitals, including both Defendants' hospitals and those of their competitors in the Chicago area, justify this Court's restriction of J&H's access to confidential documents that could be used to compromise Defendants' competitive and labor relations interests. Accordingly, Defendants request that the

---

convinced the court "of nothing other than that the concerns raised by [the defendant] have not been answered").

[15] *See, e.g., Andrx Pharms., LLC v. GlaxoSmithKline, plc,* 236 F.R.D. 583, 587 (S.D. Fla. 2006) (denying outside counsel access to confidential information in spite of offer to erect a "Chinese Wall" between himself and the rest of his firm because he was a member of a small firm of ten attorneys and two other law firms represented the plaintiff); *Motorola, Inc. v. Interdigital Tech. Corp.,* No Civ.A. 93-488-LON, 1994 WL 16189689 (D. Del. Dec. 19, 1994) ("Access to confidential information 'should be denied or granted . . . without regard to whether a particular counsel is in-house or retained.'"), *quoting U.S. Steel,* 730 F.2d at 1469.

- 12 -

Court deny Plaintiffs' Motion and enter Defendants' proposed protective order attached as

Exhibit 1.

Dated: October 27, 2006                    Respectfully submitted,


By:  /s/ Anthony T. Eliseuson            By:  /s/ Edward W. Feldman
     One of the Attorneys for Defendant       One of the Attorneys for Defendant
     University of Chicago Hospitals          Advocate Health Care

Margo Weinstein
Natalie J. Spears
Richard L. Marcus                        Michael L. Shakman
Robert T. Joseph                         Edward W. Feldman
Anthony T. Eliseuson                     Diane F. Klotnia
SONNENSCHEIN NATH &                      Thomas M. Staunton
ROSENTHAL LLP                            MILLER SHAKMAN & BEEM LLP
7800 Sears Tower                         180 North LaSalle Street
233 S. Wacker Drive                      Suite 3600
Chicago, Illinois 60606-6404            Chicago, Illinois 60601
(312) 876-8000                           (312) 263-3700
(312) 876-7934 (fax)                     (312) 263-3270 (fax)


By:  /s/ David Marx, Jr.                 By:  /s/ Martin T. Tully
     One of the Attorneys for Defendant       One of the Attorneys for Defendant
     Resurrection Health Care                 Children's Memorial Hospital

David Marx, Jr.                          Martin T. Tully
David L. Hanselman, Jr.                  David H. Kistenbroker
Amy J. Carletti                          Laura Keidan Martin
McDERMOTT WILL & EMERY LLP               KATTEN MUCHIN ROSENMAN LLP
227 West Monroe Street                   525 West Monroe Street
Chicago, Illinois 60606-5096            Chicago, Illinois 60661-3693
(312) 372-2000                           (312) 902-5200
(312) 984-7700 (fax)                     (312) 902-1061 (fax)

                                         James J. Calder
                                         KATTEN MUCHIN ROSENMAN LLP
                                         575 Madison Avenue
                                         New York, New York 10022-2585
                                         (212) 940-8800
                                         (212) 940-8776 (fax)

By:___/s/ Timothy F. Haley_____
    One of the Attorneys for Defendant
    Evanston Northwestern Healthcare

Timothy F. Haley
Scott A. Schaefers
SEYFARTH SHAW LLP
55 East Monroe Street
Suite 4200
Chicago, Illinois 60603-4205
(312) 346-8000
(312) 269-8869 (fax)

Robert E. Bloch
MAYER, BROWN, ROWE & MAW LLP
1909 K Street, N.W.
Washington, D.C. 20006
Phone: (202) 263-3203

Andrew S. Marovitz
Jonathan L. Lewis
MAYER, BROWN, ROWE & MAW LLP
71 S. Wacker Dr.
Chicago, Illinois 60606
Phone: (312) 782-0600

## CERTIFICATE OF SERVICE

I, Amy J. Carletti, an attorney of record in this case, hereby certify that, on this 27th day of October, 2006, I caused a copy of the foregoing instrument to be served electronically upon all counsel listed on the attached Service List pursuant to the Court's General Order on Electronic Case Filing and by first-class United States mail, postage pre-paid, upon the following:

**Counsel for Plaintiffs Lisa Reed and Mary McDowell**

David P. Dean
Mary Joyce Carlson
James & Hoffman
1101 17th Street, N.W.
Suite 510
Washington, DC  20036

Daniel E. Gustafson
Jason S. Kilene
Gustafson Gluek PLLC
650 Northstar East
608 Second Avenue South
Minneapolis, MN  55402

Mark A. Griffin
Raymond J. Farrow
Keller Rohrback L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA  98101

Michael P. Lehmann
The Furth Firm LLP
225 Bush Street
15th Floor
San Francisco, CA 94104

Arnold Levin
Charles E. Schaffer
Levin, Fishbein, Sedran & Berman
510 Walnut Street, Suite 500
Philadelphia, PA  19106

**Counsel for Children's Memorial Hospital**

James J. Calder
Katten Muchin Rosenman LLP
575 Madison Avenue
New York, NY  10022

_____/s/ Amy J. Carletti_____
Amy J. Carletti

- 15 -

**Service List**
Reed v. Advocate Health Care, et al., No. 06 CV 3337 (N.D. Ill.)
Schultz v. Evanston Northwestern Healthcare, et al., No. 06 CV 3569 (N.D. Ill.)

