**UNITED STATES DISTRICT COURT**
**OF THE DISTRICT OF COLUMBIA**

_____

| | |
|---|---|
| Oakwood Healthcare, Inc., | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | )    Case No. 1:07-mc- |
| | )    00458-HHK |
| | ) |
| Service Employees International Union, | ) |
| | ) |
| Respondent. | ) |

_____)

**REPLY MEMORANDUM BY THE SERVICE EMPLOYEES INTERNATIONAL**
**UNION IN SUPPORT OF MOTION FOR RECONSIDERATION OF MAGISTRATE**
**JUDGE'S ORDER GRANTING MOTION TO COMPEL**

**INTRODUCTION**

At issue here is the subpoena served by Oakwood Healthcare, Inc. ("Oakwood") on the

Service Employees International Union ("SEIU") requiring the production of documents related

to SEIU's involvement in lawsuits filed outside of Detroit and against hospital systems other

than those sued in the instant lawsuit.  Magistrate Judge Kay granted Oakwood's motion to

compel compliance with the subpoena on the ground that the documents sought "could assist

Oakwood in demonstrating that *the SEIU* had an improper motive" in its participation in the pre-

filing investigation leading to the filing of this lawsuit – and the four other nurse wage antitrust

lawsuits – and in continuing to provide financial assistance to one of the law firms that represents

the plaintiffs in these lawsuits.  Order (d/e 6) at 6 (emphasis added).

In our motion for reconsideration, we argued that this decision was due to be reversed for

three reasons:  (i) Rule 23's adequacy requirement focuses on whether the Named Plaintiffs or

their counsel have interests that are adverse to the class, not whether there is a conflict between

the motivations of a *third party* and the class; (ii) the Magistrate Judge's ruling is inconsistent with a ruling of the court in the related nurse wage antitrust case filed in Albany, New York, which court was presented with this very question; and (iii) the Magistrate Judge's ruling is contrary to the First Amendment right of advocacy organizations to use class-action lawsuits to further social and economic justice goals.

Oakwood responds to the motion for reconsideration by abandoning its initial argument that the motivations of a *third party* are relevant to the Rule 23 analysis. Now, Oakwood contends that its discovery of SEIU's actions outside the jurisdiction where this lawsuit was filed and against other hospital systems is proper because SEIU is the "real party in interest" in the *Cason-Merendo* lawsuit. The Named Plaintiffs and their counsel are, according to Oakwood, "merely a conduit" for using this lawsuit to achieve SEIU's interests. *See* Oakwood Opp. to Mot. for Reconsideration (d/e 10) at 6. As we now show, this revised argument, which was not presented to the Magistrate Judge below, is due to be rejected.

## ARGUMENT

### A.    The Motivations of a Third Party Are Not Relevant to the Rule 23 Analysis

1.      As we argued in our opening memorandum, the Magistrate Judge's ruling is clearly erroneous because it improperly shifts the Rule 23 adequacy analysis from a determination of whether there is a conflict between the interests of the Named Plaintiffs or their counsel with the interests of the putative class to whether the interests of a third party conflicts with the interests of the class. This decision runs counter to the plain language of Rule 23 of the Federal Rules of Civil Procedure, for even if the discovery revealed that the SEIU's involvement in other lawsuits was part of an ulterior motive to "exhaust [other] employers resisting unionization," Oakwood Mem. in Support of Mot. to Compel (d/e 1) at 9; Oakwood Opp. to

Mot. for Reconsideration (d/e 10) at 8-9 (quoting SEIU Contract Campaign Manual), the Rule 23 adequacy analysis would still remain – namely, will the Named Plaintiffs and their counsel serve this interest rather than the interests of the class they seek to represent.  *See* SEIU Mem. in Support of Mot. for Reconsideration (d/e 9-3) at 4-7.

As to that question, the only proper discovery would be the discovery that Oakwood has *already* taken regarding relationship between SEIU and the Named Plaintiffs and counsel for the Named Plaintiffs.  *See id.* at 5-7.[1]  There can be no dispute that Oakwood has been afforded a full opportunity to conduct discovery on those issues that are central to the Rule 23 analysis. Moreover, Oakwood has also taken discovery of SEIU regarding the extent to which SEIU is using *this lawsuit* to organize the hospitals named as defendants in this action and the full scope of SEIU's role in the investigation that led to the filing of this lawsuit.  *See id.*

By granting the motion to compel discovery of documents that have no connection to whether the Named Plaintiffs or their counsel will be adequate representatives of the class, the Magistrate Judge ignored the clear requirements of Rule 23.  Therefore, his ruling is clearly erroneous and should be reversed.

2.      Further support for this reading of Rule 23's requirements is found in the on-point ruling by the Albany court in response to a motion to compel filed by the defendants in the nurse wage antitrust case filed in that jurisdiction.  Specifically, the Albany defendants moved to compel discovery in order to establish the "extent . . . the SEIU [is] driving this case" and to show that this lawsuit "is really part and parcel of a strategy of the Union to unionize employees."  Transcript at 10, 20, *Unger v. Albany Med. Ctr.*, No. 06-CV-0765 (N.D.N.Y.) (Jan.

---

[1] This discovery included a subpoena duces tecum, four days of Rule 30(b)(6) testimony, the deposition of five current or former SEIU employees, and two depositions of consultants that had been retained by the SEIU.

23, 2007) (attached as exhibit 4 to SEIU Mem. in Support of Mot. for Reconsideration).  From

those facts, the Albany defendants, like Oakwood here, sought to show that the "class

representative is a pawn for the SEIU."  *Id.* at 11.

      a.     The Albany court squarely rejected the defendants' arguments that the

motivations of a third party, standing alone, are relevant to the Rule 23 adequacy analysis:

> Court:     You're suggesting that because the Union may have a different
> motive, the individually named plaintiffs make improper
> representatives. If I accept that argument, there are no proper
> representatives.
>
> MR. SHUMAKER [Counsel for Defendants]: That's not what I'm saying. I'm
> saying that we have the ability to look into whether in fact that
> representative has interests so in line with the Union that they
> cannot serve the proper representative.
>
> THE COURT: Well, then you need to -- the discovery regarding the particular
> individual Plaintiffs may be relevant.
>
> MR. SHUMAKER: Okay.
>
> THE COURT: Discovery regarding the Union's purposes generally is not.

Tr. at 20-21; *see also id.* at 30 ("[T]he relevancy of the Union's involvement in bringing this law

suit [to] class certification is non-existent."); *id.* at 32 (holding that "impure thoughts on behalf

of non parties" are "irrelevant" to the adequacy determination).  For those same reasons,

Oakwood's discovery into SEIU's conduct that has no connection to the "particular individual

plaintiffs" is not relevant to the Rule 23 adequacy analysis, and the Magistrate Judge's ruling,

which fails to address this decision, is clearly erroneous.

      b.     Rather than address the substance of the Albany Court's ruling, Oakwood

contends that the Magistrate Judge was correct to ignore this ruling because the motion to

compel challenging the scope of the subpoena presented solely the question of whether

"discovery to individuals who declined SEIU Local 1199's request to serve as named plaintiffs"

was proper. Oakwood Opp. (d/e 10) at 11. Oakwood's position is belied by the transcript from

that hearing. In fact, the issue that Oakwood contends was the subject of the motion to compel

arose only *after* the Albany court rejected the defense counsel's effort to seek discovery to show

that the lawsuit "is really part and parcel of a strategy of the Union to unionize employees."