**Counsel for Plaintiffs Lisa
Reed and Mary McDowell**

Joseph M. Vanek
Scott A. Ruksakiati
David P. Germaine
Vanek, Vickers & Masini, P.C.
225 West Washington Street
18th Floor
Chicago, IL 60606

Daniel A. Small
Charles P. Tompkins
Allyson B. Baker
Cohen, Milstein, Hausfeld &
    Toll, P.L.L.C.
1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, DC 20005

Thomas P. Dove
Kimberly A. Kralowec
Furth Lehmann & Grant LLP
225 Bush Street, 15th Floor
San Francisco, CA 94104

Marvin A. Miller
Miller Faucher and Cafferty LLP
30 North LaSalle Street, Suite 3200
Chicago, IL 60602

**Counsel for Plaintiff
Janet Schultz**

Lawrence Walner
Aaron R. Walner
Lawrence Walner & Associates,
Ltd.
150 North Wacker Drive
Suite 2150
Chicago, IL 60606

**Counsel for Advocate
Health Care Network**

Michael L. Shakman
Edward W. Feldman
Diane F. Klotnia
Thomas M. Staunton
Miller Shakman & Beem LLP
180 North LaSalle Street
Suite 3600
Chicago, IL 60601

**Counsel for Evanston
Northwestern Healthcare**

Timothy F. Haley
Scott A. Schaefers
Scott A. Carlson
Molly M. Joyce
Richard L. Reinish
Seyfarth Shaw LLP
131 South Dearborn Street
Suite 2400
Chicago, IL 60603

Robert E. Bloch
Mayer, Brown, Rowe & Maw LLP
1909 K Street, N.W.
Washington, DC 20006

Andrew S. Marovitz
Jonathan L. Lewis
Mayer, Brown, Rowe & Maw LLP
71 South Wacker Drive
Chicago, IL 60606

**Counsel for Children's
Memorial Hospital**

Martin T. Tully
David H. Kistenbroker
Laura Keidan Martin
Katten Muchin Rosenman LLP
525 West Monroe Street
Chicago, IL 60661

**Counsel for Michael Reese
Medical Center Corporation
and Doctors Community
Healthcare Corporation**

Tom Y. Mandler
Tom H. Luetkemeyer
Hinshaw & Culbertson LLP
222 North LaSalle Street
Suite 300
Chicago, IL 60601

Eric A. Todd
Stinson Morrison Hecker LLP
100 South Fourth Street
Suite 700
St. Louis, MO 63102

**Counsel for University of
Chicago Hospitals**

Richard L. Marcus
Robert T. Joseph
Margo L. Weinstein
Natalie J. Spears
Anthony T. Eliseuson
Sonnenschein Nath &
    Rosenthal LLP
7800 Sears Tower
233 South Wacker Drive
Chicago, Illinois 60606

CHI99 4739138-1.037442.0097

- 16 -

# EXHIBIT 5

```
1              UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF NEW YORK
2    ------------------------------------
     MARJORY UNGER, on behalf of       Docket No. 06-CV-00765-TJM-DRH
3    herself and all others
     situated,                         Albany, New York
4                                       January 23, 2007
                          Plaintiff,
5
6                    v.
7    ALBANY MEDICAL CENTER et al,
8                          Defendants.
     ------------------------------------
9          TRANSCRIPT OF STATUS/DISCOVERY CONFERENCE
            BEFORE MAGISTRATE-JUDGE DAVID R. HOMER
10               UNITED STATES DISTRICT JUDGE

11   A P P E A R A N C E S :

12   For the Plaintiff:   MICHAEL RHODES-DEVY, ESQ.
                          Of Counsel to Towne Law
13                        Office of Michael Rhodes-Devey
                          P.O. Box 15072, 7 Wembley Court
14                        Albany, New York 12212-5072
                          518-452-1800
15                        518-452-6435 fax
                          Email: DeveyLaw@aol.com
16
17   For the Plaintiff:   DANIEL A. SMALL, ESQ.
                          Cohen, Milstein Law Firm
18                        1100 New York Avenue, N.W.
                          West Tower, Suite 500
19                        Washington, DC 20005
                          202-408-4600
20                        202-408-4699 fax
                          Email: dsmall@cmht.com
21
     For the Plaintiff:   ALLYSON B. BAKER, ESQ.
22                        Cohen, Milstein Law Firm
                          1100 New York Avenue, N.W.
23                        West Tower, Suite 500
                          Washington, DC 20005
24                        202-408-4600
                          202-408-4699 fax
25                        Email: abaker@cmht.com
```