Specifically, on page 30 of the transcript, defense counsel argues that "[t]he *other* issue that pops

in my head, Your Honor, is the identity of the other individual that they contacted and potentially

serviced as a class of representatives." Tr. at 30 (emphasis added). Accordingly, Oakwood's

argument that it was correct for the Magistrate Judge to ignore the ruling by the Albany court in

a companion nurse wage antitrust lawsuit is without merit.

**B.      Oakwood's New Argument That Its Subpoena Is Proper Because SEIU is the Real Party In Interest Fails**

      1.      The Discovery of the Named Plaintiffs Makes Clear That There is No Connection Between the Named Plaintiffs and the SEIU

Oakwood's revised argument that SEIU is the real party in interest and that the Named

Plaintiffs in this lawsuit "have no identity or knowledge separate and distinct from the SEIU,"

*see* Oakwood Opp. (d/e 10) at 6, fails because the discovery Oakwood relies upon reveals that

the Named Plaintiffs were not selected by the SEIU, are not members of the SEIU, and have no

connection to the SEIU and, thus, presents no basis to conclude that the Named Plaintiffs would

choose to serve SEIU's interests over those of the class.

      a.      In its motion to compel, Oakwood argued that its subpoena sought proper

discovery under Rule 23 because "SEIU was responsible" for finding the plaintiffs in this case.

*See* Oakwood Mem. (d/e 1) at 6. As we explained in our response to the motion to compel and

in our motion for reconsideration, this contention is unfounded and belied by the discovery

defendants have taken of the Named Plaintiffs in this matter.

In addition to the plaintiffs' responses to the defendants' interrogatories, which we cited in our motion for reconsideration, *see* SEIU Mot. for Reconsideration (d/e 9-3) at Exh. 3, the deposition of Mr. Suhre that Oakwood cited in its opposition makes clear that SEIU played no role in his decision to become a plaintiff in this lawsuit. In a portion of the deposition that Oakwood omitted from its opposition brief, Mr. Suhre testified that his decision to file the lawsuit was not a result of any communication with the SEIU but instead because of a conversation with the other Named Plaintiff, Pat Cason-Merendo. *See* Deposition of Jeffrey Suhre (Nov. 14, 2007) ("Suhre Depo.") at 26-27, 106-07 (attached as Exhibit 1). Mr. Suhre further testified that, at the time of his conversation with Ms. Cason-Merendo, he was unaware that the SEIU had had any involvement in the investigation leading to the filing of the lawsuit or that the SEIU was continuing to pay the expenses of one of the law firms representing the class. *See* Suhre Depo. at 43-44.

His deposition further makes clear that neither he nor the other Named Plaintiff are members of SEIU. Instead, they are members of a different labor organization, the California Nurses Association ("CNA"), *see id.* at 25, a union that Oakwood concedes is *in regular competition* with the SEIU to organize nurses across the country. *See* Oakwood Mem. (d/e 1) at 3 (identifying CNA as a "competing union"). Mr. Suhre has attended CNA-sponsored conferences and receives regular mailings from the National Nurses Organizing Committee, a group associated with CNA. *See* Suhre Depo. at 24-25, 87, 103. Thus, rather than being a "conduit" for fulfilling SEIU's interests, the Named Plaintiffs are instead closely affiliated with SEIU's rival.

    b.    Given that there is no support for its initial argument that its subpoena was proper because "SEIU was responsible" for the Named Plaintiffs joining the lawsuit or that there

is even any affiliation with SEIU, Oakwood is left to argue that the Named Plaintiffs are a "conduit" for serving SEIU's interests because (i) an SEIU local union sought to organize an Oakwood facility four years before the lawsuit was filed and (ii) Mr. Suhre testified that he is in favor of nurses organizing. *See* Oakwood Opp. (d/e 10) at 6. Oakwood's argument that this evidence supports its contention that Mr. Suhre seeks to use this lawsuit to organize nurses on behalf of SEIU is unpersuasive.

First, as set forth above, even if Mr. Suhre's motivation for bringing this lawsuit was to organize nurses – which, we show below, is a position not supported by his deposition – there is no reason to believe that he will take actions in the interests of SEIU as opposed to the competing union of which he is a member.

Moreover, Oakwood's argument regarding Mr. Suhre's motivations ignores Mr. Suhre's clear testimony to the contrary. In his deposition, defense counsel asked Mr. Suhre to explain what goals he hoped to achieve through this litigation. Mr. Suhre identified only two goals: (i) an end to collusive practices and (ii) that nurses would, as a result, receive the compensation they were denied because of that collusive behavior. When asked whether Mr. Suhre sought anything beyond compensation and ending collusion, Mr. Suhre said "No."

> Q: What are the goals that you have for this litigation?
> A: My goal is to seek economic justice for all class members.
> Q: What is economic justice, in your view?
> A: To be fairly compensated for all nursing wages.
> Q: Is compensation all that you seek, Mr. Suhre?
> A: I seek justice for all nurses in this class.
> Q: Is there something more to justice other than compensation, in your view, Mr. Suhre?
> A: To basically right the wrong that's been going for a long time.
> Q: Okay. And how would you right the wrong other than in the form of compensation, in your view?
> A: By not allowing collusion of healthcare systems to suppress our wages.
> **Q: Let me make sure I understand your testimony, Mr. Suhre. You want compensation and you want to end collusion, right?**

**A:  Correct.**
**Q:  Anything more than that?**
**A:  No.**

Suhre Depo. at 56-57 (emphasis added).  To be sure, Mr. Suhre did testify that he was in favor of

the unionization of nurses.  *See id.*  He did not state, though, that unionization was a goal he

sought through this lawsuit.  Oakwood's argument to the contrary falls in the face of his clear

testimony.[2]

> 2.    The Discovery Makes Clear That There Is No Basis to Conclude That the
>        Seven Law Firms Representing Plaintiffs Will Serve SEIU's Interests
>        Instead of the Class

Oakwood next argues that its broad discovery into SEIU's conduct directed at hospitals

other than those named in this lawsuit is proper because the Named Plaintiffs "lack[] sufficient

knowledge to serve any interest other than that of the SEIU and Named Plaintiffs' counsel, much

less have any control over Named Plaintiffs' counsel's prosecution of the action."  Oakwood

Mem. (d/e 10) at 5.  In other words, Oakwood argues that the counsel for the Named Plaintiffs

are making decisions regarding the prosecution of this lawsuit – and in particular the choice of

defendants in this lawsuit – to benefit SEIU's efforts to organize the nurses at the specific

hospitals that have been named as defendants in this action.  As with Oakwood's argument that

the Named Plaintiffs will serve SEIU's interests, the argument that counsel is acting at the

direction of the SEIU is similarly unavailing.

---

[2] Oakwood's argument relies upon artful questioning by defense counsel.  Mr. Suhre testified
that he sought "economic justice for all class members."  Suhre Depo. at 56.  After testifying
clearly that his goals for the lawsuit were limited to compensation and ending the collusive
practices of hospitals and nothing more, defense counsel asked whether unionization would be
"one way to reach economic justice."  Suhre Depo. at 57.  Mr. Suhre responded that he
"believe[s] that nurses collectively need to stand up together united."  *Id.*  From these two
answers, Oakwood attempts to establish that unionization is a goal for this litigation.  No
reasonable reading of Mr. Suhre's deposition supports that position.

In our opening memorandum, we argued that while SEIU is serving as a third-party payor of the expenses and fees of one of the seven different law firms that represent plaintiffs in this matter (James & Hoffman), there can be no dispute that SEIU has no relationship to any of the other law firms. This is not the case, therefore, where the third-party payor (SEIU) is providing the sole support for the litigation. Accordingly, to the extent that there is a "clear affiliation," as Oakwood describes, between SEIU and James & Hoffman that creates a conflict with the interests of the class, that conflict is cured by the "addition of new and impartial counsel." *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998). At no point has Oakwood provided any response to this argument.