Marjory Unger v. Albany Medical Center et al                    7

 1  the best we can.  But that's the way it's going to end up.
 2          There are several issues that have been raised by the
 3  parties and non-parties in letters to the Court.  I would
 4  propose to take first the issues between -- I believe it's --
 5  Defendants Seton Health and the National and Local Union with
 6  respect to the subpoenas first and then address the disputes
 7  between the parties.  With respect to the Seton Health
 8  subpoenas, I'll hear from Seton Health first.
 9          MR. SHUMAKER:  Your Honor, Michael Shumaker --
10          THE COURT:  You're going to have to pull the
11  microphone as close as you can.
12          MR. SHUMAKER:  Michael Shumaker of Jones Day on behalf
13  of Seton Health.  Can you people hear me?
14          THE COURT:  Don't worry about them.
15          MR. SHUMAKER:  Your Honor, as I'm sure you saw from
16  the papers, Seton Health has served subpoenas duces tecum on the
17  SEIU.
18          THE COURT:  Let's start with the National.  How does
19  this Court have jurisdiction?
20          MR. SHUMAKER:  This Court has jurisdiction --
21          MR. WEINBERG:  Your Honor, I don't want to be rude but
22  I can't -- if anybody's speaking, I can't hear it.  It's Bob
23  Weinberg from the SEIU.
24          THE COURT:  Well, we're doing our best.
25          MR. WEINBERG:  Well, thank you.

Case 1:06-cv-00765-DRM-DRH   Document 94 (Court only)   Filed 04/06/2007   Page 56 of 64

Marjory Unger v. Albany Medical Center et al                    8

```
 1              THE COURT:  Go ahead.

 2              MR. SHUMAKER:  Your Honor, the subpoenas were issued

 3     both out of this Court as well as from the District of Columbia.

 4              THE COURT:  The one to the Local was issued out of

 5     this Court?

 6              MR. SHUMAKER:  Yes.

 7              THE COURT:  The one for the National was issued out of

 8     the District of Columbia.

 9              MR. SHUMAKER:  Yes, Your Honor.

10              THE COURT:  That's the one I'm asking you about.

11              MR. SHUMAKER:  Okay.  The Court does not have

12     jurisdiction over the subpoena issued out of the DDC.

13              THE COURT:  All right.

14              MR. SHUMAKER:  There is no question about that.  What

15     the Court does have jurisdiction over is Local 1199.  And the

16     SEIU tends to use as a corporate formality to not comply with

17     its obligation under the federal rules.  The standard is --

18              THE COURT:  It's not often I hear defense counsel

19     talking about corporate formalities.

20              MR. SHUMAKER:  Understood, Your Honor.  But this is

21     the situation where the SEIU, both the National and the Local,

22     worked together to bring this case and to recruit Named

23     Plaintiffs.  The documentation is very clear on that.  It would

24     seem that if they're going to work together to bring this case,

25     they should be treated as one with respect to their obligations
```

Marjory Unger v. Albany Medical Center et al                    9

1    in responding to discovery.

2         There are a number of cases out there that what is

3    important is actual and constructive control over the documents.

4    They have the ability to control the documents and the ability

5    to share information and they worked together to bring this

6    case.  It would seem that fairness would dictate that they have

7    control over the documents relating this entire investigation

8    that led to this.

9         THE COURT:  But everything else about the two entities

10   suggests that they are separate; separate constitutions,

11   separate bylaws, separate offices, separate locations, separate

12   everything.

13        MR. SHUMAKER:  And I do not dispute that.  And there

14   are a number of cases, Your Honor, where people have made the

15   similar argument usually in a parent subsidiary context.  Once

16   the courts say that if the subsidiary and the parent work

17   together with respect to a transaction that is an issue in the

18   litigation, they will determine they have constructive notice

19   over the documents held by the parent.  We would submit that the

20   same situation applies here.

21        If Local 1199 worked with this entity to bring this

22   case, they should be treated as one with respect to this case.