And, indeed, declarations by counsel for the plaintiffs have made clear that SEIU has "never played any role . . . in directing or controlling" this litigation and "exerts no control over the attorneys prosecuting" those lawsuits, including the decision regarding in which markets lawsuits would be filed and who should be named as Defendants in each of those lawsuits. *See* Declaration of David P. Dean in Support of Plaintiffs' Supplemental Motion for Class Certification at ¶ 8 (attached as Exhibit 2); Declaration of Mary Joyce Carlson at ¶ 12 (attached as Exhibit 3). Accordingly, SEIU is not the client but is instead limited to the role of third-party payor. In that role, the District of Columbia Rules of Professional Responsibility make clear that SEIU is prohibited from interfering with the lawyers' relationship with their nurse clients. Specifically, those rules provide that an attorney receiving compensation from a third party for its representation of a client is prohibited from allowing the third party to "interfere[] with the lawyer's independence of professional judgment or with the client-lawyer relationship," and is precluded from sharing privileged "[i]nformation relating to [the] representation of [those plaintiffs]" with the third party. *See* D.C. Rules of Professional Responsibility Rule 1.8(c).

Oakwood has presented no evidence that would contradict these declarations or that the lawyers are violating their ethical obligations under the D.C. Rules of Professional Responsibility.  Accordingly, Oakwood's argument that the Named Plaintiffs and their counsel are merely a "conduit" for advancing SEIU's interests is without any support.

## CONCLUSION

For the foregoing reasons, the Magistrate Judge's ruling ordering discovery into conduct by the SEIU that is unconnected to the Named Plaintiffs or to the hospitals that are named as defendants in this action is clearly erroneous and should be reversed.[3]

Respectfully submitted,

_____ /s/ Matthew Clash-Drexler
Robert Weinberg (DC 085530)
Matthew Clash-Drexler (DC 477334)
Bredhoff & Kaiser, P.L.L.C.
805 15th Street, NW
Suite 1000
Washington, DC   20005
202-842-2600
202-842-1888 (fax)

---

[3] In its opposition to the motion for reconsideration, Oakwood complains that because of a protective order entered in the nurse wage antitrust lawsuit filed in Chicago, Oakwood is precluded from accessing the documents that SEIU has produced in that lawsuit concerning its conduct directed at defendant Advocate Health Care.  *See* Oakwood Opp. (d/e 10) at 8.  If it would resolve this dispute, SEIU has no objection to providing Oakwood with access to those documents.

# Exhibit 1

Page 1

1              UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF MICHIGAN

3                   SOUTHERN DIVISION

4    Pat Cason-Merenda and         Case No: 2:06-cv-15601

5    Jeffrey A. Suhre, on          Judge Gerald E. Rosen

6    behalf of themselves and

7    all others similarly situated,

8              Plaintiffs,        Class Action Complaint

9         v.

10   Detroit Medical Center; Henry Ford

11   Health System; Mount Clemens General

12   Hospital, Inc.; St. John Health;

13   Oakwood Healthcare, Inc.; Bon Secours

14   Cottage Health Services; William Beaumont

15   Hospital, and Trinity Health Corp.,

16             Defendants.

17   _____/

18        V I D E O    D E P O S I T I O N

19   DEPONENT:  JEFFREY A. SUHRE

20   DATE:      Wednesday, November 14, 2007

21   TIME:      9:03 a.m.

22   LOCATION:  Stephen F. Wasinger, PLC

23             32121 Woodward Avenue, Suite 300

24             Royal Oak, Michigan

25   REPORTER:  Michele E. French, CSR-3091, RMR, CRR

Jeffrey A. Suhre

November 14, 2007

Royal Oak, MI

| Page 22 | Page 24 |
|---|---|

**Page 22**

1 two meetings prior to the deposition, do you know
2 if they were produced in this case?
3     A   I'm not sure I understood what you're
4 asking.
5     Q   Okay.  Do you know if they were provided
6 to Defendants in this case?
7     A   I believe that they have been.
8     Q   Okay.  Have you spoken with anyone other
9 than counsel in preparation for your deposition
10 here today?
11     A   I'm not sure I understand.  Are you --
12     Q   Other than your counsel, have you spoken
13 with anyone else relating to your deposition here
14 today; people at work, neighbors?
15     A   I have identified that I had a
16 deposition --
17     Q   Okay.
18     A   -- with the various people, but the
19 number of people, I cannot know.
20     Q   Any substantive discussion with anyone
21 regarding what the testimony might be about or
22 what you might be asked?
23     A   No.
24     Q   Okay.  Did you mention to anyone in the
25 workplace that you were going to be deposed today?

**Page 23**

1     A   Yes.
2     Q   Who did you mention that to?
3     A   I had mentioned it to various people at
4 various organizations.
5     Q   When you say various people at various
6 organizations, what --
7     A   Nurse colleagues.
8     Q   Nurse colleagues.  And other
9 organizations would be other places where you're
10 serving as a nurse?
11     A   That's correct.
12     Q   Who at Providence Hospital did you
13 mention the deposition to?
14     A   There are quite a few people that I've
15 talked to, and I don't recall specific names.  One
16 person I have talked to has been Susan Craft.
17     Q   Okay.  And who is Susan Craft?
18     A   A registered nurse.
19     Q   What did you tell her?
20     A   That I had a deposition coming today.
21     Q   Okay.  Did she know what it related to?
22     A   Yes.
23     Q   And did she anything in response to your
24 telling her that you were going to be sitting for
25 a deposition today?

**Page 24**

1     A   What she said was, "I will pray for you."
2     Q   Okay.  Mr. Suhre, did you talk with any
3 consultant or experts that's been retained for
4 this case, relating to this deposition?
5     A   No, I have not.
6     Q   Have you ever spoken with any of the
7 experts or consultants hired by your counsel for
8 this case?
9     A   No, I have not.
10     Q   When was it that you first met any of the
11 attorneys that represent you in this case?
12     A   The first meeting I met with the
13 attorneys was in the beginning of October 2006.
14     Q   Who did you meet with?
15     A   I met with Mark Griffin and Steve
16 Wasinger, legal counsels.
17     Q   And how did you come to meet them?
18     A   I was contacted by the other Plaintiff on
19 this lawsuit, Pat Cason.
20     Q   Okay.  And how do you know Pat Cason?
21     A   Through various organizations I have
22 attended, conferences and meetings.
23     Q   What organizations?
24     A   I have attended organizations with the
25 Michigan Nurses Association, the National Nurses

**Page 25**

1 Organizing Committee, a branch of the California
2 Nurses Association.
3     Q   So these would be nursing unions?
4     A   I --
5         MR. GRIFFIN:  Objection, form.
6         BY MR. SHUMAKER:
7     Q   You can answer, sir.  Is it your
8 understanding that these are nurse unions?
9     A   They have that capacity.
10     Q   Are you a member of any of these unions,
11 sir?
12     A   I am a member of one organization, yes.
13     Q   Which organization?
14     A   The National Nurses Organizing Committee.
15     Q   And they are associated with the
16 California Nurses Association?
17     A   Yes.
18     Q   Do you know if Pat Cason is associated
19 with any of those organizations?
20     A   Yes.
21     Q   Which organization?
22     A   She's associated with the Michigan Nurses
23 Association and California Nurses Association and
24 I believe also MICHCANN.
25     Q   What is MICHCANN?