23   At a minimum, this Court has jurisdiction over Local 1199.

24        THE COURT:  Well, let's start with the minimum then

25   because I'm not inclined to find a unity here where the Local

Marjory Unger v. Albany Medical Center et al          10

```
1    would be dictating what documents are produced by the National.
2    And you do have a remedy with respect to your subpoena to the
3    National.
4               MR. SHUMAKER:  Absolutely.  And we will follow through
5    with that.  We just felt that given that we had Your Honor's
6    attention here on the 23rd that we would bring the issue before
7    you.
8               THE COURT:  I understand.  Let's talk about the Local.
9               MR. SHUMAKER:  With respect to the Local, they have
10   raised a number of objections; over breadth, undue burden,
11   Section 7, Constitution.  When you cut through the hyperbole and
12   numerous objections, at the end of the day what we do have is
13   the Union admitting that they have "massive amount of material"
14   relating to nursing compensation and nursing recruiting.
15              THE COURT:  We're still focused on class certification
16   here, so this is not matched discovery.
17              MR. SHUMAKER:  I understand.  And what the discovery
18   seeks to get at is to what extent is the SEIU driving this case.
19   We have knowledge --
20              THE COURT:  Let's assume that they're driving it.
21              MR. SHUMAKER:  Okay.
22              THE COURT:  So what?
23              MR. SHUMAKER:  The fact that they are driving this
24   case suggests that the representative of this class is not a
25   proper representative.  If you look at the case law, there is
```

Marjory Unger v. Albany Medical Center et al          30

1    the Complaint --

2              MR. SHUMAKER:  Okay.  And I --

3              THE COURT:  -- period.  That's going to pare down the

4    scope of you demand.

5              MR. SHUMAKER:  I understand that, and I believe that

6    the other information that's being sought with respect to the

7    Union's role in bringing this case.  Documents relating to what

8    is it we're going to do, how are we going to move on this to

9    develop this action, is relevant to --

10             THE COURT:  I understand your position.  We talked

11   about it before and in my view that the relevancy of the Union's

12   involvement in bringing this law suit class certification is

13   non-existent.  The relevancy with the Union's involvement with

14   particular named putative class representatives is relevant.  I

15   am told that that's already been disclosed, so I've moved onto

16   other issues.  I don't want to go back and revisit the other

17   ones.

18             MR. SHUMAKER:  The other issue that pops in my head,

19   Your Honor, is the identity of the other individual that they

20   contacted and potentially serviced as a class of

21   representatives.

22             THE COURT:  Who declined?

23             MR. SHUMAKER:  Yes, Your Honor.

24             THE COURT:  How is that relevant?

25             MR. SHUMAKER:  It would seem that that would suggest

Marjory Unger v. Albany Medical Center et al          31

1    that their -- the fact that they decide who is or who is not an

2    adequate representative to be relevant to determine whether this

3    individual is in fact an adequate representative.

4           THE COURT:  Well, in my view, the only relevants are

5    the people who are actually named and you're entitled to

6    discovery regarding them.  Anybody who might have been wooed and

7    declined, who offered themselves and were rejected, it's

8    irrelevant at this point.

9           All right, so far I'm going to order two things -- oh,

10   one has already been produced; information regarding Ms. Unger,

11   and communications between the Local and Ms. Unger.  And the

12   second, I'm going to direct the Union to produce wage

13   information -- documents setting forth wage information for

14   nurses during the period alleged in the Complaint.  You don't

15   have to do it more than once, but you do have to produce

16   complete information regarding that.

17          MR. SHUMAKER:  Can I make one additional request, Your

18   Honor?

19          THE COURT:  Yes.

20          MR. SHUMAKER:  Documentation that would relate to

21   whether it's profitable -- whether it can be brought -- the

22   class action can be brought to the extent documents of that

23   (inaudible).  For example; if there's an internal discussion

24   among the SEIU individuals that we can bring a class action

25   (inaudible).  That was of particular relevance to whether they

UNITED STATES DISTRICT COURT
OF THE DISTRICT OF COLUMBIA

CIVIL DIVISION

| | | |
|---|---|---|
| Oakwood Healthcare Inc., | : | |
| Petitioner, | : | |
| vs. | : | Case No. 1:07-mc-00458 (HKK/AK) |
| Service Employees International Union, | : | |
| Respondent. | : | |

## ORDER DENYING SERVICE EMPLOYEE'S INTERNATIONAL UNION'S MOTION FOR RECONSIDERATION

Having considered Service's Employee's International Union's ("SEIU") Motion for

Reconsideration and Oakwood Healthcare, Inc.'s ("Oakwood") Opposition, the Court denies

SEIU's motion.  The Court orders the SEIU to comply forthwith with Magistrate Judge Kay's

December 14, 2007 Memorandum Opinion.

Dated: _____, 2008

IT IS SO ORDERED:

_____
Judge Henry H. Kennedy
UNITED STATES DISTRICT COURT JUDGE