7 (Pages 22 to 25)

Jeffrey A. Suhre                                                    November 14, 2007

Royal Oak, MI

| Page 26 | Page 28 |
|---|---|
| 1   A   It's a healthcare -- | 1   A   I am interested in pursuing this class |
| 2   Q   It's a new one for me. | 2 action lawsuit as a point that nursing wages, |
| 3   A   It's a healthcare consortium, I believe. | 3 economically wages, are being suppressed. |
| 4   Q   How many times had you associated with | 4   Q   Was that a view you held prior to hearing |
| 5 Pat Cason before she called you? | 5 from Pat Cason? |
| 6   A   To the best of my knowledge, several | 6   (Interruption.) |
| 7 times. I couldn't give you a specific number. | 7   THE WITNESS: I'm sorry. I got |
| 8   Q   Okay. Before you -- before she called, | 8 distracted here. |
| 9 were you aware that there was consideration of a | 9   MR. SHUMAKER: I don't know what the |
| 10 lawsuit relating to allegations of a conspiracy to | 10 question was, either. Can you repeat the |
| 11 suppress nurse compensation? | 11 question. |
| 12   A   I don't know if I understood that | 12   MR. GRIFFIN: There was a disruption |
| 13 question. | 13 outside of the conference room. |
| 14   Q   Okay. Prior to Miss -- to Pat Cason | 14   THE WITNESS: I realize that. I heard a |
| 15 calling you, had you had an understanding that | 15 big bang and all of a sudden I turned back to see |
| 16 there was some consideration of people bringing a | 16 people running back. |
| 17 lawsuit against Detroit hospitals alleging a | 17   (Record read as follows: |
| 18 conspiracy to suppress nurse compensation? | 18   QUESTION: "Was that a view you held |
| 19   A   No. | 19 prior to hearing from Pat Cason?") |
| 20   Q   Okay. So this was the first you had | 20   THE WITNESS: Yes, it was. |
| 21 heard of it? | 21   BY MR. SHUMAKER: |
| 22   A   Yes. | 22   Q   And what was the basis for your view? |
| 23   Q   What did she say to you? | 23   A   Based on information I had through |
| 24   A   Pat Cason telephone called me asking if I | 24 various conversations with other nurses. |
| 25 would like to speak to some attorneys in regards | 25   Q   Okay. What -- what conversations with |

| Page 27 | Page 29 |
|---|---|
| 1 to collusion of nursing hospitals -- correction, | 1 nurses are you referring to? |
| 2 collusion of hospitals to suppress nursing wages. | 2   A   There has been a multitude of |
| 3   Q   Do you know how she had your contact | 3 conversations I have had with nurses through |
| 4 information? | 4 various organizations. |
| 5   A   From prior. | 5   Q   So these were some of the union |
| 6   Q   Okay. So you had communicated with her | 6 organizations we talked about earlier? |
| 7 over the phone? | 7   MR. GRIFFIN: Objection, form. |
| 8   A   Phone or in person. | 8   THE WITNESS: I have had some |
| 9   Q   Okay. What was the next step after you | 9 conversations in that environment, yes. |
| 10 heard from Pat Cason? I assume you said you were | 10   BY MR. SHUMAKER: |
| 11 interested; correct? | 11   Q   Okay. And in that environment, you're |
| 12   A   Yes, I was interested. | 12 referring to meetings or gatherings with other |
| 13   Q   And what was the next step? | 13 nurses who are interested in these union |
| 14   A   I called Steve Wasinger's office to find | 14 activities; correct? |
| 15 out more information. | 15   A   Yes. |
| 16   Q   Okay. When do you recall this occurring? | 16   Q   Can you identify any particular |
| 17   A   To the best of my knowledge, I recall it | 17 individual that you had these discussions with? |
| 18 happening there -- approximately two or three days | 18   A   There had been a multitude of people I |
| 19 before we met in the office. | 19 have discussed this with. |
| 20   Q   Okay. So in October 2000 -- | 20   Q   Okay. |
| 21   A   Late October -- I mean, I'm sorry, | 21   A   Specific names, I don't have working |
| 22 correction, late September, early October. | 22 knowledge of all the names that I have discussed |
| 23   Q   2006? | 23 this with. |
| 24   A   Correct. | 24   Q   Can you identify one person? |
| 25   Q   Why are you interested? | 25   A   I could possibly identify one person -- |

8 (Pages 26 to 29)

Jeffrey A. Suhre                                                                                November 14, 2007

Royal Oak, MI

Page 42

1  the -- you've asked for the retainer agreement.
2  We've produced it to you.
3      MR. SHUMAKER:  Understood.
4      MR. GRIFFIN:  You are now asking him
5  questions about discussions he had with counsel.
6  That's clearly protected by the attorney/client
7  privilege.
8      MR. SHUMAKER:  I'm simply asking if he
9  had a discussion, not what the substance of
10  the discussions.
11      MR. GRIFFIN:  You've established that he
12  had a meeting with myself and Steve Wasinger.
13      MR. SHUMAKER:  But I did not establish
14  whether he had a discussion about the conflict of
15  interest.
16      MR. GRIFFIN:  You're asking about the
17  specific topics that were -- that were covered in
18  a discussion with counsel.  That's an invasion of
19  the attorney/client privilege.
20      BY MR. SHUMAKER:
21      Q   Mr. Suhre, what is your understanding of
22  the potential conflict that is referred to on this
23  page DETPLTF00009?
24      A   May I have -- repeat that question again,
25  please.

Page 43

1          (Record read as follows:
2          QUESTION:  "Mr. Suhre, what is your
3  understanding of the potential conflict that is
4  referred to on this page DETPLTF00009?")
5          THE WITNESS:  I do not have a full
6  understanding of that conflict.
7      BY MR. SHUMAKER:
8      Q   Do you have any understanding?
9      A   These matters are of a legal nature that
10  I don't have a complete understanding of.
11      Q   Okay.  Is it your understanding that the
12  SEIU is partially funding this litigation?
13      MR. GRIFFIN:  Objection, form.
14      THE WITNESS:  I'm thinking this through
15  here.  It is my understanding that the SEIU has
16  some type of connection in this case.
17      BY MR. SHUMAKER:
18      Q   What is your understanding of what that
19  connection is?
20      A   My understanding is that it's of legal
21  matters that I am not completely sure of where
22  that goes.
23      Q   Okay.  When did you first become aware
24  that the SEIU was backing this litigation?
25      MR. GRIFFIN:  Objection, form.

Page 44

1          THE WITNESS:  I was aware that the SEIU
2  was involved with this litigation by the retainer
3  agreement I obtained.
4      BY MR. SHUMAKER:
5      Q   Was that the first time you learned of
6  that?
7      A   Yes.
8      Q   Okay.  When you had discussions with Pat
9  Cason when she first asked you if you might be
10  interested, was the support of the litigation by
11  the SEIU discussed in any way?
12      A   No, it was not.
13      Q   So the first you heard of it was when
14  this agreement was presented to you?
15      A   Yes.
16      Q   Am I correct that you knew what the SEIU
17  was?
18      A   I am aware that the SEIU is the Service
19  Employees International Union.
20      Q   And you knew that they organized nurses
21  throughout the country; is that fair to say?
22      A   I am aware that they have organized
23  nurses throughout the country.
24      Q   Have you ever had any connections with
25  the SEIU?

Page 45

1      A   I have only had conversations at
2  different conferences with people.
3      Q   People from the SEIU?
4      A   That were from the SEIU.
5      Q   Okay.
6      A   Names I do not specifically recall.
7      Q   Do you have any understanding of any
8  relationship between the Michigan Nurses
9  Association and the SEIU?
10      A   No, I do not.
11      Q   Have you -- can you recall any names of
12  any people you have spoken with at the SEIU?
13      MR. GRIFFIN:  Objection, asked and
14  answered.
15      THE WITNESS:  The names I have given are
16  previously stated.
17      BY MR. SHUMAKER:
18      Q   Okay.  The names you gave me previously
19  were from Michigan Nurses Association; correct?
20      A   Yes, some of those names are.
21      Q   Okay.  I don't recall you identifying
22  anyone associated with the SEIU.
23      A   I may have not named that specific
24  person, and I'm not sure that they are a member of
25  the SEIU or not.  I am not aware of that.

12 (Pages 42 to 45)

Jeffrey A. Suhre                                                                November 14, 2007

Royal Oak, MI



Page 54

1　Q　Okay. Do you know who did undertake a
2　pre-litigation investigation of the Complaint?
3　A　That information is something that my
4　attorneys have had and I have not been afforded
5　that information to me.
6　Q　Was the pre-litigation investigation and
7　the results of that investigation presented to you
8　prior to the filing of the Complaint?
9　A　I do not recall.
10　Q　Do you recall if the SEIU played any role
11　in the pre-litigation investigation of the
12　allegations in Complaint?
13　A　I have seen the Complaint as it's been
14　presented, but I don't recall the specifics of who
15　was in it.
16　Q　Why did you decide to become a Plaintiff,
17　Mr. Suhre?
18　A　I have been a professional licensed RN
19　for the State of Michigan for 17 years, and based
20　on current data that's out there in regards to
21　supply and demand, I am looking to seek justice
22　economically for all nurses in this class.
23　Q　Okay. And that information is what was
24　supplied to you by counsel; correct?
25　MR. GRIFFIN: Objection, form.

Page 55

1　THE WITNESS: I am a little bit confused
2　here for a second. Let me have that question
3　asked again, please.
4　(Record read as follows:
5　QUESTION: "Okay. And that information
6　is what was supplied to you by counsel; correct?")
7　THE WITNESS: Some of that information
8　was supplied to me, yes.
9　BY MR. SHUMAKER:
10　Q　And the other information was what we
11　referred to earlier and what was handed out to you
12　at the union meetings?
13　MR. GRIFFIN: Objection, form.
14　THE WITNESS: On that information, as it
15　has been previously stated.
16　BY MR. SHUMAKER:
17　Q　So the answer is yes?
18　MR. GRIFFIN: Objection, form.
19　THE WITNESS: Give me a minute here to
20　think. My attorneys have supplied some of that
21　information to me, yes.
22　BY MR. SHUMAKER:
23　Q　Did you have any animosity towards St.
24　John Hospital at the time you filed the Complaint,
25　Mr. Suhre?

Page 56

1　A　No, I do not.
2　Q　No animosity whatsoever?
3　A　No, I do not.
4　Q　Would you agree with me that you have a
5　number of performance issues at St. John Hospital?
6　A　Yes, I do.
7　Q　None of that played any role in your
8　decision to bring this case?
9　A　No, it has not.
10　Q　What are the goals that you have for this
11　litigation?
12　A　My goal is to seek economic justice for
13　all class members.
14　Q　What is economic justice, in your view?
15　A　To be fairly compensated for all nursing
16　wages.
17　Q　Is compensation all that you seek,
18　Mr. Suhre?
19　A　I seek justice for all nurses in this
20　class.
21　Q　Is there something more to justice other
22　than compensation, in your view, Mr. Suhre?
23　A　To basically right the wrong that's been
24　going on for a long time.
25　Q　Okay. And how would you right the wrong

Page 57

1　other than in the form of compensation, in your
2　view?
3　A　By not allowing collusion of healthcare
4　systems to suppress our wages.
5　Q　Let me make sure I understand your
6　testimony, Mr. Suhre. You want compensation and
7　you want to end collusion; correct?
8　A　Correct.
9　Q　Anything more than that?
10　A　No.
11　Q　Are you in favor of unionization of
12　nurses?
13　A　In my opinion, that is one form to use,
14　yes.
15　Q　Okay. So you believe that one way to
16　reach economic justice would involve unionization?
17　MR. GRIFFIN: Objection, form.
18　THE WITNESS: I believe that nurses
19　collectively need to stand up together united.
20　BY MR. SHUMAKER:
21　Q　Okay. So you are -- you are in favor of
22　the unionization of nurses; correct, Mr. Suhre?
23　MR. GRIFFIN: Objection, asked and
24　answered.
25　THE WITNESS: As previously stated, I

15 (Pages 54 to 57)

Jeffrey A. Suhre                                                    November 14, 2007

Royal Oak, MI

Page 86

1    Q    Do you recall when that conversation was?
2    A    To the best of my recollection, it
3  happened in the last few years. I couldn't give
4  you a specific date.
5    Q    Was it while you were working at Oakwood
6  through Criticore?
7    A    Yes.
8    Q    If you look at your response to this
9  interrogatory in Exhibit 5, Mr. Suhre, end of page
10  6, top of page 7, the reference to your
11  conversation with the SEIU shop stewards is
12  dropped. Do you know why?
13    A    Let me make sure I understand what you're
14  looking at here.
15    Q    Sure.
16    A    This is...just so I can get myself
17  clarified correctly, it was Response Number 8 on
18  Exhibit 3 to Response Number 8 on Exhibit 5?
19    Q    Yes, sir. And you'll see there's no
20  reference to your contact with shop stewards, and
21  my question simply is do you know why?
22    A    I do not know why.
23    Q    Okay. Did you make that change?
24    A    I did not make that change.
25    Q    Okay.

Page 87

1    A    I don't know who did.
2    Q    Sticking with Exhibit 5, which you have
3  verified and has your handwritten markings on it
4  and it's probably the most -- I should say it's
5  the last response so we'll stick with those. You
6  say that, "In May 2006, I attended a National
7  Nurses" Organization "Committee/California Nurses
8  Association conference in California concerning
9  nursing working conditions." Do you see that?
10    A    On Exhibit Number 5, page 7, at the top
11  of the response, "In May 2006, I attended a
12  National Nurses Organizing Committee/California
13  Nurses Association conference in California
14  concerning nursing conditions. I have also
15  attended other NNOC/CNA meetings where working
16  conditions were discussed." Yes.
17    Q    Okay. What caused you to go to the
18  meeting in California?
19    A    I was working with the NNOC/CNA, and they
20  had a delegate conference there and offered to
21  bring me out there to listen to the conference.
22    Q    So they paid for your travel to go to
23  that committee?
24    A    Yes.
25    Q    Okay. Are you a delegate of the CNA?

Page 88

1    A    All members of the NNOC are delegates --
2    Q    Considered delegates?
3    A    -- to that.
4    Q    How long were you there?
5    A    Three days.
6    Q    Where was it?
7    A    In Sacramento, California.
8    Q    Any discussion about the possibility of
9  nurse wage collusion?
10    A    To the best of my knowledge, there may
11  have been some but I couldn't give specifics to
12  it. I don't recall the specifics to it.
13    Q    Okay. You can put those interrogatories
14  aside, Mr. Suhre. Thank you for your patience.
15  You now know how I hate supplements.
16        (Discussion off the record.)
17        VIDEOGRAPHER: Going off the record. The
18  clock says 12:05 p.m.
19        (Recess at 11:05 a.m. to 11:12 a.m.)
20        VIDEOGRAPHER: We're back on the record.
21  The clock time is 12:12 p.m.
22        MR. SHUMAKER: After a short break, I
23  wanted to, as a matter of professional courtesy,
24  make a record that Mr. Griffin did show to me --
25  did show me at a break what appears to be a

Page 89

1  verification for the first set of interrogatory
2  responses. I don't believe that ever made its way
3  to the Defendants, but either way I do not want to
4  create a misimpression on the record that there
5  was no verification whatsoever, so I wanted to
6  make that record.
7        MR. GRIFFIN: I appreciate that, and
8  we're making copies of that complete document and
9  making sure that Defendants get it. I do note
10  that there is a Certificate of Mailing showing
11  that it was mailed with a verification page. It
12  may have been an error or someone's part but I
13  appreciate the comment.
14        BY MR. SHUMAKER:
15    Q    Mr. Suhre, as the -- as one of the class
16  representatives, who do you believe you are
17  representing in this case?
18    A    As the class representative Plaintiff in
19  this class action lawsuit, class action members
20  are the nurses of the state of Michigan that work
21  in the Detroit metro area.
22    Q    Does it include all registered nurses
23  that work in the Detroit area?
24    A    Yes.
25    Q    Does it include nurses that work in --

23 (Pages 86 to 89)

Jeffrey A. Suhre                                                          November 14, 2007
Royal Oak, MI

Page 102

1    Q    Okay.
2    A    -- in regards to this litigation.
3    Q    Okay. Anything else?
4    A    No.
5         (Suhre Exhibit 6 was marked.)
6         BY MR. SHUMAKER:
7    Q    Mr. Suhre, I've handed you what's been
8    marked Exhibit 6. It appears to be a publication
9    from the Michigan Nurse Association that you
10   produced. Have you seen this before?
11   A    To the best of my recollection, I may
12   have seen something similar to this, yes.
13   Q    Is this the type of information you
14   provided your counsel?
15   A    This appears to be some of the
16   information I have provided to my counsel, yes.
17   Q    Was there a reason why you provided this
18   particular document?
19   A    It -- it was asked of my attorneys to
20   provide all the information I had, and I provided
21   it to them.
22   Q    All information you had regarding what?
23   A    The documentation that I had in my
24   possession in regards to this litigation.
25        (Suhre Exhibit 7 was marked.)

Page 103

1         BY MR. SHUMAKER:
2    Q    I hand you what's been marked Exhibit 7,
3    Mr. Suhre. This is a document that was produced
4    by you. It appears to be a National Nurses
5    Organizing Committee paper. Is that a fair
6    characterization, sir?
7    A    That is correct.
8    Q    Do you recall how you came to receive
9    this document?
10   A    To the best of my recollection, through
11   various conferences, workshops I have attended. I
12   don't recall the specifics.
13   Q    Do you recall if this was a part of a
14   packet of information received from the NNOC that
15   you testified to earlier?
16   A    I am unsure. It could have been from one
17   of my colleagues that I have talked to, that I
18   previously mentioned.
19   Q    Are you on a regular mailing distribution
20   from the NNOC?
21   A    Yes, I am a member.
22   Q    Okay. And you receive the monthly
23   pamphlets or letters?
24   A    Yes, I do.
25   Q    Okay. The same with respect to the

Page 104

1    Michigan Nurses Association?
2    A    Yes, I do.
3    Q    Do you receive any publications from any
4    other nursing organizations?
5    A    Other publications that I may receive
6    would be possibly in the form of nursing books
7    like drug reference books, IV books and things
8    like that.
9    Q    Other than Exhibit 6 and 7 that I just
10   showed you -- one from the MNA, one from NNOC --
11   do you recall providing any other information to
12   your counsel relating to those organizations?
13   A    No, I do not recall.
14   Q    Do you have any recollection of providing
15   any additional information than Exhibit 6 and 7?
16   A    The best of my recollection is all the
17   information I had was presented to my attorneys.
18   Q    Okay. Do you know if there was anything
19   more than Exhibit 6 and 7?
20   A    I provided a lot of information to them,
21   so whatever they provided to you, that's their
22   decision.
23   Q    Is any of the -- let me rephrase that.
24   You testified earlier about receiving a pamphlet
25   of information during one of the meetings that you

Page 105

1    believe supported the allegations in the Complaint
2    and included information about wage rates. Do you
3    recall that?
4    A    Yes, I recall that.
5    Q    And is any of that information in Exhibit
6    6 or 7?
7    A    I do not see any of that information in
8    these pamphlets.
9    Q    Okay. I just want to make sure that
10   we're not looking at what you testified to
11   earlier.
12        Now, Mr. Suhre, do you know the name
13   David DeRosa?
14   A    I -- to the best of my knowledge, I can't
15   recall that name.
16   Q    Okay. Let me see if I can't prompt your
17   recollection. You indicate in your interrogatory
18   that he was an individual that participated in an
19   investigation of the facts that formed the basis
20   for the lawsuit. He's an SEIU employee. Does
21   that refresh your recollection?
22   A    You're stating that I made that statement
23   in my interrogatory?
24   Q    Yes, sir.
25   A    I cannot recall that specific

27 (Pages 102 to 105)

Jeffrey A. Suhre                                                                November 14, 2007

Royal Oak, MI

Page 106

1  conversation. And to the best of my knowledge, is
2  that somebody that I could have possibly talked to
3  at some time? Yes, I have talked to many people.
4      Q    Okay. Do you know Mr. DeRosa?
5      A    I cannot recall seeing Mr. DeRosa as
6  being at any particular -- I can't give a specific
7  date of a conference or anything, but he may have
8  been in attendance at one of these conferences I
9  have attended.
10     Q    Okay. Do you know whether that
11 information might have been provided by counsel?
12     A    That's a possibility.
13     Q    Were you ever aware of the SEIU
14 conducting an investigation of the allegations of
15 the Complaint at the time the investigation was
16 occurring?
17     A    To the best of my recollection, I cannot
18 specifically recall.
19     Q    Do you recall anyone providing you
20 information regarding a pre-litigation
21 investigation prior to receiving a call from Pat
22 Cason?
23     A    To the best of my recollection, I do not
24 recall.
25     Q    Did you ever attend any meeting or

Page 107

1  conference where the SEIU presented the
2  possibility of a class action regarding the
3  alleged suppression of nurse compensation in the
4  Detroit area?
5      A    To the best of my recollection, I cannot
6  recall.
7      Q    Do you know who the Mintz Group is?
8      A    There have been many documentations
9  presented through my discussions with my attorney
10 group. That name may have come by.
11     Q    Okay. But as you sit here today, do you
12 know who The Mintz Group is and what its relation
13 might be to this litigation?
14     A    No, I do not.
15     Q    Do you know the name Barbara Bergman?
16     A    Barbara...?
17     Q    Bergman.
18     A    Bergman? I don't recall that name.
19     Q    Did you ever hear the name The Feldman
20 Group?
21     A    That information may have been in some of
22 the litigation that had been filed in this case
23 but I don't recall specifics.
24     Q    Okay. Have you ever been employed by a
25 union, sir?

Page 108

1      A    Yes, I have.
2      Q    When were you employed by a union?
3      A    I was employed by a union when I was in
4  emergency medical services. I was the President
5  of United Steel Workers.
6      Q    And when was this, sir?
7      A    That would have been in the mid 1980s.
8      Q    And the United Steel Workers had
9  unionized the EMT employees where you worked?
10     A    That's correct.
11     Q    How long did you serve in that role as
12 President?
13     A    To the best of my knowledge and
14 recollection, it was probably three years.
15     Q    What were your responsibilities in that
16 position?
17     A    I was the President of the local
18 responsible for holding scheduled meetings, and I
19 do not recall specifically if it was monthly or
20 bimonthly. It involved sitting at negotiation
21 tables for contract negotiations between Paramed
22 Ambulance as well as Taylor Ambulance, L.C. Taylor
23 at the time.
24     Q    Have you ever been involved in any
25 unionization efforts for nurses in the Detroit

Page 109

1  area?
2      A    Have I ever been involved with any
3  unionization of nurses?
4      Q    Yes, sir.
5      A    I have sat and had conferences with
6  nurses. Whether it's at work or in outside
7  facilities, in general I shop talk.
8      Q    Okay. Any effort like that with respect
9  to any St. John Hospital?
10     A    I have sat and talked with several nurse
11 colleagues about that.
12     Q    Anything more than simply discussion
13 about the benefits or costs of unionization for
14 nurses?
15     A    Not specifically, no.
16     Q    Okay. Any organized efforts to unionize
17 any hospital in the Detroit area that you worked
18 on?
19     A    No, I have not.
20     Q    Are you aware of any active unionization
21 efforts in the Detroit area by any union?
22     A    Yes, I am.
23     Q    And what is that?
24     A    I believe that Mt. Clemens has
25 unionization going on or has -- is a unionized

28 (Pages 106 to 109)

# Exhibit 2

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| MARISSA MADERAZO, ROSELIA POLLARD, And BARBARA MILES on behalf of herself and all others similarly situated,<br><br>            Plaintiff,<br><br>    v.<br><br>VHS SAN ANTONIO PARTNERS d/b/a BAPTIST HEALTH SYSTEMS; HCA, INC., a/k/a METHODIST HEALTHCARE SYSTEM OF SAN ANTONIO, LTD. L.L.P.; CHRISTUS SANTA ROSA HEALTH CARE CORP.,<br><br>            Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No. SA06-CA-0535-OG<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

DECLARATION OF DAVID P. DEAN IN SUPPORT
OF PLAINTIFFS' SUPPLEMENTAL MOTION FOR CLASS CERTIFICATION

I, David P. Dean, declare:

    1.    I am a share holder of James & Hoffman, PC ("J&H"), one of the law firms

serving as counsel for Plaintiffs Marissa Maderazo, Roselia Pollard and Barbara Miles in the

above-captioned case. I have been admitted *pro hac vice* in this matter. I submit this declaration

on the background and development of the lawsuit in support of Plaintiffs' Supplemental Motion

for Class Certification. I have personal knowledge of the facts set forth in this declaration, and

could testify competently to them if called upon to do so.



Cohen

EXHIBIT NO. 164

KY  12/20/07

2.      This lawsuit grew out of a multi-jurisdictional investigation by J&H and Cohen,

Milstein, Hausfeld & Toll, PLLC ("CMHT").  In Fall 2004, J&H received apparently reliable

information showing that hospitals in a particular metropolitan area were deliberately avoiding

competition and jointly keeping nurse wages in a narrow range to avoid a "wage war" and,

avowedly, to control health care costs.  In January 2005, a prospective plaintiff retained J&H to

bring an antitrust suit on behalf of a putative class of RNs employed by hospitals in that

metropolitan area.

3.      Shortly thereafter, J&H was asked by the Service Employees International Union

("SEIU") to undertake a multi-jurisdictional litigation project, investigating and developing class

action lawsuits to bring on behalf of nurses against hospitals in applicable regional markets

where similar collusion was ongoing.  I had represented SEIU in other matters, and J&H

represents SEIU in other matters, as described in previous filings with this Court in the context

of the Court's approval of a Protective Order governing the exchange of confidential

information.  *See* Declaration of Mary Joyce Carlson, Exhibit D to Plaintiffs' Motion for Entry

of Protective Order (Docket No. 68).  SEIU had previously learned of research by Professor

Barbara Bergmann suggesting that regional collusion among hospitals on nurse wages, facilitated

by area hospital associations, was likely a principal cause of the persistent nurse shortages in the

United States.

4.      J&H subsequently entered into a formal, written agreement with SEIU for the

union to act as a third party payor on these nurse wage matters, and, consonant with that later

agreement, SEIU compensated J&H for its work on the pre-filing investigation, and the nurse

wage litigations once commenced, at hourly rates that are a fraction of the billing rates that

lawyers of similar ability and experience in Washington, DC and San Antonio normally charge

2

for the type of work in question. In addition, SEIU partially financed the expenses for the pre-filing investigation, initially through financing the retention of an economic consulting firm, and later through partially reimbursing J&H for the expense of retaining private investigators to continue the investigation. SEIU also provided support from its internal research department, including by providing the services of a health economist who worked with J&H on econometric analyses, by providing access to certain database information-- largely from the American Hospital Association -- and by occasionally forwarding to J&H the results of independent research and analysis performed by SEIU research or other contractors. Also consonant with the terms of the later written agreement, SEIU from the beginning did not seek to direct or control J&H's professional judgment in conducting the pre-filing investigation.

5.    J&H undertook the multi-jurisdictional investigation by developing the legal theory, economic analyses and facts to support the litigations, initially by working with the economic firm of Ashenfelter & Ashmore ("A&A") to perform econometric analyses to identify the regional markets most strongly exhibiting the indices of employer collusion. One product of A&A's analysis was a ranking of regional markets by indices of collusion, which J&H then shared with SEIU.

6.    In October 2005, J&H took the next large step in the project by retaining an investigative firm to look into possible collusion among hospitals in the markets where J&H had determined, based on A&A's ranking and all other available analyses and evidence, that collusion was most likely. Soon thereafter, CMHT joined the pre-filing investigation, splitting the costs with J&H and helping to supervise the investigators. CMHT also worked with J&H to evaluate whether a sufficient basis existed for filing litigation in any of the jurisdictions, and, eventually, to prepare cases for filing.

7.    Beginning in or around January 2006, SEIU began forwarding to J&H the names and telephone numbers of nurses in various jurisdictions who were interested in finding out more about their legal rights in regard to possible collusion among hospitals in their communities. J&H, together with CMHT, decided whether to represent these individuals and whether these individuals should file claims as representatives of the putative classes.  In addition, potential plaintiffs approached the law firms through other lawyers who had been apprised of the potential litigations.

8.    Consonant with the terms and intent of the later, formal third party payor agreement between J&H and SEIU, SEIU never played any role for any nurse wage litigation in determining who among these referrals became plaintiffs, in directing or controlling the litigations, or in directing or controlling the law firms' pre-filing investigations.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my recollection and belief.

_12:|07|07_____
Date

_____
David P. Dean

4

# Exhibit 3

## Declaration of Mary Joyce Carlson

I, Mary Joyce Carlson, declare as follows,

1.    I am of counsel to the law firm of James & Hoffman, P.C. ("J&H"), currently designated co-lead counsel in the litigation Reed v. Advocate, Civ. No. 06 3337 (N.D. Ill). Ms. Lisa Reed, the lead plaintiff, retained J&H through me to bring a class action lawsuit against hospitals in the Chicago area who were colluding on nurse wages. As former Deputy General Counsel to the National Labor Relations Board from 1994 – 2000, as a long time practitioner of employee-side law in the Health Care industry, and as a long time representative and advocate for nurses in licensing and other contexts, I bring essential expertise, contacts and experience to the leadership counsel group here.

2.    I understand that certain Defendant hospitals are nevertheless currently proposing to designate certain information in discovery undiscloseable to any plaintiffs counsel "who currently represents, or who has represented at any time in the past five years, the SEIU or any other labor organization in a matter in which the labor organization was adverse to a hospital or health care system, including Mary Joyce Carlson, David Dean, and the members, associates, of counsel, and employees of James & Hoffman, P.C."

3.    I further understand that Defendants' exclusion proposal is based on the argument that the Service Employees International Union ("SEIU") is the real party in interest to the litigation; that plaintiffs are acting on behalf of the SEIU; and that information from discovery will or could be used to further SEIU public relations, organizing campaigns, or employee bargaining with the defendant hospitals.

4.    I offer the following Declaration to clarify the relationship of the SEIU to this litigation, to J&H, David Dean and myself. In short, SEIU is not the real party in interest to this

litigation; plaintiffs are acting on behalf of themselves and similarly situated nurses; and confidential information from discovery will not be available to SEIU to be used in public relations, organizing campaigns or bargaining with defendant hospitals.

## MY ROLE AT SEIU AND IN CHICAGO

5.    I advise and represent a wide variety of clients in my legal practice.  For example, I was recently retained by the Ministry of Labor for the Republic of Taiwan to instruct their staff on United States employment and labor law.  I will be traveling in November 2006 to Taiwan to teach such classes at the Ministry.  I also recently devoted substantial time to advising the United Food and Commercial Workers on NLRB preemption issues in relation to an ongoing litigation.  SEIU, however, has a retainer for a year with J&H for my services to provide advice to the SEIU Health Care Division -- though my actual activities are often driven by the SEIU's priorities at a given time.  For example, in the 2004 election cycle, I spent four months, full-time, managing and litigating a voting rights case that the union was sponsoring. Under the retainer, however, I sometimes call myself "Counsel" or "Special Counsel" to the Health Care Division.

6.    My principal current responsibility for SEIU is to negotiate and maintain national agreements with Health Care systems.  SEIU presently has such agreements with HCA, Tenet Health Systems and Doctors Community Healthcare Corporation.  In addition, I may provide other advice on an 'as requested' basis.  I utilize an office part time and some support at SEIU's headquarters in Washington to help fulfill my responsibilities. I am not an employee or officer of the SEIU and am not related by blood or marriage to any employee or officer of the SEIU.

SEIU-SA 0008

7.  I've had very limited involvement in the Chicago health care market for SEIU.  The principal SEIU attorney with responsibility for SEIU health care activities in Chicago is Craig Becker, an SEIU Associate General Counsel based in Chicago.  Doctors Community is the only healthcare system with whom SEIU has a national agreement that has a subsidiary in Chicago: Michael Reese hospital.  Pursuant to my responsibilities to implement the national agreement with Doctors Community, I have on occasion represented SEIU in dealings with that facility.  (Though I understand that Michael Reese has not joined with Defendants' proposal on the protective order).  In the past, I have also given the SEIU advice regarding discrete legal issues which have arisen in the context of SEIU or its Chicago local's organizing, bargaining or legislative activities directed toward other health care facilities in the Chicago Area.  For example, I assisted in the development of an internal policy paper with health care analysts which explored opportunities to secure state funding for quality initiatives at Chicago inner-city hospitals, and I assisted Mr. Becker in locating a law firm to argue a Title VI case.

8.  Due to the limited nature of my responsibilities in the Chicago area, I have sometimes attended meetings where SEIU officials considered whether or not to engage in organizing or bargaining activities at health care facilities in Chicago.  In order to address Defendants' concerns about confidentiality in the future, I am willing to affirm in writing that during the course of this litigation and for one year afterward, if I review or am otherwise exposed to information marked "CONFIDENTIALCNOT TO BE DISCLOSED TO UNION COUNSEL" from any hospital in Chicago, then during any SEIU organizing or bargaining campaign at that hospital, I will refrain from advising the SEIU with regard to any matter directly concerning that hospital.

**SEIU-SA 0009**

9.    Because SEIU has its own in-house legal staff consisting of more than ten full-time lawyers, and has relationships with multiple outside counsel, I can easily make this commitment consistent with my duties both to SEIU and to the plaintiffs in this matter.

## SEIU AND J&H

10.    In addition to my retainer, SEIU has a retainer with J&H for the services of Judy Scott, who serves as SEIU's full time General Counsel. Ms. Scott works full time out of the SEIU headquarters in Washington and, to avoid any potential conflicts, has been fully walled off since January 2006 from all the nurse wage antitrust litigations filed in June 2006 on which J&H is working. Ms. Scott is not involved in any capacity in, has no access to any of the files or records relating to, and receives no confidential information about these nurse wage antitrust cases.

11.    J&H presently comprises eleven other attorneys in addition to Judy and me. Those attorneys represent a wide variety of clients, both union and nonunion. David Dean, and several of the other attorneys at J&H, have in the past represented or advised the SEIU Health Care Division on discrete matters when asked. Mr. Dean plays no role in the SEIU's competitive decisions to organize or bargain with any particular employer. He has never represented SEIU against any of the Chicago defendants. Aside from the long term retainers for Ms. Scott and my services, I understand that SEIU work represented approximately 13% of J&H's overall billings in 2005. No J&H attorney is an employee or officer of the SEIU or related by blood or marriage to any employee or officer of the SEIU.

SEIU-SA 0010

<u>SEIU'S ROLE IN THE NURSE WAGE LITIGATIONS</u>

12.     The SEIU has played absolutely no role in the direction or management of this lawsuit, exerts no control over the attorneys prosecuting it, and has not and cannot impose any conditions on any potential settlement of it.  Nevertheless, SEIU played a critical role in the genesis of the nurse wage antitrust lawsuits and offers ongoing support consistent with the public service nature of the suit and its own interests in championing nurse issues.

13.     In 2004, Barbara Bergman, an economist with American University, circulated an article to the SEIU seeking to show that hospital collusion on nurse wages was a likely cause of the long term nurse shortage.  SEIU engaged her and the law firm of J&H to investigate the issue. Based on my experience in the industry, I found Ms. Bergman's thesis more than plausible.

14.     J&H's legal and factual research on behalf of SEIU indicated that collusion was in fact occurring in certain jurisdictions.  J&H, through David Dean and me, brought this research to Cohen Milstein Hausfeld and Toll for their advice on whether the antitrust laws had been violated.  Following further research and investigation, SEIU began referring interested nurses to the law firms as potential plaintiffs.  Once potential plaintiffs entered into serious discussions with the firms to bring suit in Chicago, SEIU played no further role in the direction or control of the developing litigation.  One nurse referred by the SEIU and one referred from elsewhere eventually retained the firms to bring suit.

15.     In addition to referring potential plaintiffs, SEIU is currently providing support to the lawsuits through paying J&H a reduced fee for its work on the suits and for certain

SEIU-SA 0011

expenses. Such support is fully consistent with J&H's representation of Ms. Reed and the other members of the nurse class. See, e.g., Shaffer v. Farm Fresh, 966 F.2d 142, 146 (4th Cir. 1992). Accord, Barton v. Albertson's, Inc., 1997 U.S. Dist. LEXIS 22577 (D. Idaho Dec. 23, 1997).

16. I have been an attorney for over 25 years, and have never been accused, charged, or in any way punished for violating a confidentiality agreement, for violating any other professional ethical obligation, or for any crime involving dishonesty.

17. The nature of the SEIU, its Health Care Division, and my practice is such that any projects or assignments which would present a conflict with my responsibility to avoid the unconscious or inadvertent disclosure of Defendants' confidential information can be easily be handled by other attorneys without my participation.

I declare, under penalty of perjury, that the foregoing is true and correct to the best of my recollection. Executed on *Oct 24*, 2006 at *Washington, DC*.

*Mary Joyce Carlson*
Mary Joyce Carlson